**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN IMMIGRATION COUNCIL & CAPITAL AREA IMMIGRANTS' RIGHTS COALITION,<br><br>        Plaintiffs,<br><br>    v.<br><br>EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,<br><br>        Defendant. | Civil Action No. 1:23-cv-1952-RC |

**DECLARATION OF RAUL A. PINTO IN PLAINTIFFS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

I, Raul A. Pinto, make the following declaration based on my personal knowledge and declare that the following is true and correct:

1. I am the Deputy Legal Director of Transparency with the American Immigration Council ("Council"). I previously held the title of Senior Staff Attorney with the Council. I represent the Council and Capital Area Immigrants' Rights Coalition (collectively referred to herein as "Plaintiffs") in this action brought pursuant to the Freedom of Information Act ("FOIA").

2. On October 28, 2022, Plaintiffs filed a request for public records under the FOIA, which became the subject of this litigation. ECF No. 1-1 is a true and accurate copy of that FOIA request.

3. On August 9, 2023, I received a letter from Defendant in response to Plaintiffs' request. The letter contained two records that Defendant located in its initial search: (i) aggregate data about individual hearing advancements; and (ii) an email chain about language

access in immigration court. True and accurate copies of that letter, data, and email chain are attached to ECF 25-3 as Exhibit B.

4. The parties met and conferred on September 26, 2023, about Defendant's initial search. On September 29, 2023, Defendant informed me that it would conduct a supplemental search.

5. The parties met and conferred again on December 14, 2023, and over email on December 15, 2023, to discuss this search's methods. Plaintiffs requested on the call, and again over email, that Defendant use different search terms and search the emails of Assistant Chief Immigration Judges ("ACIJs"). For the sake of negotiations, Plaintiffs proposed limiting the search of ACIJ emails to five to ten ACIJs initially with the understanding that Defendant would search the remaining ACIJs' emails if the initial search yielded responsive records. A true and correct copy of the parties' correspondence is attached as Exhibit A.

6. Defendant denied Plaintiffs' request and proposal and informed Plaintiff on February 13, 2024, of its position that "it has done an adequate search."

7. At no point during administrative processing, the parties' meet and confer, or pre-summary judgment communications did Defendant advise Plaintiffs that it had limited Item 1 of their request to "records that constitute official issued and centrally disseminated guidelines, procedures, protocols, or policies pertaining to the listed subitems."

8. On August 13, 2024, I accessed the Immigration Court Practice Manual Section 1.3 on Defendant's website. A true and correct copy of Section 1.3 is attached as Exhibit B.

9. On August 13, 2024, I accessed the Immigration Court Practice Manual's June 12, 2020, version of Appendix R on the website of the American Immigration Lawyers Association. A true and correct copy of that Appendix is attached as Exhibit C.

10. On August 13, 2024, I downloaded from Pacer a transcript for the deposition of Assistant Chief Immigration Judge Gary Smith that U.S. Department of Justice filed in *Stevens v. Holder*, 12-cv-1352 (N.D. Ga.), as ECF No. 170-32. A true and accurate excerpt from that deposition is attached as Exhibit D.

11. On August 13, 2024, I accessed a list of Assistant Chief Immigration Judge (ACIJ) Assignments on Defendant's website. A true and correct copy of that list is attached as Exhibit E.

12. On August 13, 2024, I accessed a March 2024 posting for Assistant Chief Immigration Judges on the USA Jobs website.  A true and accurate excerpt of that job posting is attached as Exhibit F.

13. On August 13, 2024, I downloaded from Pacer two declarations filed by Defendant in *National Day Labor Organizing Network v. U.S. Immigration & Customs Enforcement Agency*, No. 10-cv-3488 (S.D.N.Y) as ECFs 172 and 183, and one declaration filed by Defendant in *Hawkinson v. Executive Office for Immigration Review*, No. 21-cv-11817 (D. Mass.) as ECF 26-1. True and accurate copies of these declarations are attached as Exhibits G, H, and I respectively.

14. On August 13, 2024, I accessed Defendant's Policy Memorandum (PM) 21-13 and Director's Memorandum (DM) 22-05 on its website. True and accurate copies of these memoranda are attached as Exhibits J and K respectively.

15. On August 13, 2024, I accessed David C. Blair's and M.E. Maron's article entitled *An Evaluation of Retrieval Effectiveness for a Full-Tex Document-Retrieval System* from the Association for Computing Machinery's Digital Library. A true and accurate copy of that journal article is attached as Exhibit L.

16. On August 13, 2024, I accessed Stephen Tomlinson's, Douglas W. Oard's, Jason R. Baron's, and Paul Thompson's article entitled *Overview TREC 2007 Legal Track* from the National Institute of Standards and Technology's webpage for the 2007 Text REtrieval Conference Proceedings. A true and accurate copy of that journal article is attached as Exhibit M.

17. On August 13, 2024, I accessed the Sedona Conference Working Group on Electronic Document Retention & Production's article *The Sedona Conference Best Practices Commentary on the Use of Search & Information Retrieval Methods in E-Discovery*, 15 Sedona Conf. J. 217 (2014) from Westlaw. A true and accurate copy of this journal article is attached as Exhibit N.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of August 2024 at Rockville, MD.

_____

Raul A. Pinto, Esq.

# Exhibit A

## Raul Pinto

| | |
|---|---|
| **From:** | Raul Pinto |
| **Sent:** | Friday, December 15, 2023 4:59 PM |
| **To:** | Simon, Jeremy (USADC) |
| **Cc:** | Monica Mananzan |
| **Subject:** | RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW |

Dear Jeremy,

Apologies for the 5 o'clock on Friday email, but this day got a bit away from me. Monica and I had a chance to put our heads together, and we think the way to go is to do a search for the emails of the Assistant Chief Immigration Judges (ACIJs). As we discussed yesterday, we would be amenable to the idea of putting together a list of 5 to 10 ACIJs as a sample with the understanding that if instructions are found within the sample, the agency may be open to searching other ACIJs.

This strategy is colored by the fact that EOIR had a public engagement call between stakeholders and the ACIJs for one of the Adjudication Centers in the DC area yesterday where they talked about this issue and the ACIJ said that while there's no "formula," they do look at the particular type of cases to determine what cases will be advanced.

Further, we think that the search terms used by the agency are not precise enough to yield the correct results and the agency should use different terms if they're amenable to the ACIJ email search. To be clear, we're not seeking a new search by headquarters. But, we're hoping to work with the agency and suggest better terms to focus the agency's search and improve the potential productions. For example, an email from an ACIJ with instructions to advance cancellation of removal type hearings to any available dates would not be produced by the search terms because such instructions do not include the terms "policy," "protocol," "guidance," or "procedure." In other words, the communication itself constitute an instruction that may not include the term.

Let me know if you or the agency have any questions or whether they're amenable to this proposal. If they are, we're happy to provide you with a list of ACIJs and some terms.

If we don't speak before the end of the year, I wish you and yours a happy holiday season.

Cordially,

Raul

---

**From:** Simon, Jeremy (USADC) <Jeremy.Simon@usdoj.gov>
**Sent:** Thursday, December 14, 2023 9:42 AM
**To:** Raul Pinto <RPinto@immcouncil.org>
**Subject:** RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Raul,

The supplemental search that was done is described below.  Sheila McNulty was the identified custodian because she is currently the Chief Immigration Judge and has been part of leadership within OCIJ during the time period of the request and thus either would be the sender or any recipient of any emails that were sent to the two ACIJ or Court Administrator

group emails.   The agency advises that the only responsive document identified by this supplemental search was the same email chain that already was provided by the agency, further confirming the adequacy of the search.   In that regard, the agency's original search for email included a manual search by Judge McNulty, which identified the previously produced email chain, and the electronic search located the same email chain as the only responsive document (there were other hits based on the search terms but upon manual review they were found not to be responsive to the request).

Custodian:  "Sheila McNulty"

- Only emails sent to [AllofACIJs@EOIR.USDOJ.GOV](mailto:AllofACIJs@EOIR.USDOJ.GOV)   and [all_of_court_administrators@eoir.usdoj.gov](mailto:all_of_court_administrators@eoir.usdoj.gov)
Key terms:

1.    Policy AND "advance" AND "merit hearings"
2.    Guidance AND "advance" AND "merit hearings"
3.    Protocol AND "advance" AND "merit hearings"
4.    Procedure AND "advance" AND "merit hearings"
5.    Policy AND "continue" AND "hearing"
6.    Guidance AND "continue" AND "hearing"
7.    Protocol AND "continue" AND "hearing"
8.    Procedure AND "continue" AND "hearing"

Date range:  1/1/2017 through 10/28/2022

Thanks.

Jeremy

---

**From:** Raul Pinto <[RPinto@immcouncil.org](mailto:RPinto@immcouncil.org)>
**Sent:** Friday, December 8, 2023 9:39 AM
**To:** Simon, Jeremy (USADC) <[JSimon@usa.doj.gov](mailto:JSimon@usa.doj.gov)>
**Subject:** [EXTERNAL] RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Good morning, Jeremy –

I just sent a calendar invite for that time. I appreciate your help coordinating with the agency. I look forward to speaking with you next week.

Cordially,

Raul

---

**From:** Simon, Jeremy (USADC) <[Jeremy.Simon@usdoj.gov](mailto:Jeremy.Simon@usdoj.gov)>
**Sent:** Friday, December 8, 2023 9:27 AM
**To:** Raul Pinto <[RPinto@immcouncil.org](mailto:RPinto@immcouncil.org)>
**Subject:** RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Let's plan for 9:30 on Dec. 14.  Can you send a zoom, and I will forward it to the agency counsel who expects to participate.

Thanks.

---

**From:** Raul Pinto <RPinto@immcouncil.org>
**Sent:** Wednesday, December 6, 2023 7:47 PM
**To:** Simon, Jeremy (USADC) <JSimon@usa.doj.gov>
**Subject:** [EXTERNAL] Re: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Hi Jeremy,

I think December 14th works for us in the morning. We could do 9 or 9:30. Please let me know and I'm glad to set up a Zoom link.

Best,

Raul

> On Dec 6, 2023, at 5:15 PM, Simon, Jeremy (USADC) <Jeremy.Simon@usdoj.gov> wrote:
>
> Raul – it looks like the best day for us would be the 14th.  Do you have any availability that day?
>
> **From:** Raul Pinto <RPinto@immcouncil.org>
> **Sent:** Monday, December 4, 2023 4:14 PM
> **To:** Simon, Jeremy (USADC) <JSimon@usa.doj.gov>
> **Subject:** [EXTERNAL] RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
>
> Jeremy,
>
> Not a problem at all. Let me check in with my co-requesters as they may have some insights as to terms as well and get back to you with some common availability at the end of next week.
>
> Best,
>
> Raul
>
> **From:** Simon, Jeremy (USADC) <Jeremy.Simon@usdoj.gov>
> **Sent:** Monday, December 4, 2023 3:57 PM
> **To:** Raul Pinto <RPinto@immcouncil.org>
> **Subject:** RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
>
> Raul,
>
> Sorry – I have been buried working on an appellate brief (among all of my other deadlines).  Maybe something towards the end of next week?  I would need to check on my agency counsel's availability as well.

**From:** Raul Pinto <RPinto@immcouncil.org>
**Sent:** Monday, December 4, 2023 3:42 PM
**To:** Simon, Jeremy (USADC) <JSimon@usa.doj.gov>
**Subject:** [EXTERNAL] RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Hi Jeremy,

I'm bumping this in your inbox in case you missed it from a couple of weeks ago. Do you still want to schedule something for this week to discuss this case? Perhaps next week might be best at this point.

Cordially,

Raul

---

**From:** Raul Pinto
**Sent:** Wednesday, November 15, 2023 5:20 PM
**To:** Simon, Jeremy (USADC) <Jeremy.Simon@usdoj.gov>
**Subject:** RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Jeremy,

Thank you for filing. I have the mornings of Dec. 5, 6 or 7 completely open. Let me know if one of those works best for you.

Cordially,

Raul

---

**From:** Simon, Jeremy (USADC) <Jeremy.Simon@usdoj.gov>
**Sent:** Wednesday, November 15, 2023 2:12 PM
**To:** Raul Pinto <RPinto@immcouncil.org>
**Subject:** RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Raul,

I will file shortly. In terms of the remainder of your email, I think we are generally in agreement about the purpose of the call. Perhaps we could plan to set up a call some time in early December (after the Thanksgiving holiday) for the call. Let me know what your schedule looks like.

Thanks.

Jeremy

---

**From:** Raul Pinto <RPinto@immcouncil.org>
**Sent:** Wednesday, November 15, 2023 12:56 PM
**To:** Simon, Jeremy (USADC) <JSimon@usa.doj.gov>
**Subject:** [EXTERNAL] RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Jeremy,

The draft of the JSR looks good to me so you have our approval to file.

As to your clarification, I believe we're on the same page. I did not mean to suggest that conferring would obligate the agency to conduct yet another supplemental search. If we would have used the same search terms the agency used, I have no qualms about stipulating to dismissal. What I am hoping for is that the agency is at least open to the possibility of searching additional terms if there's a big gap.

Let me know if that's what you and your client have in mind as well.

Cordially,

Raul

---

**From:** Simon, Jeremy (USADC) <Jeremy.Simon@usdoj.gov>
**Sent:** Wednesday, November 15, 2023 10:53 AM
**To:** Raul Pinto <RPinto@immcouncil.org>
**Subject:** RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Raul,

I will need to get approval from the agency to this approach, but given that the report is due today, I have made some edits for your consideration (subject to review on our end and possible revision, even to revert back to the prior draft).

Just a few points to note in response to your email below, but which I don't think need to be in the status report.  First, the agency never agreed to any specific supplemental search terms.  As the prior status report makes clear, the agency agreed to do a supplemental search but the parameters of that search were still under consideration.   In addition, as to any conferral that the parties may have about the search terms utilized by the agency in its supplemental search, any such conferral would be with the understanding that there would be no commitment that a further search would occur.   In other words, we could explain the search that was done, hear your reaction and any concerns you have, but the agency would ultimately decide whether any further search is warranted.  The agency's position remains that it has conducted an adequate search.

For purposes of today's status report, I think it would suffice to just state that the parties plan to confer, as I propose in the attached revised report.  Again, this approach still needs agency approval, so this remains subject to revision.  In the interim, please let me know if you have any further proposed edits.

Thanks.

Jeremy

---

**From:** Raul Pinto <RPinto@immcouncil.org>
**Sent:** Wednesday, November 15, 2023 9:24 AM
**To:** Simon, Jeremy (USADC) <JSimon@usa.doj.gov>

**Subject:** [EXTERNAL] RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Good morning, Jeremy –

First, let me reiterate my appreciation for you drafting the JSR. Second, having a sense of the search conducted by the agency would be extremely helpful as we work through possibly wrapping this up. However, if the agency is amenable, I believe it would be more efficient to have a call with you and the agency so that we can assess the terms used and potentially suggest more adequate narrowing terminology. I don't think that a declaration would allow us to do that.

If this is a viable option, and for purposes of today's JSR, I propose informing the court we're working through these issues and proposing a next JSR within 90 days. This would be within an eye to completing this case by then if the agency runs the search terms to which the parties have agreed.

Let me know if something like that works and I can amend the language you provided.

Cordially,

Raul

---

**From:** Simon, Jeremy (USADC) <Jeremy.Simon@usdoj.gov>
**Sent:** Tuesday, November 14, 2023 3:41 PM
**To:** Raul Pinto <RPinto@immcouncil.org>
**Subject:** RE: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Raul,

Please see the attached draft status report, which states that a supplemental search was conducted but no responsive records were located.  As stated, the agency is willing to provide a draft search declaration if you think that would assist in narrowing/potentially resolving any dispute over the adequacy of the search.

Thanks.

Jeremy

---

**From:** Raul Pinto <RPinto@immcouncil.org>
**Sent:** Friday, November 10, 2023 12:36 PM
**To:** Simon, Jeremy (USADC) <JSimon@usa.doj.gov>
**Subject:** [EXTERNAL] FW: 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Dear Jeremy,

I'm bumping this up in your inbox in case you may have missed it a few days ago. Do you have any news for us on EOIR's search for documents?

We appreciate an update.

Raul

**From:** Raul Pinto
**Sent:** Thursday, November 2, 2023 12:03 PM
**To:** Simon, Jeremy (USADC) <Jeremy.Simon@usdoj.gov>
**Subject:** 1:23-cv-01952-RC AMERICAN IMMIGRATION COUNCIL et al v. EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

Dear Jeremy,

I hope you're doing well. I'm touching base because as you may remember, we have a status report due in a few days and wanted to check-in with you to see if EOIR had conducted the supplemental search we agreed upon during our last meet and confer.

Please let me know. I'm also trying to get to the bottom of a new FOIA confirmation number I received, i.e. 2024-02511/2024-02520, which may be related to this case but wasn't sure. The agency sent me a confirmation of receipt but it's not connected to any recent request we've made to EOIR and wondered whether it was tied to a potential new search in our case.

I sincerely appreciate any info you can provide.

Cordially,

**Raul A. Pinto**
*Deputy Legal Director, Transparency*
Pronouns: he/his
202-507-7549 | rpinto@immcouncil.org

**American Immigration Council**
www.AmericanImmigrationCouncil.org
www.ImmigrationImpact.com

# Exhibit B

responsible for hearings involving employer sanctions, anti-discrimination provisions, and document fraud under the Immigration and Nationality Act.  OCAHO's Administrative Law Judges are not affiliated with the Office of the Chief Immigration Judge.  The Board of Immigration Appeals does not review OCAHO decisions.  See Appendix B (Org Chart).

**(g) Relationship to the Administrative Appeals Office —** The Administrative Appeals Office (AAO), sometimes referred to as the Administrative Appeals Unit (AAU), was a component of the former Immigration and Naturalization Service and is now a component of the Department of Homeland Security (DHS).  The AAO adjudicates appeals from DHS denials of certain kinds of applications and petitions, including employment-based immigrant petitions and most nonimmigrant visa petitions.  See 8 C.F.R. §§ 103.2, 103.3.  The AAO is not a component of the Department of Justice.  The AAO should not be confused with the Executive Office for Immigration Review, the Office of the Chief Immigration Judge, or the Board of Immigration Appeals.  See Appendix B (Org Chart).

**(h) Relationship to the Office of Immigration Litigation (OIL) —** The Office of Immigration Litigation (OIL) represents the United States government in immigration-related civil trial litigation and appellate litigation in the federal courts.  OIL is a component of the Department of Justice, located in the Civil Division.  OIL is separate and distinct from the Executive Office for Immigration Review (EOIR).  OIL should not be confused with EOIR, the Office of the Chief Immigration Judge, or the Board of Immigration Appeals.  See Appendix B (Org Chart).

## 1.3    Composition of the Office of the Chief Immigration Judge

**(a) General —** The Office of the Chief Immigration Judge (OCIJ) supervises and directs the activities of the immigration courts.  OCIJ operates under the supervision of the Director of the Executive Office for Immigration Review (EOIR).  OCIJ develops operating policies for the immigration courts, oversees policy implementation, evaluates the performance of the immigration courts, and provides overall supervision of the immigration judges.

**(1) Chief Immigration Judge —** The Chief Immigration Judge (CIJ) oversees the administration of the immigration courts nationwide.

**(2) Principal Deputy Chief Immigration Judge —** The Principal Deputy Chief Immigration Judge (PDCIJ) assists the CIJ in overseeing the administration of the immigration courts throughout the country and supervises the Regional Deputy Chief Immigration Judges.

**(3) Regional Deputy Chief Immigration Judges —** The Regional Deputy Chief Immigration Judges (RDCIJs) assist the PDCIJ in carrying out the responsibilities of that office and are responsible for daily supervision of the Assistant Chief Immigration Judges (ACIJs) within the RDCIJs' assigned geographical regions.

**(4) Assistant Chief Immigration Judges —** The ACIJs oversee the operations of specific immigration courts.  A listing of the immigration courts

overseen by each ACIJ and assigned areas of responsibility is available on the EOIR website.

**(5) Legal Staff: Chief Counsel and Attorney Advisors/Judicial Law Clerks —** OCIJ has a sizable legal staff, which includes a chief counsel, attorneys at the OCIJ headquarters, and permanent and term attorney advisors and judicial law clerks (JLCs) at the immigration courts nationwide. The legal staff supports the CIJ, PDCIJ, RDCIJs, ACIJs, and immigration judges.

**(6) Language Services Unit —** The Language Services Unit (LSU) oversees staff interpreters and contract interpreters at the immigration courts. The LSU conducts quality assurance programs for all interpreters.

**(b) Immigration Courts —** EOIR employs immigration judges and professional staff in the immigration courts nationwide. As a general matter, immigration judges determine removability and adjudicate applications for relief or protection from removal. For the specific duties of immigration judges, see Chapter 1.4 (Jurisdiction and Authority). Immigration judge decisions are final unless timely appealed or certified to the BIA. See Chapter 6 (Appeals of Immigration Judge Decisions).

Court administrators are assigned to the local office of each immigration court. Under the supervision of an Assistant Chief Immigration Judge, the court administrator manages the daily activities of the immigration court and supervises staff interpreters, legal assistants, and clerical and technical employees.

In each immigration court, the court administrator serves as the liaison with the local office of the Department of Homeland Security, the private bar, and nonprofit organizations that represent noncitizens.

A listing of the immigration courts is available on the EOIR website.

**(c) Immigration Judge Conduct and Professionalism —** Immigration judges strive to act honorably, fairly, and in accordance with the highest ethical standards, thereby ensuring public confidence in the integrity and impartiality of immigration court proceedings. Alleged misconduct by immigration judges is taken seriously by the Department of Justice and the Executive Office for Immigration Review (EOIR), especially if it impugns the integrity of the hearing process.

Usually, when a disagreement arises with an immigration judge's ruling, the disagreement is properly raised in a motion to the immigration judge or an appeal to the Board of Immigration Appeals. When a party has an immediate concern regarding an immigration judge's conduct that is not appropriate for a motion or appeal, the concern may be raised with the Assistant Chief Immigration Judge (ACIJ) responsible for the court. Contact information for ACIJs is available on the EOIR website.

In the alternative, parties may raise concerns regarding an immigration judge's conduct directly with the Office of the Director by following the procedures outlined on the  or by sending an email to: judicial.conduct@usdoj.gov. Where appropriate, concerns may also be raised with the Department of Justice, Office of Professional

Responsibility.  All concerns, and any actions taken, may be considered confidential and not subject to disclosure.

## 1.4    Jurisdiction and Authority

**(a) Jurisdiction —** Immigration judges generally have the authority to:

- Make determinations of removability, deportability, and excludability

- Adjudicate applications for relief from removal or deportation, including, but not limited to, asylum, withholding of removal ("restriction on removal"), protection under the Convention Against Torture, cancellation of removal, adjustment of status, registry, and certain waivers

- Review credible fear and reasonable fear determinations made by the Department of Homeland Security (DHS)

- Conduct claimed status review proceedings

- Conduct custody hearings and bond redetermination proceedings

- Make determinations in rescission of adjustment of status and departure control cases

- Take any other action consistent with applicable law and regulation as may be appropriate, including such actions as ruling on motions, issuing subpoenas, and ordering pre-hearing conferences and statements

- Conduct disciplinary proceedings pertaining to practitioners, as discussed in Chapter 10 (Discipline of Practitioners)

- Administer the oath of citizenship in administrative naturalization ceremonies conducted by DHS

- Conduct removal proceedings initiated by the Office of Special Investigations

See 8 C.F.R. §§ 1240.1(a), 1240.31, 1240.41.

**(b) No Jurisdiction —** Although immigration judges exercise broad authority over matters brought before the immigration courts, there are certain immigration-related matters over which immigration judges do not have authority, such as:

- Visa petitions

- Employment authorization

- Certain waivers

- Naturalization applications

- Revocation of naturalization

- Parole into the United States under INA § 212(d)(5)

# Exhibit C

# APPENDIX R

# Standing Orders

The following immigration courts have implemented standing orders pursuant to the EOIR Director's Policy Memorandum 20-09, *The Immigration Court Practice Manual and Orders* (Feb. 13, 2020):

1) Adelanto: All immigration judges (2 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
US IMMIGRATION COURT
ADELANTO, CALIFORNIA

## STANDING ORDER OF THE ADELANTO IMMIGRATION COURT RELATING TO TELEPHONIC APPEARANCES AT ALL HEARINGS

IT IS HEREBY ORDERED that all attorneys and qualified representatives, for any party may appear telephonically in cases before the Adelanto Immigration Court, without prior approval and without filing a motion in advance. *This order supersedes all previous standing orders for the Adelanto Immigration Court.*

1. It is counsel's responsibility to provide a telephonic number, no later than noon the day before the hearing, to the court staff where they can be reached for the hearing and to be available for the court's call. If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any scheduled hearing. For the duration of this order, parties may appear by cell phone or land line. These numbers must be provided to the in-take email box at Adelanto.Immigration.Court@EOIR.USDOJ.GOV.

2. Furthermore, motions for continuance of any detained hearing due to COVID-19 are to be filed with as much notice as possible, but may, on an emergency basis, be made by submitting an email to the above in-take email box.

3. The parties are encouraged to confer and reach stipulations as to fact/legal issues to facilitate the prompt disposition of cases. This is particularly important for bond determination hearings and the parties are encouraged to confer and reach agreement on the eligibility and the amount of a bond. Further, parties should submit affidavits or written statements in lieu of witnesses appearing to facilitate the need to provide and ensure safety and social distancing for EOIR staff, Judges and all parties involved in the proceedings. For Immigration Judges conducting VTC hearings on behalf of Adelanto Immigration Court from a location outside of Adelanto , these same guidelines will apply and correspondence, motions and documents are to be submitted at the in-take email listed above.

4. Any documents which counsel wishes the Court to consider during the hearing must be filed with the Court, and a copy received by opposing counsel or the pro se Respondent at least **five business days** prior to the bond or master hearing and **ten business days** for the merits. Filings on the day of a hearing will only be accepted at the discretion of the Immigration Judge assigned to the case.

5. EMAILS to the Intake box: The subject of your email must contain the nature of the filing; the case number, the date of the next hearing or any court-mandated deadline

for the filing and the initials of the Immigration Judge assigned to the case. Any formal motions included as part of an email must be an attachment and must comply with the Immigration Court Practice Manual.

6. PAGE LIMITS: Effective immediately, for parties using the temporary email account to electronically file, supporting documentation/evidentiary filings are limited to fifty (50) pages in a particular case. If a party intends to file more than fifty (50) pages, the party must electronically file a Table of Contents and then separately submit the supporting documentation/evidentiary filing with the original Table of Contents by using the United States Postal Service or an overnight delivery service no later than the date set for filing the documents with the Immigration Court where the Immigration Judge presides.

This order shall remain in effect until rescinded by the Court.

Scott Laurent
Assistant Chief Immigration Judge
Adelanto, California
APRIL 22, 2020

2

AILA Doc. No. 20041532. (Posted 6/15/20)

2) Arlington: All immigration judges (2 orders; 2 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
ARLINGTON, VIRGINIA

STANDING ORDER OF THE IMMIGRATION COURT

This order supersedes the Standing Order effective as of March 24, 2020.

Effective immediately and until rescinded, any attorney for any party may appear telephonically in any *detained* case before the Arlington Immigration Court without prior approval and without filing a motion in advance. Section 4.15(m)(i) of the Immigration Court Practice Manual is waived for the duration of this Standing Order, including any extensions.

Attorneys who request a telephonic appearance for a particular hearing must call the court to ascertain operational status and inform the Court in advance of the hearing. Counsel shall provide the best telephone number at which counsel can be reached. Landline telephone numbers are preferred in order to minimize noise and disruption. Representatives appearing telephonically must be able to receive the Court's telephone call at the time the case is scheduled to be heard and for three hours thereafter. Respondents are required to be present in court for the hearing, unless their presence is waived or they are appearing via VTC.

Motions to Continue hearings due to COVID-19 concerns should be filed within 24 hours prior to the scheduled hearing or as soon as possible and, to the extent practicable, be made to the Court by e-filing. Any emergencies related to COVID-19 arising the day of a hearing should be brought to the Court's attention immediately by calling the Court.

Date: 10 June 2020

VANCE
SPATH

Digitally signed by
VANCE SPATH
Date: 2020.06.10
08:38:26 -04'00'

Vance H. Spath

Acting Assistant Chief Immigration Judge

3

AILA Doc. No. 20041532. (Posted 6/15/20)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**ARLINGTON, VA**

## STANDING ORDER IMPLEMENTING TWO-MONTH TEMPORAL FILING LIMIT AND PAGE LIMITATION ON ELECTONICALLY-FILED DOCUMENTS

Effective immediately the Arlington Immigration Court is imposing a two-month temporal filing limit on documents filed at the Arlington Immigration Court using the temporary email account. The Arlington Immigration Court will reject documents filed via the temporary e-mail box if filed more than two months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those parties wishing to file documents more than two-months in advance may still do so; however, the documents must be sent to the Court via the U.S. Postal Service or an overnight delivery service, and not through the temporary e-mail box. Documents rejected for not complying with the two-month temporal filing limit may be filed by mail or through an overnight delivery service. Notwithstanding the two-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the Immigration Court Practice Manual (ICPM) (*see* Ch. 3.1(b)).

HEARING EXAMPLE: If documents are filed via the temporary e-filing mailbox on May 1, 2020, for a hearing scheduled on or before July 1, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on May 1, 2020, for a hearing scheduled after July 1, 2020, they will be rejected.

CALL-UP DATE EXAMPLE: If documents are filed via the temporarily e-filing mailbox on May 1, 2020, for a call-up date scheduled on or before July 1, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on May 1, 2020, for a call-up date scheduled after July 1, 2020, they will be rejected.

**Note: Applications for asylum are exempt from the two-month temporal filing limit through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

For parties using the temporary email account to electronically file pre-hearing briefs, motion briefs, responses, or replies at the Arlington Immigration Court, such filings shall be limited to twenty-five (25) pages. (*see* ICPM, Ch. 4.19). This limitation applies to the contents of the brief including a statement of facts, issues, burden of proof, argument, conclusion stating the precise relief or remedy sought, and citations or authorities. Font size and spacing shall remain consistent with the ICPM (*see* Ch. 3.3).

For parties using a temporary email account to electronically file supporting documentation/evidentiary filings at the Arlington Immigration Court, such filings shall be limited to fifty (50) pages, in any particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the immigration court or consistent with the ICPM (*see* Ch. 3.1(b)).

This order supersedes any general electronic filing instructions presently posted online and shall remain in effect until rescinded by the Court.

30 April 2020                    **VANCE SPATH** Digitally signed by VANCE
                                                 SPATH
Date                                             Date: 2020.04.30 15:01:52 -04'00'

                                Vance H. Spath, Acting Assistant Chief Immigration Judge
                                Arlington, Virginia

4

**AILA Doc. No. 20041532. (Posted 6/15/20)**

3) Atlanta – Ted Turner Drive: All immigration judges (2 pages)


UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
ATLANTA – TED TURNER DRIVE
ATLANTA, GEORGIA

STANDING ORDER OF THE ATLANTA-TED TURNER DRIVE IMMIGRATION COURT
RELATING TO TELEPHONIC APPEARANCES OF COUNSEL AND PERMITTED
ATTENDEES AT ALL DETAINED HEARINGS

IT IS HEREBY ORDERED that, effective immediately and continuing through June 12, 2020:

1) For cases scheduled for a hearing on or before May 29, 2020:

    a. Any attorney of record for any party may appear telephonically in cases before the Atlanta – Ted Turner Drive Immigration Court without filing a motion in advance. Attorneys of record who would like to appear telephonically for a particular case should inform the Atlanta – Ted Turner Drive Immigration Court by submitting a request via the Court's temporary e-mail box (AtlantaTedTurnerDrive.Immigration.Court@usdoj.gov) **prior to the hearing date**, and provide their client's Alien number, the name of the judge, the date of the hearing, and the best phone number at which the attorney will answer. Alternatively, attorneys can call the court's main line **prior to the hearing date** at (404) 653-2140 or (404) 331-0907 to make their request.

2) For cases scheduled for a hearing on or after June 1, 2020:

    a. Any attorney of record for any party may submit a request to appear telephonically in cases before the Atlanta – Ted Turner Drive Immigration Court by either filing a written motion with the Court, or by submitting a request via the Court's temporary e-mail box (AtlantaTedTurnerDrive.Immigration.Court@usdoj.gov). Such requests or motions must be filed at least **three (3) business days** prior to the scheduled date of the hearing.

    b. The Court encourages parties who submit written motions for telephonic appearances to utilize the EOIR Case and Appeals System (ECAS) for cases with electronic records of proceeding (eROPs). Alternatively, written requests or motions may be submitted via the Court's temporary e-mail box (AtlantaTedTurnerDrive.Immigration.Court@usdoj.gov).

    c. All written requests or motions for telephonic appearance by attorneys must provide their client's Alien number, the name of the judge, the date of the hearing, and the best phone number at which the attorney will answer. Attorneys must also provide a copy of a completed E-28 with any motion or written request for telephonic appearance.

3) Any attorney who wishes to appear telephonically does so with the understanding that any paper or electronic filings to be considered by the Court must be in the official record of

1

5

AILA Doc. No. 20041532. (Posted 6/15/20)

proceeding in accordance with any deadlines set by the Court or, if none, in accordance with the filing deadlines set forth in the Immigration Court Practice Manual. No additional filings will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing. Submissions can be submitted prior to the hearing via ECAS for electronic records of proceeding or via the Court's temporary e-mail box (AtlantaTedTurnerDrive.Immigration.Court@usdoj.gov) for non-ECAS cases.

4) Any attorney appearing telephonically waives the right to object to admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

5) If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any rescheduled hearing. To ensure the quality of the record, anyone appearing by telephone shall be in a quiet, private location. The call may never be placed on hold. The use of car phones, speakerphones or phones in public places is prohibited.

6) In-person appearances for scheduled hearings are limited to attorneys, respondents, interpreters, security personnel, and other individuals determined to be essential by the presiding judge. Parties should submit affidavits or written statements in lieu of witnesses appearing in person. Telephonic appearances by witnesses may be allowed at the Immigration Judge's discretion.

7) This order supersedes the standing order entered on May 3, 2020.


SIRCE OWEN  Digitally signed by SIRCE OWEN
            Date: 2020.05.11 13:19:21 -04'00'

Sirce Elliott Owen
Assistant Chief Immigration Judge
Atlanta, Georgia

2

updates: www.justice.gov/eoir                          Version released on: June 12, 2020

AILA Doc. No. 20041532. (Posted 6/15/20)

4) Atlanta – W Peachtree St: All immigration judges (2 pages)

**UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
ATLANTA – W. PEACHTREE STREET
ATLANTA, GEORGIA**

STANDING ORDER OF THE
ATLANTA – W. PEACHTREE STREET IMMIGRATION COURT

On March 17, 2020, the Federal Government issued a memorandum directing agencies to minimize face-to-face interactions with members of the public, which is posted at https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-16.pdf. This order is made pursuant to Immigration and Nationality Act § 240(b)(1)-(2) and 8 C.F.R. §§ 1003.10(b), 1003.21(b), 1003.25, 1003.29, 1003.3 l(c), 1003.40.

All parties should continue to monitor the EOIR website at https://www.justice.gov/eoir and/or EOIR's Twitter feed at: @DOJ_EOIR (https://twitter.com/DOJ_EOIR) for the latest information on the Court's operating status.

IT IS HEREBY ORDERED that, effective immediately and continuing through July 31, 2020:

1) In-person appearances in the courtroom are limited to the following individuals: Respondent, Respondent's counsel, DHS counsel, Witnesses, Court interpreters, essential EOIR staff and security personnel. *See* ICPM § 4.9(a)(ii) (citing 8 C.F.R. § 1003.27(b)). Parties are encouraged to submit affidavits or written statements in lieu of witnesses appearing in person. Limited exceptions may be accommodated on a case-by-case basis and must be requested by written motion pursuant to the filing deadlines set forth in the Immigration Court Practice Manual. Any members of the media who wish to observe proceedings are encouraged to coordinate their visits with the Court's Public Affairs Officer, Kelly Nance, at Kelly.Nance@usdoj.gov.

2) The parties are encouraged to confer and reach stipulations as to factual and legal issues to facilitate the prompt disposition of cases.

3) Motions for telephonic appearances must be filed no later than 5 business days prior to the scheduled hearing for which the telephonic appearance is being requested. However, unless and until the motion is granted, the parties are expected to appear in person.

4) In-person appearances for respondents under the age of 14 who are in removal proceedings with a parent are waived until the expiration date of this order. Individual requests to waive the appearance of a respondent must be submitted in writing to the Court no later than 5 business days before the hearing for which the waiver request has been submitted.

5) Any individual having business in person before the Court must notify the Court Administrator or Assistant Chief Immigration Judge immediately by telephone, either personally or through counsel, if any of the following apply:
   a. The individual is displaying symptoms consistent with COVID-19 exposure;
   b. The individual has been diagnosed with COVID-19;

1

     c. The individual is pending results of a COVID-19 diagnostic test;
     d. Within the past 14 days, the individual has had contact with anyone who has been diagnosed with COVID-19;
     e. The individual has been asked to self-quarantine by local health authorities or a medical provider

6) No individual described in paragraph 5 will be permitted into the EOIR court space. Further, no individual who is subject to the restrictions articulated in Policy Memorandum 20-10, "Immigration Court Practices During the Declared National Emergency Concerning the COVID-19 Outbreak (March 19, 2020) (as amended), will be permitted into the EOIR court space.

7) Any individual having business in person before the Court is encouraged to wear a mask or other facial covering, in accordance with current Centers for Disease Control guidance, "Use of Cloth Face Coverings to Help Slow the Spread of COVID-19", located at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html (last accessed on May 20, 2020).

8) For cases with electronic records of proceeding (eROPs), the parties are encouraged to use the EOIR Courts and Appeals System (ECAS) to file motions, applications, and other documents with the Court. The Court will also accept documents filed in person, via the U.S. Postal Service (USPS), by overnight delivery service, or via the Court's temporary e-mail box (AtlantaPeachtree.Immigration.Court@usdoj.gov)

9) For cases with paper records of proceeding (ROPs), the parties may file documents in person, via the U.S. Postal Service (USPS), by overnight delivery service, or via the Court's temporary e-mail box (AtlantaPeachtree.Immigration.Court@usdoj.gov).

10) With the exception of asylum applications,[1] there is a 60-day temporal limit on filings through the temporary e-mail box and a page limit of 100 pages. Accordingly, the Court will reject documents filed via the temporary e-mail box if filed more than 60 days before the next hearing date or a court-ordered deadline (or call-up date), whichever is earlier, or if the filing exceeds 100 pages. Documents rejected through this process may be filed in person, via U.S. Postal Service or an overnight delivery service, or re-submitted electronically within the above-specified timeframe. Nothing in this order alters filing deadlines specified in the ICPM, Ch. 3.1(b) or case-specific deadlines imposed by an Immigration Judge.

SIRCE OWEN   Digitally signed by
             SIRCE OWEN
             Date: 2020.05.20
             14:37:25 -04'00'

Sirce Elliott Owen
Assistant Chief Immigration Judge
Atlanta, Georgia

---

[1] Applications for asylum are exempt from the 60-day temporal limit on filings through e-mail and will be considered filed on the date of receipt for purposes of the one-year filing deadline.

2

**AILA Doc. No. 20041532. (Posted 6/15/20)**

5) Aurora: All immigration judges (2 orders, 2 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
AURORA, CO

STANDING ORDER OF THE AURORA IMMIGRATION COURT RELATING TO TELEPHONIC
APPEARANCES OF COUNSEL AND PERMITTED ATTENDEES AT DETAINED MASTER CALENDAR
AND INDIVIDUAL HEARINGS

IT IS HEREBY ORDERED that, effective immediately and continuing through July 31, 2020:

1. Any attorney for any party may appear telephonically in cases before the Aurora Immigration Court without prior approval and without filing a motion in advance. Attorneys who would like to appear telephonically for a particular case should contact that judge's legal assistant 48 hours prior to the scheduled hearing so that they can be provided a conference line number. By requesting a telephonic appearance the parties understand and agree that conference line numbers will only be disclosed to witnesses and parties and no further disclosure is permitted.

2. The Aurora Immigration Judges will **only** accept telephonic appearances on the conference lines provided by that judge's legal assistant.

3. Telephonic appearances **will only be accepted by the Aurora Immigration Court at the lines provided by the judge's legal assistant. No other method of telephonic appearance will be permitted.** If counsel fails to appear through the utilization of the conference line or in-person, counsel will thereafter be required to appear in-person at any rescheduled hearing.

4. Also during this time period, requests to continue cases due to COVID-19 concerns should be filed with as much notice as possible. On an emergency basis, in ECAS cases, motions should be filed electronically. In non-ECAS cases, motions to continue can be made to the court by telephone facsimile (FAX), by Faxing the request to 1-303-361-0688, while serving opposing counsel.

5. Any individual who wishes to appear telephonically does so with the understanding that any paper or electronic filings to be considered by the Court must be in the official record of proceeding in accordance with any deadlines set by the Court or, if none, in accordance with the filing deadlines set forth in the Immigration Court Practice Manual. No additional filings will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing.

6. Any party appearing telephonically waives the right to object to admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

7. In person attendance at hearings shall be limited to attorneys, parties, witnesses, security officers, and any other necessary people, which will be determined by the presiding judge.

MATTHEW KAUFMAN  Digitally signed by MATTHEW KAUFMAN
Date: 2020.06.02 10:42:52 -06'00'

Matthew W. Kaufman
Assistant Chief Immigration Judge

9

AILA Doc. No. 20041532. (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
AURORA, CO

**STANDING ORDER OF THE AURORA IMMIGRATION COURT RELATING TO
PROCEDURES FOR CUSTODY REDETERMINATION HEARINGS**

IT IS HEREBY ORDERED effective immediately and continuing through July 31, 2020:

1.  All requests for custody redeterminations where Respondent is represented by counsel must include an indication as to whether an in-person or telephonic hearing is desired, and if neither party requests a hearing then it will be decided on the pleadings.

2.  Written submissions shall include, but not be limited to, the following:

    a.  The motion for custody redetermination;
    b.  All evidence in support of or in opposition to the motion;
    c.  Any brief or other pleading in support of or in opposition to the motion; and
    d.  Any other papers related to the motion.

3.  With respect to the Department of Homeland Security, the Department shall file a Form I-213 and any argument regarding whether a particular conviction requires mandatory detention.

4.  With respect to the Respondent, Respondent shall file a criminal history chart setting forth each conviction and each pending charge. Respondent shall also file any argument regarding whether a particular conviction does not require mandatory detention.

5.  Respondent shall set forth the bond amount Respondent is requesting.

6.  All submissions required by this Order shall be filed no later than 48 hours prior to the custody redetermination hearing.

MATTHEW KAUFMAN  Digitally signed by
MATTHEW KAUFMAN
Date: 2020.06.02
08:11:46 -06'00'

Matthew W. Kaufman
Assistant Chief Immigration Judge

10

**AILA Doc. No. 20041532. (Posted 6/15/20)**

6) Baltimore: All immigration judges (2 orders, 4 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
BALTIMORE, MARYLAND

## STANDING ORDER OF THE IMMIGRATION COURT

Effective immediately and for as long as the State of Maryland continues to operate under a State of Emergency, any attorney for any party may appear telephonically in any case before the Baltimore Immigration Court without prior approval and without filing a motion in advance. Section 4.15(m)(i) of the Immigration Court Practice Manual is waived for the duration of this Standing Order, including any extensions.

Attorneys who request a telephonic appearance for a particular hearing must call the court to ascertain operational status and inform the Court in advance of the hearing. Counsel shall provide the best telephone number at which counsel can be reached. Landline telephone numbers are preferred in order to minimize noise and disruption. Representatives appearing telephonically must be able to receive the Court's telephone call at the time the case is scheduled to be heard and for three hours thereafter. Respondents are required to be present in court for the hearing, unless their presence is waived.

Motions to Continue hearings due to COVID-19 concerns should be filed within 24 hours prior to the scheduled hearing or as soon as possible and, to the extent practicable, be made to the Court by e-filing. The Court's mailbox is Baltimore.Immigration.Court@usdoj.gov. Any emergencies related to COVID-19 arising the day of a hearing should be brought to the Court's attention immediately by calling the Court.

This order supersedes Judge Elizabeth A. Kessler's Standing Order dated March 16, 2020.

Date: April 2, 2020

David M. Jones
Assistant Chief Immigration Judge

11

AILA Doc. No. 20041532. (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
BALTIMORE, MARYLAND

STANDING ORDER OF THE IMMIGRATION COURT

The Immigration Court has established a temporary email address to accept evidentiary filings. We are currently receiving exceptionally large evidentiary packages for cases that are scheduled far into the future.

Effective immediately, the Baltimore Immigration Court is imposing the following standing orders on documents filed through this temporary email address.

## Fifty (50) Page Limit

IT IS HEREBY ORDERED; that effective immediately, for parties using the Baltimore Immigration Court temporary email address, *all* filings are limited to 50 pages per case submission. Submissions exceeding the 50-page limit will be rejected.

If the submission contains more than 50 pages the parties may submit the first 50 pages, to include the Table of Contents. The entire submission may not exceed 50 pages. The remaining documents may be filed separately, to include the original Table of Contents, in person, via USPS, or any other delivery service no later than the date set for the filing of documents with the immigration court.

## Three-Month Temporal Limit

IT IS HEREBY ORDRED; with the exception of asylum applications, all documents filed via email to the Baltimore Immigration Court must be for cases whose hearing dates or court-ordered filing deadlines are within three months of the submission. The Baltimore Immigration Court will reject documents filed via the temporary email address if filed more than three months before the next hearing date or court-ordered deadline, whichever is earliest. Documents filed more than three months in advance of the next hearing date or court-ordered deadline may be filed in person or sent to the court via the U.S. Postal Service (USPS) or other delivery service, not through the temporary e-mail address.

> **HEARING EXAMPLE:** A document filed via the temporary email address on April 20, 2020, for a hearing scheduled on or before July 19, 2020, will be accepted provided it conforms with the Immigration Court Practice Manual ("ICPM") and email filing instructions. However, a document filed on April 20, 2020, for a hearing scheduled on or after July 20, 2020, will be rejected and should be filed in person, via USPS, or any other delivery service.

*updates: www.justice.gov/eoir*                    *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

**CALL-UP DATE EXAMPLE:** A document filed via the temporarily email address on April 20, 2020, to satisfy a call-up date scheduled on or before July 19, 2020, would be accepted provided it conforms with the ICPM and the email filing instructions. However, a document filed on April 20, 2020, to satisfy a call-up date scheduled on or after July 20, 2020, will be rejected and should be filed in person, via USPS, or any other delivery service.

Documents rejected for not complying with the email three-month temporal limit may be filed in person, via USPS, or any other delivery service. **Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.** Parties are required to comply with all deadlines for filings, as specified in the ICPM, Ch. 3.1(b).

## Temporary Email Address Filing Protocol

IT IS HEREBY ORDRED; the following protocol must be followed when filing documents through the temporary email address. The subject of your email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandate deadline for the filing, and the initials of the immigration judge assigned to the case.

**EXAMPLE:** A motion to continue on a case whose alien registration number is 012345678 and a hearing date of June 30, 2020, would input, "Motion to Continue - 012345678 - 06/30/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 - WAJ"



**EXAMPLE:** A filer of an application for cancellation of removal whose alien registration number is 012345678 and whose hearing date is on January 2, 2021, with a court-mandated application filing deadline of June 25, 2020, would input, "Application for Cancellation of Removal - 012345678 – 06/25/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of Removal - 012345678 - 06/25/2020 – WAJ."

**AILA Doc. No. 20041532. (Posted 6/15/20)**



This order supplements the general electronic filing instructions and sets additional requirements for the Baltimore Immigration Court.

Date: April 28, 2020

David M. Jones
Assistant Chief Immigration Judge

*updates: www.justice.gov/eoir*                          *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

7) Batavia: All immigration judges (2 orders, 3 pages)

### UNITED STATES DEPARTMENT OF JUSTICE
### UNITED STATES IMMIGRATION COURT AT
### BATAVIA, NEW YORK

### STANDING ORDER OF THE BATAVIA IMMIGRATION COURT
### RELATING TO TELEPHONIC APPEARANCES AT INDIVIDUAL AND MASTER
### CALENDAR HEARINGS

Due to the COVID-19 pandemic, the Batavia Immigration Court is implementing the below safety precautions, which shall remain effective until further notice:

**IT IS HEREBY ORDERED** that parties and their counsel scheduled to appear for an individual or master calendar hearing before the Batavia Immigration Court may appear telephonically, without the need to file a motion for telephonic appearance. This permission is subject to the following caveats:

1)      Any individual who wishes to appear telephonically does so with the understanding that any paper or electronic filings to be considered by the Court must be in the official record of proceeding at the time the hearing is scheduled to be held. No additional filings will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing.

2)      Any party appearing before the Court telephonically must do so from the office of their legal counsel. Any such party waives the right to object to the admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

3)      If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any rescheduled hearing.

**IT IS FURTHER ORDERED** that in-person appearances, shall be subject to the following safety precautions:

a)      In-person appearances in the courtroom are limited to the following individuals: Respondent, Respondent's counsel, DHS counsel, Court interpreter, a witness, essential EOIR staff and security personnel. See ICPM § 4.9(a) (ii)(citing 8 C.F .R.§ 1003.27(b)).

b)      Any party that is displaying symptoms consistent with COVID-19 exposure, has been diagnosed with COVID-19, or has had contact with anyone who has been diagnosed with COVID19 must notify the Court immediately by telephone and will not be allowed to appear in Court.

c)      This order supersedes the prior order of May 12, 2020.

June 10, 2020

**JOSE SANCHEZ** Digitally signed by JOSE SANCHEZ
Date: 2020.06.10 12:42:52 -04'00'

Jose A. Sanchez
United States Assistant Chief Immigration Judge, Acting
Batavia, NY

**AILA Doc. No. 20041532. (Posted 6/15/20)**

**UNITED STATES DEPARTMENT OF JUSTICE**
**UNITED STATES IMMIGRATION COURT AT**
**BATAVIA, NEW YORK**

**STANDING ORDER OF THE BATAVIA IMMIGRATION COURT RELATING**
**TO TEMPORAL AND PAGE LIMITS ON DOCUMENTS FILED VIA EMAIL**

Due to the COVID-19 pandemic and in the interest of safety, the Batavia Immigration Court has begun accepting the filing of documents via email. The following orders regarding the filing of documents shall remain effective until further notice:

**IT IS HEREBY ORDERED** that a three-month temporal limit on filings through email shall be in effect until further notice.

The Batavia Immigration Court is imposing a three-month temporal filing limit on documents filed through email. Effective immediately, the Court will reject documents filed via the temporary e-mail boxes if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the court via the U.S. Postal Service or an overnight delivery service, not through the temporary e-mail box.

- HEARING EXAMPLE: If documents are filed via the temporary e-filing mailbox on April 20, 2020, for a hearing scheduled on or before July 19, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on April 20, 2020, for a hearing scheduled on or after July 20, 2020, they will be rejected.

- CALL-UP DATE EXAMPLE: If documents are filed via the temporarily e-filing mailbox on April 20, 2020, for a call-up date scheduled on or before July 19, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on April 20, 2020, for a call-up date scheduled on or after July 20, 2020, they will be rejected.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, ch. 3.1(b).

*Note: Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.*

The subject of your email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandated deadline for the filing, and the initials of the immigration judge assigned to the case. If you are submitting documents pursuant to a court-mandated filing deadline ("call-up date"), you must indicate such in the subject line.

Example: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would input, "Motion to Continue - 012345678 - 06/30/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 - WAJ"

**AILA Doc. No. 20041532. (Posted 6/15/20)**

Example: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a call-up date of 06/25/2020 would input, "Application for Cancellation of Removal - 012345678 – Call-up 06/25/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of Removal - 012345678 – Call-up 06/25/2020 - WAJ."

**IT IS FURTHER ORDERED** that a page-limit on filings through email shall be in effect until further notice.

Effective immediately, for parties using a temporary email account to electronically file, supporting documentation/evidentiary filings are limited to fifty (50) pages in a particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filinMgs with the original Table of Contents by using the U.S. Postal Service or an overnight delivery service no later than the date set for filing the documents with the immigration court.

This order supersedes the prior or of April 20, 2020

May 12, 2020

JOSE SANCHEZ   Digitally signed by JOSE SANCHEZ
Date: 2020.05.12 11:41:28 -04'00'

Jose A. Sanchez
(Acting) United States Assistant Chief Immigration Judge
Batavia, NY

2

17

AILA Doc. No. 20041532. (Posted 6/15/20)

8) Boston: All immigration judges (3 pages)

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### UNITED STATES IMMIGRATION COURT
### BOSTON, MASSACHUSETTS

### STANDING ORDER OF THE BOSTON IMMIGRATION COURT
### RELATING TO TELEPHONIC APPEARANCES OF COUNSEL,
### PERMITTED ATTENDEES AT MASTER CALENDAR AND
### INDIVIDUAL HEARINGS, AND ELECTRONIC FILINGS

### JUNE 10, 2020

IT IS HEREBY ORDERED that, effective immediately and continuing until further order of the court:

1) Any attorney or representative for any party may appear telephonically in cases before the Boston Immigration Court without prior approval and without filing a motion in advance. Attorneys who would like to appear telephonically for a particular case should inform the Boston Immigration Court, main desk, in advance of the hearing by calling 1-617-565-3080, provide the Alien number, the name of the judge and the best phone number at which the attorney will answer. Also during this time period, requests to continue cases due to COVID-19 concerns should be filed with as much notice as possible, but may on an emergency basis be made to the court by e-mail to Boston.Immigration.Court@EOIR.USDOJ.GOV while serving opposing counsel.

2) Any individual who wishes to appear telephonically does so with the understanding that any paper or electronic filings to be considered by the Court must be in the official record of proceeding in accordance with any deadlines set by the Court or, if none, in accordance with the filing deadlines set forth in the Immigration Court Practice Manual. No additional filings will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing.

3) Any party appearing telephonically waives the right to object to admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

4) If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any rescheduled hearing.

5) In-court proceedings shall be limited to attorneys, parties, witnesses, security

18

AILA Doc. No. 20041532. (Posted 6/15/20)

officers, and any other necessary people, which will be determined by the presiding judge.

6) Three-Month Temporal Limit on Filings through Email:

The Boston Immigration Court is imposing a three-month temporal filing limit on documents filed through email. Effective immediately, the court will reject documents filed via the temporary e-mail boxes if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the court via the U.S. Postal Service or an overnight delivery service, not through the temporary e-mail box.

HEARING EXAMPLE: If documents are filed via the temporary e-filing mailbox on April 20, 2020, for a hearing scheduled on or before July 19, 2020, they will be accepted provided they conform to the ICPM and the e-mail filing instructions. However, if documents are filed on April 20, 2020, for a hearing scheduled on or after July 20, 2020, they will be rejected.

CALL-UP DATE EXAMPLE: If documents are filed via the temporary e-filing mailbox on April 20, 2020, for a call-up date scheduled on or before July 19, 2020, they will be accepted provided they conform to the ICPM and the e-mail filing instructions. However, if documents are filed on April 20, 2020, for a call-up date scheduled on or after July 20, 2020, they will be rejected.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, Ch. 3.1(b).

**NOTE**: Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.

EMAIL:

The subject of your email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandate deadline for the filing, and the initials of the immigration judge assigned to the case.

EXAMPLE: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would input, "Motion to Continue - 012345678 - 06/30/2020" in the subject line of the email. If the filer

knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 - WAJ"

EXAMPLE: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a court-mandated filing deadline ("call-up date") of 06/25/2020 would input, "Application for Cancellation of Removal - 012345678 – 06/25/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of Removal - 012345678 - 06/25/2020 – WAJ."

PAGE LIMITS:

Effective immediately, for parties using a temporary email account to electronically file, supporting documentation/evidentiary filings are limited to fifty (50) pages in a particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the immigration court.

This order supersedes all prior Standing Orders of the Boston Immigration Court.

JOSE SANCHEZ Digitally signed by JOSE SANCHEZ
Date: 2020.06.10 13:09:42 -04'00'

Jose A. Sanchez
U.S. Assistant Chief Immigration Judge
Boston Immigration Court

June 10, 2020

AILA Doc. No. 20041532. (Posted 6/15/20)

9) Buffalo: All immigration judges (2 orders, 3 pages)

UNITED STATES DEPARTMENT OF JUSTICE
UNITED STATES IMMIGRATION COURT AT
BUFFALO, NEW YORK

STANDING ORDER OF THE BUFFALO IMMIGRATION COURT
RELATING TO TELEPHONIC APPEARANCES AT INDIVIDUAL AND
MASTER CALENDAR HEARINGS

Due to the COVID-19 pandemic, the Buffalo Immigration Court is implementing the below safety precautions, which shall remain effective until further notice:

IT IS HEREBY ORDERED that parties and their counsel scheduled to appear for an individual or master calendar hearing before the Buffalo Immigration Court may appear telephonically, without the need to file a motion for telephonic appearance. This permission is subject to the following caveats:

1)     Any individual who wishes to appear telephonically does so with the understanding that any paper or electronic filings to be considered by the Court must be in the official record of proceeding at the time the hearing is scheduled to be held. No additional filings will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing.

2)     Any party appearing before the Court telephonically must do so from the office of their legal counsel. Any such party waives the right to object to the admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

3)     If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any rescheduled hearing.

IT IS FURTHER ORDERED that in-person appearances shall be subject to the following safety precautions:

a)     In-person appearances in the courtroom are limited to the following individuals: Respondent, Respondent's counsel, DHS counsel, Court interpreter, essential EOIR staff and security personnel. See ICPM § 4.9(a)(ii)(citing 8 C.F .R.§ 1003.27(b)).

b)     Any party that is displaying symptoms consistent with COVID-19 exposure, has been diagnosed with COVID-19, or has had contact with anyone who has been diagnosed with COVID-19 must notify the Court immediately by telephone and will not be allowed to appear in Court.

c)     This order supersedes the order of May 13, 2020

JOSE SANCHEZ   Digitally signed by JOSE SANCHEZ
Date: 2020.06.10 12:29:50 -04'00'

June 10, 2020                     Jose A. Sanchez
                                  United States Assistant Chief Immigration Judge, Acting
                                  Buffalo, New York

21

Immigration Court
Practice Manual                                                                    Table of Changes

**UNITED STATES DEPARTMENT OF JUSTICE**
**UNITED STATES IMMIGRATION COURT AT**
**BUFFALO, NEW YORK**

**STANDING ORDER OF THE BUFFALO IMMIGRATION COURT RELATING TO**
**TEMPORAL AND PAGE LIMITS ON DOCUMENTS FILED VIA EMAIL**

Due to the COVID-19 pandemic and in the interest of safety, the Buffalo Immigration Court has begun accepting the filing of documents via email. The following orders regarding the filing of documents shall remain effective until further notice:

**IT IS HEREBY ORDERED** that a three-month temporal limit on filings through email shall be in effect until further notice.

The Buffalo Immigration Court is imposing a three-month temporal filing limit on documents filed through email. Effective immediately, the Court will reject documents filed via the temporary e-mail boxes if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the court via the U.S. Postal Service or an overnight delivery service, not through the temporary e-mail box.

- HEARING EXAMPLE: If documents are filed via the temporary e-filing mailbox on April 20, 2020, for a hearing scheduled on or before July 19, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on April 20, 2020, for a hearing scheduled on or after July 20, 2020, they will be rejected.

- CALL-UP DATE EXAMPLE: If documents are filed via the temporarily e-filing mailbox on April 20, 2020, for a call-up date scheduled on or before July 19, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on April 20, 2020, for a call-up date scheduled on or after July 20, 2020, they will be rejected.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, ch. 3.1(b).

*Note: Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.*

The subject of your email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandated deadline for the filing, and the initials of the immigration judge assigned to the case. If you are submitting documents pursuant to a court-mandated filing deadline ("call-up date"), you must indicate such in the subject line.

Example: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would input, "Motion to Continue - 012345678 - 06/30/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 - WAJ"

22

**AILA Doc. No. 20041532. (Posted 6/15/20)**

Example: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a call-up date of 06/25/2020 would input, "Application for Cancellation of Removal - 012345678 – Call-up 06/25/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of Removal - 012345678 – Call-up 06/25/2020 - WAJ."

**IT IS FURTHER ORDERED** that a page-limit on filings through email shall be in effect until further notice.

Effective immediately, for parties using a temporary email account to electronically file, supporting documentation/evidentiary filings are limited to fifty (50) pages in a particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. Postal Service or an overnight delivery service no later than the date set for filing the documents with the immigration court.

This order supersedes the order of April 20, 2020.

May 14, 2020

JOSE SANCHEZ  Digitally signed by JOSE SANCHEZ
Date: 2020.05.13 18:33:06 -04'00'

Jose A. Sanchez
(Acting) United States Assistant Chief Immigration Judge
Buffalo, NY

*updates: www.justice.gov/eoir*                          *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

10) Charlotte: All immigration judges (2 pages)

<br>

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
CHARLOTTE, NORTH CAROLINA

STANDING ORDER OF THE CHARLOTTE IMMIGRATION COURT RELATING TO
TEMPORAL AND PAGE LIMITS ON DOCUMENTS FILED VIA EMAIL

**IT IS HEREBY ORDERED** that a three-month temporal limit on filings through email shall be in effect until further notice.

The Charlotte Immigration Court is imposing a three-month temporal filing limit on documents filed through email. Effective immediately, the Court will reject documents filed via the temporary email boxes if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the Court via the U.S. Postal Service or an overnight delivery service, not through the temporary email box.

- HEARING EXAMPLE: If documents are filed via the temporary e-filing mailbox on April 20, 2020, for a hearing scheduled on or before July 19, 2020, they will be accepted provided they conform with the Immigration Court Practice Manual ("ICPM") and the email filing instructions. However, if the documents are filed on April 20, 2020, for a hearing scheduled on or after July 20, 2020, they will be rejected.

- CALL-UP DATE EXAMPLE: If documents are filed via the temporary e-filing mailbox on April 20, 2020, for a call-up date scheduled on or before July 19, 2020, they will be accepted provided they conform with the ICPM and the email filing instructions. However, if documents are filed on April 20, 2020, for a call-up date scheduled on or after July 20, 2020, they will be rejected.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, ch. 3.1(b).

*Note: Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.*

The subject of your email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandate deadline for the filing, and the initials of the immigration judge assigned to the case.

- HEARING EXAMPLE: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would input, "Motion to Continue - 012345678 - 06/30/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 – WAJ."

- CALL-UP DATE EXAMPLE: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a call-up date of 06/25/2020 would input, "Application for Cancellation of Removal - 012345678 – 06/25/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of Removal - 012345678 - 06/25/2020 – WAJ."

**IT IS FURTHER ORDERED** that a page-limit on filings through email shall be in effect until further notice.

Effective immediately, for parties using a temporary email account to electronically file, supporting documentation/evidentiary filings are limited to fifty (50) pages in a particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. Postal Service or an overnight delivery service no later than the date set for filing the documents with the Charlotte Immigration Court.

This order supersedes all prior Standing Orders of the Charlotte Immigration Court.

_April 23, 2020_
**DATE**

**THERESA HOLMES-SIMMONS**
U.S. Assistant Chief Immigration Judge
Charlotte, North Carolina

**AILA Doc. No. 20041532. (Posted 6/15/20)**

11) Chicago: All immigration judges (4 orders, 4 pages)

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### IMMIGRATION COURT
### CHICAGO, ILLINOIS

**Standing Order (March 19, 2020): Telephonic Appearances and Requests to Continue due to COVID-19 Concerns in Cases before the Chicago Immigration Court**

Effective immediately, any attorney or qualified representative, for any party may appear telephonically in cases before the Chicago Immigration Court, without prior approval and without filing a motion in advance. Attorneys who would like to appear telephonically, either with or without respondent(s), for a particular case before any judge with the Chicago Immigration Court, should contact the Chicago Immigration Court, detained satellite court, at 312-294-8400, in advance of the hearing. Counsel should provide: the A-number, the time and date of the scheduled hearing, and the phone number at which counsel can be reached for the hearing.

Also during this time, motions to continue cases due to COVID-19 concerns should be filed with as much notice as possible, but may, on an emergency basis, be made to the Chicago Immigration Court, detained satellite court by calling the number above.

Date:  March 19, 2020

SHEILA
MCNULTY

Digitally signed by
SHEILA MCNULTY
Date: 2020.03.19
12:50:23 -05'00'

Sheila McNulty
Assistant Chief Immigration Judge
Chicago, Illinois

AILA Doc. No. 20041532.  (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
CHICAGO, ILLINOIS

STANDING ORDER OF THE CHICAGO IMMIGRATION
COURT RELATING TO TELEPHONIC APPEARANCES
AT DETAINED JUVENILE MASTER CALENDAR AND INDIVIDUAL HEARINGS

IT IS HEREBY ORDERED that Department of Homeland Security counsels, respondents' attorneys or qualified representatives, pro bono counsels, friends of the court, and appointed child advocates in *detained juvenile cases* who are scheduled to appear for master calendar and individual hearings before the Chicago Immigration Court, may appear telephonically without the need to file a motion for telephonic appearance.

The attorneys who would like to appear telephonically shall call the Chicago Immigration Court in advance of the hearing and provide the Alien number, name of judge and the best phone number where the attorney can be reached. The parties may call: (312) 697-5718 and speak with court assistant Ms. Marissa Meza for direct information. The attorneys shall remain available for the court's call. If the court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any promptly-rescheduled hearing.

Any documents which counsel requests the court to consider during the hearing must be filed with the court, and _received_ by opposing counsel or the *pro se* respondent, at least _two business days_ prior to the hearing. Any party appearing telephonically waives the right to object to admissibility of any document offered in court on the sole basis that they are unable to examine the document.

This order shall remain in effect until rescinded by the Court.

SHEILA MCNULTY    Digitally signed by SHEILA MCNULTY
Date: 2020.04.14 14:43:34 -05'00'

SHEILA McNULTY
Chicago IL
Assistant Chief Immigration Judge

April 14, 2020

27

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
CHICAGO, ILLINOIS

## STANDING ORDER IMPLEMENTING THREE-MONTH TEMPORAL FILING LIMIT AND PAGE LIMITATION ON ELECTRONICALLY-FILED DOCUMENTS FOR NON-DETAINED CASES

Effective immediately, the **Chicago Immigration Court (Non-Detained)** is imposing a three-month temporal filing limit on documents filed at the **Chicago Immigration Court (Non- Detained)** using the temporary email account. **The Chicago Immigration Court (Non- Detained)** will reject documents filed via the temporary email box if filed **more than three months** before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those parties wishing to file documents more than three months in advance may still do so; however, the documents must be sent to the Court via the U.S. Postal Service or an overnight delivery service, not through the temporary email box. Documents rejected for not complying with the three-month temporal filing limit may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal filing limit through e-mail, parties are required to comply with all deadlines for filings, as specified in the Immigration Court Practice Manual (ICPM) (*see* Ch. 3.1(b)).

**Note: Applications for asylum are exempt from the three-month temporal filing limit through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

For parties using the temporary email account to electronically file pre-hearing briefs, motion briefs, responses, or replies at the Chicago Immigration Court (Non-Detained Court), such filings shall be limited to twenty- five (25) pages. (*see* ICPM, Ch. 4.19). This limitation applies to the contents of the brief including a statement of facts, issues, burden of proof, argument, conclusion stating the precise relief or remedy sought, and citations or authorities. Font size and spacing shall remain consistent with the ICPM (*see* Ch. 3.3).

For parties using the temporary email account to electronically    file supporting documentation/evidentiary filings at the **Chicago Immigration Court (Non-Detained)**, such filings shall be limited to fifty (50) pages in any particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the immigration court or consistent with the ICPM (*see* Ch. 3.1(b)).

This order supersedes any general electronic filing instructions presently posted online and shall remain in effect until rescinded by the Court.

Date:
April 23, 2020

SHEILA
Sheila McNulty    MCNULTY
Assistant Chief Immigration Judge

Digitally signed by SHEILA MCNULTY
Date: 2020.04.23 22:40:50 -05'00'

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
CHICAGO NON-DETAINED IMMIGRATION
COURT

STANDING ORDER OF THE CHICAGO NON-DETAINED
IMMIGRATION COURT RELATING TO FILINGS FOR CASES
ADJOURNED DUE TO COVID-19

**IT IS HEREBY ORDERED**, that **effective immediately** for cases adjourned due to COVID-19, the new filing deadline shall be as set forth in the Immigration Court Practice Manual Ch 3.1(b) unless the Immigration Judge otherwise establishes a filing deadline based upon the rescheduled hearing date (" revised call-up date"). The provisions of this court's Standing Order relating to Three Month Temporal Limit On Filings Through E-Mail remain in effect.

___5-11-20_____

Date

SHEILA
MCNULTY

Digitally signed by SHEILA
MCNULTY
Date: 2020.05.11 08:42:22
-05'00'

Sheila McNulty
Assistant Chief Immigration Judge

AILA Doc. No. 20041532. (Posted 6/15/20)

12) Cleveland: All immigration judges (3 pages)

### Third Revised Standing Order for the Cleveland Immigration Court

Effective immediately and for as long as the State of Ohio continues to operate under a state of emergency, any attorney-at-law for any party may appear telephonically in detained cases before the Cleveland Immigration Court without prior approval and without filing a motion in advance. Any attorney for the respondent must confer with the respondent in advance of the hearing and ensure that the respondent consents to the telephonic appearance. Attorneys for the parties should email Cleveland.Immigration.Court@usdoj.gov 24 hours in advance of the hearing and provide the number at which to be reached. If any attorney for the respondent wishes to appear in person at a hearing in a detained case, the attorney must provide the Court with prior notice at least 48 hours before the hearing in order to arrange for the attorney to enter the courthouse so long as the Chief Judge of the United States District Court for the Northern District of Ohio has ordered that the courthouse not be open to the public.

The parties are encouraged to confer and reach stipulations as to facts and/or legal issues (e.g. 10 years of continuous residence) to facilitate the prompt disposition of cases. The parties are also encouraged to confer and reach agreement on the eligibility for bond and the amount of the bond. The parties should also submit affidavits or written statements of witnesses in lieu of the witnesses appearing in court.

Also during this time, motions and pleadings for any detained hearings due to COVID-19 should be filed with as much notice as possible by submitting an email to Cleveland.Immigration.Court@usdoj.gov. Instructions for filings can be found at https://www.justice.gov/eoir/filing-email. Attorneys are advised that such filings must comply with Paragraph 3.3(c) of the Immigration Court Practice Manual with the exception of the requirement for binding. Attorneys are also encouraged to be succinct and to file only such documents as are reasonably necessary for the cases. Attorneys are encouraged to limit the filing of duplicative country condition reports and to file only such reports which are relevant and necessary for the hearings.

AILA Doc. No. 20041532. (Posted 6/15/20)

Do not file or send notices to any other email.

The subject line of any email filing must contain the nature of the filing, the alien registration number, the date of the next hearing or the call-up date or any court-mandated deadline for the filing, and the initials of the immigration judge assigned to the case.

Effective immediately, the Cleveland Immigration Court is imposing a 90 day limit on electronic filings made through the Cleveland.Immigration.Court@usdoj.gov mailbox. The Court will reject electronic filings if filed in excess of 90 days prior to the next hearing date or court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than 90 days in advance of a hearing or a call-up date should send the filing via the United States Postal Service or an overnight delivery service. Electronic filings rejected for not complying with the 90-day deadline may be filed via the United States Postal Service or an overnight delivery service. Notwithstanding the 90-day limit on electronic filings, parties are required to comply with all deadlines for filings as specified in Paragraph 3.1(b) of the Immigration Court Practice Manual. **Note: Applications for asylum are exempt from the 90-day electronic filing limit and will be considered filed on the date of receipt for purposes of the one-year filing deadline. This exemption from the filing deadline applies only to the I-589 and not to documentation filed in support of the application.**

Effective immediately, the Cleveland Immigration Court is imposing a 50 page limit on electronic filings made through the Cleveland.Immigration.Court@usdoj.gov mailbox. Supporting documents/evidentiary filings will be limited to 50 pages for a particular case. If a party intends to file more than 50 pages, the party must electronically file the Table of Contents and separately file the supporting documents/evidentiary filings with the original Table of Contents by the United States Postal Service or an overnight delivery service no later than the date set for the filing of the documents with the Court or the call-up date.

AILA Doc. No. 20041532. (Posted 6/15/20)

This standing order supersedes the standing orders of March 23, 2020 and April 1, 2020 and is subject to change and revocation.

JAMES MCCARTHY   Digitally signed by JAMES
                 MCCARTHY
                 Date: 2020.04.23 09:03:47 -04'00'

James F. McCarthy, III

Assistant Chief Immigration Judge

AILA Doc. No. 20041532. (Posted 6/15/20)

13) Conroe: All immigration judges

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**CONROE IMMIGRATION COURT**
**Conroe, Texas**

STANDING ORDER OF THE CONROE IMMIGRATION COURT RELATING TO
TELEPHONIC APPEARANCES OF COUNSEL AND PERMITTED ATTENDEES AT ALL
HEARINGS

IT IS ORDERED that, effective immediately and continuing until further notice:

1) Any attorney or accredited representative for any party may appear telephonically in hearings before the Conroe Immigration Court without prior approval and without filing a motion in advance. Attorneys or representatives who would like to appear telephonically for a particular hearing should call the main desk in advance of the hearing at 1-936-520-5400 and provide the Alien number, the name of the Immigration Judge (IJ) presiding over the hearing, and the best phone number to reach the attorney or representative.

2) If the Court is unable to reach the attorney or representative by telephone for the hearing, the attorney or representative will be required to appear in-person at any rescheduled hearing.

3) Any attorney or accredited representative who wishes to appear telephonically does so with the understanding that any paper or electronic filings must be filed in advance of the hearing in sufficient time to be included in the official record of proceeding in accordance with any deadlines set by the Court or, if none, in accordance with the filing deadlines set forth in the Immigration Court Practice Manual. No additional filings will be accepted at the hearing, and the decision of the Court will be based on the documents in the record at the close of the hearing.

4) No filings for any hearing will be accepted over the bench unless filed by pro se litigants. All other filings must be made via ECAS, at the filing window prior to the hearing, or via mail-delivery service.

5) Requests to continue cases due to COVID-19 concerns should be filed with as much notice as possible. On an emergency basis, requests may be made to the Court by email to tammy.young@usdoj.gov and serving the request to opposing counsel.

6) Attendees at all hearings may be limited to attorneys, respondent, witnesses, security officers, and other persons determined by the IJ to be necessary.

7) Each IJ has the discretion to alter this standing order on a case by case basis.

John R. Doolittle, II
Assistant Chief Immigration Judge
Conroe, Texas

33

**AILA Doc. No. 20041532. (Posted 6/15/20)**

14) Dallas: All immigration judges (2 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
DALLAS IMMIGRATION COURT

STANDING ORDER RELATING TO ELECTRONIC FILINGS

(Superseding the order issued on 4/22/2020)

IT IS HEREBY ORDERED that parties filing documents through the Dallas Immigration
Court's electronic mailbox shall adhere to the following instructions. These instructions supersede the
general instructions for electronic filings:

1. Three-Month Temporal Limit on Filings through E-mail

The Dallas Immigration Court is imposing a three-month temporal filing limit on documents filed
through e-mail. Effective immediately, the Dallas Immigration Court will reject documents filed via
its e-mail box if filed more than three months before the next hearing date or a court-ordered
deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three
months in advance may still do so; however, such documents must be sent to the court via the
U.S. Postal Service or an overnight delivery service, not through the e-mail box.

HEARING EXAMPLE: If documents are filed via the e-filing mailbox on April 20, 2020, for a
hearing scheduled on or before July 19, 2020, they will be accepted provided they conform
with the Immigration Court Practice Manual (ICPM) and the e-mail filing instructions.
However, if documents are filed on April 20, 2020, for a hearing scheduled on or after July 20,
2020, they will be rejected.

CALL-UP DATE EXAMPLE: If documents are filed via the e-filing mailbox on April 20,
2020, for a call-up date scheduled on or before July 19, 2020, they will be accepted provided
they conform with the ICPM and the e-mail filing instructions. However, if documents are filed
on April 20, 2020, for a call-up date scheduled on or after July 20, 2020, they will be rejected.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by
mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on
filings through email, parties are required to comply with all deadlines for filings, as specified in the
ICPM, ch. 3.1(b). *See* 8 C.F.R. §1003.31(c).

NOTE: Applications for asylum are exempt from the three-month temporal limit on filings
through email and will be considered filed on the date of receipt for purposes of the one-
year filing deadline.

2. E-mail Subject Line

The subject of filer's email must contain the nature of the filing, the alien registration number, the
date of the next hearing or any court-mandate deadline for the filing, and the initials of the
immigration judge assigned to the case, if known.

**AILA Doc. No. 20041532. (Posted 6/15/20)**

EXAMPLE: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would input, "Motion to Continue - 012345678 - 06/30/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 - WAJ"

EXAMPLE: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a court-mandated filing deadline ("call-up date") of 06/25/2020 would input, "Application for Cancellation of Removal - 012345678 – 06/25/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of Removal - 012345678 - 06/25/2020 – WAJ."

3.   Limitation on Size of Filing

Effective immediately, for parties using the Dallas Immigration Court's email account to electronically file, supporting documentation/evidentiary filings are limited to fifty (50) pages single sided and double-spaced in a particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the immigration court.

Date: June 11, 2020

DANIEL
WEISS

Digitally signed by
DANIEL WEISS
Date: 2020.06.11
15:28:40 -05'00'

Daniel H. Weiss
Assistant Chief Immigration Judge
Dallas Immigration Court

AILA Doc. No. 20041532. (Posted 6/15/20)

15) Dallas: Immigration Judge Xiomara D. Davis-Gumbs

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
DALLAS IMMIGRATION COURT

STANDING ORDER OF IMMIGRATION JUDGE XIOMARA DAVIS-GUMBS RELATING TO
TELEPHONIC APPEARANCES

IT IS HEREBY ORDERED that, for the thirty (30) day period following the signing of this order, parties scheduled to appear before Immigration Judge Xiomara Davis-Gumbs at the Dallas Immigration Court may, without need for written motion, appear telephonically. Permission to appear telephonically is subject to the following caveats:

1) Any party who wishes to appear telephonically does so with the understanding that any paper filings to be considered by the Court must be in the official Record of Proceedings (ROP) at the time the hearing is scheduled to be held. No additional filings will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the ROP at the close of the hearing.

2) Any party appearing telephonically waives the right to object to the admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

3) If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in person at any rescheduled hearing.

Date: May 29, 2020

XIOMARA
DAVIS-GUMBS

Digitally signed by XIOMARA
DAVIS-GUMBS
Date: 2020.05.28 18:12:57
-05'00'

Xiomara Davis-Gumbs
Immigration Judge
Dallas Immigration Court

36

AILA Doc. No. 20041532. (Posted 6/15/20)

16) Dallas: Immigration Judge Robert Kimball

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
DALLAS IMMIGRATION COURT

**STANDING ORDER FOR REPRESENTED NON-DETAINED MASTER CALENDAR CASES
BEFORE JUDGE ROBERT W. KIMBALL**

1) Written pleadings must conform to Appendix L of the Practice Manual.
2) Written pleadings must be filed in every case, unless removability has already been established and relief has already been filed or specified.
3) Written pleadings must be filed at the earlier of :
    a)   at the time a relief application is filed,
    b)   within 15 days of an E-28 being filed,
    c)   at the beginning of a master calendar hearing being conducted, or
    d)   within one year of an NTA being issued.
4) If, at the time written pleadings are filed, a party believes the case is not ready for an evidentiary hearing on relief or contested charges, the party shall file a written brief or motion setting forth the reasons why further master calendar proceedings are necessary.
5) For cases with an active application or E-28 at the time of issuance of this order, but for which there are no written pleadings or finding of removability, and identification of relief or relief application, the written pleadings should instead be filed within 45 days of the issuance of this order, or at the first master calendar hearing held after the issuance of this order, whichever is earlier.
6) If not already filed, relief applications must be filed within 90 days of identification of relief or the filing of written pleadings.
7) For any case in which an I-589 application lists membership in a particular social group (PSG) as a purview, a written statement with the exact delineation of the particular social group must be filed within 60 days of the filing of the I-589. For any such application pending at the time of issuance of this order, the PSG statement must be filed within 45 days of issuance of this order.
8) Parties may request pre-hearing conferences, e.g. to resolve unusual or difficult issues.  Unless otherwise specified, such conferences will be conducted telephonically and outside the presence of the Respondent.  An attorney making such a request is presumed to have waived his client's presence unless otherwise specified in the request.  A request for a pre-hearing conference shall state two alternative dates and times for the proposed conference, and a telephone number where the attorney may be reached.  A party requesting a pre-hearing conference shall make reasonable efforts to confer with opposing counsel on the proposed dates and times.  With the prior permission of the court, a request for a pre-hearing conference may be made by email to the court clerk and to the opposing party.

Date: May 1, 2020

ROBERT
KIMBALL

Digitally signed by
ROBERT KIMBALL
Date: 2020.05.01
13:33:31 -04'00'

Robert W. Kimball
Immigration Judge
Dallas Immigration Court

37

AILA Doc. No. 20041532. (Posted 6/15/20)

17) Dallas: Immigration Judge Dietrich Sims

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
DALLAS IMMIGRATION COURT

STANDING ORDER OF IMMIGRATION JUDGE DEITRICH H. SIMS RELATING TO
TELEPHONIC APPEARANCES AT MASTER CALENDAR HEARINGS AND INDIVIDUAL
MERITS HEARINGS

IT IS HEREBY ORDERED that, for the forty-five (45) day period following the signing of this order, parties scheduled to appear for a master calendar and for an individual merits hearing before Immigration Judge Deitrich H. Sims at the Dallas Immigration Court may, without need for written motion, appear telephonically. Permission to appear telephonically is subject to the following caveats:

1) Any party who wishes to appear telephonically does so with the understanding that any paper filings to be considered by the Court must be in the official Record of Proceedings (ROP) at the time the hearing is scheduled to be held. No additional filings will be accepted at the hearing and the decision of the Court will be based on the documents in the ROP at the close of the hearing.

2) Any party appearing telephonically waives the right to object to the admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

3) If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in person at any rescheduled hearing.

Date: this 16th day of April, 2020

DEITRICH SIMS  Digitally signed by DEITRICH SIMS
                Date: 2020.04.16 17:22:26 -05'00'

Deitrich H. Sims
Immigration Judge
Dallas Immigration Court

AILA Doc. No. 20041532. (Posted 6/15/20)

18) Dallas: Immigration Judge Daniel H. Weiss

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
DALLAS IMMIGRATION COURT

STANDING ORDER OF IMMIGRATION JUDGE DANIEL H. WEISS RELATING TO
TELEPHONIC APPEARANCES

IT IS HEREBY ORDERED that, for the thirty (30) day period following the signing of this
order, parties scheduled to appear before Immigration Judge Daniel H. Weiss at the Dallas Immigration
Court may, without need for written motion, appear telephonically. Permission to appear telephonically
is subject to the following caveats:

1) Any party who wishes to appear telephonically does so with the understanding that any paper
   filings to be considered by the Court must be in the official Record of Proceedings (ROP) at
   the time the hearing is scheduled to be held. No additional filings will be accepted at the
   hearing if counsel does not appear in person, and the decision of the Court will be based on
   the documents in the ROP at the close of the hearing.

2) Any party appearing telephonically waives the right to object to the admissibility of any
   document offered in Court on the sole basis that they are unable to examine the document.

3) If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be
   required to appear in person at any rescheduled hearing.

Date: May 29, 2020

DANIEL
WEISS
Digitally signed by
DANIEL WEISS
Date: 2020.05.28
10:26:17 -05'00'

Daniel H. Weiss
Assistant Chief Immigration Judge
Dallas Immigration Court

39

AILA Doc. No. 20041532. (Posted 6/15/20)

19) Detroit: All immigration judges

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### UNITED STATES IMMIGRATION COURT
### DETROIT, MICHIGAN

### STANDING ORDER RELATING TO TELEPHONIC APPEARANCES AT ALL DETAINED HEARINGS

All previous standing orders relating to telephonic participation for Detroit-detained hearings are hereby rescinded.

Effective immediately and for as long as the State of Michigan continues to operate under a state of emergency, any attorney-at-law for any party may appear telephonically in all detained cases within the jurisdiction of the Detroit Immigration Court without prior approval and without filing a motion in advance.

It is counsel's responsibility to provide a telephone number to the court staff where they can be reached for the hearing and to be available for the court's call. If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in person at any scheduled hearing.

Any motions to continue hearings due to COVID-19 should be submitted electronically to Detroit.Immigration.Court@usdoj.gov with as much advanced notice as possible. Additionally, any documents the parties wish the Court to consider for hearings covered under this standing order can be filed with the Court electronically to Detroit.Immigration.Court@usdoj.gov with a copy sent to opposing counsel, at least **three business days** prior to the bond or master hearing, and **ten business days** prior to individual merit hearings. During this time, the Court will not receive filings on the day of the hearing, except on a case-by-case basis as determined by the Immigration Judge as a matter of discretion.

The parties are encouraged to confer and reach stipulations as to factual and legal issues to facilitate the prompt disposition of cases. For bond hearings, parties are encouraged to confer and reach agreement on eligibility and/or the amount of bond when appropriate. Further, parties should submit affidavits or written statements in lieu of witnesses, for both individual hearings and bond hearings.

This order shall remain in effect until the State of Michigan ceases to operate under a state of emergency at which time it is rescinded.

CHRISTOPHER SEPPANEN  Digitally signed by CHRISTOPHER SEPPANEN
Date: 2020.04.15 08:15:24 -04'00'

Assistant Chief Immigration Judge
Christopher Seppanen

20) El Paso: All immigration judges

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**EL PASO IMMIGRATION COURT**
**700 EAST SAN ANTONIO AVENUE, SUITE 750**
**EL PASO, TEXAS 79901**


**STANDING ORDER: TELEPHONIC APPEARANCES AND REQUESTS TO**
**CONTINUE DUE TO COVID-19 CONCERNS IN CASES BEFORE THE EL PASO**
**IMMIGRATION COURT**


      Effective immediately, and for as long as the State of Texas continues to operate under a State of Disaster due to COVID-19, any attorney for any party may appear telephonically in cases before the El Paso Immigration Court without prior approval and without filing a motion in advance. Attorneys who would like to appear telephonically, either with or without the respondent(s), for a particular case should contact the El Paso Immigration Court by telephone at **(915) 534-6020,** fifteen minutes prior to the scheduled hearing and provide the Court with a landline telephone number at which they may be reached. Also, during this time period, requests to continue cases due to COVID-19 concerns should be filed with the Court with as much notice as possible.


Sunita B. Mahtabfar
Immigration Judge

Nathan L. Herbert
Immigration Judge

**AILA Doc. No. 20041532. (Posted 6/15/20)**

21) Elizabeth: All immigration judges

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**UNITED STATES IMMIGRATION COURT**
**ELIZABETH, NEW JERSEY**

**SUPERSEDING ORDER. This order herby supersedes a Standing Order issued and
signed on March 19, 2020: Telephonic Appearances and Requests to Continue due to
COVID-19 Concerns in Cases before the Elizabeth immigration Court**

    **Effective immediately** and for as long as the State of New Jersey continues to operate under a State of Emergency, any attorney for any party may appear telephonically in cases before the Elizabeth Immigration Court without filing a motion in advance. Attorneys who would like to appear telephonically for a particular case should contact Legal Assistant Harold Arango, at least one business day in advance of the hearing by calling (908) 787-1355, and should provide the best phone number at which to be reached. Also, during this time period, requests to continue cases due to COVID-19 concerns should be filed with as much notice as possible, but may, on an emergency basis, be made to the Court by phone, after notifying opposing counsel.

    Additionally, any party that is displaying symptoms consistent with COVID-19 exposure, has been diagnosed with COVID-19, or has had contact with anyone who has been diagnosed with COVID-19 must notify the Court immediately by telephone and will not be permitted to appear in Court.

    **Effective immediately**, for parties using a temporary email account to electronically file, supporting documentation/evidentiary filings are limited to fifty **(50)** pages in a particular case. If a party intends to file more than fifty **(50)** pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the immigration court.

DAVID CHENG  Digitally signed by DAVID
CHENG
Date: 2020.05.01 14:50:22
-04'00'

David Cheng
Assistant Chief Immigration Judge

42

22) Eloy: All immigration judges (3 orders, 3 pages)


UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
ELOY, ARIZONA


STANDING ORDER OF THE ELOY IMMIGRATION COURT RELATING TO
TELEPHONIC APPEARANCES AT MASTER CALENDAR AND BOND HEARINGS


**IT IS HEREBY ORDERED** that attorneys and qualified representatives scheduled to appear for a master calendar or bond hearing before the Eloy Immigration Court may appear telephonically, without the need to file a motion for telephonic appearance.

It is counsel's responsibility to provide a telephone number to the court staff where they can be reached for the hearing and to be available for the court's call. If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any rescheduled hearing. For the duration of this order parties may appear by cell phone or land line.

Any documents which counsel wishes the court to consider during the hearing must be filed with the court, and a copy _received_ by opposing counsel or the pro se respondent at least _two business days_ prior to the hearing.

This order shall remain in effect until rescinded by the court.


March 18, 2020
Date

Irene Feldman
Assistant Chief Immigration Judge
Eloy, Arizona


43

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
ELOY, ARIZONA

STANDING ORDER OF THE ELOY IMMIGRATION COURT RELATING TO
ELECTRONICALLY FILED DOCUMENTS

IT IS HEREBY ORDERED that electronic filings with the Eloy Immigration Court made through the Eloy.Immigration.Court@usdoj.gov mailbox comply with the following:

- Unless the immigration judge has established a specific submission deadline in the case, electronic filings in Master Calendar and Bond hearings must be received by the court and a copy *received* by opposing counsel or the *pro se* respondent not less than *two business days* prior to the scheduled hearing. For example, if the hearing is scheduled on Friday, electronic filings must be received by the court and the parties not later than Wednesday. If the hearing is scheduled for Monday, electronic filings must be received by the court and the parties not later than Thursday. If the immigration judge established a filing deadline in the case, the party's submissions, including any electronic filings, must comply with that deadline.

- For filings in Individual hearings, submissions may not be filed electronically with the court more than 30 calendar days in advance of the scheduled hearing.

- Electronically filed submissions are limited to 50 pages total length. This order does not affect the ability of the parties to file submissions in excess of 50 pages with the court in person, by the United States Postal Service or by a commercial delivery service.

- Only attorneys or *pro se* respondents may electronically file documents. Filings from private attorneys must come from the e-mail address they have on file with EOIR (i.e., not from a paralegal, legal assistant, or other support staff filing on the attorney's behalf). Filings from the Department of Homeland Security must come from a ".gov" address.

Electronic filings which do not comply with this order *will be summarily rejected* by the court. This order shall remain in effect until rescinded by the court.

April 23, 2020

IRENE
FELDMAN
Digitally signed by IRENE
FELDMAN
Date: 2020.04.23 08:49:12
-07'00'

Irene C. Feldman
Assistant Chief Immigration Judge

AILA Doc. No. 20041532. (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
ELOY, ARIZONA

## STANDING ORDER OF THE ELOY IMMIGRATION COURT RELATING TO TELEPHONIC APPEARANCES FOR INDIVIDUAL HEARINGS

**IT IS HEREBY ORDERED** that attorneys and qualified representatives scheduled to appear in individual hearings before the Eloy Immigration Court may appear telephonically, without the need to file a motion for telephonic appearance.

It is counsel's responsibility to provide a telephone number to the court staff where they can be reached for the hearing, and to be available for the court's call. For the duration of this order parties may appear by cell phone or land line. If the court is unable to reach counsel by telephone for the hearing, or if counsel fails to make reasonable efforts to avoid background noise, counsel will thereafter be required to appear in-person at any rescheduled hearing. The parties are strongly encouraged to discuss any stipulations or agreements prior to the individual hearing.

This order supersedes and revokes the orders of the same subject issued by Immigration Judges Paul M. Habich dated April 2, 2020, Jennifer I. Gaz dated April 3, 2020, and Jose Luis Penalosa, Jr. dated April 6, 2020.

This order shall remain in effect until rescinded by the Court.

April 24, 2020

IRENE FELDMAN
Digitally signed by IRENE FELDMAN
Date: 2020.04.23 11:30:37 -07'00'

Irene C. Feldman
Assistant Chief Immigration Judge

23) Florence: All immigration judges (2 pages)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**FLORENCE, ARIZONA**

**SUPERSEDING STANDING ORDER OF THE FLORENCE IMMIGRATION COURT**
**RELATING TO TELEPHONIC APPEARANCES AT ALL HEARINGS AND**
**PAGE LIMITS ON ELECTRONICALLY FILED DOCUMENTS**

This order supersedes the standing orders entered on March 23, 2020, and April 6, 2020, and shall remain in effect until rescinded by the Court.

**IT IS HEREBY ORDERED** that both Department of Homeland Security counsels and respondents' attorneys or qualified representatives, who are scheduled to appear for master calendar, bond, and individual hearings before the Florence Immigration Court, may appear telephonically without the need to file a motion for telephonic appearance.

Attorneys who are planning to appear telephonically shall call the **Florence Immigration Court at 520-868-3341** in advance of the hearing and provide (1) the Alien number of the case(s), (2) name of judge, and (3) the best phone number where the attorney can be reached. The attorney shall remain available for the court's call. If the court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any promptly-rescheduled hearing.

The parties are encouraged to confer with one another prior to the hearing in order to reach stipulations as to facts and/or legal issues to facilitate the prompt disposition of cases. The parties are also encouraged to confer and reach agreement on the eligibility for bond and the amount of the bond. The parties should also submit affidavits or written statements of witnesses in lieu of the witnesses appearing in court.

Any documents which counsel requests the court to consider during the hearing must be timely filed with the court, and timely received by opposing counsel or the pro se respondent, at least two business days prior to the hearing. Any party appearing telephonically waives the right to object to admissibility of any document offered in court on the sole basis that they are unable to examine the document.

Due to the current COVID-19 health crisis, motions and pleadings pertaining to detained cases should be filed with as much notice as possible, but no later than two business days in advance of the scheduled hearing by submitting an email to the Court at the following email address: Florence.Immigration.Court@usdoj.gov.  The parties shall include the A-number in the subject line of the email with the name of the respondent, last-name first, and the type of pleading included in the electronic submission. [Example: Subject: A123-456-789- LAST NAME, First Name- Motion to Terminate.] All parties are on notice that they should not file or send notices to any other email addresses.

1

Instructions for filings can be found at https://www.justice.gov/eoir/filing-email. Attorneys are advised that such filings must comply with Paragraph 3.3(c) of the Immigration Court Practice Manual with the exception of the requirement for hole-punching and binding. Attorneys are also encouraged to be succinct and to file only such documents that are relevant and probative to the case. Attorneys are encouraged to limit the filing of duplicative country condition reports and to file only such reports that are necessary and reasonable. The subject line of any email filing must contain the nature of the filing, the alien registration number, the date of the next hearing or the call-up date, or any court-mandated deadline for the filing, and the initials of the immigration judge assigned to the case.

Effective immediately, the Florence Immigration Court is imposing a fifty (50) page limit on all electronic filings made through the *Florence.Immigration.Court@usdoj.gov* electronic mailbox. Supporting documents/evidentiary filings will be limited to fifty (50) pages for a particular case. If a party intends to file more than fifty (50) single-sided pages, the party must electronically file a copy of the Table of Contents and separately file the supporting documents/evidentiary filings with the original Table of Contents by the United States Postal Service, through an overnight delivery service, or in person at the court's filing window. Documents must be filed no later than the court-ordered deadline for filing the documents, or in such an absence, consistent with the deadlines set forth in the Immigration Court Practice Manual. (See Ch. 3.1(b).)

Electronic filings which do not comply with this order will be summarily rejected by the court.

June 4, 2020

AMY
HOOGASIAN
Digitally signed by AMY
HOOGASIAN
Date: 2020.06.04 18:59:35
-07'00'

Amy C. Hoogasian
Assistant Chief Immigration Judge
Florence, Arizona

2

47

24) Ft. Snelling (Bloomington): All immigration judges (3 orders, 4 pages)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**FORT SNELLING, MINNESOTA**

## STANDING ORDER OF THE FORT SNELLING COURT

**Standing Order: (March 26, 2020) – Telephonic Appearances and Requests to Continue before the Fort Snelling Immigration Court due to the COVID-19 Pandemic**

Effective immediately, any attorney or qualified representative, for any party may appear telephonically in cases before the Fort Snelling Immigration Court, without prior approval and without filing a motion in advance. Attorneys who would like to appear telephonically without prior approval, either with or without respondent(s), for a particular case before any judge at the Court, must provide notice to the Fort Snelling Immigration Court at *FortSnelling.Immigration.Court@USDOJ.GOV*, in advance of the hearing.

Any necessary witnesses will be allowed to appear by telephone with advanced notice to the email address above.

Any party that is displaying symptoms consistent with COVID-19 exposure, has been diagnosed with COVID-19, or has had contact with anyone who has been diagnosed with COVID-19, must notify the Court immediately by telephone or the email address listed above, and will not be allowed to appear in Court.

Motions to Continue due to COVID-19 concerns should be filed with as much notice as possible, but may, on an emergency basis, be made to the Court by using the email address listed above.

Attorneys must provide the Court with the A-number, date and time of the scheduled hearing, and the phone number at which Counsel can be reached for the hearing. Private attorneys must submit their request from an email address that is on file with EOIR. DHS filings must be sent from a government email address.

Ryan R. Wood
Assistant Chief Immigration Judge

*updates: www.justice.gov/eoir*                    *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
FORT SNELLING, MINNESOTA

STANDING ORDER OF THE FORT SNELLING COURT

Second Standing Order: (April 7, 2020) – Video Teleconferencing
due to the COVID-19 Pandemic

Effective immediately, Video Teleconferencing (VTC) will be utilized for all
detained hearings, unless Respondent's appearance is waived in accordance with 8
C.F.R. § 1003.25.

Parties are strongly encouraged to meet remotely, confer, reach stipulations, and to
limit hearings to contested matters.  Further, parties should submit affidavits or
written statements in lieu of witnesses appearing.

Filing deadlines for detained matters remain in effect. Same-day filings are strongly
discouraged.  Subject to the discretion of the Immigration Judge, with good cause,
same-day filings will only be allowed at the front window or sent via email to
*FortSnelling.Immigration.Court@USDOJ.GOV*.

Starting April 9, 2020, all detained hearings will take place in Courtrooms 2 and 5.
Parties may appear in person or telephonically with prior notice to the Court in
accordance with the Standing Order dated March 26, 2020. Judges will appear via
VTC from a co-located, closed courtroom.  All hearing notices and written orders
will be served by mail.

The public galleries will be limited to eight numbered seats. See 8 C.F.R. §
1003.27(a).  All attorneys and family members must check-in at the front window.

This order remains in effect while published on the EOIR Operational Status
website:   https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic

Ryan R. Wood
Assistant Chief Immigration Judge

updates: www.justice.gov/eoir                    Version released on: June 12, 2020
AILA Doc. No. 20041532. (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
FORT SNELLING, MINNESOTA

STANDING ORDER OF THE FORT SNELLING COURT

Third Standing Order: (April 22, 2020) – Temporal and Page Limitations for
Electronic Filings

Effective immediately, all documents submitted to the temporary court email account at *FortSnelling.Immigration.Court@USDOJ.GOV*, must contain a subject heading with the nature of the filing, the alien registration number, the date of the next hearing or any court-mandated deadline for the filing, and the initials of the immigration judge assigned to the case. Example: "Motion to Continue - A012-345-678 - 06/30/2020 - RRW"

For parties using the temporary court email account to electronically file, supporting documentation/evidentiary filings are limited to fifty (50) pages in a particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the Immigration Court. Electronic submissions of U.S. Department of State Human Rights Reports are strongly disfavored. Parties may request, or the Judge may take, administrative notice of such reports *sua sponte*. The date of such reports shall be specified on the record.

The Court will reject documents filed via the temporary court e-mail account if filed more than ninety (90) days before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than ninety (90) days in advance may still do so; however, they must be sent via the U.S. Postal Service or an overnight delivery service, not through the temporary e-mail box. Documents rejected for not complying with the ninety (90) day temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the ninety (90) day temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, ch. 3.1(b). **Note: Applications for asylum are exempt from the ninety (90) day**

Page 1 of 2

*updates: www.justice.gov/eoir*                          *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

temporal limit on filings through email and will be considered filed on the date
of receipt for purposes of the one-year filing deadline.

This order remains in effect while published on the EOIR Operational Status
website:   https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-
pandemic

Ryan R. Wood
Assistant Chief Immigration Judge

Page 2 of 2

51

25) Guaynabo (San Juan): All immigration judges

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
SAN JUAN, PUERTO RICO

STANDING ORDER OF THE SAN JUAN IMMIGRATION COURT RELATING TO TELEPHONIC APPEARANCES OF
COUNSEL AND PERMITTED ATTENDEES AT DETAINED MASTER CALENDAR AND INDIVIDUAL HEARINGS

IT IS HEREBY ORDERED that effective immediately and until at least May 29, 2020:

1) Any attorney for any party may appear telephonically in cases before the San Juan Immigration Court without prior approval and without filing a motion in advance. Attorneys who would like to appear telephonically for a specific case should inform the San Juan Immigration Court's main desk in advance of the hearing by calling 787-749-4386, and providing their client's Alien number, the name of the judge, the date of the hearing, and the best phone number at which the Court may contact the attorney. Attorneys may also utilize the temporary email account for the San Juan Immigration Court, as set forth at: https://www.justice.gov/eoir/filing-email.

2) If the Court is unable to reach counsel by telephone for the hearing, thereafter, the Court will require counsel to appear in person at any rescheduled hearing.

3) Any attorney who wishes to appear telephonically does so with the understanding that any paper or electronic filings to be considered by the Court must be in the official record of proceeding in accordance with any deadlines set by the Court or, if none, in accordance with the filing deadlines set forth in the Immigration Court Practice Manual (ICPM). No additional filings will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing.

4) Any attorney appearing telephonically waives the right to object to admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

5) In-court proceedings shall be limited to attorneys, parties, security officers, and any other necessary participants, which will be determined by the presiding judge.

6) Finally, during this time period, written requests to continue cases due to COVID-19 concerns should be filed with as much notice as possible. Please note: Any party or witness who is displaying symptoms consistent with COVID-19, has been diagnosed with COVID-19, or has had contact with anyone diagnosed with COVID-19, must notify the Court immediately by telephone and will not be allowed to personally appear in Court.

7) This Order supersedes the Order issued on March 25, 2020.

James K. Grim  Digitally signed by James K. Grim
                          Date: 2020.05.06 15:50:14 -04'00'

James K. Grim
Assistant Chief Immigration Judge
May 6, 2020

AILA Doc. No. 20041532. (Posted 6/15/20)

26) Harlingen: All immigration judges (3 pages)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**HARLINGEN IMMIGRATION COURT**
**2009 W. JEFFERSON AVE. STE 300**
**HARLINGEN, TEXAS 78550**

**STANDING ORDER OF THE HARLINGEN IMMIGRATION COURT**

Due to the COVID-19 Pandemic, the Harlingen Immigration Court is implementing the following safety precautions until further notice:

1. In-person appearances in the courtroom are limited to the following individuals: Respondent, Respondent's counsel, DHS counsel, Court interpreter, essential EOIR staff and security personnel. See ICPM § 4.9(a)(ii) (citing 8 C.F.R. § 1003.27(b)).

2. Video teleconferencing ("VTC") will be utilized to the greatest extent possible, and any necessary witnesses will be allowed to appear by telephone. See ICPM § 4.7(b).

3. Limited exceptions to the above orders may be accommodated on a case-by-case basis and must be requested by written motion prior to the day of the hearing.

4. Any individual that is (a) displaying symptoms consistent with COVID-19 exposure; (b) has been diagnosed with COVID-19; (c) is pending results of a COVID-19 diagnostic test; (d) has, within the past 14 days, had contact with anyone who has been diagnosed with COVID-19; (e) or has been asked to self-quarantine by local health authorities or a medical provider, shall notify the Court immediately by telephone or the e-mail address provided below and will not be allowed to appear in Court.

5. Parties who would like to appear telephonically for a particular case should provide notice to the Court at the email address provided below, in advance of the hearing and in accordance with the attached instructions. Parties should provide the best phone number at which to be reached.

The Executive Office for Immigration Review has established a temporary email account to facilitate electronic filings for all parties during the COVID-19 Pandemic. The email address for the Harlingen Immigration Court is Harlingen.Immigration.Court@usdoj.gov The instructions for using this email account are incorporated in this Standing Order and are attached. Private attorneys must submit their request from an e-mail address that is on file with EOIR. DHS filings must be sent from a government email address. Do not send any Court filings or correspondence directly to the government e-mail accounts of Court staff, unless specifically directed to do so, as these filings and correspondence may not be accepted by the Court. This Standing Order supersedes the previous Standing Order, same subject, dated March 23, 2020.

Effective date: April 1, 2020

**ERIC**
**DILLOW**

Digitally signed by ERIC
DILLOW
Date: 2020.04.01
12:49:31 -05'00'

Eric L. Dillow
Assistant Chief Immigration Judge

53

AILA Doc. No. 20041532. (Posted 6/15/20)

The following instructions are incorporated in the Harlingen Immigration Court COVID-19 Standing Order:

The Executive Office for Immigration Review (EOIR) has established temporary email accounts for immigration courts nationwide to facilitate electronic filing for all parties while the rollout of the EOIR Court and Appeals System (ECAS) is delayed due to COVID-19. Those who have already opted-in to ECAS should continue to use ECAS where it is available. Others who wish to utilize electronic filing may file through email as instructed below. Please note EOIR cannot provide technical support or confirm receipt of filings at this time. If you have questions, please contact the EOIR Office of Policy, Communications and Legislative Affairs Division at PAO.EOIR@usdoj.gov.

**All filers:**

- Failure to follow the guidelines listed below may result in the rejection of your submitted document filing. If your submission is rejected, you will be notified by email with a request to correct the issue and refile the document.
- The subject of your email must contain the nature of the filing, the alien registration number, the date of the next hearing, and the initials of the immigration judge assigned to the case.

   **Example:** A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date on 01/02/2021 would input, "Motion to Continue - 012345678 - 01/02/2021" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 01/02/2021 - WAJ"

- While multiple documents for the same case may be submitted in one email, do not combine separate submissions into one file. Each document type must be submitted separately and include the type of filing in the file name.
- You remain responsible for service on the opposing party.
- Submit certificate of service with every filing in the same email.
- All electronically-filed documents must meet the requirements of filings outlined in the Immigration Court Practice Manual. Further, an electronically filed document cannot be larger than 25 megabytes (MB). For submissions that would be larger than 25 MB, please follow the below steps:
    o split the document into multiple files so no portion is larger than 25 MB;
    o name each document so that it is clear they should be matched with the other portions. Example: 5678_1234ABC_Brief_Part1; 5678_1234ABC_Brief_Part2
- Files must be a minimum resolution of 300dpi.
- File formats accepted are PDF and JPEG. We cannot accept other file formats.
- Do not include links to non-EOIR websites in your submissions.

54

AILA Doc. No. 20041532. (Posted 6/15/20)

- Filings with more than one page must include page numbers.
- If scanning and attaching a document, pages must appear right-side-up.
- The filing party must maintain the originals of any documents that are electronically filed and must make the originals available for production, if so ordered, or for inspection upon request by a party.

**Attorneys and fully-accredited representatives**

- If you have opted-in to ECAS, do not use email in lieu of filing through ECAS.
- Name your file with the last four digits of your client's alien registration number, your EOIR ID, and the type of filing.

**Example**: Attorney Johnson, EOIRID 1234ABC, with client 012345678, filing an asylum application would name the document: 5678_1234ABC_AsylumApplication

**Respondents**

- Name your file with the last four digits of your alien registration number, your last name, and the type of filing.

**Example**: Jane Smith, alien registration number 876543210, filing a motion to expedite, would name the document: 3210_Smith_MotionToExpedite

**Example:** Submitting an asylum application and country conditions evidence, attach the application with the file name 5678_1234ABC_AsylumApplication in one file and the
country conditions with the file name 5678_1234ABC_CountryConditions.

55

AILA Doc. No. 20041532. (Posted 6/15/20)

27) Hartford: All immigration judges (3 pages)

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### UNITED STATES IMMIGRATION COURT
### HARTFORD, CONNECTICUT

### STANDING ORDER: TELEPHONIC APPEARANCES, REQUESTS TO CONTINUE, & ELECTRONIC FILINGS DUE TO COVID-19 CONCERNS IN CASES BEFORE THE HARTFORD IMMIGRATION COURT

Effective immediately until further order of this court:

1.  Any attorney or qualified representative, for any party may appear telephonically in cases before the Hartford Immigration Court, without prior approval and without filing a motion in advance. Attorneys or qualified representatives who would like to appear telephonically, either with or without respondent(s), for a particular case should contact the Hartford Immigration Court, at 860-240-3881, in advance of the hearing and should provide: the A-number, the time and date of the scheduled hearing, and the best phone number to be reached for the hearing.

2.  Motions to continue cases due to COVID-19 concerns should be filed with as much notice as possible, but may, on an emergency basis, be made to the Hartford Immigration Court, by e-mail at Hartford.Immigration.Court@USDOJ.GOV while copying opposing counsel.

3.  Three-Month Temporal Limit on Filings through Email

    The Hartford Immigration Court is imposing a three-month temporal filing limit on documents filed through email. Effective immediately, the court will reject documents filed via the temporary e-mail boxes if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the court via the U.S. Postal Service or an overnight delivery service, not through the temporary e-mail box.

HEARING EXAMPLE: If documents are filed via the temporary e-filing mailbox on April 20, 2020, for a hearing scheduled on or before July 19, 2020, they will be accepted provided they conform to the ICPM and the e-mail filing instructions. However, if documents are filed on April 20, 2020, for a hearing scheduled on or after July 20, 2020, they will be rejected.

CALL-UP DATE EXAMPLE: If documents are filed via the temporary e-filing mailbox on April 20, 2020, for a call-up date scheduled on or before July 19, 2020, they will be accepted provided they conform to the ICPM and the e-mail filing instructions. However, if documents are filed on April 20, 2020, for a call-up date scheduled on or after July 20, 2020, they will be rejected.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, Ch. 3.1(b).

NOTE: Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.

EMAIL:

The subject of your email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandate deadline for the filing, and the initials of the immigration judge assigned to the case.

EXAMPLE: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would input, "Motion to Continue - 012345678 - 06/30/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 - WAJ"

AILA Doc. No. 20041532. (Posted 6/15/20)

EXAMPLE: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a court-mandated filing deadline ("call-up date") of 06/25/2020 would input, "Application for Cancellation of Removal - 012345678 – 06/25/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of Removal - 012345678 - 06/25/2020 – WAJ."

PAGE LIMITS

Effective immediately, for parties using a temporary email account to electronically file, supporting documentation/evidentiary filings are limited to fifty (50) pages in a particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the immigration court.

This standing order supersedes the standing order issued on March 30, 2020.

JOSE SANCHEZ  Digitally signed by JOSE SANCHEZ
Date: 2020.04.20 14:51:33 -04'00'

Jose A. Sanchez
U. S. Assistant Chief Immigration Judge
Hartford Immigration Court

58

AILA Doc. No. 20041532. (Posted 6/15/20)

28) Houston: All immigration judges (2 orders, 4 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
HOUSTON-SMITH ST. IMMIGRATION COURT
1801 SMITH ST., 9th FLOOR
HOUSTON, TEXAS 77002

STANDING ORDER NO. 01
(PROTOCOLS GOVERNING PROCEEDINGS DURING THE COVID-19 PANDEMIC)

Given the severity of the current COVID-19 pandemic, and in consideration of all attendant proclamations and restrictions, the Houston-Smith St. Immigration Court and Annex will implement the precautionary measures listed below.

Effective immediately and until further notice, it is therefore ORDERED as follows:

1.  The Court may allow anyone involved in any hearing or proceeding of any kind to participate remotely, such as by teleconferencing or video teleconferencing, as practicable.

2.  Attorneys and accredited representatives may elect to make a remote appearance by telephone without filing a motion in advance of a scheduled hearing by calling the Court's main desk at 713-718-3870 at least one business day in advance of the scheduled hearing and providing the following information:

    a.  The client's alien registration number;
    b.  The name of the presiding judge;
    c.  The date of the hearing; and,
    d.  The number at which the attorney or accredited representative can be contacted.

3.  To ensure the quality of the record, anyone appearing by telephone shall be in a quiet, private location. The call may never be placed on hold. The use of car phones, speakerphones or phones in public places is prohibited.

4.  If an attorney or accredited representative schedules a telephonic appearance and fails to respond when the matter is called, the Court may treat the failure to respond as a failure to appear by the attorney or accredited representative. Scheduling simultaneous appearances in multiple locations does not excuse a failure to appear.

5.  Attorneys and accredited representatives who appear by telephone do so with the understanding that paper or electronic filings must be filed in compliance with all deadlines set by the Court or, if none, in accordance with the filing deadlines set forth in the Immigration Court Practice Manual.

6.  No filings will be accepted in court on the date of a scheduled hearing unless filed by a *pro se* respondent or applicant. The decision of the presiding judge will be based on documents in the record at the close of the hearing.

1

7. Filing by mail and electronic means is strongly encouraged. To reduce the threat of contracting or passing the virus, the Court is temporarily accepting motions, pleadings, applications, briefs, notices, and other documents sent by e-mail to Houston.Immigration.Court@usdoj.gov. The filing instructions are found at: https://www.justice.gov/eoir/filing-email.

8. The presiding judge reserves the right to halt any remote appearance in progress, to bar any telephone appearances in any case and to order the attorney, accredited representative, respondent, applicant or witness to personally appear.

9. No attorney, accredited representative, respondent, applicant, witness, or member of the public may attend a hearing in person if they have tested positive for COVID-19 in the 14 days prior to the scheduled hearing, have had contact with anyone who has tested positive for COVID-19 in the 14 days prior to the scheduled hearing, have COVID-19 symptoms (fever, cough, shortness of breath), or are under an order to self-quarantine. Parties and counsel shall immediately inform the Court in writing or by calling the main desk at 713-718-3870 if they fall into any of the above-listed categories.

10. Nothing in this Order affects the authority of the presiding judge to exclude persons on a case-by-case basis, including persons exhibiting signs or symptoms of a potentially communicable condition.

11. In-person appearances for scheduled hearings are limited to attorneys, accredited representatives, respondents, applicants, witnesses, Court interpreters, security personnel, and other individuals determined to be essential by the presiding judge.

12. To the extent not already authorized, in all case types, whenever a judge is required to sign an order, judgment, or notification, the judge may electronically sign with a digital signature.

**SIGNED, ENTERED, AND ORDERED at Houston, Texas, this 1st day of April, 2020.**



LISA LUIS   Digitally signed by LISA LUIS
Date: 2020.04.01 13:15:35
-05'00'

Assistant Chief Immigration Judge

2

AILA Doc. No. 20041532. (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
HOUSTON-SMITH ST. IMMIGRATION COURT
1801 SMITH ST., 9th FLOOR
HOUSTON, TEXAS 77002

STANDING ORDER NO. 02
(RELATING TO ELECTRONIC FILINGS)

Effective immediately and until further notice, the Houston-Smith St. Immigration Court and Annex will impose certain limits on court filings submitted through the Court's temporary email account referenced in Standing Order No. 01.  This Order sets out the specific limitations and instructions.

IT IS ORDERED that:

1.   Three-Month Temporal Limit on Filings Through Email

A three-month temporal limit will apply to all documents filed through email. The Court will reject documents filed via the temporary e-mail box if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the Court via the U.S. Postal Service or overnight delivery service, not through the temporary e-mail box.

HEARING EXAMPLE: If documents are filed via the temporary e-filing mailbox on April 20, 2020, for a hearing scheduled on or before July 19, 2020, they will be accepted, provided they conform with the Immigration Court Practice Manual (ICPM) and the e-mail filing instructions. However, if documents are filed on April 20, 2020, for a hearing scheduled on or after July 20, 2020, they will be rejected.

CALL-UP DATE EXAMPLE: If documents are filed via the temporary e-filing mailbox on April 20, 2020, for a call-up date scheduled on or before July 19, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on April 20, 2020, for a call-up date scheduled on or after July 20, 2020, they will be rejected.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, Ch. 3.1(b).

**Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

1

AILA Doc. No. 20041532. (Posted 6/15/20)

### 2. Email Format

The subject of each email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandated deadline for the filing, and the initials of the immigration judge assigned to the case.

**EXAMPLE**: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would enter, "Motion to Continue - 012345678 - 06/30/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 – WAJ."

**EXAMPLE**: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a court-mandated filing deadline ("call-up date") of 06/25/2020 would enter, "Application for Cancellation of Removal - 012345678 – 06/25/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of Removal - 012345678 - 06/25/2020 – WAJ."

### 3. Page Limit

For parties using the Court's temporary email account to file electronically, supporting documentation/evidentiary filings are limited to fifty (50) pages in a particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the Court. Hard copy submissions will be deemed filed on the date of receipt by the Court, as specified in the ICPM, Ch. 3.1(a)(iii).

This Order supersedes the general electronic filing instructions presently posted online.

**SIGNED, ENTERED, AND ORDERED at Houston, Texas, this 24th day of April, 2020.**

LISA LUIS
Digitally signed by LISA LUIS
Date: 2020.04.24 13:21:54 -05'00'

Assistant Chief Immigration Judge

2

62

29) Houston – S. Gessner Rd: All immigration judges (3 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
HOUSTON-S. GESSNER ROAD IMMIGRATION COURT
8701 S. GESSNER ROAD, 10th FLOOR
HOUSTON, TEXAS 77074

STANDING ORDER NO. 01
(PROTOCOLS GOVERNING PROCEEDINGS DURING THE COVID-19 PANDEMIC)

Given the severity of the current COVID-19 pandemic, the Houston-S. Gessner Rd. Immigration Court will implement the precautionary measures listed below.

Effective immediately and until further notice, it is therefore ORDERED as follows:

1. The Court may allow anyone involved in any hearing or proceeding of any kind to participate remotely, such as by teleconferencing or video teleconferencing, as practicable.

2. Attorneys and accredited representatives may elect to make a remote appearance by telephone without filing a motion in advance of a scheduled hearing by calling the Court's main desk at 713-995-3900 at least one business day in advance of the scheduled hearing and providing the following information:

   a. The client's alien registration number;
   b. The name of the presiding judge;
   c. The date of the hearing; and,
   d. The number at which the attorney or accredited representative can be contacted.

3. To ensure the quality of the record, anyone appearing by telephone shall be in a quiet, private location. The call may never be placed on hold. The use of car phones, speakerphones or phones in public places is prohibited.

4. If an attorney or accredited representative schedules a telephonic appearance and fails to respond when the matter is called, the Court may treat the failure to respond as a failure to appear by the attorney or accredited representative. Scheduling simultaneous appearances in multiple locations does not excuse a failure to appear.

5. Attorneys and accredited representatives who appear by telephone do so with the understanding that paper or electronic filings must be filed in compliance with all deadlines set by the Court or, if none, in accordance with the filing deadlines set forth in the Immigration Court Practice Manual (ICPM).

6. No filings will be accepted in court on the date of a scheduled hearing unless filed by a *pro se* respondent or applicant. The decision of the presiding judge will be based on documents in the record at the close of the hearing.

1

7. Filing by mail and electronic means is strongly encouraged. To reduce the threat of contracting or passing the virus, the Court is temporarily accepting motions, pleadings, applications, briefs, notices, and other documents sent by e-mail to HoustonGessner.Immigration.Court@usdoj.gov.

8. Three-Month Temporal Limit on Filings Through Email: A three-month temporal limit will apply to all documents filed through email. The Court will reject documents filed via the temporary e-mail box if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the Court via the U.S. Postal Service or overnight delivery service, not through the temporary e-mail box.

   Hearing Example: If documents are filed via the temporary e-filing mailbox on April 20, 2020, for a hearing scheduled on or before July 19, 2020, they will be accepted, provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on April 20, 2020, for a hearing scheduled on or after July 20, 2020, they will be rejected.

   Call-Up Date Example: If documents are filed via the temporary e-filing mailbox on April 20, 2020, for a call-up date scheduled on or before July 19, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on April 20, 2020, for a call-up date scheduled on or after July 20, 2020, they will be rejected.

9. Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, Ch. 3.1(b).

10. **Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

11. Email Format: The subject of each email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandated deadline for the filing, and the initials of the immigration judge assigned to the case.

   Example: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would enter, "Motion to Continue - 012345678 - 06/30/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 – WAJ."

   Example: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a court-mandated

2

64

AILA Doc. No. 20041532. (Posted 6/15/20)

filing deadline ("call-up date") of 06/25/2020 would enter, "Application for Cancellation of Removal - 012345678 – 06/25/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of Removal - 012345678 - 06/25/2020 – WAJ."

12. Page Limit: For parties using the Court's temporary email account to file electronically, supporting documentation/evidentiary filings are limited to fifty (50) pages in a particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the Court. Hard copy submissions will be deemed filed on the date of receipt by the Court, as specified in the ICPM, Ch. 3.1(a)(iii).

13. The presiding judge reserves the right to halt any remote appearance in progress, to bar any telephone appearances in any case and to order the attorney, accredited representative, respondent, applicant or witness to personally appear.

14. No attorney, accredited representative, respondent, applicant, witness, or member of the public may attend a hearing in person if they have tested positive for COVID-19 in the 14 days prior to the scheduled hearing, have had contact with anyone who has tested positive for COVID-19 in the 14 days prior to the scheduled hearing, have COVID-19 symptoms (fever, cough, shortness of breath), or are under an order to self-quarantine. Parties and counsel shall immediately inform the Court in writing or by calling the main desk at 713-995-3900 if they fall into any of the above-listed categories.

15. Nothing in this Order affects the authority of the presiding judge to exclude persons on a case-by-case basis, including persons exhibiting signs or symptoms of a potentially communicable condition.

16. In-person appearances for scheduled hearings are limited to attorneys, accredited representatives, respondents, applicants, witnesses, Court interpreters, security personnel, and other individuals determined to be essential by the presiding judge.

17. To the extent not already authorized, in all case types, whenever a judge is required to sign an order, judgment, or notification, the judge may electronically sign with a digital signature.

**SIGNED, ENTERED, AND ORDERED at Houston, Texas, this 28th day of May, 2020.**



LISA LUIS  Digitally signed by LISA LUIS
Date: 2020.05.28 09:48:53
-05'00'

Assistant Chief Immigration Judge

3

30) Imperial: All immigration judges

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**UNITED STATES IMMIGRATION COURT**
**IMPERIAL, CALIFORNIA**

**STANDING ORDER: TELEPHONIC APPEARANCES IN CASES BEFORE THE**
**IMPERIAL IMMIGRATION COURT DUE TO COVID-19**

Effective immediately and until rescinded by the Court, any attorney or qualified representative for any party scheduled for master calendar, bonds, merits, or reasonable/credible fear hearings before the Imperial Immigration Court may appear telephonically in cases before the Imperial Immigration Court without prior approval and without filing a motion in advance.

Attorneys who wish to appear telephonically must contact court staff in advance of the hearing and provide the best phone number at which to be reached. If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any rescheduled hearing.

The Parties are encouraged to confer and reach stipulations as to fact/legal issues to facilitate the prompt disposition of cases. This is particularly important for bond determination hearings and the parties are encouraged to confer and reach agreement on the eligibility and the amount of bond. Further, parties should submit affidavits or written statements in lieu of witnesses appearing.

Any documents to be considered by the Court during the hearing must be filed with the Court, and a copy received by opposing counsel or *pro se* respondent, at least two business days prior to the hearing. The Imperial Immigration Court accepts electronic filing of documents in cases before it, and all parties are strongly encouraged to file any and all documents electronically. No additional filing will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing. Any party appearing telephonically waives the right to object to the admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

So ordered.

April 2, 2020
Date

_____
Rico J. Bartolomei
Assistant Chief Immigration Judge
Imperial Immigration Court

66

AILA Doc. No. 20041532. (Posted 6/15/20)

31) Kansas City: All immigration judges (2 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
KANSAS CITY IMMIGRATION COURT
KANSAS CITY, MISSOURI

REVISED STANDING ORDER OF THE KANSAS CITY IMMIGRATION COURT

Effective immediately, the Kansas City Immigration Court is implementing the below safety
precautions and limitations with regards to all hearings.

1. In-person appearances are limited to the following individuals: Respondent, Respondent's
   counsel, DHS counsel, court interpreter, essential EOIR staff and security personnel. *See*
   ICPM § 4.9(a)(ii) (citing 8 C.F.R. § 1003.27(b)).

2. Any attorney for a respondent may appear telephonically without prior approval and
   without filing a motion in advance. Attorneys should; however, contact the Kansas City
   Immigration Court at 816-581-5000, or through the temporary court email account at
   KansasCity.Immigration.Court@usdoj.gov, in advance of the hearing, by providing the A-
   number, time and date of the scheduled hearing, and the phone number at which counsel
   can be reached for the hearing.

3. Video conferencing will be utilized to the greatest extent possible, and any necessary
   witnesses will be allowed to appear by telephone. *See* ICPM § 4.7(b).

4. Limited exceptions may be accommodated to the above orders on a case-by-case basis and
   must be requested **prior** to the day of the hearing by written motion.

5. Any party that is displaying symptoms consistent with COVID-19 exposure, has been
   diagnosed with COVID-19, or has had contact with anyone who has been diagnosed with
   COVID-19, must notify the Court immediately by telephone or email, and will not be
   allowed to appear in Court.

6. All documents submitted to the temporary court email account must contain a subject
   heading with the nature of the filing, the alien registration number, the date of the next
   hearing or any court-mandated deadline for the filing, and the initials of the immigration
   judge assigned to the case. Example: "Motion to Continue - A012-345-678 - 06/30/2020 -
   JWH".

7. For parties using the temporary court email account to electronically file, supporting
   documentation/evidentiary filings are limited to seventy-five (75) pages in a particular
   **case**. If a party intends to file more than seventy-five (75) pages, the party must
   electronically file the Table of Contents and separately submit the supporting
   documentation/evidentiary filings with the original Table of Contents by using the U.S.
   mail or an overnight delivery service no later than the date set for filing the documents with
   the Immigration Court. Electronic submissions of U.S. Department of State Human Rights

67

AILA Doc. No. 20041532. (Posted 6/15/20)

Reports remain strongly disfavored because the Court routinely takes administrative notice of them. Parties may request, or the Judge may take, administrative notice of such reports *sua sponte*. The date of such reports shall be specified on the record.

8.   The Court will reject documents filed via the temporary court e-mail account if filed more than ninety (90) days before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than ninety (90) days in advance may still do so; however, they must be sent via the U.S. Postal Service or an overnight delivery service, not through the temporary e-mail box. Documents rejected for not complying with the ninety (90) temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the ninety (90) temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, ch. 3.1(b). **Note: Applications for asylum are exempt from the ninety (90) temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

9.   This Revised Standing Order supersedes the prior Standing Order, dated March 25, 2020, and remains in effect while published on the EOIR Operational Status website: https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic.

Date: April 24, 2020

RYAN WOOD   Digitally signed by RYAN WOOD
Date 2020.04.24 16:41:01 -05'00'

Ryan R. Wood
Assistant Chief Immigration Judge

68

AILA Doc. No. 20041532. (Posted 6/15/20)

32) Las Vegas: All immigration judges

| | |
|---|---|
| 1 | **UNITED STATES DEPARTMENT OF JUSTICE** |
| 2 | **EXECUTIVE OFFICE FOR IMMIGRATION REVIEW** |
| 3 | **UNITED STATES IMMIGRATION COURT** |
| 4 | **LAS VEGAS, NEVADA** |
| 5 | |
| 6 | April 22, 2020 |
| 7 | |
| 8 | STANDING ORDER OF THE LAS VEGAS IMMIGRATION COURT REGARDING |
| 9 | TELEPHONIC APPEARANCES OF COUNSEL AND PERMITTED ATTENDEES AT |
| 10 | DETAINED MASTER CALENDAR AND INDIVIDUAL HEARINGS |

1     **UNITED STATES DEPARTMENT OF JUSTICE**
2     **EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
3     **UNITED STATES IMMIGRATION COURT**
4     **LAS VEGAS, NEVADA**
5
6     April 22, 2020
7
8     STANDING ORDER OF THE LAS VEGAS IMMIGRATION COURT REGARDING
9     TELEPHONIC APPEARANCES OF COUNSEL AND PERMITTED ATTENDEES AT
10    DETAINED MASTER CALENDAR AND INDIVIDUAL HEARINGS
11
12    IT IS ORDERED, effective immediately and continuing through June 30, 2020:
13
14    1)     Counsel for any party may appear telephonically in cases before the Las Vegas
15    Immigration Court.  Counsel who want to appear telephonically for a particular case must inform
16    the Las Vegas Immigration Court, main desk, in advance of the hearing by either emailing the
17    court at : LasVegas.Immigration.Court@USDOJ.GOV or by calling the Court at 1-702-458-
18    0227.  You must provide the Alien number, the name of the judge and the best phone number at
19    which the attorney shall answer.  During this time of national emergency, motions to continue
20    cases due to COVID-19 concerns must be filed with as much notice as possible.  On an
21    emergency basis motions may be filed by email at the address above or by telephone facsimile
22    (FAX), to 1-702-366-0129, while serving opposing counsel.
23
24    2)     Any individual who wishes to appear telephonically does so with the understanding
25    that any paper or electronic filings to be considered by the Court must be in the official record of
26    proceeding in accordance with any deadlines set by the Court or, if none, in accordance with  the
27    filing deadlines set forth in the Immigration Court Practice Manual.  No additional filings will be
28    accepted at the hearing if counsel does not appear in person, and the decision of the Court will be
29    based on the documents in the record at the close of the hearing.
30
31    3)     Any party appearing telephonically waives the right to object to admissibility of any
32    document offered in Court on the sole basis that they are unable to examine the document.
33
34    4)     If the Court is unable to reach counsel by telephone for the hearing, counsel will
35    thereafter be required to appear in-person at any rescheduled hearing.
36
37    5)     In-court proceedings shall be limited to counsel, parties, a witness, security officers,
38    and any other necessary people, which will be determined by the presiding judge.
39
40         This order supersedes the previous Standing Order on telephonic appearance of the Las
41    Vegas Immigration Court issued as of 4/2/2020.
42                                                    DANIEL      Digitally signed by DANIEL
                                                                  DAUGHERTY
43                                                    DAUGHERTY   Date: 2020.04.22 10:25:25
                                                                  -07'00'
44                                                    Daniel J. Daugherty
45                                                    Assistant Chief Immigration Judge
46                                                    Las Vegas and Salt Lake City

69

**AILA Doc. No. 20041532. (Posted 6/15/20)**

33) LaSalle: All immigration judges

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
LASALLE IMMIGRATION COURT
JENA, LOUISIANA

STANDING ORDER OF THE LASALLE IMMIGRATION COURT RELATING TO
TELEPHONIC APPEARANCES AT IMMIGRATION COURT HEARINGS

IT IS HEREBY ORDERED that, through May 29, 2020, parties scheduled to appear for master calendar or bond hearings before the LaSalle Immigration Court may appear telephonically, without the need to file a motion for telephonic appearance. Telephonic Appearances for individual merits hearings still need to be requested (in the form of a written motion) and will decided on a case-by-cases basis. This Order is subject to the following caveats:

1)  Any individual who wishes to appear telephonically does so with the understanding that any paper or electronic filings to be considered by the Court must be in the official record of proceeding at the time the hearing is scheduled to be held. No additional filings will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing.

2)  Any party appearing telephonically waives the right to object to admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

3)  The parties will provide to the Court with a valid contact number for the telephonic appearance at least 2 business days prior to the hearing.

4)  If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any rescheduled hearing.

Date: May 6, 2020

GRADY CROOKS Digitally signed by GRADY
CROOKS
Date: 2020.05.06 11:32:21 -05'00'

Grady A. Crooks
Assistant Chief Immigration Judge
LaSalle Immigration Court
Jena, Louisiana

AILA Doc. No. 20041532. (Posted 6/15/20)

34) Los Angeles – N. Los Angeles St.: All immigration judges (3 pages)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**UNITED STATES IMMIGRATION COURT**
**LOS ANGELES (NORTH), CALIFORNIA**

**STANDING ORDER: ESTABLISHING SAFE PROCEDURES**
**DURING THE COVID-19 NATIONAL EMERGENCY**

This Order establishes filing requirements and courtroom procedures pursuant to Immigration and Nationality Act (INA) §240(b)(l)-(2) and 8 C.F.R. § 1003.10(b), 1003.21(b), 1003.31(c), 1003.40.

This Order is effective immediately and shall remain effective until it is rescinded by a superseding order of the Los Angeles (North) Immigration Court.

**IT IS HEREBY ORDERED** that, effective immediately and continuing until further order of the Court:

I.   Appearances Before the Court

     A.   No attorney, interpreter, witness, or member of the public who is subject to the restrictions articulated in Policy Memorandum 20-10, Immigration Court Practices During the Declared National Emergency Concerning the COVID-19 Outbreak (Mar. 19, 2020) (as amended), is subject to an isolation or quarantine order from a government health official or a medical provider, or has had physical contact with anyone within the past fourteen (14) days who was diagnosed with COVID-19 may appear in the Los Angeles (North) Immigration Court because the public interest requires that removal proceedings be closed to individuals likely to spread COVID-19. If an individual fails to comply with these reasonable limitations, the Court shall comply with guidance from federal, state, and county health authorities and continue the hearing.

     B.   Any attorney or qualified representative for any party may appear telephonically in cases before the Los Angeles (North) Immigration Court, without prior approval and without filing a motion in advance. Attorneys or qualified representatives who would like to appear telephonically, either with or without respondent(s), for a particular case should contact the Los Angeles (North) Immigration Court, at 213-576-4701 at least two (2) days in advance of the hearing and should provide: the A-number, the time and date of the scheduled hearing, and the best phone number to be reached for the hearing.

     C.   Any individual who wishes to appear telephonically does so with the understanding that any paper or electronic filings to be considered by the Court must be in the official record of proceeding in accordance with any deadlines set by the Court or, if none, in accordance with the filing deadlines set forth in the Immigration Court Practice Manual. No additional filings will be accepted at the hearing if counsel or

1

AILA Doc. No. 20041532. (Posted 6/15/20)

the qualified representative does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing.

D.   Any proceedings conducted in-person shall be limited to representatives who have filed a notice of appearance (Form EOIR-28), parties, witnesses, security officers, and any other necessary people, which will be determined by the presiding Immigration Judge, so long as no more than six (6) people are present in the courtroom. The court strongly encourages witnesses, family, and community members to provide telephonic testimony or submit letters or written declarations in lieu of appearing at hearings.

II.   Filing of Applications, Briefs, Motions, and Evidence

A.   The filing of documents and evidence by U.S. Postal Service first class mail is strongly preferred and highly recommended.

B.   Motions to continue cases due to COVID-19 concerns should be filed with as much notice as possible, but may, on an *emergency* basis, be made to the Los Angeles (North) Immigration Court, by e-mail at: LALosAngeles.Immigration.Court@USDOJ.GOV

C.   Opposing counsel must be served with any and all filings made with the Court, whether by email, the U.S. Postal Service, or overnight delivery service.

D.   Three-Month Temporal Limit on Filings through Email: Other than *emergency* filings, the Court is imposing a three-month temporal filing limit on documents filed through email. Effective immediately, the Court will reject documents filed via the temporary e-mail boxes if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the court via the U.S. Postal Service or an overnight delivery service, not through the temporary e-mail box.

E.   **Applications for asylum (Form I-589) are exempt from the three-month temporal limit on filings through email, and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

F.   The subject of the email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandated deadline for the filing, and the initials of the Immigration Judge assigned to the case.

Example: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would input, "Motion to Continue - 012345678 - 06/30/2020" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 - WAJ"

2

*updates: www.justice.gov/eoir*                    *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

G.    Effective immediately, for parties using the temporary email account to
electronically file, supporting documentation/evidentiary filings are limited to fifty
(50) pages in a particular case. If a party intends to file more than fifty (50) pages,
the party must electronically file the Table of Contents and separately submit the
supporting documentation/evidentiary filings with the original Table of Contents
by using the U.S. mail or an overnight delivery service no later than the date set for
filing the documents with the Immigration Court.

III.    Motion to adjudicate applications without an evidentiary hearing

A.    A respondent may file a *Motion to Adjudicate Applications Without Evidentiary
Hearing* with the Court. The Motion must be filed prior to any filing deadlines
established by the Court to request that a written decision on the merits be issued
based solely on the applications, declarations, and other evidence contained in the
record of proceeding. The motion should indicate the position of the Department of
Homeland Security, where practicable, and whether the respondent seeks voluntary
departure under INA § 240B.

B.    The Department of Homeland Security shall have five (5) business days from the
date of filing to respond or object, in writing, to the respondent's *Motion to
Adjudicate Applications Without Evidentiary Hearing*.

C.    If the respondent has sworn to the contents of the application(s) under oath before
an Immigration Judge, the court will issue a written decision, in appropriate
circumstances, as soon as practicable. The Immigration Judge will automatically
reserve the right to appeal to the Board of Immigration Appeals on behalf of both
parties. If the respondent has not yet sworn to the contents of the application(s) for
relief, the Court will schedule the respondent to appear for a master calendar
hearing to swear to the contents of the application(s) for relief.

D.    The Court reserves the discretion to deny a *Motion to Adjudicate Applications
Without Evidentiary Hearing* if it deems it necessary to examine the respondent or
other witnesses, or for any other reason.

This order supersedes all prior Standing Orders of the Los Angeles (North) Immigration Court.

**IT IS SO ORDERED.**

Dated: April 29, 2020

JEFFREY S. MILLER
ASSISTANT CHIEF IMMIGRATION JUDGE

3

updates: www.justice.gov/eoir                        Version released on: June 12, 2020

AILA Doc. No. 20041532. (Posted 6/15/20)

35) Los Angeles – Olive Street: All immigration judges (2 orders, 8 pages)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**UNITED STATES IMMIGRATION COURT**
**LOS ANGELES (OLIVE STREET) IMMIGRATION COURT**

## STANDING ORDER REGARDING DOCUMENTS FILED VIA ELECTRONIC MAIL

Due to the COVID-19 pandemic and in the interest of public health and safety, the Los Angeles (Olive Street) Immigration Court is accepting the filing of documents via electronic mail (email). The following Order regarding procedures for filing documents via email is effective immediately:

1. Under no circumstances shall any individual who is currently diagnosed with the COVID-19 virus, or who has had known contact with a person with COVID-19 within the last 14 days, or who has been asked to self-quarantine, or who is experiencing symptoms consistent with COVID-19, enter the Court to file documents or conduct any business.

2. The Court strongly encourages filings be made by U.S. mail, overnight delivery service, or email, consistent with the requirements set forth in this Order. Filings via email may be made to the Court's temporary email box at:

   LAOlive.Immigration.Court@USDOJ.gov

3. Subject to the provisions of this Order, all filings must otherwise comply with the provisions of the Immigration Court Practice Manual (ICPM).

   https://www.justice.gov/eoir/office-chief-immigration-judge-0

   All email filings must also comply with EOIR's guidelines, "Filing by Email – Immigration Courts." Failure to follow the guidelines may result in rejection of the filing.

   https://www.justice.gov/eoir/filing-email

4. **Duplicate Filings**: Each individual filing should be made one time, by one manner of filing (i.e., U.S. mail, overnight delivery service, email, or in-person), except that the original of any Form I-589 filed by email must also be submitted as described in paragraph 6.

5. **Three-Month Temporal Limit on Filings through Email**: For non-detained cases, the Court will reject email filings, if filed more than three months before the next hearing date or a Court-ordered filing deadline, whichever is earlier. Those electing to file documents more than three months in advance may still do so; however, such documents must be filed by U.S. mail, overnight delivery service, or in-person, not through the Court's temporary email box. This temporal limit does not apply to detained cases.

74

AILA Doc. No. 20041532. (Posted 6/15/20)

Example: Under most circumstances, an applicant scheduled for a non-detained individual merits hearing on December 1 may not file supporting documents via the Court's temporary email box until September 1. Except as otherwise provided in this Order, earlier submissions may be rejected.

6.  **Applications for asylum (Form I-589) are exempt from the three-month temporal limit on filings through email, and will be considered filed on the date of receipt for purposes of the one-year filing deadline.** The original of any Form I-589 filed by email must also be submitted by U.S. mail or overnight delivery service, or in person at the Court's filing window.

7.  **Email Subject Line:** For filings via the Court's temporary email box, the subject line of the email must contain the nature of the filing, the case number ("alien registration number"), the date of the next hearing and any Court-mandated deadline for the filing, and the initials of the Immigration Judge assigned to the case. The initials of each Immigration Judge are listed in Appendix "A" attached hereto.

Example: For a motion to continue a hearing before Judge William A. Jones, for case number A 012 345 678, with a hearing date of June 30, 2020, and a Court-ordered deadline of June 25, 2020, the subject line would read: "Motion to Continue – A 012 345 678 – 06/30/20 – filing deadline 06/25/20 – WAJ."

8.  **Page Limitation:** Filings made via the Court's temporary email box are limited to fifty (50) single-sided pages. Any filing over fifty (50) single-sided pages must be filed by U.S. mail or overnight delivery service, or in person at the Court's filing window.

9.  The cover page of all filings, including those filed via email, must contain the next hearing date, time, and, if applicable, the date of any Court-ordered filing deadline. Filings without this information may be rejected.

**IT IS SO ORDERED.**

**DATE: May 14, 2020**

RODIN ROOYANI  *Digitally signed by RODIN ROOYANI*
                 *Date: 2020.05.14 10:40:25 -07'00'*

**Rodin Rooyani**
**Assistant Chief Immigration Judge**

75

## APPENDIX A

### Los Angeles (Olive Street) Immigration Court

### Judge Listing

| |
|---|
| Allen (JAN) |
| Bakke Varzandeh (JBV) |
| Bank (IEB) |
| Bass (LB7) |
| Behne (ABE) |
| Chon (HYC) |
| Costa (PJC) |
| Desai (JD1) |
| Dorfman (ARD) |
| Everett (TRE) |
| Francis (LJF) |
| Hong (AHO) |
| Huddleston (NHT) |
| Jasso (JJO) |
| Juelle (CRJ) |
| Latimore (JDL) |
| Lee (EDL) |
| Malvin (DHM) |
| Miller, N (NMR) |
| Park (JPK) |
| Patti (STP) |
| Rooyani (RR1) |
| Ruane (RAR) |
| Simons (ALS) |
| Stancill (CES) |
| Vahid-Tehrani (GA) |
| Villegas (VSV) |
| Virchis (BV1) |
| Waterloo (JWO) |

AILA Doc. No. 20041532. (Posted 6/15/20)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**UNITED STATES IMMIGRATION COURT**
**LOS ANGELES (OLIVE STREET) IMMIGRATION COURT**

**STANDING ORDER REGARDING TELEPHONIC APPEARANCES**

Due to the COVID-19 pandemic and in the interest of public health and safety, the Los Angeles (Olive Street) Immigration Court hereby issues the following standing Order regarding telephonic appearances. The following Order regarding telephonic appearances is effective immediately for all scheduled hearings, both detained and non-detained, and shall remain in effect until further Order of the Court.

**A. MASTER HEARINGS**

1. All master calendar hearings for represented respondents will be conducted telephonically without the need for a motion for telephonic appearance to be filed in advance. A respondent is considered represented once counsel or an accredited representative files a Form EOIR-28 with the Court in accordance with 8 C.F.R. § 1292.4(a).

2. The Court hereby waives the presence of all represented respondents for master hearings in accordance with 8 C.F.R. § 1003.25(a).

3. For any master hearings on the Court's juvenile docket, the Court waives the presence of any respondent who is in the care and custody of the Office of Refugee Resettlement (ORR) or who has been approved for participation in the Unaccompanied Refugee Minor (URM) program.

4. Counsel or accredited representatives for respondents are strongly encouraged to file written pleadings at least fifteen (15) calendar days in advance of the telephonic master hearing. For an example of acceptable written pleadings, see the Immigration Court Practice Manual, Appendix L (April 10, 2020) at https://www.justice.gov/eoir/page/file/1258536/download.

5. Unless otherwise ordered by the individual Immigration Judge, all filings, including but not limited to applications, pretrial motions, briefs, and supplemental documents, must be filed at least fifteen (15) calendar days in advance of the telephonic master hearing. The Court will not accept any filings on the date of the telephonic master hearing. The parties are strongly encouraged to submit filings by way of U.S. mail, overnight delivery service, or e-mail, in accordance with the Court's *Standing Order Regarding Documents Filed Via Electronic Mail* at https://www.justice.gov/eoir/page/file/1276676/download.

77

**AILA Doc. No. 20041532. (Posted 6/15/20)**

**B.  MERITS HEARINGS**

1.  The individual Immigration Judge, in his or her discretion, and upon consent of the respondent, may conduct a telephonic merits hearing in accordance with 8 C.F.R. § 1003.25(c).  For any merits hearing, a timely motion for telephonic appearance is required in advance of the hearing and must include a sworn affidavit or declaration from the respondent indicating that he or she has been advised of the right to proceed in person and waives that right.  *See* 8 C.F.R. § 1003.25(c).

2.  The parties are strongly encouraged to confer and reach stipulations as to facts and/or legal issues in advance of all hearings.  *See* 8 C.F.R. § 1003.21; Immigration Court Practice Manual, Chap. 4.18; *Matter of Yewondwosen*, 21 I&N Dec. 1025 (BIA 1997).

3.  Unless otherwise ordered by the individual Immigration Judge, all filings, including but not limited to applications, pretrial motions, briefs, and supplemental documents, must be filed at least fifteen (15) calendar days in advance of the telephonic merits hearing.  The parties are strongly encouraged to submit filings by way of U.S. mail, overnight delivery service, or e-mail, in accordance with the Court's *Standing Order Regarding Documents Filed Via Electronic Mail*.  No filings, other than rebuttal or impeachment evidence, will be accepted in Court on the date of the telephonic merits hearing.  *See* Immigration Court Practice Manual, Chap. 3.1(b)(ii)(A).

4.  Unless otherwise ordered by the individual Immigration Judge, the respondent must file any changes, corrections or amendments to all pending applications and/or to his or her declaration(s) at least fifteen (15) calendar days in advance of the telephonic merits hearing.  The respondent is strongly encouraged to submit such filings by way of U.S. mail, overnight delivery service, or e-mail, in accordance with the Court's *Standing Order Regarding Documents Filed Via Electronic Mail*.

5.  In cases where the parties have agreed to request that the Court issue a decision solely on the sworn application(s) and documentary evidence, the parties must file a **Joint or Unopposed Motion to Adjudicate Application Without Evidentiary Hearing on the Merits** in advance of any hearing. The **Joint or Unopposed Motion to Adjudicate Application Without Evidentiary Hearing on the Merits** must include at a minimum the following:

    a.  A sworn affidavit or declaration from the respondent indicating:

        1)  that the respondent has been advised of the right to proceed in person and waives that right;

        2)  that any application or request for relief on which the respondent is proceeding and/or affidavit or supporting declaration has been read to the respondent in a language the respondent speaks and understands;

        3)  that any application or request for relief and all documentary evidence is true, correct and complete to the best of the respondent's knowledge; and

78

4) that any other pending relief applications are withdrawn or to be held in abeyance. *See* 8 C.F.R. § 1003.25(c).

b.  A statement from the parties regarding their respective positions on appeal;

c.  A statement from DHS counsel regarding the status of requisite identity, law enforcement, or security investigations or examinations, and, if completed, the applicable expiration date in accordance with 8 C.F.R. § 1003.47(a); and

d.  If the respondent is applying for voluntary departure under INA §§ 240B(a) or (b), his or her counsel or accredited representative must clearly indicate in the Motion that he or she has explained to the respondent the conditions that attach to voluntary departure as set forth in 8 C.F.R. § 1240.26 and *Matter of Gamero*, 25 I&N Dec. 164 (BIA 2010). The Motion must also include a sworn affidavit or declaration from the respondent that he or she understands the conditions that attach to voluntary departure, and that he or she accepts such conditions should voluntary departure be granted in the exercise of the Court's discretion. *See id.* For the purposes of post-conclusion voluntary departure during the period this Standing Order is in effect, the parties should assume the Court would set the minimum bond of $500 and grant the maximum period of sixty (60) days to depart.

**GENERAL PROVISIONS**

1.  To ensure the quality of the record, the parties appearing telephonically are strongly encouraged to be available by landline telephone in a quiet private location. Failure to respond when the case is called may result in the conclusion that counsel has failed to appear.

2.  All parties appearing telephonically before the Court must further comply with the attached instructions for making telephonic appearances. *See* Appendix A.

**An Immigration Judge may, in his or her discretion, halt any telephonic hearing, and the parties may be required to attend a future in-person hearing on a date to be determined. Further, nothing in this Standing Order should be interpreted to supplant an Immigration Judge's authority to manage his or her cases.**

**IT IS SO ORDERED.**

**DATE:  June 9, 2020**

RODIN ROOYANI  Digitally signed by RODIN ROOYANI
                Date: 2020.06.09 12:22:35 -07'00'
_____

**Rodin Rooyani**
**Assistant Chief Immigration Judge**

**AILA Doc. No. 20041532. (Posted 6/15/20)**

## Appendix A

### Instructions for Telephonic Appearances before the Los Angeles (Olive Street) Immigration Court

**Making Your Telephonic Appearance**

- You must call into the hearing at least 15 minutes before the hearing time.

- In order to access the OpenVoice telephonic system, dial **1-888-585-9008**.

- After dialing the main number, you will be prompted to enter the conference room number. To determine the appropriate conference room number for the Immigration Judge you are telephonically appearing before, please refer to the table below:

| Judge | Room Number |
|---|---|
| Allen, Janette | 271-912-105 |
| Bakke Varzandeh, Joyce | 311-872-669 |
| Bank, Ira | 808-220-125 |
| Bass, Lori | 383-675-184 |
| Behne, Audra | 698-901-176 |
| Chon, Hye | 513-735-305 |
| Costa, Philip | 943-524-976 |
| Desai, Jankhana | 901-207-402 |
| Dorfman, Arlene | 918-752-659 |
| Everett, Timothy | 230-021-243 |
| Francis, Leon | 655-305-054 |
| Hong, Andrea | 721-826-509 |
| Huddleston, Natalie | 740-297-557 |
| Jasso, Jaime | 744-291-434 |
| Juelle, Carlos | 134-823-572 |
| Latimore, Jan | 610-105-176 |
| Lee, Edward | 792-418-780 |
| Malvin, Daniel | 572-385-416 |
| Miller, Nancy | 750-040-830 |
| Park, Jeannette | 737-622-162 |
| Patti, Sebastian | 451-507-099 |
| Rooyani, Rodin | 301-283-156 |
| Ruane, Rachel | 862-340-522 |
| Simons, Anita | 955-827-572 |
| Stancill, Christine | 480-375-717 |
| Vahid-Tehrani, Gita | 451-470-567 |
| Villegas, Veronica | 700-834-918 |
| Virchis, Bridget | 446-600-441 |
| Waterloo, Jason | 195-508-243 |

**AILA Doc. No. 20041532. (Posted 6/15/20)**

- When prompted, please enter the security code. The security code will be provided by the Court to the attorney of record or accredited representative in advance of the hearing. All attorneys and accredited representatives must ensure their contact information with the court is updated and accurate.

- After entering the security code, you will be joined into the telephonic hearing and you will be asked to state your name. Please state your full name as it appears on your E-28 and the last three digits of the respondent's A# for whom you are telephonically appearing.

- After check-in, **please mute your phone** and wait until your case is called. Your case will be called in the order in which the Court deems appropriate.

- To mute and unmute your participant line, use the mute feature on your phone or please press * 2.

- Once you enter the hearing, do not place the call on hold as it will be disruptive to the hearings.

- If Court has commenced once you enter the hearing, do not interrupt. Your name will be announced upon entering the hearing and late appearances will be disruptive to hearings already commenced.

- Once your matter is concluded, please disconnect from the line.

AILA Doc. No. 20041532. (Posted 6/15/20)

36) Los Angeles – Van Nuys Blvd: All immigration judges (2 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
LOS ANGELES (VAN NUYS) CALIFORNIA

**STANDING ORDER REGARDING DOCUMENTS FILED VIA ELECTRONIC MAIL**

Due to the COVID-19 pandemic and in the interest of public health and safety, the Los Angeles (Van Nuys) Immigration Court is accepting the filing of documents via electronic mail (email). The following Order regarding procedures for filing documents via email is effective immediately:

1. Under no circumstances shall any individual who is currently diagnosed with the COVID-19 virus, or who has had known contact with a person with COVID-19 within the last 14 days, or who has been asked to self-quarantine, or who is experiencing symptoms consistent with COVID-19, enter the Court to file documents or conduct any business.

2. The Court strongly encourages filings be made by U.S. mail, overnight delivery service, or email, consistent with the requirements set forth in this Order.  Filings via email may be made to the Court's temporary email box at: LAVanNuys.Immigration.Court@usdoj.gov .

3. Subject to the provisions of this Order, all filings must otherwise comply with the provisions of the Immigration Court Practice Manual (ICPM): https://www.justice.gov/eoir/office-chief-immigration-judge-0.

All email filings must also comply with EOIR's guidelines, "Filing by Email – Immigration Courts." Failure to follow the guidelines may result in rejection of the filing. https://www.justice.gov/eoir/filing-email.

4. **Duplicate Filings**: Each individual filing should be made one time, by one manner of filing (i.e., U.S. mail, overnight delivery service, email, or in-person), except that the original of any Form I-589 filed by email must also be submitted as described in paragraph 6.

5. **Three-Month Temporal Limit on Filings through Email**: For non-detained cases, the Court will reject email filings, if filed more than three months before the next hearing date or a Court-ordered filing deadline, whichever is earlier. Those electing to file documents more than three months in advance may still do so; however, such documents must be filed by U.S. mail, overnight delivery service, or in-person, not through the Court's temporary email box. This temporal limit does not apply to detained cases.

> Example: Under most circumstances, an applicant scheduled for a non-detained individual merits hearing on December 1 may not file supporting documents via the Court's temporary email box until September 1. Except as otherwise provided in this Order, earlier submissions may be rejected.

82

**AILA Doc. No. 20041532. (Posted 6/15/20)**

6. **Applications for asylum (Form I-589) are exempt from the three-month temporal limit on filings through email, and will be considered filed on the date of receipt for purposes of the one-year filing deadline.** The original of any Form I-589 filed by email must also be submitted by U.S. mail or overnight delivery service, or in person at the Court's filing window.

7. **Email Subject Line:** For filings via the Court's temporary email box, the subject line of the email must contain the nature of the filing, the case number ("alien registration number"), the date of the next hearing and any Court-mandated deadline for the filing, and the initials of the Immigration Judge assigned to the case. The initials of each Immigration Judge are listed in Appendix "A" attached hereto.

> Example: For a motion to continue a hearing before Judge William A. Jones, for case number A 012 345 678, with a hearing date of June 30, 2020, and a Court-ordered deadline of June 25, 2020, the subject line would read: "Motion to Continue – A 012 345 678 – 06/30/20 – filing deadline 06/25/20 – WAJ."

8. **Page Limitation:** Filings made via the Court's temporary email box are limited to fifty (50) single-sided pages. Any filing over fifty (50) single-sided pages must be filed by U.S. mail or overnight delivery service, or in person at the Court's filing window.

9. The cover page of all filings, including those filed via email, must contain the next hearing date, time, and, if applicable, the date of any Court-ordered filing deadline. Filings without this information may be rejected.

**IT IS SO ORDERED.**
**DATE: May 15, 2020**

SCOTT
LAURENT

Digitally signed by SCOTT
LAURENT
Date: 2020.05.15 12:31:06
-07'00'

Scott Laurent
Assistant Chief Immigration Judge
Van Nuys, California

*updates: www.justice.gov/eoir*                          *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

## APPENDIX A

**Los Angeles (Van Nuys) Immigration Court
Judge Listing:**

Brian Burke (BB2)
David Burke (DB)
Carlos Maury (CEM)
Tara Naselow (TNN)
Ashley Tabbador (AAT)
Vacant (Formerly Kevin Riley)
Scott Laurent (SDL)

*updates: www.justice.gov/eoir*                        *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

37) Memphis: All Immigration Judges (13 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
MEMPHIS IMMIGRATION COURT

## STANDING ORDER: PROCEDURES

On March 17, 2020, the Federal Government issued a memorandum directing agencies to minimize face-to-face interactions with members of the public, which is posted at https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-16.pdf. To comply with directives from Federal, State, and County health officials and reduce the spread of COVID-19, it is hereby ordered that the following procedures shall be implemented immediately in the Memphis Immigration Court and shall remain effective until rescinded by a superseding order of the Memphis Immigration Court. This order is made pursuant to Immigration and Nationality Act § 240(b)(1)-(2) and 8 C.F.R. § 1003.10(b), 1003.21(b), 1003.25, 1003.29, 1003.31(c), 1003.40.

All parties should continue to monitor the EOIR website at https://www.justice.gov/eoir and/or EOIR's Twitter feed at: @DOJ_EOIR (https://twitter.com/doj_eoir?lang=en) for the latest information on court operating status.

## INDIVIDUALS WITH COVID-19 SYMPTOMS OR POSITIVE COVID-19 TEST

Under no circumstances shall any individual experiencing symptoms consistent with COVID-19 infection enter the Court, including but not limited to the lobby, filing window, and courtrooms. This same restriction applies to any individuals who have tested positive for COVID-19, unless they have been affirmatively advised by an appropriate medical professional that they are no longer contagious. If any individual described in this paragraph is unable to attend an upcoming hearing at which his or her presence is required, he or she shall promptly notify the Court in writing to the Court's email filing mailbox at Memphis.Immigration.Court@usdoj.gov, or in an emergency, by telephone to the Court.

## FILING OF MOTIONS, APPLICATIONS, BRIEFS, EVIDENCE, AND OTHER DOCUMENTS

Routine Filings: First class mail, express delivery services, or email sent in compliance with the guidelines posted at https://www.justice.gov/eoir/filing-email are strongly preferred over in-person submission of motions, applications, briefs, evidence, and any other documents. However, filings to the Court's email filing mailbox should not be made more than three (3) months in advance of any filing deadline or hearing date **unless it is an application for asylum and its filing is necessary to meet the one-year filing requirement of Section 208(a)(2)(B)**. Additionally, any submissions over fifty (50) pages must be made by means other than email.

Time-Sensitive Filings: All filing deadlines ordered by the Court remain in effect. Unless otherwise ordered by the Court, all filings are due in accordance with the deadlines established in the Immigration Court Practice Manual, Chapter 3.1(b). Untimely filings are subject to the consequences identified in the Immigration Court Practice Manual, Chapter 3.1(d).

Page Limit: For documents relating to country conditions or other reference materials, a maximum of 150 pages may be submitted. The relevance of each background/country condition document shall be set forth in the table of contents or by citation in the prehearing statement. A party wishing to submit more than 150 pages of such documentation must first establish good cause in a written motion that identifies the documents sought to be submitted, why they are believed to be necessary, and what they show that is not already established by any prior submissions. The U.S. Department of State's most recent Country Report on Human Rights Practices and Report on International Religious Freedom may be submitted, or made part of the record by motion, without counting against this page limit.

AILA Doc. No. 20041532. (Posted 6/15/20)

## MASTER CALENDAR HEARINGS

In order to reduce the number of personal appearances for master calendar hearings, the following shall be submitted no later than five (5) business days prior to a scheduled master calendar hearing:

1.    Written pleadings,[1] unless previously submitted; and

2.    **Either:**

     A) motion to vacate master and set for individual hearing[2] with the respondent's application(s) for relief, unless previously submitted; **or**

     B) a motion to continue establishing good cause for continuing the case to another master calendar hearing; **or**

     C) a request to appear in person or telephonically at the scheduled master calendar hearing that establishes the necessity for the hearing.

Notwithstanding the above, the Court may direct that the master calendar hearing proceed as scheduled.

## INDIVIDUAL CALENDAR HEARINGS

Pursuant to 8 C.F.R. 1003.25(a), Counsel and respondent(s) may appear by telephone for good cause shown. A motion to appear telephonically must be submitted no later than fifteen (15) days in advance of the individual calendar hearing. The motion shall include a single landline telephone number at which both counsel and the respondent(s) may be reached. Motions must also include a written acknowledgement that the respondent(s) has been advised of his or her right to personally appear at the hearing per 8 C.F.R. §1003.25(c) and consents to appearing telephonically in lieu of a personal appearance. Any party appearing by telephone waives the right to object to any evidence presented at the individual hearing on the basis that he/she is unable to view such evidence.

Motions for witnesses to appear by telephone must also be submitted no later than fifteen (15) days in advance of the individual calendar hearing. Motions for telephonic witnesses shall include a summary of the witness's expected testimony that demonstrates its relevance, materiality, and its necessity.

Appearances are not required by minor respondents under the age of fourteen (14), or for respondent(s) whose appearance has previously been waived by the Immigration Judge.

In all individual calendar hearings wherein the respondent is represented and the relief sought includes asylum, withholding of removal, and/or protection under the Convention Against Torture, Counsel for the respondent shall submit proposed stipulated facts that form the basis for the claim of relief. The proposed stipulated facts shall delineate any particular social group(s), if applicable, and shall be filed with the Court and served on the Department of Homeland Security no later than thirty (30) days prior to the individual calendar hearing.

If agreed to by the parties, the Court may adopt the proposed stipulated facts in lieu of, or in addition to, the respondent's oral testimony and rely on such stipulated facts in reaching a decision.

---

[1] Separate, written pleadings are required for each respondent, and the written pleadings must be signed by the respondent (or guardian) and the respondent's representative. Immigration Court Practice Manual, Chapter 4.15(j)(April 10, 2020). Pleadings must comply with the requirements set forth in the Immigration Court Practice Manual, and representatives are strongly encouraged to submit written pleadings using the template provided at Attachment A.

[2] Representatives are strongly encouraged to submit motions to vacate using the template provided at Attachment B.

86

## REQUESTS FOR TELEPHONIC PREHEARING CONFERENCES

Parties are reminded that telephonic prehearing conferences may be requested to narrow issues, obtain stipulations, exchange information, or otherwise simplify and organize the proceeding.  8 C.F.R. § 1003.21(a).  Prehearing conferences may be initiated by the Immigration Judge or requested by a party, in writing, to resolve matters without the need for a hearing.  If either party believes that a matter is appropriately resolved via a pretrial conference, that party shall confer with the opposing party and file an appropriate motion with the Court.  The Court will then review the record and take action as appropriate.

Dated, this ___1st___ day of ___May___, 2020.


Renae M. Hansell
Assistant Chief Immigration Judge
Memphis, Tennessee



Attachments:   Attachment A
               Attachment B

updates: www.justice.gov/eoir                          Version released on: June 12, 2020

AILA Doc. No. 20041532.  (Posted 6/15/20)

A

updates: *www.justice.gov/eoir*                         *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
MEMPHIS, TENNESSEE

IN THE MATTER OF                           )
                                           )
_____                  )    A _____
                                           )
IN REMOVAL PROCEEDINGS                     )

## RESPONDENT'S WRITTEN PLEADINGS

On behalf of my client I make the following representations:

1.  The respondent waives a formal reading of the NTA and concedes proper service of the Notice to Appear dated _____.
2.  I have explained to the respondent, and the respondent acknowledges:
    a.  The rights set forth in 8 C.F.R. § 1240.10(a);
    b.  The consequences of failing to appear in Court as set forth in INA §240(b)(5);
    c.  The limitation on discretionary relief for failure to appear set forth in INA § 240(b)(7);
    d.  The consequences of knowingly filing or making a frivolous application as set forth in INA §208(d)(6);
    e.  The requirements to notify the Court within 5 business days of any change of address or telephone number, using Form E-33/IC pursuant to 8 C.F.R. §1003.15(d); and
    f.  That if any application is not timely filed, the application will be deemed waived and abandoned under 8 C.F.R. § 1003.31(c).
3.  The respondent **admits** factual allegations _____ and **denies** _____.
4.  The respondent **concedes** the following charges of removability _____ and **denies** the following charges of removability _____.
5.  In the event of removal, the respondent names as the country to which removal should be directed _____ or **declines to designate** a country of removal.
6.  The respondent will apply for the following forms of relief:
    □Termination of Proceedings □ Asylum □ Withholding of Removal □ CAT □ Adjustment of Status □ 42B □ 42A □ Voluntary Departure □ Waiver of inadmissibility pursuant to INA _____
    □ Other _____
    □ Relief Outside the Jurisdiction of the Court _____
7.  The respondent's best language is _____, and we request an interpreter in that language for the individual hearing.
8.  The respondent's address is _____.
9.  If the relief from removal requires an application, the respondent will file the application as directed by the court. The respondent acknowledges that if the application(s) are not timely filed, the applications(s) will be deemed waived and abandoned under 8 C.F.R. 1003.31(c).
10. The respondent has received biometrics instructions and will timely comply with instructions. I have explained the instructions to the respondent. I have also explained to the respondent that under 8 C.F.R. 1003.47(d), failure to provide biometrics or other biographical information within the time allowed will constitute abandonment of the application unless the respondent demonstrates that such failure was a result of good cause.
11. The respondent estimates _____ hours will be necessary for the individual hearing.

Attorney for the respondent: _____        Date: _____

AILA Doc. No. 20041532. (Posted 6/15/20)

Respondent's pleading declaration:

I have been advised of my rights in these proceedings by my attorney or representative. I understand those rights. I waive a further explanation of those rights by this Court. I have been advised by my attorney or representative of the consequences of failing to appear for a hearing. I have also been advised by my attorney of the consequences of failing to appear for a scheduled date of departure or deportation. I understand those consequences. I have been advised by my attorney or representative of the consequences of knowingly filing a frivolous asylum application. I understand the consequences. I have been advised by my attorney or representative of the consequences of failing to follow the DHS biometrics instructions within the time allowed. I understand those consequences. I understand that if my mailing address changes I must notify the court within 5 days of such change by completing an Alien's Change of Address Form (Form EOIR-33/IC) and filing it with this court. Finally, my attorney or representative has explained to me what this Written Pleading says. I understand it, I agree with it, and I request that the court accept it as my pleading.

Respondent (or guardian if a minor): _____     Date: _____

updates: www.justice.gov/eoir                                Version released on: June 12, 2020

AILA Doc. No. 20041532. (Posted 6/15/20)

B

*updates: www.justice.gov/eoir*                    *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

A. Tourney, Esquire                                      NON-DETAINED

Law Offices of A. Tourney
123 Main Street
Anytown, TN  12345


UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
MEMPHIS, TENNESSEE

IN THE MATTER OF                    )
                                    )
_____             )    A_____
                                    )    A_____
_____             )    A_____
                                    )
IN REMOVAL PROCEEDINGS              )


Immigration Judge:   Holt            Next Hearing Date:   January 1, 2000


RESPONDENT'S MOTION TO VACATE MASTER CALENDAR HEARING
AND SET FOR AN INDIVIDUAL HEARING (OR TO STATUS DOCKET)

updates: www.justice.gov/eoir                    Version released on: June 12, 2020

AILA Doc. No. 20041532. (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
MEMPHIS, TENNESSEE

IN THE MATTER OF                    )
                                    )
                                    )   A _____
_____           )   A _____
                                    )   A _____
_____           )
                                    )
IN REMOVAL PROCEEDINGS              )

RESPONDENT'S MOTION TO VACATE MASTER CALENDAR HEARING
AND SET FOR AN INDIVIDUAL HEARING (OR TO STATUS DOCKET)

COMES NOW, the respondent, by and through counsel, and requests that this Court vacate the currently-scheduled master calendar hearing and set this matter for an individual hearing.  In support of such Motion, the following scheduling information is provided:

1.  A **COPY** of an application filed with USCIS.                    _____

    *DO NOT enter this as an application for the Court.

                              *or*

    An application for the Court.                                     _____

    Relief requested: _____.

2.  I want an expedited hearing on my asylum application.            _____

                              *or*

    I reject a setting on the first available hearing date.          _____

3.  I **HAVE** complied with all biometrics instructions.           _____

                              *or*

    I **HAVE NOT** complied with all biometrics instructions.       _____

WHEREFORE, in consideration of my written pleadings and the scheduling information provided herein, I hereby request that the Court vacate my currently-scheduled master calendar hearing and set this matter for an individual hearing.

_____
A. Tourney, Esquire

93

Alien Name(s)
Alien Number(s)

## CERTIFICATE OF SERVICE

On _____, I _____
          (date)                    (printed name of person signing below)

served a copy of this Motion to Vacate Master Calendar Hearing and Set for an Individual

Hearing (or to Status Docket) and any attached pages to _____
                                                       (name of party served)

_____
          (address of party served)

by _____
          (method of service – courier, first class mail, hand-delivery, etc.)

_____                    _____
     Signature                              date

94

AILA Doc. No. 20041532. (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
MEMPHIS, TENNESSEE

IN THE MATTER OF                    )
                                    )
                                    )     A
_____        )     A
                                    )     A
_____        )
                                    )
IN REMOVAL PROCEEDINGS              )

ORDER OF THE IMMIGRATION JUDGE

Upon consideration of the Motion to Vacate Master Calendar Hearing and Set for an Individual Hearing

(or to Status Docket), it is HEREBY ORDERED that the motion be: ☐ **GRANTED** ☐ **DENIED** because:

☐     DHS does not oppose the motion.

☐     The respondent does not oppose the motion.

☐     A response to the motion has not been filed with the Court.

☐     Good cause has been established for the motion.

☐     The Court agrees with the reasons stated in the opposition.

☐     The motion is untimely per the _____.

☐     Other: _____.

**An individual hearing is set for** _____ **at** _____ **AM/PM**

in Courtroom _____. Supplemental documents are due _____ days in advance of the individual

hearing.  If biometrics instructions have not yet been complied with, the respondent must comply, and

provide proof of such to the Court, no later than _____.

*OR*

A master calendar hearing on the Court's status docket is set for _____

at _____ AM/PM in Courtroom _____.

_____          _____
Date                                 [name], Immigration Judge

Certificate of Service
This document was served by:      [ ] Mail       [ ] Personal Service
To:   [ ] Alien       [ ] Alien, c/o Custodial Officer      [ ] Alien's Atty/Rep      [ ] DHS
Date: _____          By: Court Staff _____

95

AILA Doc. No. 20041532. (Posted 6/15/20)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**MEMPHIS, TENNESSEE**

IN THE MATTER OF                    )
                                    )
_____             )   A _____
                                    )   A _____
_____             )   A _____
                                    )
IN REMOVAL PROCEEDINGS              )

ORDER OF THE IMMIGRATION JUDGE

Upon consideration of the Motion to Vacate Master Calendar Hearing and Set for an Individual Hearing

(or to Status Docket), it is HEREBY ORDERED that the motion be: □ **GRANTED** □ **DENIED** because:

□    DHS does not oppose the motion.

□    The respondent does not oppose the motion.

□    A response to the motion has not been filed with the Court.

□    Good cause has been established for the motion.

□    The Court agrees with the reasons stated in the opposition.

□    The motion is untimely per the _____.

□    Other: _____.

**An individual hearing is set for** _____ **at** _____ **AM/PM**

in Courtroom _____. Supplemental documents are due _____ days in advance of the individual

hearing. If biometrics instructions have not yet been complied with, the respondent must comply, and

provide proof of such to the Court, no later than _____.

*OR*

A master calendar hearing on the Court's status docket is set for _____

at _____ AM/PM in Courtroom _____.

_____
Date                         [name], Immigration Judge

Certificate of Service
This document was served by:      [ ] Mail      [ ] Personal Service
To:   [ ] Alien      [ ] Alien, c/o Custodial Officer      [ ] Alien's Atty/Rep      [ ] DHS
Date: _____      By: Court Staff _____

AILA Doc. No. 20041532. (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
MEMPHIS, TENNESSEE

IN THE MATTER OF                    )
                                    )
_____         )   A _____
                                    )   A _____
_____         )   A _____
                                    )
IN REMOVAL PROCEEDINGS              )

ORDER OF THE IMMIGRATION JUDGE

Upon consideration of the Motion to Vacate Master Calendar Hearing and Set for an Individual Hearing

(or to Status Docket), it is HEREBY ORDERED that the motion be: ☐ **GRANTED** ☐ **DENIED** because:

☐    DHS does not oppose the motion.

☐    The respondent does not oppose the motion.

☐    A response to the motion has not been filed with the Court.

☐    Good cause has been established for the motion.

☐    The Court agrees with the reasons stated in the opposition.

☐    The motion is untimely per the _____.

☐    Other: _____.

**An individual hearing is set for** _____ **at** _____ **AM/PM**

in Courtroom _____. Supplemental documents are due _____ days in advance of the individual

hearing.  If biometrics instructions have not yet been complied with, the respondent must comply, and

provide proof of such to the Court, no later than _____.

*OR*

**A master calendar hearing on the Court's status docket is set for** _____

at _____ **AM/PM in Courtroom** _____.

_____          _____
Date                                 [name], Immigration Judge

Certificate of Service
This document was served by:     [ ] Mail     [ ] Personal Service
To:   [ ] Alien    [ ] Alien, c/o Custodial Officer     [ ] Alien's Atty/Rep        [ ] DHS
Date: _____    By:  Court Staff _____

97

38) New Orleans: All immigration judges (2 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
NEW ORLEANS IMMIGRATION COURT
NEW ORLEANS, LOUISIANA

STANDING ORDER OF THE NEW ORLEANS IMMIGRATION COURT
RELATING TO TEMPORAL AND PAGE LIMITS ON DOCUMENTS FILED VIA
EMAIL

Effective immediately and until further notice, the New Orleans Immigration Court will impose certain limits on court filings submitted through the Court's temporary email account referenced. This Order sets out the specific limitations and instructions.

IT IS ORDERED that:

1.  THREE-MONTH TEMPORAL LIMIT ON FILINGS THROUGH EMAIL

A three-month temporal limit will apply to all documents filed through email. The Court will reject documents filed via the temporary e-mail box if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the Court via the U.S. Postal Service or overnight delivery service, not through the temporary e-mail box.

HEARING EXAMPLE: If documents are filed via the temporary e-filing mailbox on May 20, 2020, for a hearing scheduled on or before August 19, 2020, they will be accepted, provided they conform with the Immigration Court Practice Manual (ICPM) and the e-mail filing instructions. However, if documents are filed on May 20, 2020, for a hearing scheduled on or after August 20, 2020, they will be rejected.

CALL-UP DATE EXAMPLE: If documents are filed via the temporary e-filing mailbox on May 20, 2020, for a call-up date scheduled on or before August 19, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on May 20, 2020, for a call-up date scheduled on or after August 20, 2020, they will be rejected.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, Ch. 3.1(b).

**Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

98

AILA Doc. No. 20041532. (Posted 6/15/20)

**2.     EMAIL FORMAT**

The subject of each email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandated deadline for the filing, and the initials of the immigration judge assigned to the case.

**EXAMPLE**: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would enter the following in the subject line of the email: *"Motion to Continue - A012 345 678 – 06/30/2020"*

If the filer knows the hearing is scheduled before Judge William A. Jones, the subject line would be: *"Motion to Continue - A012 345 678 - 06/30/2020 – WAJ"*

**EXAMPLE**: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a court-mandated filing deadline ("call-up date") of 06/25/2020 would enter the following in the subject line of the email: *"Application for Cancellation of Removal - A012 345 678 – 06/25/2020"*

If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be: *"Application for Cancellation of Removal - A012 345 678 - 06/25/2020 – WAJ"*

**3.   PAGE LIMIT**

For parties using the Court's temporary email account to file electronically, supporting documentation/evidentiary filings are limited to **fifty (50) pages** in a particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the Court. Hard copy submissions will be deemed filed on the date of receipt by the Court, as specified in the ICPM, Ch. 3.1(a)(iii).

This Order supersedes the general electronic filing instructions presently posted online.

**SIGNED, ENTERED, AND ORDERED at New Orleans, Louisiana, this 11th day of May, 2020.**

CHRISTA LAMPLEY    Digitally signed by CHRISTA LAMPLEY
                   Date: 2020.05.11 15:46:08 -05'00'

Joy Lampley-Fortson
Assistant Chief Immigration Judge
New Orleans Immigration Court

**AILA Doc. No. 20041532. (Posted 6/15/20)**

39) New York – Broadway: All immigration judges (2 orders, 3 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
NEW YORK BROADWAY IMMIGRATION COURT

STANDING ORDER OF THE NEW YORK BROADWAY IMMIGRATION COURT
RELATING TO THREE-MONTH TEMPORAL LIMIT ON FILINGS THROUGH E-MAIL

IT IS HEREBY ORDERED that, The New York Broadway Immigration Court is imposing a three-month temporal filing limit on documents filed through e-mail. Effective immediately, The New York Broadway Immigration Court will reject documents filed via the temporary e-mail boxes if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the court via the U.S. Postal Service or an overnight delivery service, not through the temporary e-mail box.

HEARING EXAMPLE: If documents are filed via the temporary e-mail box on May 4, 2020, for a hearing scheduled on or before August 4, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on May 4, 2020, for a hearing scheduled after August 4, 2020, they will be rejected.

CALL-UP DATE EXAMPLE: If documents are filed via the temporarily e-filing mailbox on May 4, 2020, for a call-up date scheduled on or before August 4, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on May 4, 2020 for a hearing scheduled after August 4, 2020, they will be rejected.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on filings through e-mail, parties are required to comply with all deadlines for filings, as specified in the ICPM, Ch. 3.1(b).

Note: Applications for asylum are exempt from the three-month temporal limit on filings through e-mail and will be considered filed on the date of receipt for purposes of the one-year filing deadline.

E-MAIL
The subject of your e-mail must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandated deadline for the filing, and the initials of the Immigration Judge assigned to the case. Below is a listing of Immigration Judges/Initials assigned to the New York Broadway Immigration Court:

Three-Month Temporal Limit on Filings through E-Mail

| JUDGE | INITIALS |
|---|---|
| IJ Laforest | BLF |
| IJ Christensen | JBC |
| IJ Poczter | AVP |
| IJ McCarthy | JMM |
| IJ Navarro | MEN |
| IJ Chung | JCG |
| IJ Dodd | DED |
| IJ Calvelli | AWC |
| IJ Gundlach | RTG |
| IJ Krasinski | CKI |

Example: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would input, "Motion to Continue – 012345678 – 06/30/2020" in the subject line of the e-mail. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue – 012345678 – 06/30/2020 – WAJ."

Example: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a court-mandated filing deadline ("call-up date") of 06/25/2020 would input, "Application for Cancellation of Removal – 012345678 – 06/25/2020" in the subject line of the e-mail. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of Removal – 012345678 – 06/25/2020 – WAJ."

Effective immediately, for parties using a temporary e-mail box to electronically file, supporting documentation/evidentiary filings are limited to fifty (50) pages in a particular case. If a party intends to file more than (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. Postal Service or an overnight delivery service no later than the date set for filing the documents with the immigration court.

**This standing order supersedes all previously posted e-mail filing instructions for the duration of this standing order.**

5-1-2020

Date

H. Kevin Mart                    Digitally signed by H. Kevin Mart
                                 Date: 2020.05.01 14:33:12 -04'00'

H. Kevin Mart
Assistant Chief Immigration Judge
New York Broadway Immigration Court

2

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
NEW YORK BROADWAY IMMIGRATION COURT

STANDING ORDER OF THE NEW YORK BROADWAY IMMIGRATION COURT
RELATING TO FILINGS FOR CASES ADJOURNED  DUE TO COVID-19

IT IS HEREBY ORDERED, that effective immediately for cases adjourned due to COVID-19, the new filing deadline shall be as set forth in the Immigration Court Practice Manual Ch 3.1(b) unless the Immigration Judge otherwise establishes a filing deadline based upon the rescheduled hearing date (" revised call-up date"). The provisions of this court's Standing Order relating to Three Month Temporal Limit On Filings Through E-Mail remain in effect.

 5-8-2020
Date

H. Kevin Mart          Digitally signed by H. Kevin Mart
                       Date 2020.05.08 11:02:07-04'00'

H. Kevin Mart
Assistant Chief Immigration Judge
New York Broadway Immigration Court

102

AILA Doc. No. 20041532. (Posted 6/15/20)

40) New York – Federal Plaza: All immigration judges (2 orders, 4 pages)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**UNITED STATES IMMIGRATION COURT**
**26 FEDERAL PLAZA**
**NEW YORK, NEW YORK**

**STANDING ORDER:**

**Effective immediately**, the New York Immigration Court (NYC) is imposing a three-month temporal filing limit on electronically filed documents. NYC will reject electronically filed documents via the temporary e-mail boxes if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. The Court further requests that parties consider limiting filings to those that are emergencies and time-sensitive. For parties using the temporary email account to electronically file, supporting documentation/evidentiary filings are limited to fifty **(50)** pages in a particular filing. If a party intends to file more than fifty **(50)** pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. Postal Service, or an overnight delivery service no later than the date set for filing the documents with the immigration court.

Paper filing is discouraged and electronic filing is **strongly encouraged** during this period. Those wishing to make paper submissions more than three months in advance may still do so; however, they must be sent to the court via the U.S. Postal Service, or an overnight delivery service, not through the temporary e-mail box, and the Court would recommend that such filings not be in person. Notwithstanding the three-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, ch. 3.1(b).

The parties should also submit affidavits or written statements of witnesses in lieu of the witnesses appearing in court. The parties are encouraged to confer and reach stipulations as to facts and/or legal issues (*e.g.*, 10 years of continuous physical presence) to facilitate the prompt disposition of cases. *See, generally, Matter of E-F-H-L-*, 26 I&N Dec. 319, 322 fn.3 (BIA 2014); *vacated on other grounds*, 27 I&N Dec. 226 (A.G. 2018). *Matter of Fefe*, 20 I&N Dec. 116, 118 (BIA 1989). Nothing in this Standing Order should be construed as interfering with any ethical responsibilities of any attorney or accredited representative to confer with his or her client. Nothing in this Standing Order should be interpreted to supplant the individual Immigration Judge's (IJ) authority to manage his or her cases.

**Email Subject Line for Electronic Filings:** The subject of your email and the name of the attached file must contain the nature of the filing, the alien registration number, the date of the next hearing, the initials of the IJ assigned to the case and the respondent's detention status. For example, a motion to continue filed in a case with alien registration number 012345678 and a hearing date on 06/18/2020 before IJ XYZ would input, "Motion to Continue - 012345678 - 06/18/2020-Judge XYZ- non-detained" in the subject line of the email. If the filer does not know which IJ is assigned to their case, please include the phrase "IJ Unknown" in the subject line of the email. If the IJ assigned does not appear in the list, use the full last name. The Immigration Judges' initials are attached to this Order as *Appendix A*.

103

**Note:  Applications for asylum are exempt from the three-month temporal limit on electronic filings and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**   Additionally, if a party has a hearing date that is scheduled after the three-month deadline and wishes to file a substantive motion, related to the merits of their claim, such motions may still be filed.

*This order supersedes any general electronic filing instructions presently posted online and shall remain in effect until rescinded by the Court.*

*Appendix A*

| JUDGE | INITIALS |
|---|---|
| IJ Noel A. Brennan | NB |
| IJ Olivia L. Cassin | OLC |
| IJ Amit Chugh | AC2 |
| IJ Raisa Cohen | RAC |
| IJ Evalyn P. Douchy | EPD |
| IJ L. Batya Schwartz Ehrens | LES |
| IJ Samuel M. Factor | SAF |
| IJ Lena Golovnin | LGN |
| IJ Cynthia Gordon | CYG |
| IJ Vivienne E. Gordon-Uruakpa | VGU |
| IJ Dorothy Harbeck | DH |
| IJ Howard C. Hom | HH |
| IJ Carrie Johnson-Papillo | CCJ |
| IJ Amiena A. Khan | AAK |
| IJ Deborah E. Klahr | DKR |
| IJ Theodora N. Kouris | TKS |
| IJ Frederic G. Leeds | FGL |
| IJ F. James Loprest Jr. | JLP |
| IJ Maria Lurye | MLY |
| IJ Michael G. McFarland | MMF |
| IJ Barbara A. Nelson | BAN |
| IJ Brian T. Palmer | BTP |
| IJ Laura N. Pierro | LPO |

**AILA Doc. No. 20041532.  (Posted 6/15/20)**

| IJ Cathy Sagesse | CSE |
|---|---|
| IJ Douglas B. Schoppert | DBS |
| IJ Alice Segal | ASL |
| IJ Helen Sichel | HJS |
| IJ John J. Siemietkowski | JNS |
| IJ Rantideva Singh | SHR |
| IJ Oshea Denise Spencer | ODS |
| IJ Jem C. Sponzo | JCS |
| IJ Donald Thompson | DWT |
| IJ Mimi Tsankov | MMT |
| IJ Virna Wright | VAW |
| IJ Randa Zagzoug | RZA |

CARRIE PAPILLO   Digitally signed by CARRIE PAPILLO
                 Date 2020.05.01 13:25:47 -04'00'

Carrie C. Johnson-Papillo
Assistant Chief Immigration Judge

AILA Doc. No. 20041532. (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
NEW YORK FEDERAL PLAZA IMMIGRATION COURT


STANDING ORDER OF THE NEW YORK FEDERAL PLAZA IMMIGRATION COURT
RELATING TO FILINGS FOR CASES ADJOURNED DUE TO COVID-19


IT IS HEREBY ORDERED, that effective immediately for cases adjourned due to COVID-19, the new
filing deadline shall be as set forth in the Immigration Court Practice Manual Ch 3.1(b) unless the
Immigration Judge otherwise establishes a filing deadline based upon the rescheduled hearing date (" revised
call-up date"). The provisions of this court's Standing Order relating to Three Month Temporal Limit On
Filings Through E-Mail remain in effect.


  5-8-2020                                    CARRIE PAPILLO   Digitally signed by CARRIE
                                                               PAPILLO
                                                               Date: 2020.05.08 15:37:14 -04'00'
Date                                          Carrie C. Johnson-Papillo
                                              Assistant Chief Immigration Judge
                                              New York Broadway Immigration Court


106

AILA Doc. No. 20041532.  (Posted 6/15/20)

41) New York – Varick: All immigration judges (2 orders, 3 pages)


**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**VARICK STREET IMMIGRATION COURT**


**STANDING ORDER OF THE VARICK STREET IMMIGRATION COURT**
**RELATING TO THREE-MONTH TEMPORAL LIMIT ON FILINGS THROUGH E-MAIL**


        **IT IS HEREBY ORDERED** that, The Varick Street Immigration Court is imposing a three-month temporal filing limit on documents filed through e-mail. Effective immediately, The Varick Street Immigration Court will reject documents filed via the temporary e-mail boxes if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the court via the U.S. Postal Service or an overnight delivery service, not through the temporary e-mail box.

HEARING EXAMPLE: If documents are filed via the temporary e-mail box on May 4, 2020, for a hearing scheduled on or before August 4, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on May 4, 2020, for a hearing scheduled after August 4, 2020, they will be rejected.

CALL-UP DATE EXAMPLE: If documents are filed via the temporarily e-filing mailbox on May 4, 2020, for a call-up date scheduled on or before August 4, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on May 4, 2020 for a hearing scheduled after August 4, 2020, they will be rejected.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on filings through e-mail, parties are required to comply with all deadlines for filings, as specified in the ICPM, Ch. 3.1(b).

**Note: Applications for asylum are exempt from the three-month temporal limit on filings through e-mail and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

E-MAIL
The subject of your e-mail must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandated deadline for the filing, and the initials of the Immigration Judge assigned to the case. Below is a listing of Immigration Judges/Initials assigned to the Varick Street Immigration Court:

107

**AILA Doc. No. 20041532. (Posted 6/15/20)**

Three-Month Temporal Limit on Filings through E-Mail

| JUDGE | INITIALS |
|-------|----------|
| IJ Conroy | CCI |
| IJ Norkin | DNO |
| IJ Hoover | FHR |
| IJ Prieto | FPO |
| IJ Cortes | JOC |
| IJ Ling | LLG |
| IJ Farber | LTF |
| IJ Kolbe | MGK |
| IJ Burnham | SEB |
| IJ Mulligan | TJM |

Example: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would input, "Motion to Continue – 012345678 – 06/30/2020" in the subject line of the e-mail. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue – 012345678 – 06/30/2020 – WAJ."

Example: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a court-mandated filing deadline ("call-up date") of 06/25/2020 would input, "Application for Cancellation of Removal – 012345678 – 06/25/2020" in the subject line of the e-mail. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of Removal – 012345678 – 06/25/2020 – WAJ."

Effective immediately, for parties using a temporary e-mail box to electronically file, supporting documentation/evidentiary filings are limited to fifty (50) pages in a particular case. If a party intends to file more than (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. Postal Service or an overnight delivery service no later than the date set for filing the documents with the immigration court.

**This standing order supersedes all previously posted e-mail filing instructions for the duration of this standing order.**

5-1-2020
Date

H. Kevin Mart         Digitally signed by H. Kevin Mart
                      Date: 2020.05.01 14:21:12 -04'00'

H. Kevin Mart
Assistant Chief Immigration Judge
Varick Street Immigration Court

2

**UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
VARICK STREET IMMIGRATION COURT**

**STANDING ORDER OF THE VARICK STREET IMMIGRATION COURT
RELATING TO FILINGS FOR CASES ADJOURNED DUE TO COVID-19**

**IT IS HEREBY ORDERED**, that effective immediately for cases adjourned due to COVID-19, the new filing deadline shall be as set forth in the Immigration Court Practice Manual Ch 3.1(b) unless the Immigration Judge otherwise establishes a filing deadline based upon the rescheduled hearing date (" revised call-up date"). The provisions of this court's Standing Order relating to Three Month Temporal Limit On Filings Through E-Mail remain in effect.

5-8-2020
Date

H. Kevin Mart

H. Kevin Mart
Assistant Chief Immigration Judge
Varick Street Immigration Court

**AILA Doc. No. 20041532. (Posted 6/15/20)**

42) New York – Varick: Immigration Judge H. Kevin Mart

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## VARICK STREET IMMIGRATION COURT

### STANDING ORDER OF IMMIGRATION JUDGE H. KEVIN MART
### RELATING TO TELEPHONIC APPEARANCES AT MASTER CALENDAR HEARINGS

**IT IS HEREBY ORDERED** that, for the thirty (30) day period following the signing of this order, parties scheduled to appear for a master calendar hearing before Immigration Judge H. Kevin Mart at the Varick Street Immigration Court may appear telephonically, without the need to file a motion for telephonic appearance. This permission is subject to the following caveats:

1) Any individual who wishes to appear telephonically does so with the understanding that any paper filings to be considered by the Court must be in the official record of proceeding at the time the hearing is scheduled to be held. No additional filings will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing.

2) Any party appearing telephonically waives the right to object to admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

3) If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in person at any rescheduled hearing.

_____                    HERBERT MART   Digitally signed by HERBERT MART
                                                          Date: 2020.03.21 18:04:50 -04'00'

Date    March 21, 2020                      _____
                                                     H. Kevin Mart
                                            Assistant Chief Immigration Judge
                                            Varick Street Immigration Court

updates: www.justice.gov/eoir                Version released on: June 12, 2020

AILA Doc. No. 20041532. (Posted 6/15/20)

43) Newark: All immigration judges (1 order; 2 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
NEWARK, NEW JERSEY

NEWARK-Immigration Court is imposing a three-month temporal filing limit on documents filed through email.

**Effective immediately**, NEW will reject documents filed via the temporary e-mail boxes if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the court via the U.S. Postal Service or an overnight delivery service, not through the temporary e-mail box.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, ch. 3.1(b).

**Note: Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

EMAIL

The subject of your email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandate deadline for the filing, and the initials of the immigration judge assigned to the case.

**Effective immediately**, for parties using a temporary email account to electronically file, supporting documentation/evidentiary filings are limited to fifty **(50)** pages in a particular case. If a party intends to file more than fifty **(50)** pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the immigration court.

DAVID CHENG    Digitally signed by DAVID CHENG
               Date: 2020.04.22 08:40:03 -04'00'

David Cheng
Assistant Chief Immigration Judge

111

AILA Doc. No. 20041532. (Posted 6/15/20)

44) Oakdale: All immigration judges (2 pages)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**OAKDALE IMMIGRATION COURT**
**OAKDALE, LOUISIANA**

**STANDING ORDER OF THE OAKDALE IMMIGRATION COURT RELATING TO**
**TEMPORAL AND PAGE LIMITS ON DOCUMENTS FILED VIA EMAIL**

Effective immediately and until further notice, the Oakdale Immigration Court will impose certain limits on court filings submitted through the Court's temporary email account referenced. This Order sets out the specific limitations and instructions.

**IT IS ORDERED** that:

**1.   THREE-MONTH TEMPORAL LIMIT ON FILINGS THROUGH EMAIL**

A three-month temporal limit will apply to all documents filed through email. The Court will reject documents filed via the temporary e-mail box if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the Court via the U.S. Postal Service or overnight delivery service, not through the temporary e-mail box.

**HEARING EXAMPLE**: If documents are filed via the temporary e-filing mailbox on May 20, 2020, for a hearing scheduled on or before August 19, 2020, they will be accepted, provided they conform with the Immigration Court Practice Manual (ICPM) and the e-mail filing instructions. However, if documents are filed on May 20, 2020, for a hearing scheduled on or after August 20, 2020, they will be rejected.

**CALL-UP DATE EXAMPLE**: If documents are filed via the temporary e-filing mailbox on May 20, 2020, for a call-up date scheduled on or before August 19, 2020, they will be accepted provided they conform with the ICPM and the e-mail filing instructions. However, if documents are filed on May 20, 2020, for a call-up date scheduled on or after August 20, 2020, they will be rejected.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the ICPM, Ch. 3.1(b).

**Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

112

## 2.   EMAIL FORMAT

The subject of each email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandated deadline for the filing, and the initials of the immigration judge assigned to the case.

**EXAMPLE**: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would enter the following in the subject line of the email: *"Motion to Continue - A012 345 678 – 6/30/2020"*

If the filer knows the hearing is scheduled before Judge William A. Jones, the subject line would be: *"Motion to Continue - A012 345 678 - 06/30/2020 – WAJ"*

**EXAMPLE**: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a court-mandated filing deadline ("call-up date") of 06/25/2020 would enter the following in the subject line of the email: *"Application for Cancellation of Removal - A012 345 678 – 06/25/2020"*

If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be: *"Application for Cancellation of Removal - A012 345 678 - 06/25/2020 – WAJ."*

## 3.   PAGE LIMIT

For parties using the Court's temporary email account to file electronically, supporting documentation/evidentiary filings are limited to **fifty (50) pages** in a particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the Court. Hard copy submissions will be deemed filed on the date of receipt by the Court, as specified in the ICPM, Ch. 3.1(a)(iii).

This Order supersedes the general electronic filing instructions presently posted online.

**SIGNED, ENTERED, AND ORDERED at Oakdale, Louisiana, this 11ᵗʰ day of May, 2020.**

CHRISTA LAMPLEY  Digitally signed by CHRISTA LAMPLEY
Date: 2020.05.11 15:52:11 -05'00'

Joy Lampley-Fortson
Assistant Chief Immigration Judge
Oakdale Immigration Court

113

45) Omaha: All immigration judges

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**OMAHA IMMIGRATION COURT**
**OMAHA, NEBRASKA (DETAINED)**

**STANDING ORDER OF THE OMAHA IMMIGRATION COURT**

Due to the COVID-19 Pandemic, the Omaha Immigration Court is implementing the following safety precautions until further notice:

1. In-person appearances in the courtroom are limited to the following individuals: Respondent, Respondent's counsel, DHS counsel, Court interpreter, essential EOIR staff and security personnel. See ICPM § 4.9(a)(ii) (citing 8 C.F.R. § 1003.27(b)).

2. Video teleconferencing ("VTC") will be utilized to the greatest extent possible, and any necessary witnesses will be allowed to appear by telephone. See ICPM § 4.7(b).

3. Limited exceptions to the above orders may be accommodated on a case-by-case basis and must be requested by written motion prior to the day of the hearing.

4. Any individual that is (a) displaying symptoms consistent with COVID-19 exposure; (b) has been diagnosed with COVID-19; (c) is pending results of a COVID-19 diagnostic test; (d) has, within the past 14 days, had contact with anyone who has been diagnosed with COVID-19; (e) or has been asked to self-quarantine by local health authorities or a medical provider, shall notify the Court immediately by telephone or the e-mail address provided below and will not be allowed to appear in Court.

5. Parties who would like to appear telephonically for a particular case should provide notice to the Court at the email address provided below, in advance of the hearing and in accordance with the attached instructions. Parties should provide the best phone number at which to be reached.

The Executive Office for Immigration Review has established a temporary email account to facilitate electronic filings for all parties during the COVID-19 Pandemic. The email address for the Omaha Immigration Court is Omaha.Immigration.Court@usdoj.gov   Instructions for using this email account can be found at https://www.justice.gov/eoir/filing-email Private attorneys must submit their request from an e-mail address that is on file with EOIR. DHS filings must be sent from a government email address. Do not send any Court filings or correspondence directly to the government e-mail accounts of Court staff, unless specifically directed to do so, as these filings and correspondence may not be accepted by the Court. This Standing Order supersedes the previous Standing Order, same subject, dated March 18, 2020.

**ERIC DILLOW**     Digitally signed by
                    ERIC DILLOW
                    Date: 2020.04.06
                    13:41:07 -05'00'

Effective date: April 6, 2020

Eric L. Dillow
Assistant Chief Immigration Judge

114

AILA Doc. No. 20041532. (Posted 6/15/20)

46) Orlando: All immigration judges

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
ORLANDO, FLORIDA

STANDING ORDER OF THE ORLANDO IMMIGRATION COURT RELATING TO TELEPHONIC APPEARANCES OF
COUNSEL AND PERMITTED ATTENDEES AT DETAINED MASTER CALENDAR AND INDIVIDUAL HEARINGS

IT IS HEREBY ORDERED that effective immediately and until at least May 29, 2020:

1) Any attorney for any party may appear telephonically in cases before the Orlando Immigration
   Court without prior approval and without filing a motion in advance. Attorneys who would like
   to appear telephonically for a specific case should inform the Orlando Immigration Court's main
   desk in advance of the hearing by calling 407-722-8900, and providing their client's Alien number,
   the name of the judge, the date of the hearing, and the best phone number at which the Court
   may contact the attorney. Attorneys may also utilize the temporary email account for the
   Orlando Immigration Court, as set forth at: https://www.justice.gov/eoir/filing-email.

2) If the Court is unable to reach counsel by telephone for the hearing, thereafter, the Court will
   require counsel to appear in person at any rescheduled hearing.

3) Any attorney who wishes to appear telephonically does so with the understanding that any paper
   or electronic filings to be considered by the Court must be in the official record of proceeding in
   accordance with any deadlines set by the Court or, if none, in accordance with the filing deadlines
   set forth in the Immigration Court Practice Manual (ICPM). No additional filings will be accepted
   at the hearing if counsel does not appear in person, and the decision of the Court will be based
   on the documents in the record at the close of the hearing.

4) Any attorney appearing telephonically waives the right to object to admissibility of any document
   offered in Court on the sole basis that they are unable to examine the document.

5) In-court proceedings shall be limited to attorneys, parties, security officers, and any other
   necessary participants, which will be determined by the presiding judge.

6) Finally, during this time period, written requests to continue cases due to COVID-19 concerns
   should be filed with as much notice as possible. Please note: Any party or witness who is displaying
   symptoms consistent with COVID-19, has been diagnosed with COVID-19, or has had contact with
   anyone diagnosed with COVID-19, must notify the Court immediately by telephone and will not
   be allowed to personally appear in Court.

7) This Order supersedes the Order issued on March 25, 2020.

James K. Grim   Digitally signed by James K. Grim
                Date: 2020.05.06 15:55:10 -04'00'
_____
James K. Grim
Assistant Chief Immigration Judge
May 06, 2020

115

AILA Doc. No. 20041532. (Posted 6/15/20)

47) Otay Mesa: All immigration judges

**UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
OTAY MESA, CALIFORNIA**

**STANDING ORDER: TELEPHONIC APPEARANCES IN CASES BEFORE THE OTAY
MESA IMMIGRATION COURT DUE TO COVID-19**

Effective immediately and until rescinded by the Court, any attorney for any party may appear telephonically in cases before the Otay Mesa Immigration Court without prior approval and without filing a motion in advance.

Attorneys who wish to appear telephonically must contact court staff in advance of the hearing and provide the best phone number at which to be reached. If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any rescheduled hearing.

Any documents to be considered by the Court during the hearing must be filed with the Court, and a copy received by opposing counsel or *pro se* respondent, at least two business days prior to the hearing. The Otay Mesa Immigration Court accepts electronic filing of documents in cases before it, and all parties are strongly encouraged to file any and all documents electronically. No additional filing will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing. Any party appearing telephonically waives the right to object to the admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

So ordered.

March 30, 2020
Date

Rico J. Bartolomei
Assistant Chief Immigration Judge
Otay Mesa Immigration Court

116

AILA Doc. No. 20041532. (Posted 6/15/20)

48) Otero: Immigration Judge Brock Taylor (2 total, 3 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
OTERO IMMIGRATION COURT
26 MCGREGOR RANGE ROAD
CHAPARRAL, NEW MEXICO 88081

STANDING ORDER OF THE IMMIGRATION JUDGE: IMPEACHMENT EVIDENCE

Effective April 10, 2020, the Department of Homeland Security (DHS) is hereby ordered to file with the Court and to serve upon the Respondent any impeachment evidence it wishes to submit in the Respondent's case at least 10 days prior to the Respondent's individual merits hearing.

"Impeachment evidence" includes copies of any documents or records in the possession of DHS that may be used in the Respondent's case in order to impeach the Respondent's testimony, including, but not limited to, the following: (1) any record of statements attributed to the Respondent; (2) the Respondent's Form I-213, Record of Deportable/Inadmissible Alien; (3) the Respondent's Record of Sworn Statement; (4) the Respondent's Record of Determination/Credible Fear Interview; (5) the Respondent's passport or other identification documents; (6) any record of prior visa application by the Respondent; and (7) any document related to the Respondent's criminal history.

The Court has authority to exercise "independent judgment and discretion and may take any action consistent with [its] authorities under the Act and regulations that is appropriate and necessary for the disposition of cases." 8 C.F.R. § 1003.10(b). The Court has authority to set time limits for filing documents. 8 C.F.R. § 1003.31(c); *see also* Immigration Court Practice Manual Chapter 3.1(b)(i)(B) & (b)(ii)(B). The Court notes that the Respondent is "entitled to the production of his visa or other entry document, if any, and of any other documents and records … pertaining to such entry in the custody of the Service." INA § 291. The Court recognizes that the

117

AILA Doc. No. 20041532. (Posted 6/15/20)

Respondent is entitled to have "a reasonable opportunity to examine the evidence against the alien." INA § 240(b)(4)(B); 8 C.F.R. § 1534(c)(3). The Court finds that filing impeachment evidence with the Court and serving this evidence upon the respondent at least 10 days prior to the Respondent's individual merits hearing is necessary to ensure a fundamentally fair and orderly hearing. *Mukhia v. Holder*, 506 F. App'x 824, 828 (10th Cir. 2013); *Osei v. INS*, 305 F.3d 1205, 1208 (10th Cir. 2002).

If impeachment evidence is not filed within the time set by the Court, the opportunity to file that evidence shall be deemed waived. 8 C.F.R. § 1003.31(c).

This Order supersedes any contrary instruction or policy, including the Immigration Court Practice Manual. *See* 8 C.F.R. § 1003.10(b).

WHEREFORE, IT IS HEREBY ORDERED that all impeachment evidence shall be filed with the Court and served upon the Respondent no later than 10 days prior to the Respondent's individual merits hearing.

IT IS SO ORDERED.

3/27/20
_____
DATE

_____
BROCK E. TAYLOR
United States Immigration Judge

AILA Doc. No. 20041532. (Posted 6/15/20)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
OTERO IMMIGRATION COURT
26 MCGREGOR RANGE ROAD
CHAPARRAL, NEW MEXICO 88081

### STANDING ORDER OF THE IMMIGRATION JUDGE: TELEPHONIC APPEARANCES DUE TO COVID-19 CONCERNS IN CASES BEFORE IMMIGRATION JUDGE BROCK E. TAYLOR

Effective immediately, any attorney for any party may appear telephonically in cases before Immigration Judge Brock E. Taylor without prior approval and without filing a motion in advance. Attorneys who would like to appear telephonically for a particular case shall contact the Otero Immigration Court by telephone at (575) 824-8900 at least 15 minutes prior to the scheduled hearing and provide the Court with a landline telephone number at which the attorney may be reached.

IT IS SO ORDERED.

3/27/20
DATE

BROCK E. TAYLOR
United States Immigration Judge

119

AILA Doc. No. 20041532. (Posted 6/15/20)

49) Pearsall: All immigration judges (2 orders, 3 pages)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**SOUTH TEXAS ICE PROCESSING CENTER**
**566 VETERAN DRIVE**
**PEARSALL, TX 78061**

**STANDING ORDER OF THE PEARSALL IMMIGRATION COURT**
(Superseding the order issued March 19, 2020)

Due to the COVID-19 pandemic, the Pearsall Immigration Court is implementing the below safety precautions until further notice:

1. In-person appearances in the courtroom are limited to the following individuals:  Respondent, Respondent's counsel, DHS counsel, Court interpreter, essential EOIR staff and security personnel.  See ICPM § 4.9(a)(ii) (citing 8 C.F.R. § 1003.27(b)).  No more than eight respondents will be allowed in the courtroom at any time.

2. Video teleconferencing ("VTC") will be utilized to the greatest extent possible, and any necessary witnesses will be allowed to appear by telephone.  See ICPM § 4.7(b).

3. Limited exceptions to the above orders may be accommodated on a case-by-case basis and must be requested by written motion prior to the day of the hearing.

4. Any individual having business in person before the Court must notify the Court immediately by telephone if any of the following apply:

   a. The individual is displaying symptoms consistent with COVID-19 exposure
   b. The individual has been diagnosed with COVID-19
   c. The individual is pending results of a COVID-19 diagnostic test
   d. Within the past 14 days, the individual has had contact with anyone who has been diagnosed with COVID-19
   e. The individual has been asked to self-quarantine by local health authorities or a medical provider

   No individual described in one of the above categories will be permitted into the EOIR court space.

Attorneys who would like to appear telephonically for a particular case should inform the Immigration Judge's legal assistant in advance of the hearing by email and should provide the best phone number at which to be reached.  Emails can be sent to the Pearsall Immigration Court email inbox at: Pearsall.Immigration.Court@USDOJ.GOV

Effective date:  April 2, 2020

CLAY MARTIN    Digitally signed by CLAY MARTIN
              Date: 2020.04.02 13:25:54 -05'00'

Clay N. Martin
Assistant Chief Immigration Judge

120

AILA Doc. No. 20041532.  (Posted 6/15/20)

```
1          UNITED STATES DEPARTMENT OF JUSTICE
2          EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
3          SOUTH TEXAS ICE PROCESSING CENTER
4                    566 VETERAN DRIVE
5                  PEARSALL, TX 78061

6                      May 19, 2020
7
8    STANDING ORDER OF THE PEARSALL IMMIGRATION COURT REGARDING
9            ELECTRONIC / EMAIL FILINGS BY COUNSEL
10
11       IT IS HEREBY ORDERED, effective immediately and continuing through June 30, 2020:
12
13       The Pearsall Immigration Court is imposing a one-month chronological filing limit on
14   documents filed through email at: Pearsall.Immigration.Court@USDOJ.GOV  Effective
15   immediately, the Court will reject documents filed via the temporary e-mail box if filed more
16   than 30 days before the next hearing date or a court-ordered deadline ("call-up date"), whichever
17   is earlier.  Those wishing to file documents more than 30 days in advance may still do so;
18   however, they must be delivered to the court via the U.S. Mail or a delivery service, and may not
19   be filed through the temporary e-mail box.  Those documents delivered through the temporary e-
20   mail box that do not comply with the timeframes set forth herein will be rejected and regarded as
21   not filed.
22
23       HEARING EXAMPLE: If documents are filed via the temporary e-filing mailbox on April
24   23, 2020, for a hearing scheduled on or before May 26, 2020, they will be accepted provided
25   they conform to the Immigration Court Practice Manual (ICPM) and the e-mail filing
26   instructions.  However, if documents are filed on April 22, 2020, for a hearing scheduled on or
27   after May 27, 2020, they will be rejected and regarded as not filed.
28
29       CALL-UP DATE EXAMPLE: If documents are filed via the temporarily e-filing mailbox on
30   April 23, 2020, for a call-up date scheduled on or before May 26, 2020, they will be accepted
31   provided they conform to the ICPM and the e-mail filing instructions.  However, if documents
32   are filed on April 22, 2020, for a call-up date scheduled on or after May 27, 2020, they will be
33   rejected and regarded as not filed.
34
35       REJECTED FILINGS: Documents rejected for not complying with the one-month
36   chronological limit may be filed by mail or a delivery service.  Notwithstanding the one-month
37   chronological limit on filings through email, parties are required to comply with all deadlines for
38   filings, as specified by the Judge or the ICPM, ch. 3.1(b).
39
40   Note: Applications for asylum are exempt from the one-month temporal limit on filings
41   through email and will be considered filed on the date of receipt for purposes of the one-
42                          year filing deadline.
43
44       EMAIL - The subject of the email must contain the nature of the filing, the alien
45   registration number, the date of the next hearing or any court-mandate deadline for the filing, and
46   the initials of the immigration judge assigned to the case.
47
```

121

AILA Doc. No. 20041532. (Posted 6/15/20)

1      Example: A filer of a motion to continue with a case with alien registration number
2  012345678 and a hearing date of 06/30/2020 would input, "Motion to Continue - 012345678 -
3  06/30/2020" in the subject line of the email.  If the filer knows the hearing is scheduled before
4  Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 -
5  WAJ"
6
7      Example: A filer of an application for cancellation of removal with a case with alien
8  registration number 012345678 and a hearing date on 01/02/2021 but a court-mandated filing
9  deadline ("call-up date") of 06/25/2020 would input, "Application for Cancellation of Removal -
10  012345678 – 06/25/2020" in the subject line of the email.  If the filer knows the hearing is
11  scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of
12  Removal - 012345678 - 06/25/2020 – WAJ."
13
14      FILING PAGE LIMIT: Effective immediately, for parties using the temporary email box
15  to electronically file, supporting documentation/evidentiary filings are limited to seventy-five
16  (75) total pages per case.  If a party intends to file more than seventy-five (75) pages, the party
17  must electronically file the Table of Contents and separately submit the supporting documents or
18  evidentiary filings with the original Table of Contents by U.S. Mail or a delivery service no later
19  than the filing deadline.
20
21      COUNTRY CONDITIONS REPORTS: Either party may move for administrative notice
22  of the U.S. Department of State Human Rights country conditions for the designated country of
23  removal.  8 C.F.R. § 1208.12(a), without production of a copy.

24  The language above modifies the instructions presently posted online and supersedes the general
25  electronic filing instructions.
26
27      This order augments the Standing Order of the Pearsall Immigration Court issued as of
28  4/2/2020.
29
30                         DANIEL     Digitally signed by
31                                          DANIEL DAUGHERTY
32                        DAUGHERTY Date: 2020.05.19
                                         06:47:00 -07'00'
33                        Daniel J. Daugherty
34                        Assistant Chief Immigration Judge
35                        Las Vegas, Salt Lake City
36                        (Acting) Pearsall, San Antonio

AILA Doc. No. 20041532. (Posted 6/15/20)

50) Philadelphia: All immigration judges

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
PHILADELPHIA, PENNSYLVANIA

## STANDING ORDER OF THE PHILADELPHIA IMMIGRATION COURT RELATING TO TELEPHONIC APPEARANCES AT HEARINGS

**IT IS HEREBY ORDERED** that, for the thirty (30) day period following the signing of this order, parties scheduled to appear for a master calendar, custody, or individual hearing before the Philadelphia Immigration Court may appear telephonically, without the filing of a motion for telephonic appearance. This permission is subject to the following caveats:

1) Any party, whether an attorney or a litigant, who wishes to appear telephonically does so with the understanding that any paper or electronic filings to be considered by the Court must be in the official record of proceeding at the time the hearing is scheduled to be held. No additional filings will be accepted at the hearing from a party not appearing in person, and the decision of the Court will be based on the documents in the record at the close of the hearing.

2) Any party appearing telephonically waives the right to object to admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

3) If the Court is unable to reach a party by telephone for the hearing, the party will thereafter be required to appear in person at any rescheduled hearing.

4) The parties may offer testimony from witnesses appearing telephonically if the witness's contact information is provided to the Court prior to the hearing. Witnesses must be sequestered to the best of their ability when others are testifying. If a witness fails to appear, it is within the Court's discretion whether to proceed with or reschedule the hearing.

THERESA HOLMES
SIMMONS
Digitally signed by THERESA
HOLMES SIMMONS
Date: 2020.06.11 19:37:35
-04'00'

June 11, 2020
Date

Theresa H. Holmes-Simmons
Assistant Chief Immigration Judge
Philadelphia, Pennsylvania

123

AILA Doc. No. 20041532. (Posted 6/15/20)

51) Phoenix: All immigration judges (2 orders, 2 pages)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**UNITED STATES IMMIGRATION COURT**
**PHOENIX, ARIZONA**

**STANDING ORDER IMPLEMENTING THREE-MONTH TEMPORAL FILING LIMIT AND**
**PAGE LIMITATION ON ELECTRONICALLY-FILED DOCUMENTS**

Effective immediately, the Phoenix Immigration Court is imposing a three-month temporal filing limit on documents filed at the Phoenix Immigration Court using the temporary email account. The Phoenix Immigration Court will reject documents filed via the temporary e-mail box if filed **more than three months** before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier. Those parties wishing to file documents more than three months in advance may still do so; however, the documents must be sent to the Court via the U.S. Postal Service or an overnight delivery service, not through the temporary e-mail box. Documents rejected for not complying with the three-month temporal filing limit may be filed by mail or through an overnight delivery service. Notwithstanding the three-month temporal filing limit through email, parties are required to comply with all deadlines for filings, as specified in the Immigration Court Practice Manual (ICPM) (*see* Ch. 3.1(b)).

**Note: Applications for asylum are exempt from the three-month temporal filing limit through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

For parties using a temporary email account to electronically file pre-hearing briefs, motion briefs, responses, or replies at the Phoenix Immigration Court, such filings shall be limited to twenty-five (25) pages. (*see* ICPM, Ch. 4.19). This limitation applies to the contents of the brief including a statement of facts, issues, burden of proof, argument, conclusion stating the precise relief or remedy sought, and citations or authorities. Font size and spacing shall remain consistent with the ICPM (*see* Ch. 3.3).

For parties using a temporary email account to electronically file supporting documentation/evidentiary filings at the Phoenix Immigration Court, such filings shall be limited to fifty (50) pages in any particular case. If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the immigration court or consistent with the ICPM (*see* Ch. 3.1(b)).

This order supersedes any general electronic filing instructions presently posted online and shall remain in effect until rescinded by the Court.

4/22/2020
Date

AMY HOOGASIAN    Digitally signed by AMY HOOGASIAN
Date: 2020.04.22 11:21:14 -07'00'

Amy C. Hoogasian, Assistant Chief Immigration Judge
Phoenix, Arizona

**UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
PHOENIX, ARIZONA**

**STANDING ORDER OF THE PHOENIX IMMIGRATION COURT
RELATING TO TELEPHONIC APPEARANCES
AT DETAINED JUVENILE MASTER CALENDAR AND INDIVIDUAL HEARINGS**

**IT IS HEREBY ORDERED** that Department of Homeland Security counsels respondents' attorneys or qualified representatives, pro bono counsels, friends of the court, and appointed child advocates in *detained juvenile cases* who are scheduled to appear for master calendar and individual hearings before the Phoenix Immigration Court, may appear telephonically without the need to file a motion for telephonic appearance.

The attorneys who would like to appear telephonically shall call the Phoenix Immigration Court in advance of the hearing and provide the Alien number, name of judge and the best phone number where the attorney can be reached. The attorney shall remain available for the court's call. If the court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any promptly-rescheduled hearing.

Any documents which counsel requests the court to consider during the hearing must be filed with the court, and *received* by opposing counsel or the *pro se* respondent, at least *two business days* prior to the hearing. Any party appearing telephonically waives the right to object to admissibility of any document offered in court on the sole basis that they are unable to examine the document.

This order shall remain in effect until rescinded by the Court.

April 3, 2020

AMY HOOGASIAN     Digitally signed by AMY HOOGASIAN
                  Date: 2020.04.03 09:32:25 -07'00'

Amy C. Hoogasian
Assistant Chief Immigration Judge
Phoenix, Arizona

AILA Doc. No. 20041532. (Posted 6/15/20)

52) Port Isabel: All immigration judges (3 pages)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
PORT ISABEL IMMIGRATION COURT
27991 BUENA VISTA BLVD
LOS FRESNOS, TEXAS 78566

## STANDING ORDER OF THE PORT ISABEL IMMIGRATION COURT

Due to the COVID-19 Pandemic, the Port Isabel Immigration Court is implementing the following safety precautions until further notice:

1. In-person appearances in the courtroom are limited to the following individuals: Respondent, Respondent's counsel, DHS counsel, Court interpreter, essential EOIR staff and security personnel. See ICPM § 4.9(a)(ii) (citing 8 C.F.R. § 1003.27(b)).

2. Video teleconferencing ("VTC") will be utilized to the greatest extent possible, and any necessary witnesses will be allowed to appear by telephone. See ICPM § 4.7(b).

3. Limited exceptions to the above orders may be accommodated on a case-by-case basis and must be requested by written motion prior to the day of the hearing.

4. Any individual that is (a) displaying symptoms consistent with COVID-19 exposure; (b) has been diagnosed with COVID-19; (c) is pending results of a COVID-19 diagnostic test; (d) has, within the past 14 days, had contact with anyone who has been diagnosed with COVID-19; (e) or has been asked to self-quarantine by local health authorities or a medical provider, shall notify the Court immediately by telephone or the e-mail address provided below and will not be allowed to appear in Court.

5. Parties who would like to appear telephonically for a particular case should provide notice to the Court at the email address provided below, in advance of the hearing and in accordance with the attached instructions. Parties should provide the best phone number at which to be reached.

The Executive Office for Immigration Review has established a temporary email account to facilitate electronic filings for all parties during the COVID-19 Pandemic. The email address for the Port Isabel Immigration Court is PortIsabel.Immigration.Court@usdoj.gov   The instructions for using this email account are incorporated in this Standing Order and are attached. Private attorneys must submit their request from an e-mail address that is on file with EOIR. DHS filings must be sent from a government email address. Do not send any Court filings or correspondence directly to the government e-mail accounts of Court staff, unless specifically directed to do so, as these filings and correspondence may not be accepted by the Court. This Standing Order supersedes the previous Standing Order, same subject, dated March 24, 2020.

ERIC
DILLOW

Digitally signed by
ERIC DILLOW
Date: 2020.04.01
12:51:38 -05'00'

Effective date: April 1, 2020

Eric L. Dillow
Assistant Chief Immigration Judge

AILA Doc. No. 20041532. (Posted 6/15/20)

The following instructions are incorporated in the Port Isabel Immigration Court COVID-19 Standing Order:

The Executive Office for Immigration Review (EOIR) has established temporary email accounts for immigration courts nationwide to facilitate electronic filing for all parties while the rollout of the EOIR Court and Appeals System (ECAS) is delayed due to COVID-19. Those who have already opted-in to ECAS should continue to use ECAS where it is available. Others who wish to utilize electronic filing may file through email as instructed below. Please note EOIR cannot provide technical support or confirm receipt of filings at this time. If you have questions, please contact the EOIR Office of Policy, Communications and Legislative Affairs Division at PAO.EOIR@usdoj.gov.

**All filers:**

- Failure to follow the guidelines listed below may result in the rejection of your submitted document filing. If your submission is rejected, you will be notified by email with a request to correct the issue and refile the document.
- The subject of your email must contain the nature of the filing, the alien registration number, the date of the next hearing, and the initials of the immigration judge assigned to the case.

   **Example:** A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date on 01/02/2021 would input, "Motion to Continue - 012345678 - 01/02/2021" in the subject line of the email. If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 01/02/2021 - WAJ"

- While multiple documents for the same case may be submitted in one email, do not combine separate submissions into one file. Each document type must be submitted separately and include the type of filing in the file name.
- You remain responsible for service on the opposing party.
- Submit certificate of service with every filing in the same email.
- All electronically-filed documents must meet the requirements of filings outlined in the Immigration Court Practice Manual. Further, an electronically filed document cannot be larger than 25 megabytes (MB). For submissions that would be larger than 25 MB, please follow the below steps:
  - split the document into multiple files so no portion is larger than 25 MB;
  - name each document so that it is clear they should be matched with the other portions. Example: 5678_1234ABC_Brief_Part1; 5678_1234ABC_Brief_Part2
- Files must be a minimum resolution of 300dpi.
- File formats accepted are PDF and JPEG. We cannot accept other file formats.
- Do not include links to non-EOIR websites in your submissions.

AILA Doc. No. 20041532. (Posted 6/15/20)

- Filings with more than one page must include page numbers.
- If scanning and attaching a document, pages must appear right-side-up.
- The filing party must maintain the originals of any documents that are electronically filed and must make the originals available for production, if so ordered, or for inspection upon request by a party.

**Attorneys and fully-accredited representatives**

- If you have opted-in to ECAS, do not use email in lieu of filing through ECAS.
- Name your file with the last four digits of your client's alien registration number, your EOIR ID, and the type of filing.

**Example**: Attorney Johnson, EOIRID 1234ABC, with client 012345678, filing an asylum application would name the document: 5678_1234ABC_AsylumApplication

**Respondents**

- Name your file with the last four digits of your alien registration number, your last name, and the type of filing.

**Example**: Jane Smith, alien registration number 876543210, filing a motion to expedite, would name the document: 3210_Smith_MotionToExpedite

**Example**: Submitting an asylum application and country conditions evidence, attach the application with the file name 5678_1234ABC_AsylumApplication in one file and the country conditions with the file name 5678_1234ABC_CountryConditions.

*updates: www.justice.gov/eoir*                          *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

53) Portland: All immigration judges (3 pages)

**UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
PORTLAND IMMIGRATION COURT**

**STANDING ORDER 20-02[1]: Special Procedures During the COVID-19 National Emergency**

On March 17, 2020, the Federal Government issued a memorandum directing agencies to minimize face-to-face interactions with members of the public, which is posted at https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-16.pdf. To comply with directives from Federal, State, and County health officials and reduce the spread of COVID-19, the following procedures shall be implemented immediately and shall remain effective until rescinded by a superseding order of the Portland Immigration Court. This order is made pursuant to Immigration and Nationality Act § 240(b)(1)-(2) and 8 C.F.R. § 1003.10(b), 1003.21(b), 1003.25, 1003.29, 1003.31(c), 1003.40.

**INDIVIDUALS WITH COVID-19 SYMPTOMS OR POSITIVE COVID-19 TEST**

Under no circumstances shall any individual experiencing symptoms consistent with COVID-19 infection enter the Court, including but not limited to the lobby, filing window, and courtrooms. This same restriction applies to any individuals who have tested positive for COVID-19, unless they have been affirmatively advised by an appropriate medical professional that they are no longer contagious. If any individual described in this paragraph is therefore unable to attend an upcoming hearing at which his or her presence is required, he or she shall promptly notify the Court.

**FILING OF MOTIONS, APPLICATIONS, BRIEFS, EVIDENCE, AND OTHER DOCUMENTS**

First class mail, express delivery services, or email sent in compliance with both the guidelines posted at https://www.justice.gov/eoir/filing-email and the special rules below, are strongly preferred over in-person submission of motions, applications, briefs, evidence, and any other documents, to reduce the risk of COVID-19 transmission. Nothing here alters any deadline set by the Court for a specific case, or set by statute, regulation, or the Immigration Court Practice Manual, Chapter 3.1(b).

Special Rules for Email Filings:

> Three-Month Email Filing Window: Email filings shall not be made for cases with a hearing date or court-ordered call-up date which is more than three months beyond the date of filing. The Court will reject documents filed via the temporary email box if filed more than three months before the next hearing date or call-up date, whichever is sooner. Those wishing to file documents more than three months in advance may do so via the U.S. Postal Service or an express delivery service. **Note: Form I-589 is exempt from this limitation and will be considered filed on the date of the Court's receipt of the email for purposes of the one-year asylum filing deadline.**

> 50-Page Limit for Email Filings: For email filings, supporting documentation/evidentiary filings are limited to 50 pages per case. A party wishing to file more than 50 pages of such materials shall file the Table of Contents by email, while filing the full set of documents (with the original

---

[1] This Standing Order supersedes Standing Order 20-01.

Portland Immigration Court
Standing Order 20-02

AILA Doc. No. 20041532. (Posted 6/15/20)

Table of Contents) via U.S. mail or express delivery service no later than the date set for filing the documents with the Court.

Routine Filings; Prehearing Filings: Prehearing submissions remain due 15 days before the individual hearing, as usual. The parties are reminded that submissions filed less than 15 days prior to the individual hearing are untimely and will be excluded from the evidentiary record, unless the Court determines that there is good cause to excuse the late filing and that there is no undue prejudice to the opposing party.

Page Limit: For background/country conditions documents that do not relate to Respondent(s), their family, or others with whom they have a personal connection, a maximum of 150 pages may be submitted. The relevance of each background/country conditions document shall be set forth in the table of contents or by citation in the prehearing statement. A party wishing to submit more than 150 pages of such documentation must establish good cause in a written motion that identifies the documents sought to be submitted, why they are believed to be necessary, and what they show that is not already established by any prior submissions. The State Department's most recent Country Report on Human Rights Practices and Report on International Religious Freedom may be submitted, or made part of the record by motion, without counting against this page limit.

In-Court Filings: Until such time as this Standing Order is rescinded or superseded, documents physically submitted at a hearing will not be handled or considered by the Court at the hearing. In the case of a merits hearing, such filings will be considered in the adjudication of the matter only upon a showing that 1) There is good cause to excuse the late filing, 2) There is no undue prejudice to the opposing party, *and* 3) The document is necessary for the appropriate resolution of the case, and is not cumulative, inconsequential, or otherwise unnecessary.

Emergency Motions: In the case of an emergency motion (e.g., motion for stay of removal), counsel may call to alert the Court to the need to review and process the filing immediately; in such cases, filing the motion by email will greatly assist the Court in handling the motion expeditiously.

### MOTIONS TO CONTINUE
It is unnecessary to file a motion to continue any hearing scheduled before June 15, 2020; cases scheduled prior to June 15 are being reset by the Court. A motion to continue any hearing scheduled on or after June 15 shall contain a statement that the party seeking the continuance has communicated with the opposing party regarding the motion, and shall state the position of the opposing party. Motions to continue, including those based on the COVID-19 outbreak, must explain specifically why the continuance is necessary, and what efforts were made to prepare for the hearing before filing the motion to continue.

### IDENTIFICATION OF MATTERS APPROPRIATE FOR PROMPT ADJUDICATION
If either party believes that a matter is appropriately resolved either without a hearing or on a telephonic short matter calendar, that party shall confer with the opposing party. If an agreement is reached that the matter can be resolved in such a manner, either party may file notice with the Court, using language agreed to by both parties. The Court will then review the record and take action as appropriate.

Portland Immigration Court
Standing Order 20-02

**AILA Doc. No. 20041532. (Posted 6/15/20)**

So ordered.

RICHARD
ZANFARDINO    Digitally signed by
              RICHARD ZANFARDINO
              Date: 2020.05.22 10:40:12
              -07'00'
_____
Richard Zanfardino
Immigration Judge

MINDY
HOEPPNER     Digitally signed by
             MINDY HOEPPNER
             Date: 2020.05.22
             10:46:16 -07'00'
_____
Mindy Hoeppner
Immigration Judge

CHRISTOPHER   Digitally signed by
LYONS         CHRISTOPHER LYONS
              Date: 2020.05.22 12:48:32
              -07'00'
_____
Joren Lyons
Immigration Judge

THERESA SCALA   Digitally signed by THERESA
                SCALA
                Date: 2020.05.22 15:45:57 -07'00'
_____
Theresa Scala
Assistant Chief Immigration Judge

Portland Immigration Court
Standing Order 20-02

54) Sacramento: All immigration judges (3 pages)

131

AILA Doc. No. 20041532. (Posted 6/15/20)

**UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
SACRAMENTO IMMIGRATION COURT**

**STANDING ORDER 01-20:  Special Procedures During the COVID-19 National Emergency**

On March 17, 2020, the Federal Government issued a memorandum directing agencies to minimize face-to-face interactions with members of the public, which is posted at https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-16.pdf.  To comply with directives from Federal, State, and County health officials and reduce the spread of COVID-19, the following procedures shall be implemented immediately and shall remain effective until rescinded by a superseding order of the Sacramento Immigration Court. This order is made pursuant to Immigration and Nationality Act § 240(b)(1)-(2) and 8 C.F.R. § 1003.10(b), 1003.21(b), 1003.25, 1003.29, 1003.31(c), 1003.40.

**INDIVIDUALS WITH COVID-19 SYMPTOMS OR POSITIVE COVID-19 TEST**

Under no circumstances shall any individual experiencing symptoms consistent with COVID-19 infection enter the Court, including but not limited to the lobby, filing window, and courtrooms.  This same restriction applies to any individuals who have tested positive for COVID-19, unless they have been affirmatively advised by an appropriate medical professional that they are no longer contagious.  If any individual described in this paragraph is therefore unable to attend an upcoming hearing at which his or her presence is required, he or she shall promptly notify the Court.

**FILING OF MOTIONS, APPLICATIONS, BRIEFS, EVIDENCE, AND OTHER DOCUMENTS**

First class mail, express delivery services, or email sent in compliance with the guidelines posted at https://www.justice.gov/eoir/filing-email are strongly preferred over in-person submission of motions, applications, briefs, evidence, and any other documents, to reduce the risk of COVID-19 transmission.

Routine Filings; Prehearing Filings:  Prehearing submissions remain due 15 days before the individual hearing, as usual.  The parties are reminded that submissions filed less than 15 days prior to the individual hearing are untimely and will be excluded from the evidentiary record, unless the Court determines that there is good cause to excuse the late filing and that there is no undue prejudice to the opposing party.

Page Limit:  For background/country conditions documents that do not relate to Respondent(s), their family, or others with whom they have a personal connection, a maximum of 150 pages may be submitted.  The relevance of each background/country conditions document shall be set forth in the table of contents or by citation in the prehearing statement.  A party wishing to submit more than 150 pages of such documentation must establish good cause in a written motion that identifies the documents sought to be submitted, why they are believed to be necessary, and what they show that is not already established by any prior submissions.  The State Department's most recent Country Report on Human Rights Practices and Report on International Religious Freedom may be submitted, or made part of the record by motion, without counting against this page limit.

Sacramento Immigration Court
Standing Order 01-20

**AILA Doc. No. 20041532.  (Posted 6/15/20)**

In-Court Filings:  Until such time as this Standing Order is rescinded or superseded, documents physically submitted at a hearing will not be handled or considered by the Court at the hearing.  In the case of a merits hearing, such filings will be considered in the adjudication of the matter only upon a showing that 1) There is good cause to excuse the late filing, 2) There is no undue prejudice to the opposing party, *and* 3) The document is necessary for the appropriate resolution of the case, and is not cumulative, inconsequential, or otherwise unnecessary.

Emergency Motions:  In the case of an emergency motion (e.g., motion for stay of removal), counsel may call to alert the Court to the need to review and process the filing immediately; in such cases, filing the motion by email will greatly assist the Court in handling the motion expeditiously.

## MOTIONS TO CONTINUE

It is unnecessary to file a motion to continue any individual hearing or any master calendar hearing scheduled before May 18, 2020; cases scheduled prior to this date are being reset by the Court.  A motion to continue any hearing scheduled on or after this date shall contain a statement that the party seeking the continuance has communicated with the opposing party regarding the motion, and shall state the position of the opposing party.  Motions to continue, including those based on the COVID-19 outbreak, must explain specifically why the continuance is necessary, and what efforts were made to prepare for the hearing before filing the motion to continue.

## TEMPORAL LIMIT ON FILINGS

There is a three-month temporal filing limit on documents filed through email.  Effective immediately, the Sacramento Court will reject documents filed via the temporary e-mail boxes if filed more than three months before the next hearing date or a court-ordered deadline ("call-up date"), whichever is earlier.  Those wishing to file documents more than three months in advance may still do so; however, they must be sent to the court via the U.S. Postal Service or an overnight delivery service, not through the temporary e-mail box.

Documents rejected for not complying with the three-month temporal limit on filing may be filed by mail or through an overnight delivery service.  Notwithstanding the three-month temporal limit on filings through email, parties are required to comply with all deadlines for filings, as specified in the Immigration Court Practice Manual ch. 3.1(b).

The subject of the email must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandated deadline for the filing, and the initials of the immigration judge assigned to the case.

**Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

### Limitations on page numbers:

Effective immediately, for parties using a temporary email account to electronically file, supporting documentation/evidentiary filings are limited to fifty (50) pages in a particular case.  If a party intends to file more than fifty (50) pages, the party must electronically file the Table of Contents and separately

Sacramento Immigration Court
Standing Order 01-20

**AILA Doc. No. 20041532.  (Posted 6/15/20)**

submit the supporting documentation/evidentiary filings with the original Table of Contents by using the U.S. mail or an overnight delivery service no later than the date set for filing the documents with the immigration court.

This order supersedes the general electronic filing instructions.

SO ORDERED.

LORETO
GEISSE
_____
Loreto S. Geisse
Immigration Judge
Date:

WILLIAM
NEUMEISTER
_____
David Neumeister
Immigration Judge
Date:

ROBERT
MAGGARD
_____
Print Maggard
Immigration Judge
Date:

CHRISTOP
HER PHAN
_____
Christopher Phan
Immigration Judge
Date:

GILDA TERRAZAS
_____
Gilda Terrazas
Immigration Judge
Date:

THERESA
SCALA
_____
Theresa Scala
Assistant Chief Immigration Judge
Date:

Sacramento Immigration Court
Standing Order 01-20

134

55) Salt Lake City: All immigration judges (2 pages)

1
2            **UNITED STATES DEPARTMENT OF JUSTICE**
3            **EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
4               **UNITED STATES IMMIGRATION COURT**
5                    **SALT LAKE CITY, UTAH**
6
7                          April 22, 2019
8
9    STANDING ORDER OF THE SALT LAKE CITY IMMIGRATION COURT REGARDING
10            ELECTRONIC / EMAIL FILINGS BY COUNSEL
11
12      IT IS HEREBY ORDERED, effective immediately and continuing through June 30, 2020:
13
14      The Salt Lake City Immigration Court (SLC) is imposing a three-month chronological filing
15   limit on documents filed through email at: SaltLakeCity.Immigration.Court@USDOJ.GOV
16   Effective immediately, SLC will reject documents filed via the temporary e-mail box if filed
17   more than three months before the next hearing date or a court-ordered deadline ("call-up date"),
18   whichever is earlier.  Those wishing to file documents more than three months in advance may
19   still do so; however, they must be delivered to the court via the U.S. Mail or a delivery service,
20   and may not be filed through the temporary e-mail box.  Those documents delivered through the
21   temporary e-mail box that do not comply with the timeframes set forth herein will be rejected
22   and regarded as not filed.
23
24      HEARING EXAMPLE: If documents are filed via the temporary e-filing mailbox on April
25   22, 2020, for a hearing scheduled on or before July 21, 2020, they will be accepted provided they
26   conform to the Immigration Court Practice Manual (ICPM) and the e-mail filing instructions.
27   However, if documents are filed on April 22, 2020, for a hearing scheduled on or after July 22,
28   2020, they will be rejected and regarded as not filed.
29
30      CALL-UP DATE EXAMPLE: If documents are filed via the temporarily e-filing mailbox on
31   April 22, 2020, for a call-up date scheduled on or before July 21, 2020, they will be accepted
32   provided they conform to the ICPM and the e-mail filing instructions.  However, if documents
33   are filed on April 22, 2020, for a call-up date scheduled on or after July 22, 2020, they will be
34   rejected and regarded as not filed.
35
36      REJECTED FILINGS: Documents rejected for not complying with the three-month
37   chronological limit may be filed by mail or a delivery service.  Notwithstanding the three-month
38   chronological limit on filings through email, parties are required to comply with all deadlines for
39   filings, as specified by the Judge or the ICPM, ch. 3.1(b).
40
41      **Note: Applications for asylum are exempt from the three-month temporal limit on filings**
42      **through email and will be considered filed on the date of receipt for purposes of the one-**
43                          **year filing deadline.**
44
45      EMAIL - The subject of the email must contain the nature of the filing, the alien
46   registration number, the date of the next hearing or any court-mandate deadline for the filing, and
47   the initials of the immigration judge assigned to the case.

135

Example: A filer of a motion to continue with a case with alien registration number 012345678 and a hearing date of 06/30/2020 would input, "Motion to Continue - 012345678 - 06/30/2020" in the subject line of the email.  If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 - WAJ"

Example: A filer of an application for cancellation of removal with a case with alien registration number 012345678 and a hearing date on 01/02/2021 but a court-mandated filing deadline ("call-up date") of 06/25/2020 would input, "Application for Cancellation of Removal - 012345678 – 06/25/2020" in the subject line of the email.  If the filer knows the hearing is scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of Removal - 012345678 - 06/25/2020 – WAJ."

FILING PAGE LIMIT: Effective immediately, for parties using the temporary email box to electronically file, supporting documentation/evidentiary filings are limited to seventy-five (75) pages in each case.  If a party intends to file more than seventy-five (75) pages, the party must electronically file the Table of Contents and separately submit the supporting documentation or evidentiary filings with the original Table of Contents by U.S. Mail or a delivery service no later than the filing deadline.

The language above modifies the instructions presently posted online and supersedes the general electronic filing instructions.

This order augments the Standing Order of the Salt Lake City Immigration Court issued as of 4/22/2020.

DANIEL DAUGHERTY  Digitally signed by DANIEL DAUGHERTY Date: 2020.04.22 11:01:45 -07'00'

Daniel J. Daugherty
Assistant Chief Immigration Judge
Salt Lake City

56) San Antonio: All immigration judges (2 orders, 3 pages)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**SAN ANTONIO IMMIGRATION COURT**
**800 DOLOROSA STREET, SUITE 300**
**SAN ANTONIO, TX 78207**

**STANDING ORDER OF THE SAN ANTONIO IMMIGRATION COURT**
(Superseding the order issued on March 19, 2020)

Due to the COVID-19 pandemic, the San Antonio Immigration Court is implementing the below safety precautions until further notice:

1. In-person appearances in the courtroom are limited to the following individuals: Respondent, Respondent's counsel, DHS counsel, Court interpreter, essential EOIR staff and security personnel. *See* ICPM § 4.9(a)(ii) (citing 8 C.F.R. § 1003.27(b)).

2. Video teleconferencing ("VTC") will be utilized to the greatest extent possible, and any necessary witnesses will be allowed to appear by telephone. *See* ICPM § 4.7(b).

3. Limited exceptions to the above orders may be accommodated on a case-by-case basis and must be requested by written motion prior to the day of the hearing.

4. Any individual having business in person before the Court must notify the Court immediately by telephone if any of the following apply:

   a. The individual is displaying symptoms consistent with COVID-19 exposure
   b. The individual has been diagnosed with COVID-19
   c. The individual is pending results of a COVID-19 diagnostic test
   d. Within the past 14 days, the individual has had contact with anyone who has been diagnosed with COVID-19
   e. The individual has been asked to self-quarantine by local health authorities or a medical provider

   No individual described in one of the above categories will be permitted into the EOIR courtspace.

Attorneys who would like to appear telephonically for a particular case should inform the Immigration Judge's legal assistant in advance of the hearing by email and should provide the best phone number at which to be reached. Emails can be sent to the San Antonio Immigration Court email inbox at:

SanAntonio.Immigration.Court@USDOJ.GOV

Effective date:  April 2, 2020

**CLAY MARTIN** Digitally signed by CLAY MARTIN
Date: 2020.04.02 12:01:54 -05'00'

Clay N. Martin
Assistant Chief Immigration Judge

1   **UNITED STATES DEPARTMENT OF JUSTICE**
2   **EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
3   **SAN ANTONIO IMMIGRATION COURT**
4   **800 DOLOROSA STREET, SUITE 300**
5   **SAN ANTONIO, TX 78207**
6
7   **STANDING ORDER OF THE SAN ANTONIO IMMIGRATION COURT REGARDING**
8   **ELECTRONIC / EMAIL FILINGS BY COUNSEL**
9   (Augmenting the order issued on 4/2/2020)

10      The San Antonio Immigration Court is imposing a three-month chronological filing limit on
11  documents filed through email at: SanAntonio.Immigration.Court@USDOJ.GOV.  Effective
12  immediately, the Court will reject documents filed via the temporary e-mail box if filed more
13  than three months before the next hearing date or a court-ordered deadline ("call-up date"),
14  whichever is earlier.  Those wishing to file documents more than three months in advance may
15  still do so; however, they must be delivered to the court via the U.S. Mail or a delivery service,
16  and may not be filed through the temporary e-mail box.  Those documents delivered through the
17  temporary e-mail box that do not comply with the timeframes set forth herein will be rejected
18  and regarded as not filed.
19
20      HEARING EXAMPLE: If documents are filed via the temporary e-filing mailbox on April
21  22, 2020, for a hearing scheduled on or before July 21, 2020, they will be accepted provided they
22  conform to the Immigration Court Practice Manual (ICPM) and the e-mail filing instructions.
23  However, if documents are filed on April 22, 2020, for a hearing scheduled on or after July 22,
24  2020, they will be rejected and regarded as not filed.
25
26      CALL-UP DATE EXAMPLE: If documents are filed via the temporarily e-filing mailbox on
27  April 21, 2020, for a call-up date scheduled on or before July 20, 2020, they will be accepted
28  provided they conform to the ICPM and the e-mail filing instructions.  However, if documents
29  are filed on April 22, 2020, for a call-up date scheduled on or after July 22, 2020, they will be
30  rejected and regarded as not filed.
31
32      REJECTED FILINGS: Documents rejected for not complying with the three-month
33  chronological limit may be filed by mail or a delivery service.  Notwithstanding the three-month
34  chronological limit on filings through email, parties are required to comply with all deadlines for
35  filings, as specified by the Judge or the ICPM, ch. 3.1(b).
36
37      **Note: Applications for asylum are exempt from the three-month temporal limit on filings**
38      **through email and will be considered filed on the date of receipt for purposes of the one-**
39                          **year filing deadline.**
40
41      EMAIL - The subject of the email must contain the nature of the filing, the alien
42  registration number, the date of the next hearing or any court-mandate deadline for the filing, and
43  the initials of the immigration judge assigned to the case.
44
45      Example: A filer of a motion to continue with a case with alien registration number
46  012345678 and a hearing date of 06/30/2020 would input, "Motion to Continue - 012345678 -

138

**AILA Doc. No. 20041532. (Posted 6/15/20)**

1  06/30/2020" in the subject line of the email.  If the filer knows the hearing is scheduled before
2  Judge William A. Jones, the subject would be, "Motion to Continue - 012345678 - 06/30/2020 -
3  WAJ"
4
5          Example: A filer of an application for cancellation of removal with a case with alien
6  registration number 012345678 and a hearing date on 01/02/2021 but a court-mandated filing
7  deadline ("call-up date") of 06/25/2020 would input, "Application for Cancellation of Removal -
8  012345678 – 06/25/2020" in the subject line of the email.  If the filer knows the hearing is
9  scheduled before Judge William A. Jones, the subject would be, "Application for Cancellation of
10 Removal - 012345678 - 06/25/2020 – WAJ."
11
12         **FILING PAGE LIMIT**: Effective immediately, for parties using the temporary email
13 box to electronically file, supporting documents/evidentiary filings are limited to fifty (50) pages
14 in each case.  If a party intends to file more than fifty (50) pages, the party must electronically
15 file the Table of Contents and separately submit the supporting documents or evidentiary filings
16 with the original Table of Contents by U.S. Mail or a delivery service no later than the filing
17 deadline.
18
19 The language above modifies the instructions presently posted online and supersedes the general
20 electronic filing instructions.
21
22         This order augments the Standing Order of the San Antonio Immigration Court issued as
23 of 4/2/2020.
24
25
26
27
28 Daniel J. Daugherty
29 Assistant Chief Immigration Judge
30 Las Vegas, Salt Lake City
31 (Acting) Pearsall, San Antonio
32

DANIEL DAUGHERTY — Digitally signed by DANIEL DAUGHERTY  Date: 2020.05.18 16:12:21 -07'00'

139

57) San Diego: All immigration judges

**UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
SAN DIEGO, CALIFORNIA**

**STANDING ORDER: TELEPHONIC APPEARANCES IN CASES BEFORE THE SAN
DIEGO IMMIGRATION COURT DUE TO COVID-19**

Effective immediately and until rescinded by the Court, any attorney for any party may appear telephonically in cases before the San Diego Immigration Court without prior approval and without filing a motion in advance.

Attorneys who wish to appear telephonically must contact court staff in advance of the hearing and provide the best phone number at which to be reached. If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any rescheduled hearing.

Any documents to be considered by the Court during the hearing must be filed with the Court, and a copy received by opposing counsel or *pro se* respondent, at least two business days prior to the hearing. The San Diego Immigration Court accepts electronic filing of documents in cases before it, and all parties are strongly encouraged to file any and all documents electronically. No additional filing will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing. Any party appearing telephonically waives the right to object to the admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

So ordered.

_March 30, 2020_
Date

Rico J. Bartolomei
Assistant Chief Immigration Judge
San Diego Immigration Court

AILA Doc. No. 20041532. (Posted 6/15/20)

58) San Francisco: All immigration judges (2 orders, 3 pages)

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## UNITED STATES IMMIGRATION COURT
## SAN FRANCISCO, CALIFORNIA

### STANDING ORDER RELATING TO TELEPHONIC APPEARANCES AT ALL DETAINED HEARINGS

All previous standing orders relating to telephonic participation for San Francisco-detained hearings are hereby rescinded.

**IT IS HEREBY ORDERED** that all attorneys for parties and all qualified representatives may appear telephonically for all master calendar, merits, bond, reasonable fear review, or credible fear review hearings, without having to file a formal motion for telephonic appearance.

It is each attorney's responsibility to provide a valid telephone number to court staff prior to the telephonic appearance, if different than the phone number listed on the attorney's E-28. Attorneys can email Court staff at sfd.review@usdoj.gov to provide their contact information for telephonic appearances. The emails should clearly state the A#, name of respondent and date of the scheduled hearing in the subject line. If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person for future hearings. For the duration of this order, parties may appear by cell phone or landline.

Any motions to continue hearings due to COVID-19 should be submitted electronically to SanFrancisco.Immigration.Court@usdoj.gov with as much advanced notice as possible. Additionally, any documents the parties wish the Court to consider for hearings covered under this standing order can be filed with the Court electronically to SanFrancisco.Immigration.Court@usdoj.gov with a copy sent to opposing counsel, at least **three business days** prior to the bond or master hearing, and **ten business days** prior to individual merit hearings. During this time, the Court will not receive filings on the day of the hearing, except on a case-by-case basis as determined by the Immigration Judge as a matter of discretion.

The parties are encouraged to confer and reach stipulations as to factual and legal issues to facilitate the prompt disposition of cases. For bond hearings, parties are encouraged to confer and reach agreement on eligibility and/or the amount of bond when appropriate. Further, parties should submit affidavits or written statements in lieu of witnesses, for both individual hearings and bond hearings.

This order shall remain in effect until rescinded.

CHRISTOPHER SEPPANEN  Digitally signed by CHRISTOPHER SEPPANEN
                       Date: 2020.04.03 14:06:31 -04'00'

Assistant Chief Immigration Judge
Christopher Seppanen

AILA Doc. No. 20041532. (Posted 6/15/20)

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**UNITED STATES IMMIGRATION COURT**
**SAN FRANCISCO, CALIFORNIA**

**STANDING ORDER  REGARDING TEMPORAL AND PAGE LIMITS**
**ON DOCUMENTS FILED VIA E-MAIL**

Due to the COVID-19 pandemic and in the interest of safety, the San Francisco Immigration
Court has begun accepting the filing of documents via e-mail.  The following orders regarding
these filings supersedes the general electronic filing instructions.  They are effective immediately
and shall remain effective until further notice.

**IT IS HEREBY ORDERED** that with the exception of asylum applications,[1] there is a **three-
month temporal limit** on filings through e-mail.

Accordingly, the Court will reject documents filed via the temporary e-mail box if filed more
than three months before the next hearing date or a court-ordered deadline (or call-up date),
whichever is earlier.  Documents rejected through this process may be filed via U.S. Postal
Service or an overnight delivery service, or re-submitted electronically within the above-
specified timeframe.  Further, those wishing to file documents more than three months in
advance must submit such filing via U.S. Postal Service or an overnight delivery service.

- EXAMPLE:  If documents for either a **hearing or call-up date** are filed via the
  temporary e-filing mailbox on April 20, 2020, for a hearing scheduled on or before July
  19, 2020, they will be accepted provided they conform with the ICPM and the e-mail
  filing instructions.  However, if documents are filed on April 20, 2020, for a hearing
  scheduled on or after July 20, 2020, they will be rejected.

Nothing in this order alters filing deadlines specified in the ICPM, ch. 3.1(b) or case-specific
deadlines imposed by an Immigration Judge.

**IT IS FURTHER ORDERED** filings submitted through e-mail shall be limited to **100 pages**.

Accordingly, the Court will reject a filing submitted via the temporary e-mail box if it is over
100 pages including the caption page, proposed order, and proof of service.[2]  Those wishing to

---

[1] *Applications for asylum are exempt from the three-month temporal limit on filings through
e-mail and will be considered filed on the date of receipt for purposes of the one-year filing
deadline.*
[2] Disassembled submissions of voluminous filings will be rejected.  Multiple filings in a single
matter will only be accepted where the filings are clearly unrelated (such as an updated
application and a separate Country Conditions filing).

142

AILA Doc. No. 20041532.  (Posted 6/15/20)

submit a filing more than 100 pages must submit such filing via U.S. Postal Service or an overnight delivery service.

**IT IS FURTHER ORDERED** that filings submitted via e-mail shall contain sufficient information to identify the requirements noted above.

The subject of the e-mail must contain the nature of the filing, the alien registration number, the date of the next hearing or any court-mandated deadline/call-up date for the filing, and the initials of the Immigration Judge assigned to the case.

- EXAMPLE:  A motion to continue filed for a respondent with the A number of 012-345-678 and a hearing date of 6/30/2020 before Judge John S. Doe would input, "Motion to Continue – A#012-345-678 – 6/30/2020 – JSD."

- EXAMPLE:  An application filed for a respondent with the A number of 012-345-678 and a hearing date of 1/02/2021 but a call-up date of 6/30/2020 before Judge John S. Doe would input, "Cancellation of Removal – A#012-345-678 – call-up 6/30/2020 – JSD."

- EXAMPLE:  A filing for a respondent where the Immigration Judge is unknown should indicate UNK or N/A.  The above examples would be "Motion to Continue – A#012-345-678 – 6/30/2020 – UNK" or "Cancellation of Removal – A#012-345-678 – call-up 6/30/2020 – UNK."

DATE:                          CHRISTOPHER          Digitally signed by CHRISTOPHER
                               SEPPANEN             SEPPANEN
                                                    Date: 2020.04.24 08:17:34 -04'00'

                               ASSISTANT CHIEF IMMIGRATION JUDGE

04/24/2020                     CHRISTOPHER R. SEPPANEN

59) Seattle: All immigration judges (3 pages)

## UNITED STATES DEPARTMENT OF JUSTICE

## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

## SEATTLE IMMIGRATION COURT

### STANDING ORDER 01-20: Establishing Safe Procedures During the COVID-19 National Emergency

This Order establishes filing requirements and courtroom procedures pursuant to Immigration and Nationality Act §240(b)(1)-(2) and 8 C.F.R. §§ 1003.10(b), 1003.21(b), 1003.31(c), 1003.40. This order is effective immediately and shall remain effective until it is rescinded by a superseding order of the Seattle Immigration Court.

On Wednesday March 17, 2020, the Federal Government directed agencies to minimize face-to-face interactions with members of the public.[1] To comply with directives from Federal, State, and County health officials and reduce the spread of COVID-19, the following procedures shall be implemented immediately.

No attorney, interpreter, witness, or member of the public who is subject to the restrictions articulated in Policy Memorandum 20-10, Immigration Court Practices During the Declared National Emergency Concerning the COVID-19 Outbreak (Mar. 19, 2020) (as amended), is subject to an isolation or quarantine order from a government health official or a medical provider, or has had physical contact with anyone within the past fourteen (14) days who was diagnosed with COVID-19 may appear in the Seattle Immigration Court because the public interest requires that removal proceedings be closed to individuals likely to spread COVID-19. 8 C.F.R. § 1003.27(c). If an individual fails to comply with these reasonable limitations, the Court shall comply with guidance from federal, state, and/or county health authorities and continue the hearing. 8 C.F.R. § 1240.6.

While the Court in ordinary circumstances prefers in-court appearance by the representatives of the parties, attorneys and accredited representatives may file motions to appear telephonically for any hearing. Such motion shall clearly identify the telephone number to be called, and the Court prefers a landline for audible clarity if such is an option.

Witnesses, family, and community members may attend a hearing in the same courtroom as the alien so long as no more than 6 people, including the hearing's participants, are present in the courtroom. During this emergency situation, the Court strongly encourages witnesses, family, and community members to rely on written statements in lieu of appearing at the hearing to limit the potential spread of COVID-19.

Members of the general public may be asked to leave a hearing to accommodate a member of the media. 8 C.F.R. § 1003.27(a).

The filing of documents and evidence by first class mail is strongly preferred to reduce the risk of COVID-19 transmission. 8 C.F.R. § 1003.32(a).

---

[1] OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, Memorandum for the Heads of Departments and Agencies (Mar. 17, 2020) https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-19.pdf.

1

AILA Doc. No. 20041532. (Posted 6/15/20)

For individual calendar hearings, all filings must be submitted in accordance with the deadlines ordered by the Court. 8 C.F.R. 1003.31(c). Absent a prehearing order to the contrary, all filings must be submitted at least fifteen (15) days in advance of the hearing. To reduce the risk of COVID-19 transmission, the Court will NOT accept untimely documents filed less than 48 hours prior to the individual hearing. If a party wishes the Court to consider a filing despite its untimeliness, the party must make a written motion to accept the untimely filing no later than 48 hours prior to the date of hearing. A motion to accept an untimely filing must explain the reasons for the late filing and show good cause for acceptance of the filing. The Court may not consider or give any evidentiary weight to untimely evidence presented at the hearing. *Taggar v. Holder*, 736 F.3d 866, 889 (9th Cir. 2013).

The Executive Office for Immigration Review (EOIR) has established temporary email accounts for immigration courts nationwide to facilitate electronic filing for all parties while the rollout of the EOIR Court and Appeals System is delayed due to COVID-19. Guidelines for emailed filings can be found at https://www.justice.gov/eoir/filing-email . Emailed submissions shall be limited to 50 pages per case, and shall not be filed more than 3 months prior to any hearing or Court-ordered call-up date. **Applications for asylum are exempt from the three-month temporal limit on filings through email and will be considered filed on the date of receipt for purposes of the one-year filing deadline.**

A Respondent may file a "Motion to Adjudicate Applications Without Evidentiary Hearing" with the Court, prior to any filing deadlines established by the Court, to request that a written decision on the merits be issued based solely on the applications, declarations, and other evidence contained in the record of proceeding. 8 C.F.R. § 1003.37(a). The motion should indicate whether the respondent is seeking to apply for voluntary departure under INA § 240B. Should the respondent be seeking voluntary departure the motion must clearly indicate that the counsel or accredited representative has explained the conditions that attach to voluntary departure as set forth in *Matter of Gamero*, 25 I&N Dec. 164 (BIA 2010). For the purposes of post-conclusion voluntary departure during the period of this Standing Order, the parties should assume the Court would set the minimum bond of $500 and grant the maximum period of 60 days to depart.

Included with a Motion to Adjudicate Applications Without Evidentiary Hearing must be a signed statement from the respondent that he or she understands his or her right to present testimony, but that such right is knowingly waived. In addition, should the respondent be seeking voluntary departure, the motion must also include a signed statement from the alien that he or she understands the conditions that attach pursuant to *Matter of Gamero, supra*, and that he or she accepts such conditions should voluntary departure be granted in the exercise of discretion.

The Department of Homeland Security (DHS) will be granted 7 calendar days to object, in writing, to a Motion to Adjudicate Applications Without Evidentiary Hearing. Absent a response, the Court will assume that background checks have been completed or will be completed prior to the issuance of a decision. The Court will not assume, however, that the DHS supports any application unless the DHS specifically submits a written response so indicating. Absent an indication the parties agree to an outcome, the Court will issue a decision on the merits of the applications and suitable for appellate purposes.

While this order is effective, in an urgent situation, any party may call the Seattle Immigration Court at (206) 553-5953 to request that a hearing be continued if the Respondent's attorney, accredited representative, or

Seattle Immigration Court
Standing Order 01-20

witnesses are unable to appear, pursuant to the procedures articulated by this order, because they are exhibiting any symptoms of COVID-19, are subject a quarantine or isolation order of a local, state, or federal official including situations where the attorney cares for a sick or at-risk family member or a minor child, or because of guidance or orders issued by the Centers for Disease Control, the Washington Department of Health, or a County Health Officer. 8 C.F.R. § 1003.10(b), 1003.29. Absent an urgent situation described above, a motion to continue should be filed in writing.

It is so ordered.

THERESA SCALA
Digitally signed by THERESA SCALA
Date: 2020.08.31 17:44:12 -07'00'

Theresa M. Scala
*Assistant Chief Immigration Judge*

SHANE JOHNSON
Digitally signed by SHANE JOHNSON
Date: 2020.05.01 09:49:31 -07'00'

Shane E. Johnson
*Immigration Judge*

ROBERT MCSEVENEY
Digitally signed by ROBERT MCSEVENEY
Date: 2020.05.01 14:16:16 -07'00'

Robert B.C. McSeveney
*Immigration Judge*

BRETT PARCHERT
Digitally signed by BRETT PARCHERT
Date: 2020.05.01 08:47:06 -07'00'

Brett M. Parchert
*Immigration Judge*

Seattle Immigration Court
Standing Order 01-20

146

AILA Doc. No. 20041532. (Posted 6/15/20)

60) Stewart: All immigration judges

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**STEWART IMMIGRATION COURT**
**Lumpkin, Georgia**

STANDING ORDER OF THE STEWART IMMIGRATION COURT RELATING TO
TELEPHONIC APPEARANCES OF COUNSEL AND PERMITTED ATTENDEES AT ALL
HEARINGS

IT IS ORDERED that, effective immediately and continuing until further notice:

1) Any attorney or accredited representative for any party may appear telephonically in hearings
before the Stewart Immigration Court without prior approval and without filing a motion in
advance. Attorneys or representatives who would like to appear telephonically for a particular
hearing should call the main desk in advance of the hearing at 1-229-838-1324 and provide
the Alien number, the name of the Immigration Judge (IJ) presiding over the hearing, and the
best phone number to reach the attorney or representative.

2) If the Court is unable to reach the attorney or representative by telephone for the hearing, the
attorney or representative will be required to appear in-person at any rescheduled hearing.

3) Any attorney or accredited representative who wishes to appear telephonically does so with
the understanding that any paper or electronic filings must be filed in advance of the hearing
in sufficient time to be included in the official record of proceeding in accordance with any
deadlines set by the Court or, if none, in accordance with the filing deadlines set forth in the
Immigration Court Practice Manual. No additional filings will be accepted at the hearing, and
the decision of the Court will be based on the documents in the record at the close of the
hearing.

4) No filings for any hearing will be accepted over the bench unless filed by pro se litigants. All
other filings must be made via ECAS, at the filing window prior to the hearing, or via mail-
delivery service.

5) Requests to continue cases due to COVID-19 concerns should be filed with as much notice as
possible. On an emergency basis, requests may be made to the Court by facsimile by faxing
the request to 1-229-838-9538 and serving the request to opposing counsel.

6) Attendees at all hearings may be limited to attorneys, respondent, witnesses, security officers,
and other persons determined by the IJ to be necessary.

7) Each IJ has the discretion to alter this standing order on a case by case basis.

John R. Doolittle, II
Assistant Chief Immigration Judge
Lumpkin, Georgia

*updates: www.justice.gov/eoir*                          *Version released on: June 12, 2020*

**AILA Doc. No. 20041532. (Posted 6/15/20)**

61) Tacoma: All immigration judges (3 pages)

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### TACOMA IMMIGRATION COURT

**STANDING ORDER 02-20: Procedures for Safe Hearings During the COVID-19 National Emergency**

This order establishes filing requirements and courtroom procedures pursuant to Immigration and Nationality Act § 240(b)(1)-(2) and 8 C.F.R. §§ 1003.10(b), 1003.21(b), 1003.31(c), 1003.40. This order is effective immediately. Standing Order 01-20: Establishing Safe Procedures During the COVID-19 National Emergency, is revoked and rescinded.

#### FACTUAL FINDINGS

On Wednesday March 17, 2020, the Federal Government directed agencies to minimize face-to-face interactions with members of the public.[1] To comply with directives from Federal, State, and County health officials and reduce the spread of COVID-19, the following procedures shall be implemented immediately.

#### VIDEO CONFERENCE AND TELEPHONIC PROCEEDINGS

All master calendar, bond, credible and reasonable fear review, and individual calendar hearings shall be conducted by video conference in one of five (5) court rooms, including VTC Courtroom 1 (E-145-H) and VTC Courtroom 2 (E-145-G), separate from immigration judges and court staff. INA § 240(b)(2)(A)(iii); 8 C.F.R. § 1003.25(c); *see Vilchez v. Holder*, 682 F.3d 1195, 1199 (9th Cir. 2012). Immigration judges will conduct video conference hearings from their offices or remote courtrooms. Respondents have a right to proceed in person or through video conference at an evidentiary hearing on the merits. INA § 240(a)(B). If a Respondent objects to conducting an evidentiary hearing where their attorney appears telephonically, Respondent may request a continuance for good cause. 8 C.F.R. §§ 1003.29, 1240.6.

No attorney, interpreter, witness, or member of the public who is subject to the restrictions articulated in Policy Memorandum 20-10, Immigration Court Practices During the Declared National Emergency Concerning the COVID-19 Outbreak (Mar. 19, 2020) (as amended), is subject to an isolation or quarantine order from a government health official or a medical provider, or has had physical contact with anyone within the past fourteen (14) days who was diagnosed with COVID-19 may appear in the Tacoma Immigration Court because the public interest requires that removal proceedings be closed to individuals likely to spread COVID-19. 8 C.F.R. § 1003.27(c). If an individual fails to comply with these reasonable limitations, the court shall comply with guidance from federal, state, and county health authorities and continue the hearing. 8 C.F.R. § 1240.6.

#### A.    Attorneys and Accredited Representatives

Attorneys and accredited representatives are strongly encouraged to appear by telephone conference at the phone number contained in the Form EOIR-28, Notice of Entry of Appearance, filed with the court. INA § 240(b)(2)(A)(iv). No prior request for a telephonic hearing is required—the court will call an attorney, using information contained in the Form EOIR-28, if one is not physically present in the video conference courtroom at the start of a hearing. Attorneys and accredited representatives may also provide an alternative phone number by calling the Tacoma Immigration Court at least two (2) days prior to a hearing. Attorneys may also appear with Respondent in the video conference courtroom.

---

[1] OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, Memorandum for the Heads of Departments and Agencies (Mar. 17, 2020) https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-16.pdf.

1

Tacoma Immigration Court
Standing Order 02-20

AILA Doc. No. 20041532. (Posted 6/15/20)

**B.     Witnesses, Family Members, and Community Members**

Witnesses, family, and community members may attend a hearing in the same courtroom as Respondent, so long as no more than six (6) people—including Respondent, DHS counsel, an interpreter, a bailiff, and Executive Office for Immigration Review staff—are present in the courtroom.   8 C.F.R. § 1003.27(a).  The court strongly encourages witnesses, family, and community members to provide telephonic testimony or submit letters or written declarations in lieu of appearing at hearings to limit the potential spread of COVID-19.

**C.     Members of the Media**

Members of the general public may be asked to leave a hearing to accommodate a member of the media. 8 C.F.R. § 1003.27(a).

**D.     Members of *Franco-Gonzales* Class**

Notwithstanding this order, the court will implement safeguards and adopt all procedures necessary to ensure a full and fair hearing for members of the *Franco-Gonzalez v. Holder*, 2014 WL 5475097 (C.D. Cal. 2014) class, including an in-person hearing.

## FILING OF APPLICATIONS, DOCUMENTS, BRIEFS, AND EVIDENCE

The filing of documents and evidence by first class mail is strongly preferred to reduce the risk of COVID-19 transmission.  8 C.F.R. § 1003.32(a).  Documents filed by email pursuant to Immigration Court Practice Manual, Chapter 3.1(a)(viii) (Apr. 10, 2020) may not exceed fifty (50) pages—all filings greater than fifty (50) pages must be submitted at the court's filing window or by mail or overnight delivery service.  The court may not consider or give any evidentiary weight to untimely evidence presented at the hearing.  *See Taggar v. Holder*, 736 F.3d 866, 889 (9th Cir. 2013).  Further, the court may continue a hearing if documents are presented during a hearing, so that the court has an opportunity to review and carefully consider the new evidence.  8 C.F.R. §§ 1003.29, 1240.6.

## MOTION TO ADJUDICATE APPLICATIONS WITHOUT EVIDENTIARY HEARING

A Respondent may file a "Motion to Adjudicate Applications Without Evidentiary Hearing" with the court, prior to any filing deadlines established by the court, to request that a written decision on the merits be issued based solely on the applications, declarations, and other evidence contained in the record of proceeding. 8 C.F.R. § 1003.37(a).  The motion should indicate the position of the Department of Homeland Security, where practicable, and whether Respondent is seeking to apply for voluntary departure under INA § 240B.

**A.     Department of Homeland Security Opportunity to Respond**

The Department of Homeland Security has **five (5) calendar days** to respond or object, in writing, to Respondent's Motion to Adjudicate Applications Without Evidentiary Hearing.  8 C.F.R. § 1003.31(c).

**B.     Procedures for Issuance of a Written Decision**

If Respondent has already sworn to the contents of their application under oath before an immigration judge, the court will issue a written decision, in appropriate circumstances, as soon as practicable, automatically reserving both parties' right to appeal to the Board of Immigration Appeals.  *See Grava v.*

2

Tacoma Immigration Court
Standing Order 02-20

149

AILA Doc. No. 20041532. (Posted 6/15/20)

*INS*, 205 F.3d 1177, 1181 (9th Cir. 2000) ("neither [*Matter of Fefe*, 20 I&N Dec. 116 (BIA 1989)] nor the regulations allow the Board to reject, as a matter of law, testimony limited to an affirmation that the application materials are true."). If Respondent has not yet sworn to the contents of their application for relief, Respondent will be scheduled for a master calendar hearing to swear to the contents of their applications for relief. A "Motion to Adjudicate Applications Without Evidentiary Hearing" may be denied if the court needs to examine Respondent or other witnesses, or for any other reason.

## MOTIONS TO CONTINUE

While this order is effective, any party may call the Tacoma Immigration Court at (253) 779-6020 to request that a hearing be continued if Respondent's attorney, accredited representative, or witnesses are unable to appear, pursuant to the procedures articulated by this order, because they are exhibiting any symptoms of COVID-19, are subject a quarantine or isolation order of a local, state, or federal official—including situations where the attorney or accredited representative cares for a sick or at-risk family member or a minor child—or because of guidance or orders issued by the Centers for Disease Control, the Washington Department of Health, or a County Health Officer. 8 C.F.R. § 1003.10(b), 1003.29. Motions to Continue may also be filed in writing.

So ordered.

Theresa M. Scala
Assistant Chief Immigration Judge
Date: 4/30/2020.

John Odell
Immigration Judge
Date: 4/30/2020

Tammy L. Fitting
Immigration Judge
Date: 4-30-2020

Charles Neil Floyd
Immigration Judge
Date: 4-30-2020

3

Tacoma Immigration Court
Standing Order 02-20

150

AILA Doc. No. 20041532. (Posted 6/15/20)

62) Tucson: All immigration judges (2 pages)

**UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
300 WEST CONGRESS STREET, SUITE 300
TUCSON, ARIZONA 85701**

**STANDING ORDER OF THE TUCSON IMMIGRATION COURT
RELATING TO TELEPHONIC APPEARANCES AT ALL HEARINGS
AND TEMPORAL AND PAGE LIMITS
ON ELECTRONICALLY FILED DOCUMENTS**

This standing order supersedes all prior standing orders and is subject to change and/or revocation without notice. Effective immediately, and until further notice, any attorney or qualified representative for any party may appear telephonically before the Tucson Immigration Court without prior approval and without filing a motion for telephonic appearance for any type of hearing, including hearings conducted by video teleconference ("VTC") from the La Palma Correctional Center and/or any juvenile detention facility.

Any attorney or qualified representative must confer with the respondent or applicant in advance of the hearing to ensure that the respondent or applicant consents to the telephonic appearance. Attorneys or representatives should email the Tucson Immigration Court at Tucson.Immigration.Court@usdoj.gov no later than one business day in advance of the hearing to provide the telephone number where the attorney or representative may be reached. If any attorney or representative wishes to appear in-person at a hearing in a detained case, the attorney must provide the Court with two business days of notice. It is the responsibility of all parties to inquire as to any social or physical distancing requirements that have been established by the Court, CoreCivic, or the General Services Administration.

The parties are encouraged to confer with one another prior to the hearing, in order to reach stipulations as to facts and/or legal issues (e.g. 10 years of continuous residence) to facilitate the prompt disposition of cases. The parties are also encouraged to confer and reach agreement on the eligibility for bond and the amount of the bond. The parties should also submit affidavits or written statements of witnesses in lieu of the witnesses appearing in court. Any documents that counsel wishes the Court to consider at the hearing must be both timely filed with the Court and timely received by opposing counsel or the *pro se* respondent or applicant at least two business days prior to the hearing.

Due to the current COVID-19 health crisis, motions and pleadings pertaining to detained cases should be filed with as much notice as possible, but no later than two business days in advance of the scheduled hearing by submitting an email to the Court at Tucson.Immigration.Court@usdoj.gov. All parties are on notice that they should not file or send notices to any other email address. Instructions for filings can be found at https://www.justice.gov/eoir/filing-email. Attorneys are advised that such filings must comply with Paragraph 3.3(c) of the Immigration Court Practice Manual with the exception

**AILA Doc. No. 20041532. (Posted 6/15/20)**

STANDING ORDER OF THE TUCSON IMMIGRATION COURT
RELATING TO TELEPHONIC APPEARANCES AT ALL HEARINGS
AND TEMPORAL AND PAGE LIMITS ON ELECTRONICALLY FILED DOCUMENTS
Page 2 of 2

of the requirement for hole-punching and binding. Attorneys are also encouraged to be succinct and to file only such documents that are relevant and probative. Attorneys are encouraged to limit the filing of duplicative country condition reports and to file only such reports that are necessary and reasonable.

The subject line of any email filing must contain the nature of the filing, the alien registration number, the date of the next hearing or the call-up date, or any court-mandated deadline for the filing, and the initials of the immigration judge assigned to the case.

With respect to electronic filings, the Tucson Immigration Court is imposing a 90-day limit on electronic filings made through the Tucson.Immigration.Court@usdoj.gov mailbox. The Court will reject electronic filings if they are filed in excess of 90 days prior to the next hearing date or court-ordered deadline ("call-up date"), whichever is earlier. Those wishing to file documents more than 90 days in advance of a hearing or a call-up date may file the submission in person, or should send the filing via the United States Postal Service or an overnight delivery service. Electronic filings rejected for not complying with the 90-day deadline may be filed in person, by the United States Postal Service or by an overnight delivery service. Notwithstanding the 90-day limit on electronic filings, all parties are required to comply with all deadlines for filings as specified in Paragraph 3.1(b) of the Immigration Court Practice Manual and as set forth in any Scheduling Order issued by any Tucson Immigration Judge. **Applications for asylum are exempt from the 90-day electronic filing limit and will be considered filed on the date of receipt for purposes of the one-year filing deadline. This exemption from the filing deadline applies only to the Form I-589, and not to documentation filed in support of the application.**

The Tucson Immigration Court is imposing a 50-page limit on all electronic filings made through the Tucson.Immigration.Court@usdoj.gov electronic mailbox. Supporting documents/evidentiary filings will be limited to 50 pages for a particular case. If a party intends to file more than 50 pages, the party must electronically file a copy of the Table of Contents and separately file the supporting documents/evidentiary filings with the original Table of Contents in person, or by the United States Postal Service or an overnight delivery service no later than the date set by the Court for the filing of the documents. Only attorneys, and not legal assistants, paralegals or others, may electronically file documents; all documents must be filed from the specific email address on file with EOIR, if the email does not come from the email address on file, the submission will be rejected.

IRENE
FELDMAN

Digitally signed by IRENE
FELDMAN
Date: 2020.04.22 14:52:24
-07'00'

Irene C. Feldman
Assistant Chief Immigration Judge

AILA Doc. No. 20041532. (Posted 6/15/20)

63) York: All immigration judges

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
YORK, PENNSYLVANIA

STANDING ORDER OF THE YORK IMMIGRATION COURT
RELATING TO TELEPHONIC APPEARANCES AT HEARINGS

IT IS HEREBY ORDERED that, for the thirty (30) day period following the signing of this order, parties scheduled to appear for a master calendar, custody, or individual hearing before the York Immigration Court may appear telephonically, without the filing of a motion for telephonic appearance. This permission is subject to the following caveats:

1) Any party, whether an attorney or a litigant, who wishes to appear telephonically does so with the understanding that any paper or electronic filings to be considered by the Court must be in the official record of proceeding at the time the hearing is scheduled to be held. No additional filings will be accepted at the hearing from a party not appearing in person, and the decision of the Court will be based on the documents in the record at the close of the hearing.

2) Any party appearing telephonically waives the right to object to the admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

3) If the Court is unable to reach a party by telephone for the hearing, the party will thereafter be required to appear in person at any rescheduled hearing.

4) The parties may offer testimony from witnesses appearing telephonically if the witness's contact information is provided to the Court prior to the hearing. Witnesses must be sequestered to the best of their ability when others are testifying. If a witness fails to appear, it is within the Court's discretion whether to proceed with or reschedule the hearing.

June 11, 2020
Date

THERESA HOLMES SIMMONS

Theresa H. Holmes-Simmons
Assistant Chief Immigration Judge
York, Pennsylvania

153

# Table of Changes

Appendix R of the Immigration Court Practice Manual is updated periodically. The tables below are arranged by most recent date of change, and contain within each table the section amended and nature of the change made to Appendix R. Page numbers throughout Appendix R may have changed as the result of updates.

## June 12, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Replaced standing orders for Dallas, Philadelphia, and York Immigration Courts. |

## June 11, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Replaced standing orders for Batavia, Boston, and Buffalo Immigration Courts. |

## June 10, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Replaced standing order for Arlington Immigration Court; Added standing order for Los Angeles – Olive Street Immigration Court. |

## June 5, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Replaced standing orders for Florence and Los Angeles – Olive Street Immigration Courts. |

AILA Doc. No. 20041532. (Posted 6/15/20)

## June 2, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Replaced standing orders for Aurora Immigration Court. |

## May 28, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Added standing order for Houston – S. Gessner Rd Immigration Court; Replaced standing orders for Dallas Immigration Court. |

## May 26, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Replaced standing order for Portland Immigration Court. |

## May 20, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Added standing order for Atlanta – W Peachtree St Immigration Court. |

## May 19, 2020

updates: www.justice.gov/eoir                          Version released on: June 12, 2020

AILA Doc. No. 20041532. (Posted 6/15/20)

| Section amended | Nature of change |
|---|---|
| Appendix R | Added standing orders for San Antonio and Pearsall Immigration Courts. |

## May 18, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Added standing order for Los Angeles – Van Nuys Boulevard Immigration Court. |

## May 15, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Added standing order for Los Angeles – Olive Street Immigration Court; Replaced standing order for Atlanta – Ted Turner Drive. |

## May 14, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Replaced standing orders for Buffalo and Batavia Immigration Courts. |

## May 12, 2020

| Section amended | Nature of change |
|---|---|
| | |

156

AILA Doc. No. 20041532. (Posted 6/15/20)

| Appendix R | Added standing orders for Chicago, New Orleans, NYC – Broadway, NYC – Federal Plaza, NYC – Varick, and Oakdale Immigration Courts. |

## May 7, 2020

| Section amended | Nature of change |
| --- | --- |
| Appendix R | Replaced standing orders for Aurora, Guaynabo (San Juan) and Orlando Immigration Courts. |

## May 6, 2020

| Section amended | Nature of change |
| --- | --- |
| Appendix R | Replaced standing order for LaSalle Immigration Court. |

## May 5, 2020

| Section amended | Nature of change |
| --- | --- |
| Appendix R | Added standing orders for Dallas, New York – Broadway, New York – Varick, and Seattle Immigration Courts; Replaced standing order for Atlanta – Ted Turner Drive Immigration Court. |

## May 1, 2020

| Section amended | Nature of change |
| --- | --- |
| Appendix R | Added standing orders for Memphis and New York – Federal Plaza Immigration Courts; Replaced standing order for Elizabeth and Tacoma Immigration Courts. |

updates: www.justice.gov/eoir                                    *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

## April 30, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Adding standing order for Arlington Immigration Court; Replaced standing order for Los Angeles – N. Los Angeles Street Immigration Court |

## April 29, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Adding standing order for Baltimore Immigration Court; Replaced standing order for Portland Immigration Court. |

## April 27, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Adding standing orders for Houston and Sacramento Immigration Courts; Replaced standing order for Kansas City Immigration Court. |

## April 24, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Adding standing orders for Chicago, Ft. Snelling (Bloomington), and San Francisco Immigration Courts; Replaced standing orders for Kansas City and Eloy Immigration Courts. |

## April 23, 2020

| Section amended | Nature of change |
|---|---|
|  |  |

updates: *www.justice.gov/eoir*                          *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

| | Adding standing orders for Charlotte and Portland Immigration Courts; Replaced standing order for Adelanto, Batavia, Buffalo, Eloy, and Tucson Immigration Courts. |
|---|---|
| Appendix R | |

## April 22, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Added standing orders for Dallas, Las Vegas, Newark, Phoenix, and Salt Lake City Immigration Courts. |

## April 21, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Added standing orders for Batavia and Buffalo Immigration Courts; Revised standing orders for Boston, Cleveland, and Hartford Immigration Courts. |

## April 17, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Revised standing order for Dallas Immigration Court. |

## April 16, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Revised standing orders for Aurora, Batavia, and Buffalo Immigration Courts. |

## April 15, 2020

AILA Doc. No. 20041532. (Posted 6/15/20)

| Section amended | Nature of change |
|---|---|
| Appendix R | Added standing order for Chicago Immigration Court; Replaced standing order for Detroit Immigration Court. |

## April 10, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Appendix R moved to standalone document; Replaced standing order for Atlanta-Ted Turner Drive Immigration Court. |

*updates: www.justice.gov/eoir*                                          *Version released on: June 12, 2020*

AILA Doc. No. 20041532. (Posted 6/15/20)

# Exhibit D

Deposition of          Gary W. Smith          August 20, 2014

---

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2               ATLANTA DIVISION
3
  JACQUELINE STEVENS,
4
       Plaintiff,
5                          CIVIL ACTION FILE
  vs.
6                          NO. 1:12-CV-1352-0DE
7 ERIC HOLDER, JR.,
  Attorney General of the
8 United States, in his official
  capacity, et al.,
9
       Defendants.
10
11
12              DEPOSITION OF
13              GARY W. SMITH
14             August 20, 2014
15               9:40 a.m.
16
17     Richard B. Russell Federal Building
18
19           75 Spring Street, SW
20
21            Atlanta, Georgia
22
23
24
25        Marsi Koehl, CCR, CCR-B-2424
```

---

Page 2

```
1          C O N T E N T S
2          E X A M I N A T I O N
3                    Page
4 Examination by Mr. Brown...........................7
5 Examination by Mr. Hollis.....................121
6
7
8
9
10              E X H I B I T S
11 Defendants'
   Exhibit No.    Description       Page
12
13 Exhibit 1    Federal Defendants' Response  56
14             to Plaintiff's First Continuing
15             Interrogatories
16 Exhibit 2    Memorandum, 8/9/06           63
17 Exhibit 3    A Guide for Immigration Judges  64
18             on Investigation by the OPR
19 Exhibit 4    Article from The Nation      66
20 Exhibit 5    E-mail String, 1/27/10       67
21             RE: Stewart Tour
22 Exhibit 6    E-mail String, 1/27/10       68
23             RE: Visits to Detention Centers
24 Exhibit 7    E-mail String, 1/27/10       70
25             RE: Visitors Feb ICE Tours
```

---

Page 3

```
1          E X H I B I T S  C O N T I N U E D
2 Defendants'
   Exhibit No.    Description       Page
3
4 Exhibit 8    MegaCenter Transcript        78
5 Exhibit 9    E-mail String, 5/12/10       80
6             RE: Judge Cassidy
7 Exhibit 10   E-mail String, 6/1/10        83
8             RE: Ms. Stevens
9 Exhibit 11   E-mail String, 4/19/10       88
10            RE: Journalist
11 Exhibit 12  E-mail from M. Crosby        89
12            4/19/10
13 Exhibit 13  E-mail String, 4/19/10       90
14            RE: Ms. Stevens-April 19, 2010
15 Exhibit 14  E-mail String, 4/19/10       91
16            RE: Jackie Stevens is at the
17            Atlanta Immigration Court
18 Exhibit 15  E-mail from M. Crosby        93
19            4/19/10
20 Exhibit 16  E-mail String, 4/27/10       96
21            RE: Judge Cassidy
22 Exhibit 17  E-mail String, 4/27/10       99
23            RE: Jackie Stevens
24 Exhibit 18  E-mail String, 4/28/10      100
25            RE: Jackie Stevens
```

---

Page 4

```
1          E X H I B I T S  C O N T I N U E D
2 Defendants'
   Exhibit No.    Description       Page
3
4 Exhibit 19   Single Complaint Detail     105
5 Exhibit 20   E-mail String, 6/1/10       106
6             RE: Judge Cassidy
7 Exhibit 21   E-mail String, 6/1/10       106
8             RE: Case #810004327
9 Exhibit 22   Letter to Ms. Stevens from  110
10            Mr. Smith, 6/3/10
11 Exhibit 23  E-mail String, 4/13/10      114
12            RE: Journalist
13 Exhibit 24  E-mail String, 4/21/10      116
14            RE: Disruptive Courtroom
15            Behavior
16 Exhibit 25  E-mail String, 5/11/10      117
17            RE: Federal Protective Service
18
19
20 (Original exhibits attached to Original transcript.)
21
22
23
24
25
```

---

APG USA INC.

Case 1:23-cv-01952-RDE Document 27-70 Filed 08/22/14 Page 180 of 329

Deposition of         Gary W. Smith        August 20, 2014

Page 5

1 APPEARANCES OF COUNSEL
2 On behalf of the Plaintiff:
3      BRUCE P. BROWN
4      Attorney at Law
5      BRUCE P. BROWN LAW, LLC
6      309 North Highland Avenue
7      Suite A
8      Atlanta, Georgia 30307
9      (404) 548-0400
10      bbrown@brucepbrownlaw.com
11 On behalf of the Defendants:
12      CHRISTOPHER W. HOLLIS
13      PATRICIA ALLEN
14      Attorneys at Law
15      U.S. DEPARTMENT OF JUSTICE
16      OFFICE OF IMMIGRATION LITIGATION
17      Liberty Square
18      450 5th Street, NW
19      Washington, D.C. 20001
20      (202) 305-0899
21      christopher.hollis@usdoj.gov
22
23 -- and --
24
25

Page 6

1 APPEARANCES OF COUNSEL CONTINUED
2 On behalf of the Defendants:
3      AILEEN BELL HUGHES
4      Attorney at Law
5      U.S. DEPARTMENT OF JUSTICE
6      NORTHERN DISTRICT OF GEORGIA
7      75 Spring Street, SW
8      Suite 600
9      Atlanta, Georgia 30303
10      (404) 581-6133
11      aileen.bell.hughes@usdoj.gov
12 Also present:
13      Jacqueline Stevens
14
15
16
17      (Pursuant to OCGA 15-14-37 (a) and (b) a
18 written disclosure statement was submitted
19 by the court reporter to all counsel present
20 at the deposition and is attached hereto.)
21
22
23
24
25

Page 7

1      P R O C E E D I N G S
2      GARY W. SMITH,
3 having been first duly sworn, was examined and testified
4 as follows:
5      EXAMINATION
6 BY MR. BROWN:
7    Q. Please state your full name for the record.
8    A. It's Gary W. Smith.
9    Q. Mr. Smith, my name is Bruce Brown and I
10 represent the plaintiff in this case. I'm asking you
11 some questions. If you have any -- if you don't
12 understand a question, if you want me to reframe it,
13 please feel free to do so.
14      Have you had your deposition taken before?
15    A. Yes.
16    Q. Well, then you know it's important for me to
17 allow you to finish your answer and it's important
18 for you to allow me to finish the question so that
19 we're not talking over each other. The court
20 reporter knows that I never talk over witnesses, so
21 it probably will never happen. But just in case,
22 stop me and make sure that I allow you to give a full
23 answer.
24    A. Sure.
25    Q. Are you currently employed?

Page 8

1    A. I retired in May 2012. I was in a graduate
2 program for 18 months and I just finished that. I
3 got a masters of business administration degree. So
4 for the last two weeks, I've been unemployed.
5    Q. Congratulations. Where did you study?
6    A. Georgia Regents University.
7    Q. Before you retired, by whom were you
8 employed?
9    A. Well, I was in the Army as a judge advocate
10 for 30 years and I retired from the Army in February
11 2005. And I began with the Executive Office for
12 Immigration Review as an immigration judge in San
13 Francisco. And in late October of that year, I moved
14 to Falls Church, Virginia, to become an assistant
15 chief immigration judge; and then retired May 31st,
16 2012.
17    Q. Where were you stationed after you became an
18 assistant chief immigration judge?
19    A. At the headquarters in Falls Church,
20 Virginia.
21    Q. Did you ever spend time in Atlanta?
22    A. Yes. I supervised the Atlanta Immigration
23 Court as one of the courts that I supervised over
24 time from the end of October 2005 until I -- until
25 about spring 2011.

Deposition of          Gary W. Smith          August 20, 2014

Page 9

1    Q. Where were you, for lack of a better
2 expression, housed when you were performing these
3 obligations, both places or primarily in Falls
4 Church?
5    A. Oh, in Falls Church at the headquarters of
6 the Executive Office for Immigration Review. It's, I
7 believe, on Columbia Pike there in Falls Church. And
8 so I was physically there.
9    Q. Where do you live now?
10    A. I live in the Augusta area.
11    Q. So after you retired from EOIR, did you move
12 to Augusta?
13    A. Yes. My family was there, so I just moved
14 back there.
15    Q. I see. Describe for me just generally at a
16 high level what your responsibilities were as
17 assistant chief immigration judge in the 2008, 2012
18 time frame?
19    A. Okay. Most of that time I supervised
20 11 immigration courts. For about four months I
21 supervised 13 immigration courts. And then towards
22 the end, we got a few more assistant chief
23 immigration judges and so we were able -- the chief
24 immigration judge was able to divide the duties a
25 little bit more. And so towards the end I had seven

Page 10

1 immigration courts that I supervised.
2         That included supervising all the people in
3 the immigration courts that I was in charge of: the
4 judges, the law clerks, the staff, the court
5 administrator, students, volunteers, interns, as well
6 as, you know, the human resources aspects that the
7 supervisor deals with.
8         And I also was responsible for watching the
9 case load and making sure that we had enough people
10 to do our jobs and that people were trained properly
11 and that type of thing.
12    Q. You mentioned 11 and then 13 and then
13 towards the end seven courts.
14         Were the Stewart and Atlanta courts always
15 within your domain?
16    A. Up until spring 2011, yes. We opened the
17 Stewart Immigration Court, I believe, in January of
18 2010. But we didn't have any judges there until
19 later that year.
20    Q. As a general matter, how would you
21 characterize the difference between your
22 responsibilities as the chief -- assistant chief
23 immigration judge on the one hand and the actual work
24 of adjudicating immigration cases on the other?
25    A. Well, since I had served as an immigration

Page 11

1 judge, I was pretty familiar with that role. And
2 that is pretty much -- you are either reading or on
3 the bench most of your day. The only time is if
4 somebody doesn't appear for court or doesn't appear
5 for a hearing, you may have a little break and then
6 you go to reading your next case.
7         So you spend a lot more time focusing on the
8 law aspect. You still have to do that as an
9 assistant chief immigration judge because, you know,
10 supervising a good number of judges, you have to be
11 familiar with what they are doing and also reviewing
12 their appellate decisions and things like that, which
13 we did regularly.
14    Q. How much responsibility did you have, or did
15 the office of the assistant chief immigration judge
16 or judges, over the substantive correctness of actual
17 immigration decisions by immigration judges?
18    A. The actual decisions of the judges were --
19 if the person were -- if either the government or the
20 respondent in the case was -- believed they had a
21 basis for appeal, would appeal that to the Board of
22 Immigration Appeals and then to the circuit courts.
23         So at that point, you know, as long as it
24 was within the realm of reason of what a judge does
25 every day with their duties -- the cases would go to

Page 12

1 the Board of Immigration Appeals if there was an
2 appeal. So we didn't intercede in that process
3 because we let the due process take its course.
4    Q. Did you also have a role in considering
5 complaints about immigration judges?
6    A. Yes.
7    Q. Can you describe that role, please?
8    A. Yes. Assistant Chief Immigration Judge
9 MaryBeth Keller was the assistant chief immigration
10 judge for conduct and professionalism. She came to
11 us in 2006 from being a general counsel. And she,
12 basically, began that program. And if a person had a
13 complaint, there was a complaint procedure that's on
14 the website where they can download that. And they
15 can complain either to her through a mailbox or
16 telephone or letter or to the assistant chief
17 immigration judge directly.
18    Q. So in our situation, if something arose out
19 of Atlanta or Stewart, one of those judges, it could
20 go to you or it could go to Judge Keller?
21    A. That's correct. Or it possibly could go to
22 the chief immigration judge who would then refer it
23 to Judge Keller. And it would work its way, if there
24 was an inquiry needed, to the assistant chief
25 immigration judge.

Case 1:22-cv-01952-RDE Document 27-70 Filed 08/22/24 Page 182 of 329

Deposition of          Gary W. Smith          August 20, 2014

Page 25

1  to; correct?
2      A.  Yes.
3      Q.  I understand that.  But are you aware of any
4  regulation that would shield the digital audio
5  recordings from public inspection in response to a
6  Freedom of Information Act request?
7      A.  Let me tell you what I am aware of in that
8  regard.  If a respondent in a case wanted a copy of
9  the recording of his or her hearing that was done,
10  say, yesterday, they could come in to the court
11  administrator and ask for a copy of the recording.
12  And we actually provided them a CD.  We would copy it
13  on a system called -- a software that would burn a CD
14  of that hearing.  And we'd provide it to the
15  respondent or the respondent's counsel, if they were
16  the counsel of record.
17      Q.  Would the public be able to do that also or
18  do you know?
19      A.  If it were, let's say, an asylum case,
20  you've got very personal information involved in that
21  where a person might be describing some beatings or,
22  you know, behavior, that type, in another country,
23  that -- it would be given to the respondent or the
24  respondent's counsel.  But just anyone walking in the
25  door that wouldn't -- they would have to put in a

Page 26

1  FOIA request because they're not the respondent or
2  respondent's counsel.
3      Q.  So as matter of course, the respondent or
4  respondent's counsel would presumptively have access
5  to the --
6      A.  Yes.
7          MS. HUGHES:  Objection to form.
8  Foundation.  And we're getting into FOIA --
9          MR. BROWN:  Understand.  Objection
10  noted.
11  BY MR. BROWN:
12      Q.  In your perspective, based upon your
13  knowledge, a member of the public would probably need
14  to present a FOIA request and go through that system
15  to access the recording?
16      A.  That's my belief because...
17      Q.  What role did you have or did your office
18  have in managing the court docket itself?  How --
19      A.  Well, one of our -- we had a database.  It
20  was called CASE, which was an acronym.  And it -- we
21  could look at records within the database.  We could
22  also use -- do Cognos reports.  And they would tell
23  us how many pending cases there were for each judge
24  for a particular court.
25          And if you had a small court, for example,

Page 27

1  and you had one judge who had 5,000 cases and another
2  judge who had 500, then you probably want to even
3  that out a little bit so that the workload was a
4  little bit more even.  And you'd also have to look at
5  the type of docket that person was doing, whether
6  they were doing a juvenile docket, a detained docket,
7  a non-detained docket.
8          So, yes, that was part of our role to look
9  at the docket and discuss that with our court
10  administrators and make sure that we were fairly
11  apportioning the workload so that the judges had the
12  same challenges.
13      Q.  Was there a particular person on your staff
14  who was tasked with the responsibility of making sure
15  that the work was distributed as evenly as you could?
16      A.  I didn't have a staff assistant.  I had -- I
17  had an assistant who helped me more with the
18  administrative things.  But I primarily did that
19  myself with the court administrators.
20      Q.  For all the courts that were --
21      A.  For the courts that I supervised.  And I
22  was -- you know, I knew the database system and I
23  knew how to use -- do reports.  And so I could -- I
24  could pull that up pretty quickly.
25      Q.  If a member of the public was interested in

Page 28

1  a particular case for a particular detainee, let's
2  say, would the member of the public have access to
3  the docket such that they would know when that case
4  would be heard by a particular judge?
5          MR. HOLLIS:  Objection.  Complex.  I
6  don't know what that question means.
7          You can answer if you understand the
8  question.
9      A.  We had -- all of our courts had a docket
10  board where we put the calendar for that day.  And it
11  usually was by -- in some form it would identify the
12  number or something.  We were very careful about what
13  went up there because we didn't want to embarrass
14  anyone.  But it was -- the calendar was posted for
15  that judge for that day.
16  BY MR. BROWN:
17      Q.  Beyond the docket board -- the docket board
18  would be actually in the -- physically in the
19  courthouse?
20      A.  In the waiting area.
21      Q.  In the waiting area of the courthouse?
22      A.  (Witness nods head affirmatively.)
23      Q.  So the docket board would be just against
24  the wall, correct, in the waiting area?
25      A.  Yes.

Deposition of          Gary W. Smith          August 20, 2014

---

Page 29

1    Q. It would be changed every day, roughly?
2    A. It would -- if you had -- if it was a weekly
3  calendar. It depends on if it's weekly or daily.
4  Usually, there were daily calendars.
5    Q. And they would have like Judge Cassidy and
6  his cases, Judge Pelletier and his cases, et cetera?
7    A. Yes.
8    Q. And that would be posted by the court
9  administrator for that court?
10    A. Or someone they designated to do it.
11    Q. And then they would or their designee would
12  know what was on that by looking at the case
13  database; correct?
14    A. Yes. They'd run the reports and -- we had
15  two major types of hearings. One is called master
16  calendar and that's -- if you were talking about a
17  criminal docket, it would be sort of like an
18  arraignment day.
19      So we had master calendars and that would be
20  where you might have -- and each judge had a number
21  of cases on the master calendar. And so they would
22  know what cases were coming up for that day and they
23  could review the files before they started the
24  hearings, so they were not completely out of the
25  touch. When the case came up, they would know where

---

Page 30

1  the case stood and that type of thing.
2    Q. I'm familiar with how it's done in some
3  civil courts. I know more about the state court
4  system than the federal court system on this
5  particular issue.
6      The computer doesn't decide -- obviously, it
7  doesn't decide on its own when a particular case is
8  going to come up and the schedule for a particular
9  matter. But that's going to be driven to some extent
10  by the judge handling the matter; correct?
11    MR. HOLLIS: Objection. Form.
12      Are you asking a question?
13  BY MR. BROWN:
14    Q. Go ahead.
15    MR. HOLLIS: You can answer if you
16  understand it.
17    A. The master calendars, they were set out so
18  that if you had a hundred new cases and you had five
19  judges, if they were all doing the same types of
20  cases, the same types of dockets -- we had what we
21  called a hard counting system where you evenly
22  apportioned those out so that each of the five judges
23  would get 20 cases on their master calendar.
24      We tried to keep the master calendars
25  manageable. It was different at different courts

---

Page 31

1  depending on the case load, the type of docket being
2  done and that type of thing.
3      The individual -- the judge, himself or
4  herself -- since I did this as an immigration judge,
5  if you have a master calendar and you set the case
6  over to a new date, you deal with your legal
7  assistant and say, Is this date open for 8:30? If it
8  is, then you set their case. And then the legal
9  assistant enters that into the database. And that's
10  the case that's going to be on that day at that time.
11  BY MR. BROWN:
12    Q. The cases stayed with a particular
13  immigration judge until they were fully adjudicated,
14  generally; correct?
15    A. Unless the judge had a reason to recuse
16  himself or herself for some reason to disqualify
17  them.
18    Q. Other than a disqualification, did the judge
19  have the discretion to assign the case that --
20    A. Not the individual judges. They'd have to
21  usually go to the assistant chief immigration judge.
22  And they would also be working with the court
23  administrator. For instance, if the judge was going
24  to have a medical issue or something like that where
25  he was going to be out for an extended period, we'd

---

Page 32

1  probably have to reassign his cases in fairness to
2  the respondents so that they don't sit around and
3  have anxiety because their hearing was postponed.
4    MR. BROWN: Let's switch gears a little
5  bit.
6    MS. HUGHES: I need to use the rest
7  room. Can we take a quick break?
8      (Recess from 10:15 a.m. to 10:25 a.m.)
9  BY MR. BROWN:
10    Q. Sir, when do you first recall hearing of the
11  plaintiff Jacqueline Stevens?
12    A. In 2009.
13    Q. And what was the occasion for that?
14    A. Either the court administrator or the Office
15  of Legislative and Public Affairs told me that we had
16  a person that would be coming to the immigration
17  courts to view some proceedings. So that was about
18  the extent of my knowledge at that point.
19    Q. It seems to me, at least, unusual for the
20  visit of a citizen to the courts to engender that
21  kind of attention. Was --
22    MR. HOLLIS: Objection to form.
23  BY MR. BROWN:
24    Q. -- there a particular --
25    MR. HOLLIS: May I object?

---

Deposition of       Gary W. Smith       August 20, 2014

Page 121

1   any reason to be doing that. I mean, I was concerned
2   about conduct, of course, and that our proceedings
3   are -- go on properly and that people are allowed to
4   attend. But my preference by all means is that the
5   public be able to observe hearings.
6      I've done this work for a long time. I've
7   been a lawyer for a long time. I think people should
8   be able to come in and see the system. I think it --
9   the system works. It gives them a feeling whether
10   this system is working properly.
11      MR. BROWN: Okay. Thank you. That's
12   all we've got.
13      MR. HOLLIS: I have a few follow-up
14   questions.
15           EXAMINATION
16   BY MR. HOLLIS:
17    Q. Judge Smith, is security a concern in
18   immigration court?
19    A. Security is a concern at every immigration
20   court proceeding because we don't ever know -- in any
21   court proceeding, honestly, because you never know
22   when someone is going to explode or threaten a judge
23   or threaten counsel. You know there are just too
24   many things that can happen and security is certainly
25   a concern.

Page 122

1    Q. Are there ever any vulnerable persons, for
2   example children, before the immigration judge?
3    A. Yes.
4    Q. Are there ever violent offenders that come
5   before the immigration judge?
6    A. Yes.
7    Q. Are there ever any gang members that come
8   before the immigration judge?
9    A. Yes.
10    Q. If a proceeding is ongoing, that is, the
11   immigration judge has already begun his pleadings and
12   a member of the public wants to enter the courtroom,
13   is there any reason why a court personnel would check
14   with the judge before allowing that person to enter?
15    A. If the court personnel knew or suspected
16   that it was an asylum case or a case where it was
17   closed to the public, that would be a concern.
18      MR. HOLLIS: I'm finished.
19    (Deposition concluded at 1:11 p.m.)
20    (Signature reserved.)
21
22
23
24
25

Page 123

1           CERTIFICATE
2
3   STATE OF GEORGIA:
4   COUNTY OF FULTON:
5
6      I hereby certify that the foregoing transcript
7   was taken down, as stated in the caption, and the
8   colloquies, questions, and answers were reduced to
9   typewriting under my direction; that the transcript is a
10   true and correct record of the evidence given upon said
11   proceeding.
12      I further certify that I am not a relative or
13   employee or attorney of any party, nor am I financially
14   interested in the outcome of this action.
15      This the 5th day of September, 2014.
16
17
18
19
20      Marsi Koehl, CCR, CCR-B-2424
21
22
23
24
25

Page 124

1         DISCLOSURE
2
3   STATE OF GEORGIA:
4   COUNTY OF DEKALB:
5      Deposition of GARY W. SMITH.
6      Pursuant to Article 8.B. of the Rules and
   Regulations of the Board of Court Reporting of the
7   Judicial Counsel of Georgia, I make the following
   disclosure:
8
     I am a Georgia Certified Court Reporter acting
9   as an agent of APG USA, Inc., who was contacted by the
   offices of BRUCE P. BROWN LAW, LLC, to provide court
10   reporting services for this deposition. I will not be
   taking this deposition under any contract that is
11   prohibited by O.C.G.A. 15-14-37 (a) and (b).
12      APG USA, Inc., has no contract to provide
   reporting services with any party to the case, any
13   counsel in the case, or any reporter or reporting agency
   from whom a referral might have been made to report this
14   deposition. APG USA, Inc., will charge its usual and
   customary rate to all parties in the case, and a
15   financial discount will not be given to any party to this
   litigation.
16
17
18
19
20    Marsi Koehl, CCR B-2424    Date: 9/5/14
21
22
23
24
25

Deposition of        Gary W. Smith        August 20, 2014

---

Page 125

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION
3
   JACQUELINE STEVENS,
4
        Plaintiff,
5                           CIVIL ACTION FILE
   vs.
6                      NO. 1:12-CV-1352-0DE
7  ERIC HOLDER, JR.,
   Attorney General of the
8  United States, in his official
   capacity, et al.,
9
        Defendants.
10
11
12
13
14
15     The preceding deposition taken in the matter, on
16 the date, and at the time and place set out on the title
17 page hereof.
18
19     It was requested that the deposition be taken by
20 the reporter and that same be reduced to typewritten
21 form.
22
23     It was agreed by and between counsel and the
24 parties that the Deponent will read and sign the
25 transcript of said deposition.

---

Page 126

1                    CERTIFICATE
2  STATE OF
   COUNTY/CITY OF
3
4      Before me, this day, personally appeared, GARY W.
   SMITH, who, being duly sworn, states that the foregoing
5  transcript of his deposition, taken in the matter, on the
   date, and at the time and place set out on the title page
6  hereof, constitutes a true and accurate transcript of
   said deposition.
7
8
9
                   GARY W. SMITH
10
11
12
13 SUBSCRIBED and SWORN to before me this
14      day of              , 2014 in the
15 jurisdiction aforesaid.
16
17
18 My Commission Expires      Notary Public
19
20
21    [] No changes made to the Errata Sheet; therefore, I
22 am returning only this signed notarized certificate.
23
24    [] I am returning this signed, notarized certificate
25 and Errata Sheet with changes noted.

---

Page 127

1  DEPOSITION ERRATA SHEET
2  Deponent:  GARY W. SMITH
3  Deposition Date:  August 20, 2014
4  To Reporter:
5  I have read the entire transcript of my deposition taken
6  in the captioned matter or the same has been read to me.
7  I request that the following changes be entered upon the
8  record for the reasons indicated.  I have signed my name
9  to the Errata Sheet and appropriate Certificate and
10 authorize you to attach both to the original transcript.
11
12 Page No.        Line No.
13 Change to:
14 Reason for Change:
15
16 Page No.        Line No.
17 Change to:
18 Reason for Change:
19
20 Page No.        Line No.
21 Change to:
22 Reason for Change:
23
24
25

---

Page 128

1          Deposition of GARY W. SMITH
2
3  Page No.        Line No.
4  Change to:
5  Reason for Change:
6
7  Page No.        Line No.
8  Change to:
9  Reason for Change:
10
11 Page No.        Line No.
12 Change to:
13 Reason for Change:
14
15 Page No.        Line No.
16 Change to:
17 Reason for Change:
18
19 Page No.        Line No.
20 Change to:
21 Reason for Change:
22
23
24 Signature:              Date:
25      GARY W. SMITH

---

# Exhibit E

 **Executive Office for
Immigration Review**
U.S. Department of Justice

# Assistant Chief Immigration Judge (ACIJ) Assignments

| Immigration Court | ACIJ | Backup ACIJ |
|---|---|---|
| Adelanto | Jonathan W. Hitesman | Julie L. Nelson |
| Annandale | Rebecca J. Walters | Wynne P. Kelly |
| Atlanta - Ted Turner Drive | Joy Lampley-Fortson | David Cheng |
| Atlanta - W. Peachtree Street | Joy Lampley-Fortson | David Cheng |
| Aurora | Matthew W. Kaufman | Irene C. Feldman |
| Baltimore | Claudia Cubas | Megan B. Herndon |
| Batavia | Brandon C. Jaroch | Theresa Holmes-Simmons |
| Boston | Theresa Holmes-Simmons (Acting) | Brandon C. Jaroch |
| Buffalo | Brandon C. Jaroch | Theresa Holmes-Simmons |
| Charlotte | Theresa Holmes-Simmons | Brandon C. Jaroch |
| Chicago | Jennifer I. Peyton | Megan R. Jackler |

| Immigration Court | ACIJ | Backup ACIJ |
|---|---|---|
| Cleveland | Ryan R. Wood | Renae M. Hansell |
| Concord | Julie L. Nelson | Jonathan W. Hitesman |
| Conroe | Daniel P. Kinnicutt | Lisa Luis |
| Dallas | Tara Naselow-Nahas | Jeffrey S. Miller |
| Denver | Matthew W. Kaufman | Irene C. Feldman |
| Detroit | Brandon C. Jaroch | Theresa Holmes-Simmons |
| El Paso | Jaime Diaz | Melissa Joy Garcia |
| El Paso SPC | Jaime Diaz | Melissa Joy Garcia |
| Elizabeth | David Cheng | Joy Lampley-Fortson |
| Eloy | Irene C. Feldman | Matthew W. Kaufman |
| Falls Church IAC | Rebecca J. Walters | Wynne P. Kelly |
| Florence | Irene C. Feldman | Matthew W. Kaufman |
| Fort Snelling | Ryan R. Wood | Renae M. Hansell |
| Fort Worth IAC | E. Mark Barcus | Irene C. Feldman |
| Harlingen | Jefferson B. Brown | Noelle Sharp |
| Hartford | Brandon C. Jaroch | Theresa Holmes-Simmons |
| Honolulu | Rhana Ishimoto | Anne Kristina Perry |

| Immigration Court | ACIJ | Backup ACIJ |
|---|---|---|
| Houston - Smith Street | Lisa Luis | Daniel P. Kinnicutt |
| Houston - Greenspoint Park | Jeffrey S. Miller | Tara Naselow-Nahas |
| Houston - S. Gessner Road | Noelle Sharp | Jefferson B. Brown |
| Hyattsville | Claudia Cubas | Megan B. Herndon |
| Imperial | Anne Kristina Perry | Rhana Ishimoto |
| Kansas City | Jayme Salinardi (Acting) | Eric L. Dillow |
| Krome | Elisa M. Sukkar | H. Kevin Mart |
| Laredo | Melissa Joy Garcia | Jaime Diaz |
| Las Vegas | Charles P. Koutras | Theresa M. Scala |
| LaSalle | Jefferson B. Brown | Noelle Sharp |
| Los Angeles - N. Los Angeles Street | Tara Naselow-Nahas | Daren K. Margolin |
| Los Angeles - Olive Street | Rodin Rooyani | E. Mark Barcus |
| Los Angeles - Van Nuys Boulevard | Tara Naselow-Nahas | Daren K. Margolin |
| Memphis | Renae M. Hansell | Ryan R. Wood |
| Miami | Elisa M. Sukkar | H. Kevin Mart |
| New Orleans | Megan R. Jackler | Jennifer I. Peyton |
| New York - Broadway | Khalilah M. Taylor | Ubaid ul-Haq |
| New York - Federal Plaza | Amiena A. Khan | Khalilah M. Taylor |

| Immigration Court | ACIJ | Backup ACIJ |
|---|---|---|
| New York-Varick | Ubaid ul-Haq | Khalilah M. Taylor |
| Newark | David Cheng | Joy Lampley-Fortson |
| Oakdale | Jefferson B. Brown | Noelle Sharp |
| Omaha | Eric L. Dillow | Jayme Salinardi |
| Orlando | Daniel H. Weiss (Acting) | Elisa M. Sukkar |
| Otay Mesa | Anne Kristina Perry | Rhana Ishimoto |
| Otero | Jaime Diaz | Melissa Joy Garcia |
| Pearsall | Melissa Joy Garcia | Jaime Diaz |
| Philadelphia | Theresa Holmes-Simmons (Acting) | Brandon C. Jaroch |
| Phoenix | Irene C. Feldman | Matthew W. Kaufman |
| Port Isabel | Jefferson B. Brown | Noelle Sharp |
| Portland | Charles P. Koutras | Theresa M. Scala |
| Richmond IAC | Megan B. Herndon | Jamee E. Comans |
| Sacramento | Jonathan W. Hitesman | Julie L. Nelson |
| Saipan | Rhana Ishimoto | Jonathan W. Hitesman |
| Salt Lake City | Charles P. Koutras | Theresa M. Scala |
| San Antonio | Melissa Joy Garcia | Jefferson B. Brown |
| San Diego | Rhana Ishimoto | Anne Kristina Perry |

| Immigration Court | ACIJ | Backup ACIJ |
|---|---|---|
| San Francisco | Elizabeth L. Young | Julie L. Nelson |
| San Juan | Daniel H. Weiss (Acting) | Elisa M. Sukkar |
| Santa Ana | Jonathan W. Hitesman (Acting) | Rhana Ishimoto |
| Seattle | Theresa M. Scala | Charles P. Koutras |
| Sterling | Wynne P. Kelly | Rebecca J. Walters |
| Stewart | Joy Lampley-Fortson | David Cheng |
| Tacoma | Theresa M. Scala | Charles P. Koutras |
| Tucson | Irene C. Feldman | Matthew W. Kaufman |
| Ulster | Brandon C. Jaroch | Theresa Holmes-Simmons |

To file a complaint regarding an immigration judge's conduct, please click here.

*Updated August 1, 2024*



**Executive Office for Immigration Review**
5107 Leesburg Pike
**Falls Church, VA 22041**

Phone: 703-305-0289

# Exhibit F

# Supervisory Immigration Judge (Assistant Chief Immigration Judge)

DEPARTMENT OF JUSTICE
Executive Office for Immigration Review

# Summary

This position is located in the Office of the Chief Immigration Judge, Executive Office for Immigration Review, U. S. Department of Justice. Incumbent serves as Supervisory Immigration Judge (Assistant Chief Immigration Judge).

This is a Excepted Service position; additional positions may be filled from this announcement within 90 days of certificate issuance. Upon completion of the required probationary period, and appointment by the Attorney General, the position will be permanent.

# Overview

**Reviewing applications**

**Open & closing dates**
🕐 03/12/2024 to 03/26/2024

**Salary**
$159,383 - $204,000 per year

**Pay scale & grade**
IJ 00

**Locations**
3 vacancies in the following locations:

📍 **San Francisco, CA**

📍 **Kansas City, MO**

📍 **Philadelphia, PA**

**Remote job**
No

**Telework eligible**
No

**Travel Required**
50% or less - You may be expected to travel for this position.

**Relocation expenses reimbursed**
No

**Appointment type**
Permanent

**Work schedule**
Full-time

**Service**
Competitive

**Promotion potential**
00

**Job family (Series)**
0905 Attorney

**Supervisory status**
Yes

**Security clearance**
Top Secret

**Drug test**
Yes

**Position sensitivity and risk**
High Risk (HR)

**Trust determination process**
Credentialing

---

**Announcement number**
IMP-12348490-24-TNY

**Control number**
781137300

# This job is open to

 **Internal to an agency**
Current federal employees of this agency.

## Clarification from the agency

You may apply if you are a current Executive Office for Immigration Review (EOIR) employee. (You must submit an SF-50 that reflects current employment with EOIR).

# Duties

EOIR consists of three adjudicatory components: the Office of the Chief Immigration Judge, which is responsible for managing the numerous immigration courts located throughout the United States and supervising immigration judges who adjudicate individual cases; the Board of Immigration Appeals, which primarily conducts appellate reviews of the immigration judges' decisions; and the Office of the Chief Administrative Hearing Officer, which adjudicates immigration-related employment cases. EOIR's Headquarters is located in Falls Church, Virginia, about 10 miles from downtown Washington, DC.

As Assistant Chief Immigration Judge, the incumbent serves as a principal assistant to the Chief Immigration Judge and/or Regional Deputy Chief Immigration Judges in managing and coordinating Immigration Judge activities throughout the United States and in supervising the administrative operations of the program. As necessary, the incumbent also presides as an Immigration Judge in formal, quasi-judicial hearings, and enters decisions that are final, subject to appeal to the Board of Immigration Appeals.

Responsibilities:

- Assisting the Chief Immigration Judge and/or Regional Deputy Chief Immigration Judge in managing and coordinating Immigration Judge activities and in supervising the administrative operations of the program.
- Assisting in development of policy and procedure for the operations of the program, determining and accounting for resource needs, evaluating and adjusting broad objectives as needed, determining need for and effecting changes in organizational structure and delegation of authority, and establishing effective internal and external communication channels.
- Participating with the Chief Immigration Judge and/or Regional Deputy Chief Immigration Judge in the formulation of Executive Office for Immigration Review programs and policies.
- Analyzing programs and projects and prepares reports to the OCIJ leadership, recommending adoption or rejection of policy changes.
- Providing legal counsel and advice to the OCIJ leadership on matters pertaining to the Immigration and Nationality Act and all other applicable law.

# Requirements

## Conditions of Employment

- You must be a U.S. Citizen or National.
- Employment is contingent upon the completion and satisfactory adjudication of a background investigation. Selectee(s) must be able to obtain and maintain a top secret clearance.
- Selective Service Registration is required, as applicable.
- Moving and Relocation Expense are not authorized.
- Relevant experience (see qualifications below.)
- Qualifications must be met by the closing date of the announcement.
- All Federal employees are required to have Federal salary payments made by direct deposit to a financial institution of their choosing.
- Must be a current EOIR employee and provide a current Notice of Personnel Action SF50 verifying EOIR employment.

## Qualifications

# Exhibit G

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NATIONAL DAY LABORER ORGANIZING NETWORK, CENTER FOR CONSTITUTIONAL RIGHTS, and IMMIGRATION JUSTICE CLINIC OF THE BENJAMIN N. CARDOZO SCHOOL OF LAW, | : : : : : | No. 10 Civ. 3488 (SAS)(KNF) |
| Plaintiffs, | : : | |
| v. | : : | |
| | : | **DECLARATION OF** |
| UNITED STATES IMMIGRATION | : | **CRYSTAL RENE SOUZA** |
| AND CUSTOMS ENFORCEMENT AGENCY, | : | |
| UNITED STATES DEPARTMENT OF | : | |
| HOMELAND SECURITY, FEDERAL BUREAU | : | |
| OF INVESTIGATION, EXECUTIVE OFFICE | : | |
| FOR IMMIGRATION REVIEW, and OFFICE OF | : | |
| LEGAL COUNSEL, | : | |
| Defendants. | : | |

I, Crystal Rene Souza, depose and say as follows:

1. I am the Supervisory Freedom of Information Act (FOIA) Specialist for the Office of the

   General Counsel (OGC) at the U.S. Department of Justice, Executive Office for Immigration

   Review (EOIR). This declaration supplements and hereby incorporates my three prior

   declarations submitted in this case, and is being submitted in support of EOIR's motion for

   partial summary judgment on the adequacy of its search for opt-out and Rapid Production

   List records, i.e., the records produced in the above-captioned litigation between August

   2010 and February 2011.

2. On or about February 12, 2010, EOIR received a FOIA request from the National Day

   Laborer Organizing Network, Center for Constitutional Rights, and Immigration Justice

   Clinic of the Benjamin N. Cardozo School of Law (collectively, the "Plaintiffs"). The

request sought a wide variety of records relating to an immigration enforcement initiative called "Secure Communities."

3. EOIR oversees the immigration court and immigration appeals processes. EOIR generally receives its cases directly from the Department of Homeland Security (DHS) enforcement personnel when the government is seeking the removal of aliens who are in the country without lawful status or who have committed some act, typically a criminal offense, that renders them removable. Enforcement strategies employed by DHS can create caseload increases for EOIR. Thus, EOIR is kept informed of DHS enforcement programs such as Secure Communities in order to plan for resources necessary to adjudicate its cases.

4. In response to Plaintiffs' FOIA request, the EOIR FOIA Service Center in consultation with the agency attorney assigned to Plaintiffs' FOIA request determined that most of the information plaintiffs requested would be in the possession of defendant agencies other than EOIR. Specifically, EOIR determined that most likely it would only have potentially responsive information to items in 1a, 1f, 2g and 5a(iii) of the request. Nevertheless, the FOIA Service Center sent the full request to the EOIR components most likely to have potentially responsive information and requested that they provide any potentially responsive information in their possession to the FOIA Service Center.

5. The FOIA Service Center identified the following EOIR components as potentially possessing responsive information: the Office of the Chief Immigration Judge (OCIJ); the Board of Immigration Appeals (BIA); the Office of Legislative and Public Affairs (OLPA); and the Office of the General Counsel (OGC). The FOIA Service Center determined that these components were the ones most likely to have responsive documents because the adjudicating components, OCIJ and BIA, were most likely to possess "Overview

Documents" as described in 1a, information on the relationship between Secure Communities and other ICE enforcement programs as requested in 1f, and Notice to Appear information as requested in 2g. OLPA or OGC were most likely to possess "Communications" as described in 5a(iii).

6. The EOIR FOIA Service Center also conferred with the Office of Planning, Analysis and Technology (OPAT) to determine that EOIR could not provide responsive information to item 3 of the Plaintiff's request seeking "Individual Records" that would be in an Immigration Court Record of Proceeding because the Case Access System for EOIR (CASE)[1] database does not contain any case identifier for the Secure Communities Program.

7. The FOIA Service Center determined that it was unlikely that the remaining components within EOIR, including the Office of the Director (OOD), the Administration Division, the Office of Management Programs (OMP)[2] and the Office of the Chief Administrative Hearing Officer (OCAHO), would possess responsive information since these components do not adjudicate immigration removal proceedings. The FOIA Service Center also did not send the request to the individual immigration courts located throughout the United States because the mission of the courts is case-by-case adjudication, which was not a subject of the request. Moreover, any information regarding Secure Communities possessed by the immigration courts would have been disseminated by OCIJ, which received the FOIA request.

8. On or about March 1, 2010, the EOIR FOIA Service Center submitted a search request to the FOIA points of contact (POC) for each of the identified components to search for all documents including correspondence and emails. The FOIA component POC identifies the

---

[1] CASE is EOIR's electronic database, which includes case information for immigration proceedings before the Immigration Court and BIA.

[2] OLPA, however, is a subcomponent of OMP, and, as stated in paragraph 5 above, it did receive the request because it was identified as likely to possess potentially responsive records.

individuals who are tasked with handling the subject matter of the FOIA request by working with management within the component. According to the POCs, the individuals tasked with conducting searches included: Assistant Chief Immigration Judges; Senior Legal Advisors; Assistant Directors; Deputy Assistant Directors; and the General and Deputy General Counsel. These individuals searched paper records, e-mails, and their computer records on shared drives located in each component. In accordance with standard FOIA practice, the potentially responsive records were gathered and provided in paper form to the FOIA Service Center.

9. On or about May 6, 2010, prior to EOIR providing Plaintiffs with a response to their request, EOIR received notice that Plaintiffs had filed the instant lawsuit regarding their FOIA request in the United States District Court for the Southern District of New York. Subsequently, through its attorneys at the U.S. Attorney's Office for the Southern District of New York, EOIR negotiated with Plaintiffs over the scope of their broad request.

10. During a conference held on December 9, 2010, and subsequently in a scheduling order dated December 17, 2010, this Court ordered the defendant agencies, including EOIR, to: (1) produce to plaintiffs, by January 17, 2011, "opt-out records," defined as "records relating to the ability of states or localities to decline or limit participation in Secure Communities, including documents, memoranda, manuals, and communications referencing the technological capacity of ICE and the FBI to honor requests to opt-out, opt-in, or limit participation in Secure Communities;" and (2) produce to plaintiffs, by February 25, 2011, all remaining records responsive to plaintiffs' "Rapid Production List" ("RPL"), which purported to identify certain types of records Plaintiffs sought on a priority basis. With respect to the opt-out records, the Court's order set a search cut-off date of October 15, 2010.

4

11. In response to the Court's order, EOIR used the paper documents initially provided by the
components in response to plaintiffs' request as a whole to identify a list of forty-three key
custodians, which included all named persons in the original documents. The FOIA Service
Center determined that these individuals would be the most likely to possess records
pertaining to Secure Communities including any responsive records to the opt-out issue and
the RPL. These custodians were directed to refer the search request to additional parties if
there was the possibility that others would possess potentially responsive documents. An
additional nine employees ultimately provided documents to the FOIA Service Center. The
fifty-two EOIR employees were located in the following components: OOD; OGC; BIA;
OCIJ; OCAHO; the Administration Division; OMP; and OPAT. Included among the
individuals who conducted searches were the former Director and the Acting Director and his
staff; the General Counsel; the former Acting General Counsel; the Chief Immigration Judge;
Assistant Chief Immigration Judges who were identified as participating in discussions
regarding Secure Communities with DHS; the Chief Administrative Hearing Officer;
Assistant Directors, and relevant staff in Administration, OGC, OMP, and OPAT.

12. The search request EOIR's agency counsel sent to custodians requested that each custodian
conduct a search for records that were potentially responsive to the opt-out issue or the RPL
using a search cut-off date of October 15, 2010. In addition, key custodians were instructed
to search their paper files, the CASE database, individual email repositories tied to their
personal computer accounts, and shared drives segregated by component. OPAT conducted
searches of five key custodian accounts including email and stored files for individuals who
had left the agency. The search instructions that were sent to the key custodians were
accompanied by the original litigation hold notice issued in May 2010, which instructed

employees to preserve information including, but not limited to, the following: all
documents, records, data, correspondence, notes, e-mails (including e-mails on a computer or
personal digital assistant (PDA)), and other materials, whether official or unofficial, original
or duplicates; spreadsheets, databases, calendars, voice messages, videos and/or photographs.
Additionally, employees were advised to preserve the information in its original electronic
form.

13. With respect to electronic files, the search included, but was not limited to, the following
terms: Secure Communities; SC; SCI; Alternative to Removal; ADT; DHS Enforcement
Initiatives; Opt-Out; Opting-Out; Mandate; Mandatory. Directions regarding the search
advised the key custodians to include any other search term that they believed might identify
potentially responsive records.

14. EOIR's Supervisory FOIA Specialist and agency counsel monitored responses through e-
mail and the creation of an excel spreadsheet to ensure that each key custodian certified that
they conducted the requested searches and provided the potentially responsive information to
the FOIA Service Center.

15. Upon completion of their searches, the key custodians submitted all of the potentially
responsive records they identified, including both hard copy and electronic records, to the
EOIR FOIA Service Center. Several of the searches produced no records, but the custodians
affirmed that they conducted a search and provided a no-record response. After reviewing
the information collected, the EOIR FOIA Service Center determined that the bulk of the
information consisted of e-mail messages that were nonresponsive to the Plaintiffs' request,
including to the opt-out issue and the RPL. EOIR identified four responsive documents

(consisting of 27 pages) that were responsive to the opt-out production, which it produced to the Plaintiffs on January 17, 2011.

16. EOIR did not locate any responsive information from the Rapid Production List. This determination was made based on a page-by-page review by agency counsel of all of the collected information. Counsel sorted the electronic information into responsive and non-responsive material and then conducted a specific search for RPL documents.

17. EOIR properly identified key custodians and conducted a headquarters-wide search. In addition, by tracking responses to the request, EOIR adopted a process to ensure that searches were conducted by each of the key custodians. The search was conducted by each custodian based on a set list of terms and any additional terms likely to generate responsive information. This process was reasonably designed and ultimately identified responsive records.

18. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Crystal Rene Souza
Supervisory FOIA Specialist
Executive Office for Immigration Review

January 12, 2012

7

# Exhibit H

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NATIONAL DAY LABORER ORGANIZING   :
NETWORK, CENTER FOR CONSTITUTIONAL :
RIGHTS, and IMMIGRATION JUSTICE   :    No. 10 Civ. 3488 (SAS)(KNF)
CLINIC OF THE BENJAMIN N. CARDOZO :
SCHOOL OF LAW,   :
           Plaintiffs,   :
  :
v.   :
  :    **DECLARATION OF**
UNITED STATES IMMIGRATION   :    **CRYSTAL RENE SOUZA**
AND CUSTOMS ENFORCEMENT AGENCY, :
UNITED STATES DEPARTMENT OF   :
HOMELAND SECURITY, FEDERAL BUREAU :
OF INVESTIGATION, EXECUTIVE OFFICE :
FOR IMMIGRATION REVIEW, and OFFICE OF :
LEGAL COUNSEL,   :
           Defendants.   :
  :

I, Crystal Rene Souza, depose and say as follows:

1. I am the Supervisory Freedom of Information Act (FOIA) Specialist for the Office of the General Counsel (OGC) at the U.S. Department of Justice, Executive Office for Immigration Review (EOIR). This declaration supplements and hereby incorporates my prior declarations submitted in this case, and is being submitted in support of EOIR's motion for partial summary judgment on the adequacy of its search for opt-out and Rapid Production List records, i.e., the records produced in the above-captioned litigation between August 2010 and February 2011.

2. On or about February 12, 2010, EOIR received a FOIA request from the National Day Laborer Organizing Network, Center for Constitutional Rights, and Immigration Justice Clinic of the Benjamin N. Cardozo School of Law (collectively, the "Plaintiffs"). The

request sought records relating to a Department of Homeland Security (DHS) immigration enforcement initiative called "Secure Communities."

3.  EOIR oversees the immigration courts and the immigration appeals process. EOIR generally receives its cases directly from the DHS enforcement personnel when the government is seeking the removal of aliens who are in the country without lawful status or who have committed some act, typically a criminal offense, that renders them removable. Enforcement strategies employed by DHS can create caseload increases for EOIR. Thus, EOIR is kept informed of DHS enforcement programs, such as Secure Communities, in order to plan for resources necessary to adjudicate its cases.

4.  After receiving Plaintiffs' FOIA request, the EOIR FOIA Service Center, in consultation with the agency attorney assigned to Plaintiffs' FOIA request, determined that most of the information Plaintiffs requested would be in the possession of defendant agencies other than EOIR. EOIR determined that most likely it would only have potentially responsive information to items in 1a, 1f, 2g, and 5a(iii) of the request. The EOIR FOIA Service Center also conferred with the Office of Planning, Analysis and Technology (OPAT) and determined that EOIR could not provide responsive information to item 3 of Plaintiffs' request seeking "Individual Records" that would be in an Immigration Court Record of Proceeding, because the Case Access System for EOIR (CASE)[1] database does not contain any case identifier for the Secure Communities program; therefore, EOIR cannot identify which cases may relate to the Secure Communities program.

---

[1] CASE is an electronic database. It consists of searchable fields containing case information about immigration proceedings before the Immigration Court and Board of Immigration Appeals (BIA), such as the name of the respondent in immigration proceedings, his or her alien registration number, the court where the case is located, whether the respondent is *pro se*, the name of the respondent's representative, if any, etc. CASE does not contain a specific identifier for Secure Communities, i.e., it does not reflect whether an individual in immigration proceedings was identified by DHS through Secure Communities.

5. Nonetheless, the FOIA Service Center identified the following EOIR components as potentially possessing information responsive to Plaintiffs' request: the Office of the Chief Immigration Judge (OCIJ); the Board of Immigration Appeals (BIA); the Office of Legislative and Public Affairs (OLPA); and the Office of the General Counsel (OGC). The FOIA Service Center determined that the adjudicating components, OCIJ and BIA, were most likely to possess "Overview Documents" as described in 1a, information on the relationship between Secure Communities and other ICE enforcement programs as requested in 1f, and Notice to Appear information as requested in 2g; OLPA and OGC were most likely to possess "Communications" as described in 5a(iii).

6. The FOIA Service Center determined that the remaining components within EOIR — the Office of the Director (OOD), the Administration Division, the Office of Management Programs (OMP),[2] and the Office of the Chief Administrative Hearing Officer (OCAHO) — likely would not possess responsive information because these components do not adjudicate immigration removal proceedings and would therefore have little or no interaction with the Secure Communities program. Consequently, the FOIA Service Center did not provide Plaintiffs' FOIA request to these components. The FOIA Service Center also did not send the request to the individual immigration courts located throughout the United States because the mission of the courts is case-by-case adjudication, which was not a subject of the request. Moreover, any information regarding Secure Communities possessed by the immigration courts would have been disseminated by – and in the possession of – OCIJ, which did receive the FOIA request.

---

[2] OLPA, however, is a subcomponent of OMP, and, as stated in paragraph 5 above, it did receive the request because it was identified as likely to possess potentially responsive records.

7. On or about March 1, 2010, the EOIR FOIA Service Center distributed Plaintiffs' FOIA request to the agency components identified in paragraph 5, above. The FOIA Service Center also supplied these components with the agency's standard search memorandum, which requested that the FOIA points of contact (POCs) for each of the identified components coordinate searches for all records potentially responsive to Plaintiffs' FOIA request, including, but not limited to, paper records, electronic records, and emails.

8. Under standard agency practice, upon receipt of a FOIA request, the FOIA component POCs, working with management within the component, identify the employees whose responsibilities relate to the subject matter of the FOIA request, and task those employees with conducting searches. With respect to Plaintiffs' FOIA request, the POCs for the components identified in paragraph 5 tasked the following employees with conducting searches for potentially responsive records:

- OCIJ: Assistant Chief Immigration Judges, Chief Clerk, Chief of Staff;
- BIA: Board Members, Acting Board Members, and Senior Legal Advisors;
- OPLA: OPLA Counsel and Public Affairs Specialists;
- OGC: General Counsel, Deputy General Counsel, and Office Manager.

These employees then conducted manual searches of their paper records as well as electronic files contained in their individual Microsoft Outlook accounts; individual computer hard drives; Microsoft Office suite files including Microsoft Excel and PowerPoint; shared drives segregated by components; and electronic folders organized by business unit and individual users.[3] With respect to their searches of electronic records, the employees were instructed to employ search terms as appropriate to identify responsive records, but were not instructed to use any particular

---

[3] All individual records of this type are contained within JCON-II, EOIR's agency network system. EOIR does not have an email archiving system, nor does it have in place a means by which to run searches across JCON-II in its entirety without the assistance of specialized information technology staff.

search terms or given any further instructions. In accordance with the agency's standard FOIA practice, any potentially responsive records that these employees identified were gathered and provided in paper form to the FOIA Service Center.

9. On or about May 6, 2010, prior to EOIR providing Plaintiffs with a response to their request, EOIR received notice that Plaintiffs had filed the instant lawsuit regarding their FOIA request in the United States District Court for the Southern District of New York. Subsequently, through its attorneys at the U.S. Attorney's Office for the Southern District of New York, EOIR negotiated with Plaintiffs over the scope of their broad request.

10. During a conference held on December 9, 2010, and subsequently in a scheduling order dated December 17, 2010, this Court ordered the defendant agencies, including EOIR, to: (1) produce to plaintiffs, by January 17, 2011, "opt-out records," defined as "records relating to the ability of states or localities to decline or limit participation in Secure Communities, including documents, memoranda, manuals, and communications referencing the technological capacity of ICE and the FBI to honor requests to opt-out, opt-in, or limit participation in Secure Communities;" and (2) produce to plaintiffs, by February 25, 2011, all remaining records responsive to plaintiffs' "Rapid Production List" ("RPL"), which listed certain types of records Plaintiffs sought on a priority basis. As part of the RPL requirements, EOIR was not required to produce records created by other defendant agencies. With respect to the opt-out records, the Court's order set a search cut-off date of October 15, 2010. EOIR applied that cut-off date to its searches for both opt-out and RPL records.

11. EOIR determined that it was unlikely to have any responsive opt-out records because the opt-out issue did not relate to any business or mission-related work of EOIR. Because EOIR was not involved with this aspect of the Secure Communities program, it was unlikely to uncover

5

any responsive documents. Nevertheless, EOIR directed custodians to gather all information related to or discussing Secure Communities in order to ensure that it did not possess any responsive information.

12. In response to the Court's order, the EOIR FOIA Service Center reviewed the records initially provided by the components and individual employees described in paragraphs 5 and 8 above in response to Plaintiffs' request as a whole. The names of 43 EOIR custodians appeared in these records. Although, as explained above, EOIR believed that it was unlikely to have any responsive opt-out records, the FOIA Service Center nonetheless determined that if EOIR had any such records, these would be the custodians most likely to have them. These 43 custodians were also directed to identify any additional EOIR employees who they believed possessed potentially responsive opt-out or RPL documents. The EOIR FOIA Service Center received responses from an additional nine employees who were identified in this manner.

13. Thus, a total of 52 EOIR employees ultimately searched for opt-out and RPL records. These 52 employees were located in the following components: OOD; OGC; BIA; OCIJ; OCAHO; the Administration Division; OMP; and OPAT. The individuals who conducted these searches were:

- OOD: former Director, Acting Director, Associate Director, Executive Secretariat, and support staff;

- OGC: General Counsel, former Acting General Counsel, Deputy General Counsel and Former Deputy General Counsel, Fraud and Abuse Prevention Counsel; and Chief Counsel for the Immigration Unit;

6

- OCIJ: Chief Immigration Judge, Deputy Chief Immigration Judge, Assistant Chief Immigration Judges identified as participating in discussions with DHS regarding Secure Communities, Chief Clerk, Chief of Staff, Legal Counsel, and support staff;

- OCAHO: Chief Administrative Hearing Officer and Deputy Chief Administrative Hearing Officer, Administrative Law Judge, and support staff;

- OPAT, OMP, and Administration Division: Assistant Directors, Deputy Assistant Directors, and Counsel for Public and Legislative Affairs, Public Affairs Specialists, and support staff.

14. EOIR's agency counsel sent a search request to each of the custodians described in paragraph 13 above, requesting that each custodian conduct a search for records that were potentially responsive to the opt-out issue or the RPL using a search cut-off date of October 15, 2010. The instructions provided guidance on: 1) the search terms they should use; 2) the types of records they should search; and 3) the requirement to preserve e-mails in a .pst format. The FOIA Service Center provided custodians with the following search terms: Secure Communities; SC; SCI; Alternative to Removal; ADT; DHS Enforcement Initiatives; Opt-Out; Opting-Out; Mandate; and Mandatory. The FOIA Service Center stated that searches should be full-text word searches and should not be limited to the titles of documents or the subject lines of emails. The instructions also stated that custodians should not limit their search to the suggested search terms if they believed that they had responsive documents that they could locate with other search terms. Finally, the FOIA Service Center also directed custodians to contact the EOIR help desk if they needed assistance or encountered any difficulty in completing the searches. EOIR did not provide further instructions, such as the

7

use (or non-use) of connectors, and the specific structure of each search was left to the discretion of the individual custodians, because the FOIA Service Center determined that these custodians would know how their files were organized and what was the best way to perform their search. The FOIA Service Center instructed the custodians to produce all responsive emails in electronic format. Finally, the custodians were given a copy of the litigation hold notice, described in paragraph 17 below, that provided further detail on the types of records involved.

15. The FOIA Service Center enlisted the services of OPAT Information Technology (IT) personnel to conduct the searches of five custodian accounts, including three people who were no longer in their positions at the General Counsel's office: the former Acting General Counsel, the former Immigration Unit Chief and the former Fraud Attorney; and the EOIR Director and BIA Chair who were on detail and not able to personally conduct a search. The IT contractor assigned to this matter spent 7.5 hours pulling information from back-up tapes and 31 hours reviewing the material to locate responsive information on shared drives, including email and stored files. To conduct the searches, the contractors used the terms listed in paragraph 14.

16. When questions arose, agency counsel provided additional instructions directing custodians to conduct a new search beginning from the date of their last search, which was conducted in response to the original search request as described in paragraph 8. If custodians were unsure when or whether they had conducted a search, they were instructed to conduct a new search.

17. As noted above, in addition to the search request described above, EOIR agency counsel provided the custodians with a copy of the original litigation hold notice issued in May 2010, which instructed employees to preserve information including, but not limited to, the

following: all documents, records, data, correspondence, notes, e-mails (including e-mails on a computer or personal digital assistant (PDA)), and other materials, whether official or unofficial, original or duplicates; spreadsheets, databases, calendars, voice messages, videos and/or photographs. Additionally, employees were advised to preserve the information in its original electronic form.

18. On December 21, 2010, agency counsel provided additional guidance to clarify that because EOIR was expanding the cut-off date for the search, custodians should update previous searches conducted in response to the original request. In this supplemental guidance, custodians were again directed to search all records that included evidence of the organization, functions, policies, or other activities of the agency.

19. EOIR's Supervisory FOIA Specialist and agency counsel monitored responses through e-mail and the creation of an excel spreadsheet, which listed each of the 52 custodians who produced opt-out and RPL records. The dates on which the custodians returned their searches were noted on the spreadsheet, as were the dates on which any material provided by each custodian was reviewed for responsiveness. The specific search terms used by the individual custodians were not tracked, although it was clear from the responses that the custodians were not unduly limiting their searches.

20. Upon completion of their searches, the custodians submitted all of the potentially responsive records they identified, including both hard copy and electronic records, to the EOIR FOIA Service Center. Several of the searches produced no records, but each of the relevant custodians affirmed that they conducted a search and provided a "no-record" response. Based upon the EOIR FOIA Service Center's subsequent page-by-page review of the documents, EOIR's custodians complied with the FOIA Service Center's instructions and did

not limit their searches to the titles of documents or the subject lines of e-mails, other electronic files or paper documents. In addition, the production of hard copy documents indicated that custodians also conducted searches and produced documents from files located on their individual computer accounts and from hard copy file systems within their components.

21. After reviewing the information collected, the EOIR FOIA Service Center determined that the bulk of the information was non-responsive. EOIR identified a total of four responsive opt-out documents, totaling 27 pages, and produced those documents to the Plaintiffs on January 17, 2011.

22. EOIR did not locate any information responsive to the RPL. This determination was made based on a page-by-page review by agency counsel of all of the responsive information provided to the FOIA Service Center by the 52 custodians, including documents potentially responsive to the request as it was originally submitted. Counsel sorted the electronic information into responsive and non-responsive material, first by eliminating records that post-dated October 15, 2010, and then by reviewing subject lines to reduce the amount of material that was subject to a full line-by-line review. The remaining potentially responsive records were then reviewed in their entirety for responsiveness to the RPL. Because EOIR does not have any electronic discovery tools, it did not rely on any technical support to conduct its review.

23. EOIR properly identified key custodians and conducted a headquarters-wide search. In addition, by tracking responses to the request, EOIR adopted a process to ensure that searches were conducted by each of the key custodians. The search was conducted by each custodian based on a set list of terms and any additional terms likely to generate responsive

10

information. This process was reasonably designed and ultimately identified responsive records.

24. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Crystal Rene Souza
Supervisory FOIA Specialist
Executive Office for Immigration Review

March 2, 2012

11

# Exhibit I

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN A. HAWKINSON,

                Plaintiff,

    v.                            C.A. No.  1:21-CV-11817-MPK

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW,

                Defendant.

**DECLARATION OF JOSEPH R. SCHAAF IN SUPPORT OF THE EXECUTIVE
OFFICE FOR IMMIGRATION REVIEW'S MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

       I, Joseph R. Schaaf, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

       1.      I am the Supervisor Attorney Advisor with the Office of the General Counsel
("OGC") in the FOIA Program at the Department of Justice's ("DOJ"), Executive Office for
Immigration Review ("EOIR"). I have held this position since 2016. In my role as
Supervisory Attorney Advisory (FOIA), I manage the agency's Freedom of Information Act
Unit (FOIA Unit) for the agency. Prior to this position, I was a Judge Advocate in the
United States Navy and held the position of Staff FOIA officer at various times from 1999
through 2016.

       2.      The EOIR FOIA Unit is responsible for executing EOIR's FOIA Program
pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act
("PA"), 5 U.S.C. § 552a. The EOIR FOIA Unit is comprised of a FOIA Service Center and

a separate group of FOIA Attorney Advisors with support staff.

       3.       As the Supervisory Attorney Advisor in EOIR's FOIA Program, my official duties and responsibilities include supervision of litigation support defending the agency in FOIA litigation matters, supervision of processing complex FOIA requests, creating and implementing policy and procedures for the EOIR FOIA Program, and conducting FOIA training for EOIR personnel. In connection with my official duties, I am familiar with EOIR's procedures for responding to requests for information pursuant to provisions of the FOIA and the Privacy Act. In that respect, I am familiar with the FOIA request made by Plaintiff dated October 1, 2021, and assigned FOIA control number FOIA 2022-00208 ("FOIA Request 2022-00208"). The statements contained in this declaration are based upon my personal knowledge, my review of records kept by EOIR in the ordinary course of business, and information provided to me by other EOIR employees in the course of my official duties.

## II.      DESCRIPTION OF EOIR'S FOIA PROGRAM

       4.       EOIR's FOIA Program operates as a bifurcated system based on whether a FOIA request is designated as "Simple" (or Track 2) or "Complex" (or Track 3), under a multi-tracking system.[1] FOIA intake is managed by a FOIA Service Center and is comprised of government information professionals and contractors. The FOIA Service Center processes all Simple requests. One supervisory attorney advisor, two attorney advisors, one judicial law

---

[1] EOIR's FOIA Program also maintains an "Expedited" (or Track 1) multi-track designation in which a request can either be Complex or Simple; however, Expedited requests have generally made up less than 20 requests per year over the last 5 years. In practice, "expedited" merely means that the request moves to the front of the queue in either the Complex track (Track 3) or the Simple track (Track 2).

clerk, and one part-time specialized contractor within OGC manage and process substantially

all Complex requests.[2] Simple requests are generally first- or third-party requests seeking a

Respondent's Record of Proceeding ("ROP") generated by an immigration proceeding,

including Immigration Judge decisions and orders and Board of Immigration Appeals ("BIA"

or "Board") decisions related to a particular Respondent. Complex requests are generally

requests seeking agency records other than ROPs and generally require collection of records

from one or more program offices (including field offices), involve a search for numerous

records necessitating a wide-ranging search, and/or involve processing of voluminous records.

In accordance with standard FOIA processing practice, FOIA requests are processed in the

order received absent a grant of "Expedited" (Track 1) processing, generally referred to as a

"First-in, First-out" system.

    5.      Historically, Simple requests comprise over 95% of FOIA/PA requests received

at the FOIA Service Center. For example, in fiscal year (FY) 2020, EOIR processed 42,764

Simple perfected[3] requests and 413 Complex perfected requests. In FY 2019, EOIR processed

42,541 Simple perfected requests and 331 Complex perfected requests. In FY 2018, EOIR

processed 44,216 Simple perfected requests and 310 Complex perfected requests. In FY 2017,

EOIR processed 36,793 Simple perfected requests and 143 Complex perfected requests. In FY

2016, EOIR processed 30,515 Simple perfected requests and 136 Complex perfected requests.

---

[2] Infrequently, attorneys within OGC who are not part of the FOIA Unit will be tasked on Complex requests if resources allow.

[3] "Perfected" requests are those requests that are actually processed by the agency. Requests that are received by the agency that are not "reasonably described" or are deemed "improper" for some other reason, including a failure to agree to pay fees when applicable, are referred to as "unperfected" requests. 28 C.F.R. § 16.3(b). Such "unperfected" requests are annotated by the agency in its Annual Report as having been received; however these requests are closed without processing. *See Department of Justice Handbook for Agency Annual Freedom of Information Act Report*, https://www.justice.gov/oip/page/file/1325056/download (last updated Oct. 6, 2020).

In FY 2015, EOIR processed 27,740 Simple perfected requests and 12 Complex perfected requests. *See* https://www.justice.gov/oip/reports-1.

6.      EOIR's FOIA Program for processing FOIA requests begins with the FOIA Service Center. A FOIA request may be submitted through an on-line portal or by other submission means. The FOIA request is received or logged in by FOIA intake personnel into an electronic database, and a control number is automatically assigned. FOIA intake personnel briefly review the FOIA request to make an immediate determination on whether the request seeks a ROP, in which case it is designated as Simple (Track 2), or other agency records, in which case it is designated as Complex (Track 3).[4] The requester then receives an acknowledgment letter if submitted through an on-line portal, or, alternatively FOIA intake personnel send an acknowledgment letter or a combined acknowledgement/response letter to the requester. The acknowledgement letter includes the control number and other information related to fees, multi-tracking, approximate time to process, and resources to assist the requester. The processing of Simple requests remains within the FOIA Service Center for the life of the request until closed. All Complex requests are forwarded to the supervisory attorney advisor overseeing the FOIA Program for managing, processing, and/or delegating, and such Complex requests remain within OGC for the life of the request until closed.

7.      For Simple requests, or first- or third-party requests for ROPs, the first step is to identify the physical location of the ROP by entering a unique Respondent number into the agency's CASE database.  Generally, a ROP is located in one of three locations: (1) within one or more of 15 Federal Records Centers ("FRC") (long-term storage facilities) geographically located throughout the contiguous United States; (2) within the 70

---

[4] Requests for expedited processing are sent to the Complex request attorneys for a legal determination on whether the requester is entitled to expedited processing.

Immigration Courts and/or Immigration Adjudication Centers geographically located throughout the United States and its territories; or (3) within Headquarters, if the Respondent filed an appeal of a lower court decision. If located, the FOIA Service Center will order or retrieve the physical file ROP, scan and process its contents, and provide responsive records, if any, to the requester.[5]

8.      First-party requests for ROPs require verification of identity that the requester, or his or her representative, has authorization to receive the ROP since the records contained therein include a substantial amount of personally identifiable information (PII) and are essentially analogous to Privacy Act records. On the agency's website, EOIR advises: "To ensure that privacy protected information is not improperly released, a request seeking records regarding yourself must verify your identity. The FOIA Service Center recommends providing a notarized original signature or submitting an originally signed Form DOJ-361, Certification of Identity." *See* https://www.justice.gov/eoir/foia-submit a request#How do I request records about myself?. If the requester submits proper verification of identity for the ROP requested, EOIR provides an unredacted copy of the entire contents of the official immigration proceeding.

9.      Third-party requests for ROPs are by definition requests for ROPs without verification of identity. In those situations, EOIR may take one of two approaches to respond to the requester depending on the public interest related to the subject of the ROP. In the first approach, EOIR may issue a partial grant providing a redacted copy of an immigration judge decision or order within the ROP if the Respondent is the subject of a precedential BIA or

---

[5] Since 2018, EOIR has been creating electronic versions of ROPs for Respondents newly entering immigration proceedings, or "eROPs"; however, less than 2% of FOIA requests have eROPs as of the date this declaration was signed.

Attorney General published decision. *See* https://www.justice.gov/eoir/ag-bia-decisions. In

that situation, the public interest weighs in favor of partial disclosure notwithstanding the lack

of a verification of identity in view of the publicly-available published decision. In the second

approach, EOIR may issue a so-called Glomar response, meaning the agency neither confirms

nor denies existence of any record related to the Respondent identified by the requester. *See*

*Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976). In this situation, the privacy interest

of the individual identified by the requester outweighs any public interest in

acknowledgement that the agency maintains any record related to the identified Respondent

assuming any such record exists.

10.     For Complex requests, the first step is to identify which program offices, based

on experience and knowledge of EOIR's program offices, within EOIR are reasonably likely

to possess records responsive to that request (assuming any exist) and to initiate searches

within those program offices. Once the appropriate program office(s) is/are identified for a

given request, FOIA points of contact ("FOIA POCs") within each of those program offices

are provided with a copy of the FOIA request and/or a detailed description of the request. The

FOIA POC(s) then review(s) the FOIA request along with any case-specific instructions that

may have been provided, and based on their experience and knowledge of their program

office practices and activities, forward(s) the request and instructions to the individual

employee(s) or component office(s) within the program office that they believe are reasonably

likely to have responsive records, if any.

11.     EOIR's organizational chart illustrates that the agency is organized as follows:

the Office of the Director ("OOD") and seven components thereunder, specifically, the BIA,

the Office of the Chief Administrative Hearing Officer ("OCAHO"), the Office of the Chief

Immigration Judge ("OCIJ"), the Office of the General Counsel ("OGC"), the Office of

Administration ("OA"), the Office of Information Technology ("OIT"), and the Office of

Policy ("OP"). *See* https://www.justice.gov/eoir/eoir-organization-chart/chart. Several sub-

components fall under OOD, including, the Planning, Analysis, and Statistics Division

("PASD"), the Office of Legal Access Programs ("OLAP"), and the Office of Equal

Employment Opportunity ("EEO"). *See* https://www.justice.gov/eoir /office-of-the-director.

Additionally, several sub-components fall under OP, including, the Communications and

Legislative Affairs Division ("CLAD"), the Immigration Law Division ("ILD"), and the Legal

Education and Research Services Division ("LERS").

12.     In accordance with the EOIR FOIA Unit's instructions, the individuals and

component offices are directed to conduct searches of their file systems, which in their

judgment, based on their knowledge of the manner in which they routinely keep records,

would be the file systems likely to contain responsive documents. Once those searches are

completed, the individuals and component offices provide any potentially responsive records

to their program office's POC, who in turn provides the records to me, one of three FOIA

Unit attorney advisors, or judicial law clerk, who manage, process, and/or delegate tasking of

Complex (Track 3) requests.

13.     In some instances, FOIA Unit personnel have direct access to certain internal

agency databases that hold records related to another Office or Program. In those cases, FOIA

Unit personnel may conduct a search within such a database without sending a search request

to the Office or Program FOIA POC. In particular, I and four other FOIA Unit personnel,

have direct access to two BIA internal agency databases. The two BIA internal agency

databases house copies of BIA unpublished and published decisions on appeal from an

immigration judge's decisions ("BIA Decisions") at the lower immigration court.[6] By definition, as explained in paragraph 4, all FOIA requests for records other than ROPs are designated as Complex (Track 3) requests, including requests for BIA Decisions.

14.     One database housing copies of BIA Decisions is called BIA eDecisions and houses copies of BIA unpublished decisions from 2001 through the present. Search capabilities are limited to the following: Date Range, A-Number (alien registration number), Fine Number, Appeal Type, IJ Name (Immigration Judge Name), and Base City (Immigration Court location) within BIA eDecisions. The copies of BIA unpublished decisions within BIA eDecisions are made searchable by using QR Code and renaming with an Appeal Identifier to facilitate "matching" to EOIR's CASE databased to certain identifiers related to the scanned official BIA decisions, specifically A-Number/Fine Number, NTA Date, Appeal Type, BIA Decision Type, IJ Code, and Base City. These copies are not subject to optical character recognition (OCR) and cannot be searched using key terms.

15.     The other database housing copies of BIA Decisions is called BIA Decisions Search Application (formally "BIA Decisions Portal") and originally housed copies of BIA unpublished decisions from approximately 2016 through the present. However, since its inception, older decisions have been gradually integrated, and the date of the oldest decision as of the date of this declaration dates back to 1989. The copies of BIA unpublished decisions within BIA Decisions Search Application are subject to OCR for searching using key terms rather than relying on the scanning of QR codes to define search parameters like the BIA eDecisions application. Additionally, search results within BIA Decisions Search Application

---

[6] The BIA adjudicates approximately 30,000 appeals every year. Approximately 30 of the 30,000 BIA decisions are published and precedential while the remaining are unpublished and non-precedential. *See* https://www.justice.gov/eoir/ag-bia-decisions.

can be filtered by BIA Decision Date, Appeal Type, Filed By, Circuit Court, Base City, Immigration Judge, BIA Decision Code, Board Member, and BIA Attorney/Paralegal.

16.     EOIR utilizes the Microsoft Windows operating system to conduct agency business. One feature of Microsoft Windows is File Explorer, which allows for the creation of Shared Drives used to collaborate and store certain agency records. A Shared Drive is also known as a Network File Share and is an area dedicated for file users to create and share files. A Shared Drive can be created and assigned to a certain group of file users with access privileges. Only those Shared Drives to which a file user has access privileges will be displayed to the file user when File Explorer is selected. Numerous folders and sub-folders can be created under each Shared Drive. A true and correct copy of a screenshot of File Explorer is attached as Exhibit A to this Declaration.

17.     Until August 9, 2021, pre-decisional drafts at various stages of the deliberative process were generally stored in the BIA's Shared Drive, also known as the "G:\ Drive."[7] Drafts within the G:\ Drive were saved within various sub-folders that may have been created and managed by the drafter, a supervisor, a Board member, or other individuals involved in the decision-drafting process at the BIA. The last draft of a BIA Decision was finalized by printing from the G:\ Drive, signing by at least one Board member, and finally scanning and saving directly to BIA Decisions Search Application as a PDF document in addition to adding it to the Record of Proceeding (ROP). FOIA attorneys are generally not granted access to the G:\ Drive since they are not BIA employees. In order to locate a specific draft decision within these sub-folders in an efficient manner, an employee within the BIA who had access to the G:\ Drive would need to know specifically in which sub-folder the file was saved, have access

---

[7] Plaintiff's FOIA Request 2022-00208 characterized this drive as "BIA's DATA LIBRARY of "shared network folders."

to that specific folder, and also know the file name. Without knowing such information, each individual file, within each sub-folder, would need to be opened and reviewed for the desired key terms. Considering that the BIA decides approximately 30,000 cases per year and each decision typically has multiple draft versions, it would be an unfathomable task to locate decisions containing specific key terms for a timeframe spanning months or years. Although it is technically possible to conduct a search within File Explorer using key terms, EOIR default search settings can only locate key terms matching file names within the folder and/or sub-folder(s) being searched. Policy group settings, which are generally unmodifiable even through a request to the Office of Information Technology, dictate indexing options that only allow indexing of properties rather than both properties and file contents. In other words, only items such as a specific file name can be searched, but the words within the document of the file cannot. Therefore, a search using File Explorer would not locate key terms in the body of any document housed in the G:\ Drive even if the person searching had access to the drive. Draft decisions located within the G:\ Drive have file names typically containing information such as A-number, non-citizen name, and drafter's initials, but not key terms pertaining to the topic of the decision. A search within the G:\ Drive using key terms such as "alternatives to detention," for example, would not result in any draft decisions, making it an unreasonable starting point for a request that has included specific key terms contained within BIA decisions as a requirement of the search.[8]

---

[8] I have reviewed the Declaration of Matthew Hoppock, which was submitted as Exhibit 2 with Plaintiff's Opposition to Summary Judgement and Cross-Motion for Summary Judgement in 20-cv-12273-MPK. Hawkinson v. EOIR, No. 20-12273-MPK (D. Mass. Sept. 27, 2021) (granting summary judgement to Defendant). Mr. Hoppock is not, and has never been, an employee of EOIR or DOJ, and is not in any way personally familiar with the internal processes of the agency.  Mr. Hoppock surmises, based solely on documents obtained through the FOIA, that "BIA's internal 'network folders'" could be searchable by "keyword." In fact, search capabilities of shared network drives for EOIR employees are controlled by a "group policy object ("GPO")," which is intentionally set to only search and index file *properties* but not file *contents*, as including the contents of the file would dramatically slow down searching and indexing. For settings that are controlled by a GPO, even changing the setting, which requires a heightened IT request, would only be temporary—the settings would revert back to their originally specified parameters at an unknown time, potentially

18.     On August 9, 2021, the BIA began using a new case management system called Judicial Tools. *See* https://www.equivant.com/judicial-tools/. Since its introduction, Judicial Tools has been used to draft decisions using a Microsoft Word integration that allows for the draft to be saved directly to Judicial Tools under a record that is searchable only by A-number. Some drafts have also been "pulled in" from folders within the G:\ Drive if the drafting process had been started in the G:\ Drive. In order to search for any drafts within Judicial Tools, it is necessary to first know the A-number. Therefore, searching Judicial Tools for specifically requested draft decisions based on key terms is not an option. Similarly to the G:\ Drive finalization process, a draft decision created in Judicial Tools is not final until it has been signed and uploaded directly to BIA Decisions Search Application, which does allow for a search using key terms. In short, the only database that can reasonably be searched through the use of key terms is the BIA Decisions Search Application.

19.     The FOIA Unit receives two types of requests for BIA Decisions: (1) untargeted requests or (2) targeted requests. Untargeted FOIA requests, like Plaintiff's request at issue here, are those that request BIA Decisions based on a particular immigration judge, a particular immigration court, a date range, and/or key term without identifying a particular Respondent by name or A-number. In other words, the request does not include personally identifiable information (PII), the disclosure of which would cause an unwarranted invasion of personal privacy. The FOIA Unit processes untargeted requests, assuming any records are located, since the BIA databases can be searched and PII can be withheld under the FOIA statute without identifying a respondent's name, A-number, or other PII, the disclosure of which would cause an unwarranted invasion of personal privacy.

---

even in the midst of a search, which would skew the search results.

20.     Targeted FOIA requests are those that request BIA Decisions identifying a Respondent by name or A-number. The FOIA Unit does not generally process targeted requests and issues a Glomar response, neither confirming nor denying the existence of any record related to the Respondent identified by the requester because acknowledging that such record existed would implicitly acknowledge the existence of the Respondent in the agency's system of records, causing an unwarranted invasion of personal privacy. An exception to processing a targeted request is if the requester submits a proper verification of identity as explained in paragraph 8.

### III.    PROCESSING OF PLAINTIFF'S FOIA REQUEST 2022-00208

21.     I have reviewed in its entirety Plaintiff's FOIA Request dated October 1, 2021, which requested a "search [of] the BIA's DATA LIBRARY of 'shared network folders' that contain native (Word) electronic versions of BIA decisions" originating from the Boston, MA or Hartford, CT immigration courts containing the text "alternatives to detention" or "alternatives-to-detention" from December 1, 2019 through the present. The request further elaborated, "I understand this request may capture draft decisions as well as unsigned final decisions." A true and correct copy of the October 1, 2021 FOIA Request 2022-00208 is attached as Exhibit B to this Declaration.

22.     On October 1, 2021, the FOIA Service Center sent correspondence to Plaintiff advising that Plaintiff's request was assigned control number 2022-00208. The October 1, 2021 correspondence, a true and correct copy of which is attached as Exhibit C to this Declaration, notified Plaintiff that the request involved "unusual circumstances" and that the request was designated as Complex (Track 3). That same day, the request was assigned to a legal assistant who then routed the request to an attorney advisor on October 5, 2021, for

processing in accordance with EOIR's current practices.

23.     On October 5, 2021, the assigned attorney, Ms. Shelley O'Hara, reviewed the request, noting that the key terms, origin courts, and starting date of the timeframe for the requested BIA decisions were identical to a prior FOIA request by Plaintiff, which was assigned control number FOIA 2021-02706. The similarity of the requests was immediately apparent to the assigned attorney because she had processed FOIA Request 2021-02706. Additionally, FOIA Request 2021-02706 was the subject of *Hawkinson v. EOIR*, 20-cv-12273 (D. Mass. Sept. 27, 2021), which had resulted in summary judgment for defendant three days prior to the date Plaintiff filed FOIA Request 2022-00208. In addition to the duplicative key terms, originating courts, and starting date of the timeframe, the request was duplicative in that the most reasonably calculated location to discover BIA decisions would have been within BIA Decisions Search Application, rather than within a shared network drive as Plaintiff attempted to direct. Indeed, the assigned attorney had already conducted the search within BIA Decisions Search Application in response to FOIA 2021-02706. Given the duplicative nature of FOIA Request 2022-00208, the assigned attorney issued a response to Plaintiff explaining that the same request had already been issued a response under FOIA Request 2021-02706, and therefore, the most recent request would be closed as a duplicate request. A true and correct copy of EOIR's October 5, 2021 response to Plaintiff is attached as Exhibit D to this Declaration.

24.     On October 5, 2021, Plaintiff contacted the FOIA Public Liaison by email, stating that his request was not duplicative because it specified a "particular location to search for BIA decisions, a location that was not searched in [FOIA Request] 2021-02706" and because the time scope of the two requests was different. Plaintiff also contacted the FOIA Unit through the Public Access Link (PAL) portal, which repeated his October 5, 2021 email

13

to the FOIA Public Liaison. A true and correct copy of Plaintiff's October 5, 2021 correspondence to EOIR is attached as Exhibit E to this Declaration.

25.     On October 6, 2021, the assigned attorney replied to Plaintiff's portal message explaining that "there is no precedent or authority permitting a requester to direct an agency where to search for records" and reaffirmed the agency's determination that FOIA Request 2022-00208 was a duplicate of FOIA Request 2021-02706. The response additionally reminded Plaintiff that "a federal district court found EOIR's search related to FOIA [Request] 2021-02706 to be reasonable and dismissed the case in EOIR's favor." A true and correct copy of EOIR's October 6, 2021 correspondence was submitted as Exhibit C of Plaintiff's Complaint for this action.

26.     On October 8, 2021, I was notified that Plaintiff filed an appeal with the Department of Justice, Office of Information Policy (OIP), the appellate authority who adjudicates all appeals of FOIA request determinations for all Department of Justice components. A true and correct copy of OIP's acknowledgement and assignment of appeal number A-2022-00065 is attached as Exhibit F to this Declaration.

27.     Upon additional review of FOIA Request 2022-00208, it was determined that the timeframe for the search of the FOIA Request 2022-00208 was slightly broader than that of FOIA Request 2021-02706 due to the respective filing dates of each request even though the subject matter of both requests was identical. Specifically, FOIA Request 2021-02706 was filed October 20, 2020, and FOIA Request 2022-00208 was filed October 1, 2021, leaving a timeframe of approximately one year to search. In that regard, a determination was made that a supplemental search should be conducted to capture those unpublished BIA decisions issued between the search conducted for FOIA Request 2021-02706 and the search conducted for FOIA Request 2022-00208 with those same key terms and same immigration courts.

14

28.     On November 18, 2021, a supplemental search was conducted in the BIA

Decisions Search Application since that is the record repository most likely to house the

requested information and permit key term searches. The key terms "alternatives to detention"

OR "alternatives-to-detention" were input to the BIA Decisions Search Application, resulting

in 975 potential hits. Then, a filter was applied to limit the results to the time frame of

November 17, 2020, which was the date following the end of the timeframe applied to FOIA

Request 2021-02706, to October 1, 2021, the request date of FOIA Request 2022-00208. This

filter reduced the results to sixty-seven (67) potential hits. Finally, a filter was applied for the

requested courts. Since only Boston remained as a choice, the list was filtered to the Boston

immigration court, resulting in twelve (12) potential hits. Of the twelve (12) resulting

potential hits, the requested search terms only appeared in one (1) BIA decision while the

other eleven (11) BIA decisions did not contain the search terms at all. A true and correct

copy of the November 18, 2021 supplemental search in the BIA Decisions Search Application

is attached as Exhibit G to this Declaration.

29.     On November 19, 2021, the assigned attorney issued a supplemental response to

Plaintiff's FOIA Request 2022-00208, granting partial access to the located record. A true and

correct copy of the November 19, 2021 supplemental response is attached as Exhibit H to this

Declaration. Consequently, the universe of file systems reasonably likely to contain

responsive records was searched.

30.     On December 29, 2021, I was notified that OIP sent correspondence to Plaintiff

that it had been informed of this lawsuit and consequently closed the appeal file in accordance

with Department of Justice regulations located at 28 C.F.R. § 16.8(b)(2) (2020). A true and

correct copy of the December 29, 2021 OIP correspondence to Plaintiff is attached as Exhibit

I to this Declaration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated the 4rd day of March 2022.

Joseph R. Schaaf
Supervisory Attorney (FOIA)

# Exhibit J



OOD
PM 21-13

Effective:  January 8, 2021

To:     All of EOIR
From:  James R. McHenry III, Director
Date:   January 8, 2021

JAMES
MCHENRY

Digitally signed by JAMES
MCHENRY
Date: 2021.01.08
16:42:36 -05'00'

## CONTINUANCES

| | |
|---|---|
| PURPOSE: | Update Executive Office for Immigration Review guidance on continuances in immigration proceedings |
| OWNER: | Office of the Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | Operating Policies and Procedures Memorandum 17-01 |

## I.      Background

This Policy Memorandum (PM) updates and replaces Operating Policies and Procedures Memorandum (OPPM) 17-01, *Continuances* to account for legal and policy developments subsequent to its issuance. *See*, *e.g*., *Matter of L-A-B-R-*, 27 I&N Dec. 405 (A.G. 2018). Although this PM replaces OPPM 17-01,[1] it retains that OPPM's core principle: although fundamental fairness and due process require that legal proceedings be postponed in appropriate circumstances, Immigration Judges must also be mindful to ensure that each decision granting or denying a continuance request is in accordance with the law. Moreover, although the appropriate use of continuances serves to protect due process, which Immigration Judges must safeguard above all, there is also a strong incentive by respondents in immigration proceedings to abuse continuances, and Immigration Judges must be equally vigilant in rooting out continuance requests that serve only as dilatory tactics. As the Supreme Court has recognized, "[o]ne illegally present in the United States who wishes to remain already has a substantial incentive to prolong litigation in order to delay physical deportation for as long as possible." *INS v. Rios-Pineda*, 471 U.S. 444, 450 (1985). Further, "as a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States." *INS v. Doherty*, 502 U.S. 314, 323 (1992). Continuance requests that seek only to prolong a removable alien's presence in the United States serve neither the public's interest nor the interests of justice, including the related interests of other aliens with meritorious claims whose cases may be delayed collaterally.

---

[1] This PM does not supersede or alter any other OPPM or PM.

1

## II.      Continuances

This PM provides the following, non-exhaustive list of relevant legal and policy principles as an aid to adjudicators considering common types of continuance requests, though adjudicators should always remain cognizant of and apply the most current and appropriate law to any motion for a continuance:

- All continuance requests should be adjudicated only based on the record and in accordance with applicable law—statutes, regulations, and binding precedents or court orders.

- EOIR has no policy mandating or requiring Immigration Judges to grant a continuance for any reason in any particular case or circumstance, except where a continuance is required by binding law. *See* PM 20-07, *Case Management and Docketing Practices* at 5 (Jan. 31, 2020). EOIR management does not possess authority to direct the result of an adjudication by an Immigration Judge by directing the Judge to grant or deny a continuance request in specific cases.

- Consistent with former OPPM 17-01, continuances based on requests made by the U.S. Department of Homeland Security (DHS) should be comparatively rare.

  - Consistent with OPPM 05-03, *Background and Security Investigations in proceedings Before Immigration Judges and the Board of Immigration Appeals* (Mar. 28, 2005) and PM 21-06, *Asylum Processing* (Dec. 4, 2020), a failure by DHS to report on the completion and results of relevant investigations and examinations does not require a continuance of the hearing, though Immigration Judges may not grant certain applications until the results of those investigations and examinations have been reported. 8 C.F.R. § 1003.47.[2]

  - Consistent with PM 20-07, EOIR has no policy requiring an Immigration Judge to grant a continuance if a DHS attorney does not appear for a hearing or does not possess that agency's administrative file at the hearing.

- The general standard for a continuance is good cause, 8 C.F.R. § 1003.29. By statute, however, "[i]n the absence of exceptional circumstances, final administrative adjudication of [an] asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed." INA § 208(d)(5)(A)(iii). "Exceptional circumstances" is a higher standard than "good cause." PM 19-05, *Guidance Regarding the Adjudication of Asylum Applications Consistent with INA § 208(d)(5)(A)(iii)* (Nov. 19, 2018) at 2-3 ("A continuance does not automatically justify exceeding the 180-day timeline in INA § 208(d)(5)(A)(iii), however, because the statute's 'exceptional circumstances'

---

[2] If DHS cannot report the results because the alien failed to timely provide biometrics and other biographical information without good cause, such failure by the alien "will constitute abandonment of the application" at issue. 8 C.F.R. § 1003.47(d).

standard is higher than the 'good cause' standard for continuances."). Thus, "if granting a continuance would result in missing the 180-day deadline, the Immigration Judge may only grant the continuance if the respondent satisfies both the good-cause standard of 8 C.F.R. § 1003.29 and also shows the 'exceptional circumstances' required by INA § 208(d)(5)(A)(iii)." *Id*. at 2.

- Continuance requests regarding collateral matters, especially applications for benefits pending before DHS, are generally governed by the Attorney General's decision in *Matter of L-A-B-R-*, 27 I&N Dec. 405 (A.G. 2018). To the extent they are consistent with *Matter of L-A-B-R*, the following principles may also apply in specific cases:

  o Potential visa availability that is "too remote" does not establish good cause for a continuance. *Matter of L-A-B-R-*, 27 I&N Dec. at 418 ("good cause does not exist if the alien's visa priority date is too remote to raise the prospect of adjustment of status above the speculative level"); *accord Matter of Quintero*, 18 I&N Dec. 348, 350 (BIA 1982) ("In any case, the fact that the respondent has an approved visa petition does not entitle him to delay the completion of deportation proceedings pending availability of a visa number."), *aff'd sub nom. Quintero-Martinez v. INS*, 745 F.2d 67 (9th Cir. 1984).

  o Under well-established precedent from the Board of Immigration Appeals (Board), a request for deferred action by DHS does not support an adjournment of proceedings. *Matter of Quintero*, 18 I&N Dec. at 350 ("Furthermore, since the respondent can request deferred action status at any stage in the proceedings, the immigration judge did not err in refusing to adjourn the hearing to allow him to pursue that relief.").

  o Aliens who are *prima facie* eligible for an 1-751 waiver, including as a matter of discretion, should generally have their cases continued while that waiver application is pending with DHS. *Matter of Stowers*, 22 I&N Dec. 605 (BIA 1999).

  o Cases in which a confirmed unaccompanied alien child (UAC) has filed an asylum application with DHS must be continued while that application is pending adjudication with DHS because DHS has initial jurisdiction over such applications. INA § 208(b)(3)(C).[3]

---

[3]Immigration Judges retain authority, however, to determine their own jurisdiction in this context, *i.e.* whether an alien in immigration proceedings met or meets the legal definition of a UAC, 6 U.S.C. § 279(g)(2), at the time the asylum application was filed. *See* PM 21-06 at 1 n.2; *accord Garcia v. Barr*, 960 F.3d 893, 895 (6th Cir. 2020) ("Nowhere does the statute ask whether an immigration official previously found the applicant to be an 'unaccompanied alien child.' Rather, it asks only whether the alien meets the statutory criteria at the time of his application. And like other judges, immigration judges have the power to determine their own jurisdiction. . .Thus, the immigration judge properly exercised jurisdiction once he found that [the respondent] did not meet the statutory criteria at the time of his asylum application.").

○ Continuance requests related to applications for a U nonimmigrant visa involve a recent and developing area of law. Accordingly, as case law evolves, adjudicators are encouraged to review applicable precedents, including *Matter of L-A-B-R-* and new circuit court decisions as appropriate. *See, e.g., Matter of L-N-Y-*, 27 I&N Dec. 755 (BIA 2020); *Matter of Sanchez-Sosa*, 25 I&N Dec. 807 (BIA 2012)[4]; *see also, e.g.*, *Alvarez-Espino v. Barr*, 959 F.3d 813, 818 (7th Cir. 2020) ("[DHS] will process the [U visa] application whether or not Alvarez-Espino has a final order of removal against him . . . . Because Alvarez-Espino can continue to pursue every immigration benefit he seeks [outside of removal proceedings], the Board did not abuse its discretion in denying his motion for remand or for a continuance."); *Maldonado-Guzman v. Sessions*, 715 F. App'x 277, 284-85 (4th Cir. 2017) ("To the contrary, the Board did not violate the Due Process Clause when it dismissed Maldonado-Guzman's appeal because the denial of a continuance does not affect Maldonado-Guzman's interest in filing or pursuing the U visa application. . .Furthermore, Maldonado-Guzman's right to be heard is in no way prejudiced by the denial of a continuance. Even if he is subject to a final order of removal, he is not precluded from filing a petition for U–1 nonimmigrant status directly with [DHS]. . .If [DHS] later grants Maldonado-Guzman's U visa, he may file to reopen and terminate the removal proceedings against him. . .Most significantly, Maldonado-Guzman can seek an administrative stay of removal despite being subject to a final order of removal. . .Given that Maldonado-Guzman's right to be heard was not prejudiced by the denial of a continuance on removal proceedings, he has failed to establish a violation of the Due Process Clause." (cleaned up)).

• Category (2) status-docket cases generally warrant continuances until they can be resolved. *See generally* PM 19-13, *Use of Status Dockets* at (Aug. 16, 2019) at 2.

○ Cases in which an Immigration Judge intends to grant cancellation of removal for certain nonpermanent residents pursuant to INA § 240A(b), which are subject to an annual statutory cap of 4000, should be continued if the cap has been reached for the year and that application is the only one the alien has filed. 8 C.F.R. § 1240.21(c)(1); *see also* OPPM 17-04, *Applications for Cancellation of Removal or Suspension of Deportation that are Subject to the Cap* (Dec. 20, 2017).

○ Cases in which an alien otherwise *prima facie* eligible for adjustment of status before an Immigration Judge in the United States had an immediately-available visa at the time the adjustment of status application was filed with the immigration court but the visa category subsequently retrogressed by the time of the hearing, should be held in abeyance. *Matter of Briones*, 24 I&N Dec. 355, 357 n.3 (BIA 2007).

---

[4]The Board did not address visa availability—or the remoteness of such availability—in *Matter of Sanchez Sosa*, as it appears that the annual statutory cap on U visas had not been reached at the time the decision was issued.

4

- By statute, "[i]n order that an alien be permitted the opportunity to secure counsel before the first hearing date in proceedings under section 240 of the Act, the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear, unless the alien requests in writing an earlier hearing date." INA § 239(b)(1). But, "[n]othing in this subsection may be construed to prevent the Attorney General from proceeding against an alien pursuant to section 240 of the Act if the [10-day] time period described [above] has elapsed and the alien has failed to secure counsel." INA § 239(b)(3). Aliens should receive a fair opportunity to seek counsel, if they wish to do so, consistent with the statute and applicable case law. *Matter of C-B-*, 25 I&N Dec. 888 (BIA 2015).[5]

- Consistent with former OPPM 17-01, requests for attorney preparation time should be reviewed carefully, especially given that the time between a master calendar hearing and an individual merits hearing, which often exceeds one year in a non-detained case, already encompasses substantial time for preparation.

  o Frequent or multiple requests for additional preparation time based on a practitioner's workload concerns related to large numbers of other pending cases should be rare and warrant careful review. "A practitioner's workload must be controlled and managed so that each matter can be handled competently." 8 C.F.R. § 1003.102(q)(1). Thus, for a practitioner who takes on more cases than he or she can responsibly and professionally handle, necessitating the need for multiple continuances across multiple cases, it may be appropriate for an Immigration Judge to consider referral to EOIR disciplinary counsel for further action and possible sanction for a violation of 8 C.F.R. § 1003.102.

- Consistent with former OPPM 17-01, requests to continue an individual merits hearing that has already been scheduled remain of particular importance. Such hearings are typically scheduled far in advance, which provides ample opportunity for preparation time, and often involve interpreters or third-party witnesses whose schedules have been carefully accommodated. Moreover, slots for individual merits hearings cannot be easily filled by other cases, especially if the decision to continue the hearing is made close in time to the scheduled date. Although some continuances of individual merits hearings are unavoidable, the continuance of an individual merits hearing necessarily has a significant adverse ripple effect on the ability to schedule other hearings across an Immigration Judge's docket. Thus, such a request should be reviewed very carefully, especially if it is made close in time to the hearing. For a continuance request made well in advance of the scheduled date of the hearing, an Immigration Judge should adjudicate that request expeditiously and, if granted, should endeavor to fill that hearing slot with another individual merits hearing after providing sufficient notice. Further, because an individual merits hearing is typically scheduled far in advance and generally only after considering the availability of a respondent's representative, a request for a continuance based on a

---

[5]The respondent in *Matter of C-B-* was detained, and his only hearing occurred eight days after he was issued a notice to appear, in apparent contravention of INA § 239(b)(1). 25 I&N Dec. at 889. Thus, that decision did not address the relevance of the statutory language in INA § 239(b)(1),(3) regarding an alien's opportunity to seek representation, nor did it address a situation common in non-detained cases in which a respondent has many months after the issuance of a notice to appear to seek representation before a hearing.

scheduling conflict with a respondent's representative that arose after the individual merits hearing has been calendared should be rare and should be considered very carefully.

- Consistent with former OPPM 17-01, continuance requests solely for dilatory purposes should not be countenanced by Immigration Judges. *See also* 8 C.F.R. § 1003.102(j)(1) ("A practitioner engages in frivolous behavior when he or she knows or reasonably should have known that his or her actions. . .are taken for an improper purpose, such as. . .to cause unnecessary delay.").

- A decision on a continuance request based solely on agency case completion goals or an employee's individual performance appraisal is improper and contrary to well-established law. *Matter of L-A-B-R-*, 27 I&N Dec. at 416. However, Immigration Judges are not prohibited from appropriately considering "the number of continuances previously requested or the continuance's impact on the efficient determination of the case" when adjudicating a continuance request. *Id*. at 417.

- On November 27, 2020, the Department of Justice published a Notice of Proposed Rulemaking (NPRM) proposing to codify multiple principles related to continuances in EOIR's regulations. Good Cause for a Continuance in Immigration Proceedings, 85 *Fed. Reg.* 75925 (Nov. 7, 2020). Although that NPRM has not been finalized—and, thus, the proposed regulatory changes in the NPRM are not in effect—it nevertheless contains a wealth of potentially helpful information for adjudicators regarding continuance requests in immigration proceedings.[6] Accordingly, adjudicators who are interested are encouraged to review the NPRM for additional information on the subject.

- In all situations in which a continuance is granted at a hearing, Immigration Judges must make the reason(s) for the adjournment clear on the record by annotating the case worksheet on the left side of the Record of Proceedings with the corresponding adjournment code. The Court Administrators and court staff must ensure that each adjournment code is accurately entered into CASE (or any successor case management system). *See* PM 21-07 *Annotating Adjournment, Call-up, and Case Identification Codes* (Dec. 10, 2020).

## III.    Conclusion

This PM is intended solely to assist adjudicators in considering continuance requests by both parties in immigration proceedings. It is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing herein should be construed as mandating a particular outcome in any

---

[6] If the NPRM is finalized and becomes effective, then EOIR will provide specific guidance on the final rule's regulatory provisions accordingly.

specific case. Nothing in this PM limits an adjudicator's independent judgment and discretion in adjudicating cases or an adjudicator's authority under applicable law.

Please contact your supervisor if you have any questions.

# Exhibit K



OOD
DM 22-05

Issued:          Apr. 18, 2022
Effective:       Immediately

## CANCELLATION OF POLICY MEMORANDA 19-05, 21-06, AND 21-13

| | |
|---|---|
| PURPOSE: | Rescind and cancel Policy Memoranda 19-05, 21-06, and 21-13 |
| OWNER: | David L. Neal, Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | Policy Memorandum 19-05<br>Policy Memorandum 21-06<br>Policy Memorandum 21-13 |

As EOIR continues to review existing agency policies and practices, the following Policy Memoranda (PM) are rescinded:

1.  PM 19-05, *Guidance Regarding the Adjudication of Asylum Applications Consistent with INA § 208(d)(5)(A)(iii)*

2.  PM 21-06, *Asylum Processing*

3.  PM 21-13, *Continuances*

Please contact your supervisor if you have any questions.

# Exhibit L



COMPUTING PRACTICES

*Edgar H. Sibley*
*Panel Editor*

*An evaluation of a large, operational full-text document-retrieval system (containing roughly 350,000 pages of text) shows the system to be retrieving less than 20 percent of the documents relevant to a particular search. The findings are discussed in terms of the theory and practice of full-text document retrieval.*

# AN EVALUATION OF RETRIEVAL EFFECTIVENESS FOR A FULL-TEXT DOCUMENT-RETRIEVAL SYSTEM

**DAVID C. BLAIR and M. E. MARON**

Document retrieval is the problem of finding stored documents that contain useful information. There exist a set of documents on a range of topics, written by different authors, at different times, and at varying levels of depth, detail, clarity, and precision, and a set of individuals who, at different times and for different reasons, search for recorded information that may be contained in some of the documents in this set. In each instance in which an individual seeks information, he or she will find some documents of the set useful and other documents not useful; the documents found useful are, we say, *relevant*; the others, not relevant.

How should a collection of documents be organized so that a person can find all and only the relevant items? One answer is automatic full-text retrieval, which on its surface is disarmingly simple: Store the full text of all documents in the collection on a computer so that every character of every word in every sentence of every document can be located by the machine. Then, when a person wants information from that stored collection, the computer is instructed to search for all documents containing certain specified words and word combinations, which the user has specified.

Two elements make the idea of automatic full-text retrieval even more attractive. On the one hand, digital technology continues to provide computers that are larger, faster, cheaper, more reliable, and easier to use; and, on the other hand, full-text retrieval avoids the

⊕ 1985 ACM 0001-0782/85/0300-0289 75¢

need for human indexers whose employment is increasingly costly and whose work often appears inconsistent and less than fully effective.

A pioneering test to evaluate the feasibility of full-text search and retrieval was conducted by Don Swanson and reported in *Science* in 1960 [6]. Swanson concluded that text searching by computer was significantly better than conventional retrieval using human subject indexing. Ten years later, in 1970, Salton, also in *Science*, reported optimistically on a series of experiments on automatic full-text searching [3].

This paper describes a large-scale, full-text search and retrieval experiment aimed at evaluating the effectiveness of full-text retrieval. For the purposes of our study, we examined IBM's full-text retrieval system, STAIRS. STAIRS, an acronym for "STorage And Information Retrieval System," is a very fast, large-capacity, full-text document-retrieval system. Our empirical study of STAIRS in a litigation support situation showed its retrieval effectiveness to be surprisingly poor. We offer theoretical reasons to explain why this poor performance should not be surprising and also why our experimental results are not inconsistent with the earlier more favorable results cited above. The retrieval problems we describe would be problems with any large-scale, full-text retrieval system, and in this sense our study should not be seen as a critique of STAIRS alone, but rather a critique of the principles on which it and other full-text document-retrieval systems are based.

*Computing Practices*

## THE ALLURE OF FULL-TEXT DOCUMENT RETRIEVAL

Retrieving document texts by subject content occupies a special place in the province of information retrieval because, unlike data retrieval, the richness and flexibility of natural language have a significant impact on the conduct of a search. The indexer chooses subject terms that will describe the informational content of the documents included in the database, and the user describes his or her information need in terms of the subject descriptors actually assigned to the documents (Figure 1). However, there are no clear and precise rules to govern the indexers' choice of appropriate subject terms, so that even trained indexers may be inconsistent in their application of subject terms. Experimental studies have demonstrated that different indexers will generally index the same document differently [9], and even the same individual will not always select the identical index terms if asked at a later time to index a document he or she has already indexed. The problems associated with manual assignment of subject descriptors make computerized, full-text document retrieval extremely appealing. By entering the entire, or the most significant part of, a document text onto the database, one is freed, it is argued, from the inherent evils of manually creating document records reflecting the subject content of a particular document; among these, the construction of an indexing vocabulary, the training of indexers, and the time consumed in scanning/reading documents and assigning context and subject terms. The economies of full-text search are appealing, but for it to be worthwhile, it must also provide satisfactory levels of retrieval effectiveness.

## MEASURING RETRIEVAL EFFECTIVENESS

Two of the most widely used measures of document-retrieval effectiveness are Recall and Precision. Recall measures how well a system retrieves *all* the relevant documents; and Precision, how well the system retrieves *only* the relevant documents. For the purposes of this study, we define a document as relevant if it is judged useful by the user who initiated the search. If not, then it is nonrelevant (see [4]). More precisely, Recall is the proportion of relevant documents that the system retrieves, the ratio of $x/n_2$ (Figure 2). Notice that one can interpret Recall as the probability that a relevant document will be retrieved. Precision, on the other hand, measures how well a system retrieves *only* the relevant documents; it is defined as the ratio $x/n_1$ and can be interpreted as the probability that a retrieved document will be relevant.

## THE TEST ENVIRONMENT

The database examined in this study consisted of just under 40,000 documents, representing roughly 350,000 pages of hard-copy text, which were to be used in the



**FIGURE 1.  The Dynamics of Information Retrieval**

$$\text{Recall} = \frac{\text{Number of Relevant and Retrieved}}{\text{Total Number Relevant}} = \frac{x}{n_2}$$

$$\text{Precision} = \frac{\text{Number of Relevant and Retrieved}}{\text{Total Number Retrieved}} = \frac{x}{n_1}$$

**FIGURE 2.   Definitions of Precision and Recall**

defense of a large corporate law suit. Access to the documents was provided by IBM's STAIRS/TLS software (STorage And Information Retrieval System/Thesaurus Linguistic System). STAIRS software represents state-of-the-art software in full-text retrieval. It provides facilities for retrieving text where specified words appear either singly or in complex Boolean combinations. A user can specify the retrieval of text in which words appear together anywhere in the document, within the same paragraph, within the same sentence, or adjacent to each other (as in "New"adjacent "York"). Retrieval can also be performed on fields such as author, date, and document number. STAIRS provides ranking functions that permit the user to order retrieved sets of 200 documents or less in either ascending or descending numerical (e.g., by date) or alphabetic (e.g., by author) order. In addition, retrieved sets of less than 200 documents can also be ordered by the frequency with which specified search terms occur in the retrieved documents. The Thesaurus Linguistic System (TLS) provides the facilities to manually create an interactive thesaurus that can be called up by the user to semantically broaden (or narrow) his or her searches; it allows the designer to specify semantic relationships between search terms such as "narrower than," "broader than," "related to," "synonomous with," as well as automatic phrase decomposition. STAIRS/TLS thus represents a comprehensive full-text document-retrieval system.

## THE EXPERIMENTAL PROTOCOL
To test how well STAIRS could be used to retrieve *all* and *only* the documents relevant to a given request for information, we wanted in essence to determine the values of Recall (percentage of relevant documents retrieved) and Precision (percentage of retrieved documents that are relevant). Although Precision is an important measure of retrieval effectiveness, it is meaningless unless compared to the level of Recall desired by the user. In this case, the lawyers who were to use the system for litigation support stipulated that they must be able to retrieve at least 75 percent of all the documents relevant to a given request for information, and that they regarded this entire 75 percent as essential to the defense of the case. (The lawyers divided the relevant retrieved documents into three groups: "vital," "satisfactory," and "marginally relevant." All other retrieved documents were considered "irrelevant.")

## CONDUCT OF THE TEST
For the test, we attempted to have the retrieval system used in the same way it would have been during actual litigation. Two lawyers, the principal defense attorneys in the suit, participated in the experiment. They generated a total of 51 different information requests, which were translated into formal queries by either of two paralegals, both of whom were familiar with the case and experienced with the STAIRS system. The paralegals searched on the database until they found a set of documents they believed would satisfy one of the initial requests. The original hard copies of these documents were retrieved from files, and xerox copies were sent to the lawyer who originated the request. The lawyer then evaluated the documents, ranking them according to whether they were "vital," "satisfactory," "marginally relevant," or "irrelevant" to the original request. The lawyer then made an overall judgment concerning the set of documents received, stating whether he or she wanted further refinement of the query and further searching. The reasons for any subsequent query revisions were made in writing and were fully recorded. The information-request and query-formulation procedures were considered complete only when the lawyer stated in writing that he or she was satisfied with the search results for that particular query (i.e., in his or her judgment, more than 75 percent of the "vital," "satisfactory," and "marginally relevant" documents had been retrieved). It was only at this point that the task of measuring Precision and Recall was begun. (A diagram of the information-request procedure is given in Figure 3.) The lawyers and paralegals were permitted as much interaction as they thought necessary to ensure highly effective retrieval. The paralegals were able to seek clarification of the lawyers' information request in as much detail and as often as they desired, and the lawyers were encouraged to continue requesting information from the database until they were satisfied they had enough information to defend the lawsuit on that particular issue or query. In the test, each query required a number of revisions, and the lawyers were not generally satisfied until many retrieved sets of documents had been generated and evaluated.

Precision was calculated by dividing the total number of relevant (i.e., "vital," "satisfactory," and "marginally relevant") documents retrieved by the total number of retrieved documents. If two or more retrieved sets were generated before the lawyer was satisfied with the results of the search, then the retrieved set considered for calculating Precision was computed as the *union* of all retrieved sets generated for that request. (Documents that appeared in more than one retrieved set were automatically excluded from all but one set.)

Recall was considerably more difficult to calculate since it required finding relevant documents that had not been retrieved in the course of the lawyers' search. To find the *unretrieved* relevant documents, we developed sample frames consisting of subsets of the unretrieved database that we believed to be rich in relevant documents (and from which duplicates of retrieved rel-

*Computing Practices*



**FIGURE 3.   The Information Request Procedure**

evant documents had been excluded]. Random samples were taken from these subsets, and the samples were examined by the lawyers in a blind evaluation; the lawyers were not aware they were evaluating sample sets rather than retrieved sets they had personally gen-

erated. The total number of relevant documents that existed in these subsets could then be estimated. We sampled from subsets of the database rather than the entire database because, for most queries, the percentage of relevant documents in the database was less than

2 percent, making it almost impossible to have both manageable sample sizes and a high level of confidence in the resulting Recall estimates. Of course, no extrapolation to the entire database could be made from these Recall calculations. Nonetheless, the estimation of the number of relevant unretrieved documents in the subsets did give us a *maximum* value for Recall for each request.

## TEST RESULTS
Of the 51 retrieval requests processed, values of Precision and Recall were calculated for 40. The other 11 requests were used to check our sampling techniques and control for possible bias in the evaluation of retrieved and sample sets.

In Table I we show the values of Precision and Recall for each of the 40 requests. The values of Precision ranged from a maximum of 100.0 percent to a minimum of 19.6 percent. The unweighted average value of Precision turned out to be 79.0 percent (standard deviation = 23.2). The weighted average was 75.5 percent. This meant that, on average, 79 out of every 100 documents retrieved using STAIRS were judged to be relevant.

The values of Recall ranged from a maximum of 78.7 percent to a minimum of 2.8 percent. The unweighted average value of Recall was 20 percent (standard deviation = 15.9), and the weighted average value was 20.26

percent. This meant that, on average, STAIRS could be used to retrieve only 20 percent of the relevant documents, whereas the lawyers using the system believed they were retrieving a much higher percentage (i.e., over 75 percent).

When we plot the value of Precision against the corresponding value of Recall for each of the 40 information requests, we get the scatter diagram given in Figure 4. Although Figure 4 contains no more data than Table I, it does show the relationships in a more explicit way. For example, the heavy clustering of points in the lower right corner shows that in over 50 percent of the cases we get values of Precision above 80 percent with Recall at or below 20 percent. The clustering in the lower portion of the diagram shows that in 80 percent of the information requests the value of Recall was at or below 20 percent. Figure 4 also depicts the frequently observed inverse relationship between Recall and Precision, where high values of Precision are often accompanied by low values for Recall, and vice versa [8].

## OTHER FINDINGS
After the initial Recall/Precision estimations were done, several other statistical calculations were carried out in the hope that additional inferences could be made. First, the results were broken down by lawyer to ascertain whether certain individuals were prima facie

TABLE I.   Recall and Precision Values for Each Information Request

| Information request number | Recall | Precision | Information request number | Recall | Precision |
|---|---|---|---|---|---|
| 1 | • | • | 27 | 50.0% | 42.6% |
| 2 | 45.5% | 92.6% | 28 | 50.0 | 19.6 |
| 3 | • | • | 29 | • | • |
| 4 | • | • | 30 | 7.0 | 100.0 |
| 5 | • | • | 31 | • | • |
| 6 | 8.9 | 60.0 | 32 | 12.5 | 100.0 |
| 7 | 20.6 | 64.7 | 33 | 18.2 | 79.5 |
| 8 | 43.9 | 88.8 | 34 | 14.1 | 45.1 |
| 9 | 13.3 | 48.9 | 35 | • | • |
| 10 | 10.4 | 96.8 | 36 | 4.2 | 33.3 |
| 11 | 12.8 | 100.0 | 37 | 15.9 | 81.8 |
| 12 | 9.6 | 84.2 | 38 | 24.7 | 68.3 |
| 13 | 15.1 | 85.0 | 39 | 18.5 | 83.3 |
| 14 | 78.7 | 99.0 | 40 | 4.1 | 100.0 |
| 15 | • | • | 41 | 18.3 | 96.9 |
| 16 | • | • | 42 | 45.4 | 91.0 |
| 17 | • | • | 43 | 18.9 | 100.0 |
| 18 | 13.0 | 38.0 | 44 | 10.6 | 100.0 |
| 19 | 15.8 | 42.1 | 45 | 20.3 | 94.0 |
| 20 | 19.4 | 68.9 | 46 | 11.0 | 85.7 |
| 21 | 41.0 | 33.8 | 47 | 13.4 | 100.0 |
| 22 | 22.2 | 94.8 | 48 | 13.7 | 87.5 |
| 23 | 2.8 | 100.0 | 49 | 17.4 | 87.8 |
| 24 | • | • | 50 | 13.5 | 75.7 |
| 25 | 13.0 | 94.0 | 51 | 4.7 | 100.0 |
| 26 | 7.2 | 95.0 | | | |

Average Recall = 20.0% +- (Standard deviation = 15.9)
Average Precision = 79.0% +-(Standard deviation = 23.3)

*Computing Practices*



**FIGURE 4.   Plot of Precision versus Recall for All Information Requests**

more adept at using the system than others. The results were as follows:

|  | Recall | Precision |
|---|---|---|
| Lawyer 1 | 22.7% | 76.0% |
| Lawyer 2 | 18.0% | 81.4% |

Although there is some difference between the results for each lawyer, the variance is not statistically significant at the .05 level. Although this was a very limited test, we can conclude that at least for this experiment the results were independent of the particular user involved.

Another area of interest related to the revisions made to requests when the lawyer was not completely satisfied with the initial retrieved sets of documents. We hypothesized that if the values of Recall and Precision for the requests where substantial revisions had to be made (about 30 percent of the total) were significantly different from the overall mean values we might be able to infer something about the requesting procedure. Unfortunately, the values for Recall and Precision for the substantially revised queries (23.9 percent and 62.1 percent, respectively) did not indicate a statistically significant difference.

Finally, we tested the hypothesis that extremely high values of Precision for the retrieved sets would correlate directly with the lawyers' judgments of satisfaction with that set of documents (which might indicate that the lawyers were confusing Precision with Recall). To do this, we computed the mean Precision for all requests where the lawyers were satisfied with the initial retrieved set, and compared this value to the mean Precision for all requests. Although the Precision for requests that were not revised came out to be 85.4

percent, again the results were not statistically significant at the .05 level.

### The Retrieval Effectiveness of Lawyers versus Paralegals

The argument can be made that, because STAIRS is a high-speed, on-line, interactive system, the searcher at the terminal can quickly and effectively evaluate the output of STAIRS during the query modification process. Therefore, retrieval effectiveness might be significantly improved if the person originating the information request is actually doing the searching at the terminal. This would mean that if a lawyer worked directly on the query formulation and query modification at the STAIRS terminal, rather than using a paralegal as intermediary, retrieval effectiveness might be improved.

We tested this conjecture by comparing the retrieval effectiveness of the lawyer vis à vis the paralegal on the *same* information request. We selected (at random) five information requests for which the searches had already been completed by the paralegal, and for which retrieved sets had been evaluated by the lawyer and values of Recall computed. (Neither the lawyer who made the relevance judgments nor the paralegal knew the Recall figures for these original requests.) We invited the lawyer to use STAIRS directly to access the database, giving the lawyer copies of his or her original information requests. The lawyer translated these requests into formal queries, evaluating the text displayed on the screen, modifying the queries as he or she saw fit, and finally deciding when to terminate the search. For each of the five information requests, we estimated the minimum number of relevant documents in the entire file, and knowing which documents the lawyer had previously judged relevant, we were able to compute the values of Recall for the lawyer at the terminal as we had already done for the paralegal. If it were true that STAIRS would give better results when the lawyers themselves worked at the terminal, the values of Recall for the lawyers would have to be significantly higher than the values of Recall when the paralegals did the searching. The results were as follows:

| Request number | Recall (paralegal) | Recall (lawyer) |
|---|---|---|
| 1 | 7.2% | 6.6% |
| 2 | 19.4% | 10.3% |
| 3 | 4.2% | 26.4% |
| 4 | 4.1% | 7.4% |
| 5 | 18.9% | 25.3% |
| Mean | 10.7% | 15.2% |
|  | (s.d. = 7.65) | (s.d. = 9.83) |

Although there is a marked improvement in the lawyer's Recall for requests 3, 4, and 5, and in the average Recall for all five information requests, the improvement is not statistically significant at the .05 level ($z = -0.81$). Hence, we cannot reject the hypothesis that

both the lawyer and the paralegal get the same results for Recall.

## WHY WAS RECALL SO LOW

The realization that STAIRS may be retrieving only one out of five relevant documents in response to an information request may surprise those who have used STAIRS or had it demonstrated to them. This is because they will have seen only the retrieved set of documents and not the total corpus of relevant documents; that is, they have seen that the proportion of relevant documents in the retrieved set (i.e., Precision) is quite good (around 80 percent). The important issues to consider here are (1) why was Recall so low and (2) why did the users (lawyers and paralegals) believe they were retrieving 75 percent of the relevant documents when, in fact, they were only retrieving 20 percent.

The low values of Recall occurred because full-text retrieval is difficult to use to retrieve documents by subject because its design is based on the assumption that it is a simple matter for users to foresee the exact words and phrases that will be used in the documents they will find useful, and *only* in those documents. This assumption is not a new one; it goes back over 25 years to the early days of computing. The basic idea is that one can use the formal aspects of text to predict its meaning or subject content: formal aspects such as the occurrence, location, and frequency of words; and to the extent that it can be precisely described, the syntactic structure of word phrases. It was hoped that by exploiting the high speed of a computer to analyze the formal aspects of text, one could get the computer to deal with text in a "comprehending-like" way (i.e., to identify the subject content of texts). This endeavor is known as "Automatic Indexing" or, in a more general sense, "Natural Language Processing." During the past two decades, many experiments in automatic indexing (of which full-text searching is the simplest form) have been carried out, and many discussions by linguists, psychologists, philosophers, and computer scientists have analyzed the results and the issues [5]. These experiments show that full-text document retrieval has worked well only on unrealistically small databases.

The belief in the predictability of the words and phrases that may be used to discuss a particular subject is a difficult prejudice to overcome. In a naive sort of way, it is an appealing prejudice but a prejudice nonetheless, because the effectiveness of full-text retrieval has not been substantiated by reliable Recall measures on realistically large databases. Stated succinctly, it is impossibly difficult for users to predict the exact words, word combinations, and phrases that are used by *all* (or most) relevant documents and *only* (or primarily) by those documents, as can be seen in the following examples.

In the legal case in question, one concern of the lawyers was an accident that had occurred and was now an object of litigation. The lawyers wanted all the reports, correspondence, memoranda, and minutes of meetings that discussed this accident. Formal queries were constructed that contained the word "accident(s)" along with several relevant proper nouns. In our search for *unretrieved* relevant documents, we later found that the accident was not always referred to as an "accident," but as an "event," "incident," "situation," "problem," or "difficulty," often without mentioning any of the relevant proper names. The manner in which an individual referred to the incident was frequently dependent on his or her point of view. Those who discussed the event in a critical or accusatory way referred to it quite directly—as an "accident." Those who were personally involved in the event, and perhaps culpable, tended to refer to it euphemistically as, inter alia, an "unfortunate situation," or a "difficulty." Sometimes the accident was referred to obliquely as "the subject of your last letter," "what happened last week was . . . ," or, as in the opening lines of the minutes of a meeting on the issue, "Mr. A: We all know why we're here . . . ." Sometimes relevant documents dealt with the problem by mentioning only the technical aspects of why the accident occurred, but neither the accident itself nor the people involved. Finally, much relevant information discussed the situation *prior* to the accident and, naturally, contained no reference to the accident itself.

Another information request resulted in the identification of 3 key terms or phrases that were used to retrieve relevant information; later, we were able to find 26 other words and phrases that retrieved additional relevant documents. The 3 original key terms could not have been used individually as they would have retrieved 420 documents, or approximately 4000 pages of hard copy, an unreasonably large set, most of which contained irrelevant information. Another request identified 4 key terms/phrases that retrieved relevant documents, which we were later able to enlarge by 44 additional terms and combinations of terms to retrieve relevant documents that had been missed.

Sometimes we followed a trail of linguistic creativity through the database. In searching for documents discussing "trap correction" (one of the key phrases), we discovered that relevant, unretrieved documents had discussed the same issue but referred to it as the "wire warp." Continuing our search, we found that in still other documents trap correction was referred to in a third and novel way: the "shunt correction system." Finally, we discovered the inventor of this system was a man named "Coxwell" which directed us to some documents he had authored, only he referred to the system as the "Roman circle method." Using the Roman circle method in a query directed us to still more relevant but unretrieved documents, but this was not the end either. Further searching revealed that the system had been tested in another city, and all documents germane to those tests referred to the system as the "air truck." At this point the search ended, having consumed over an entire 40-hour week of on-line searching, but there is no reason to believe that we had reached the end of the trail; we simply ran out of time.

As the database included many items of personal cor-

*Computing Practices*

respondence as well as the verbatim minutes of meetings, the use of slang frequently changed the way in which one would "normally" talk about a subject. Disabled or malfunctioning mechanisms with which the lawsuit was concerned were sometimes referred to as "sick" or "dead," and a burned-out circuit was referred to as being "fried." A critical issue was sometimes referred to as the "smoking gun."

Even misspellings proved an obstacle. Key search terms like "flattening," "gauge," "memos," and "correspondence," which were essential parts of phrases, were used effectively to retrieve relevant documents. However, the misspellings "flatening," "guage," "gage," "memoes" and "correspondance," using the same phrases, also retrieved relevant documents. Misspellings like these, which are tolerable in normal everyday correspondence, when included in a computerized database become literal traps for users who are asked not only to anticipate the key words and phrases that may be used to discuss an issue but also to foresee the whole range of possible misspellings, letter transpositions, and typographical errors that are likely to be committed.

Some information requests placed almost impossible demands on the ingenuity of the individual constructing the query. In one situation, the lawyer wanted "Company A's comments concerning . . . ." Looking at the documents authored by Company A was not enough, as many relevant comments were embedded in the minutes of meetings or recorded secondhand in the documents authored by others. Retrieving all the documents in which Company A was mentioned was too broad a search; it retrieved over 5,000 documents (about 40,000+ pages of hard copy). However, predicting the exact phraseology of the text in which Company A commented on the issue was almost impossible; sometimes Company A was not even mentioned, only that so-and-so (representing Company A) "said/considered/remarked/pointed out/commented/noted/explained/discussed," etc.

In some requests, the most important terms and phrases were not used at all in relevant documents. For example, "steel quantity" was a key phrase used to retrieve important relevant documents germane to an actionable issue, but unretrieved relevant documents were also found that did not report *steel quantity* at all, but merely the *number* of such things as "girders," "beams," "frames," "bracings." etc. In another request, it was important to find documents that discussed "nonexpendable components." In this case, relevant unretrieved documents merely listed the names of the components (of which there were hundreds) and made no mention of the broader generic description of these items as "nonexpendable."

Why didn't the lawyers realize they were not getting all of the information relevant to a particular issue? Certainly they knew the lawsuit. They had been involved with it from the beginning and were the principal attorneys representing the defense. In addition, one of the paralegals had been instrumental not only in setting up the database but also in supervising the se-

lection of relevant information to be put on-line. Might it not be reasonable to expect them to be suspicious that they were not retrieving everything they wanted? Not really. Because the database was so large (providing access to over 350,000 pages of hard copy, all of which was in some way pertinent to the lawsuit), it would be unreasonable to expect four individuals (two lawyers and two paralegals) to have total recall of all the important supporting facts, testimony, and related data that were germane to the case. If they had such recall they would have no need for a computerized, interactive retrieval system. It is well known among cognitive psychologists that man's power of literal recall is much less effective than his power of recognition. The lawyers could remember the exact text of some of the important information, but as we have already stated, this was a very small subset of the total information relevant to a particular issue. They could *recognize* the important information when they saw it, and they could do so with uncanny consistency. (As a control, we submitted some retrieved sets and sample sets of documents to the lawyers several times in a blind test of their evaluation consistency, and found that their consistency was almost perfect.) Also, since the lawyers were not experts in information retrieval system design, there were no a priori reasons for them to suspect the Recall levels of STAIRS.

## DETERIORATION OF RECALL AS A FUNCTION OF FILE SIZE

One reason why Recall evaluations done on small databases cannot be used to estimate Recall on larger databases is because, ceteris paribus, the value of Recall decreases as the size of the database increases, or, from a different point of view, the amount of search effort required to obtain the same Recall level increases as the database increases, often at a faster rate than the increase in database size. On the database we studied, there were many search terms that, used by themselves, would retrieve over 10,000 documents. Such *output overload* is a frequent problem of full-text retrieval systems.

As a retrieved set of several thousand documents is impractical, the user must reduce the output overload by reformulating the single-term query so that it retrieves fewer documents. If a single term query $w_1$ retrieves too many documents, the user may add another term, $w_2$, so as to form the new query "$w_1$ and $w_2$" (or "$w_1$ adjacent $w_2$," or "$w_1$ same $w_2$"). The reformulated query cannot retrieve more documents than the original; most probably, it will retrieve many fewer. The process of adding intersecting terms to a query can be continued until the size of the output reaches a manageable number. (This strategy, and its consequences, is discussed in more detail in [1].) However, as the user narrows the size of the output by adding intersecting terms, the value of Recall goes down because, with each new term, the probability is that some relevant documents will be excluded by that reformulated query.

The deterioration of Recall from a probabilistic point of view is really startling. For each query, there is a class of relevant documents that we designate as R. We represent the probability that each of those documents will contain some word $w_1$ as $p$, and the probability that a relevant document will contain some other word $w_2$ as $q$. Thus, the value of Recall for a request using only $w_1$ will be equal to $p$, and Recall for a request using only $w_2$ will be equal to $q$. Now the probability that a relevant document will contain both $w_1$ and $w_2$ is less than or equal to either $p$ or $q$. If we assume that the respective appearances of $w_1$ and $w_2$ in a relevant document are independent events, then the probability of both of them appearing in a relevant document would be equal to the product of $p$ and $q$. Since both $p$ and $q$ are usually numbers less than unity, their product usually will be smaller than either $p$ or $q$. This means that Recall, which can also be thought of as the probability of retrieving a relevant document, is now equal to the product of $p$ and $q$. In other words, reducing the number of documents retrieved by intersecting an increasing number of terms in the formal query causes Recall for that query also to decrease.

However, the problem is really much worse. In order for a relevant document, which contains $w_1$ and $w_2$, to be retrieved by a single query, a searcher must select and use those words in his or her query. The probability that the searcher will select $w_1$ is, of course, generally less than 1.0; and the probability that $w_1$ will occur in a relevant document is also usually less than 1.0. However, these probabilities must be multiplied by the probability that the searcher will select $w_2$ as part of his or her query, and the probability that $w_2$ will occur in a relevant document. Thus, calculating Recall for a two-term search involves the multiplication of four numbers each of which is usually less than 1.0. As a result, the value of Recall gets very small (see Table II). When we consider a three- or four-term query, the value of Recall drops off even more sharply.

The problem of output overload is especially critical in full-text retrieval systems like STAIRS, where the frequency of occurrence of search terms is considerably larger than (and increases faster than) the frequency of occurrence (or "breadth") of index terms in a database where the terms are manually assigned to documents. This means that the user of a full-text retrieval system will face the problem of output overload sooner than the user of a manually indexed system. The solution that STAIRS offers—conjunctively adding search terms to the query—does reduce the number of documents retrieved to a manageable number but also eliminates relevant documents. Search queries employing four or five intersecting terms were not uncommon among the queries used in our test. However, the probability that a query that intersects five terms will retrieve relevant documents is quite small. If we were to assign a probability of .7 to all the respective probabilities in a hypothetical five-term query as we did in the two-term query in Table II (and .7 is an optimistic average value), the Recall level for that query would be .028. In other words, that query could be expected to retrieve *less than* 3 percent of the relevant documents in the database. If the probabilities for the five-term query were a more realistic average of .5, the Recall value for that query would be .0009! This means that if there were 1000 relevant documents on the database, it is likely that this query would retrieve only one of them. The searcher must submit many such low-yield queries to the system if he or she wants to retrieve a high percentage of the relevant documents.

## DISCUSSION

The reader who is surprised at the results of this test of retrieval effectiveness is not alone. The lawyers who participated in the test were equally astonished. Although there are sound theoretical reasons why we should expect these results, they seem to run counter to previous tests of retrieval effectiveness for full-text retrieval.

Two pioneering evaluations of full-text retrieval systems by respected researchers in the field (Swanson [6] and Salton [3]) determined to their satisfaction that full-text document-retrieval systems could retrieve relevant documents at a satisfactory level while avoiding the problems of manual indexing. Our study, on the other hand, shows that full-text document retrieval does *not* operate at satisfactory levels and that there are sound theoretical reasons to expect this to be so. Who is right? Well, we all are, and this is not an equivocation. The two earlier studies drew the correct conclusions from their evaluations, but these conclusions were different from ours because they were based on small experimental databases of less than 750 documents. Our study was done not on an experimental database but an actual, operational database of almost 40,000 documents. Had Swanson and Salton been fortunate enough to study a retrieval system as large as ours, they

**TABLE II.  The Probability of Retrieving a Relevant Document Containing Terms $w_1$ and $w_2$**

$P(Sw_1) = .6$ = Probability searcher uses term $w_1$ in a search query

$P(Sw_2) = .5$ = Probability searcher uses term $w_2$ in a search query

$P(Dw_1) = .7$ = Probability $w_1$ appears in a relevant document

$P(Dw_2) = .6$ = Probability $w_2$ appears in a relevant document

Probability of searcher selecting $w_1$ and a relevant document containing $w_1$:

$$P(Sw_1) \times P(Dw_1) = (.6) \times (.7) = .42$$

Probability of searcher selecting $w_2$ and a relevant document containing $w_2$:

$$P(Sw_2) \times P(Dw_2) = (.5) \times (.6) = .30$$

Probability of searcher selecting $w_1$ and $w_2$ and a relevant document containing $w_1$ and $w_2$:

$$P(Sw_1) \times P(Dw_1) \times P(Sw_2) \times P(Dw_2)$$

$$(e.g., P(.6) \times P(.7) \times P(.5) \times P(.6) = .126$$

would undoubtedly have observed similar phenomena (Swanson was later to comment perceptively on the difficulty of drawing accurate conclusions about document retrieval from experiments using small databases [7]). In addition, it has only recently been observed that information-retrieval systems do not scale up [2]. That is, retrieval strategies that work well on small systems do not necessarily work well on larger systems (primarily because of output overload). This means that studies of retrieval effectiveness must be done on full-sized retrieval systems if the results are to be indicative of how a large, operational system would perform. However, large-scale, detailed retrieval-effectiveness studies, like the one reported here, are unprecedented because they are incredibly expensive and time consuming; our experiment took six months; involved two researchers and six support staff; and, taking into account all direct and indirect expenses, cost almost half a million dollars. Nevertheless, Swanson and Salton's earlier full-text evaluations remain pioneering studies and, rather than contradict our findings, have an illuminating value of their own.

An objection that might be made to our evaluation of STAIRS is that the low Recall observed was not due to STAIRS but rather to query-formulation error. This objection is based on the realization that, at least in principle, virtually any subset of the database is retrievable by some simple or complex combination of search terms. The user's task is simply to find the right combination of search terms to retrieve *all* and *only* the relevant documents. However, we believe that users should not be asked to shoulder the blame, and perhaps an analogy will indicate why. Suppose you ask a company to make a lock for you, and they oblige by providing a combination lock; but when you ask them for the combination to open the lock, they say that finding the correct combination is your problem, not theirs. Now, it is possible, in principle, to find the correct combination, but in practice it may be impossibly difficult to do so. A full-text retrieval system bears the burden of retrieval failure because it places the user in the position of having to find (in a relatively short time) an impossibly difficult combination of search terms. The person using a full-text retrieval system to find information on a relatively large database is in the same unenviable position as the individual looking for the combination to the lock. It is true that we, as evaluators, found the combinations of search terms necessary to retrieve many of the unretrieved relevant documents, but three things should be kept in mind. First, we make no claim to having found *all* the relevant unretrieved documents; we may not have found even half of them, as our sampling technique covered only a small percentage of the database. Second, a tremendous amount of search time was involved with *each* request (sometimes over 40 hours of on-line time), and the entire test took almost 6 months. Such inefficiency is clearly not consonant with the high speed desired for computerized retrieval. Third, the evaluators in this case represented, together, over 40 years of practical and theoretical ex-

perience in information systems analysis and should be expected to have somewhat better searching abilities than the typical STAIRS searcher. Moreover, STAIRS is sold under the premise that it is easy to use and requires no sophisticated training on the part of the user. Yet this study is a clear demonstration of just how sophisticated search skills must be to use STAIRS, or, mutatis mutandis, any other full-text retrieval system. There is evidence that this problem is beginning to be recognized by at least one full-text retrieval vendor, WESTLAW, which has made its reputation by offering full-text access to legal cases. WESTLAW has now begun to supplement its full-text retrieval with manually assigned index terms.

## SUMMARY

This paper has presented a major, detailed evaluation of a full-text document-retrieval system. We have shown that the system did not work well in the environment in which it was tested and that there are theoretical reasons why full-text retrieval systems applied to large databases are unlikely to perform well in any retrieval environment. The optimism of early studies was based on the small size of the databases used, and were geared toward showing only that full-text search was *competitive* with searching based on manually assigned index terms, under the assumption that, if it were competitive, full-text retrieval would eliminate the cost of indexing. However, there are costs associated with a full-text system that a manual system does not incur. First, there is the increased time and cost of entering the full text of a document rather than a set of manually assigned subject and context descriptors. The average length of a document record on the system we evaluated was about 10,000 characters. In a manually assigned index-term system of the same type, we found the average document record to be less than 500 characters. Thus, the full-text system incurs the additional cost of inputting and verifying *20 times* the amount of information that a manually indexed system would need to deal with. This difference alone would more than compensate for the added time needed for manual indexing and vocabulary construction. The 20-fold increase in document record size also means that the database for a full-text system will be some 20 times larger than a manually indexed database and entail increased storage and searching costs. Finally, because the average number of searchable subject terms per document for the full-text retrieval system described here was approximately 500, whereas a manually indexed system might have a subject indexing depth of about 10, the dictionary that lists and keeps track of these assignments (i.e., provides pointers to the database) could be as much as *50 times* larger on a full-text system than on a manually indexed system. A full-text retrieval system does not give us something for nothing. Full-text searching is one of those things, as Samuel Johnson put it so succinctly, that "⋯ is never done well, and one is surprised to see it done at all."

***Acknowledgments.*** The authors would like to thank William Cooper of the University of California at Berkeley for his comments on an earlier version of this manuscript, and Barbara Blair for making the drawings that accompany the text.

**REFERENCES**
1. Blair, D.C. Searching biases in large interactive document retrieval systems. *J. Am. Soc. Inf. Sci.* 31 (July 1980), 271–277.
2. Resnikoff, H.L. The national need for research in information science. STI Issues and Options Workshop, House subcommittee on science, research and technology, Washington, D.C., Nov. 3, 1978.
3. Salton, G. Automatic text analysis. *Science* 168, 3929 (Apr. 1970), 335–343.
4. Saracevic, T. Relevance: A review of and a framework for thinking on the notion in information science. *J. Am. Soc. Inf. Sci.* 26 (1975), 321–343.
5. Sparck Jones, K. *Automatic Keyword Classification for Information Retrieval.* Butterworths, London, 1971.
6. Swanson, D.G. Searching natural language text by computer. *Science* 132, 3434 (Oct. 1960), 1099–1104.
7. Swanson, D.R. Information retrieval as a trial and error process. *Libr. Q.* 47, 2 (1976), 128–148.
8. Swets, J.A. Information retrieval systems. *Science 141* (1963), 245–250.
9. Zunde, P., and Dexter, M.E. Indexing consistency and quality. *Am. Doc.* 20, 3 (July 1969), 259–264.

**CR Categories and Subject Descriptors:** H.1.0 [Models and Principles]: General; H.3.3 [Information Storage and Retrieval]: Information Search and Retrieval—*search process, query formulation*
General Terms: Design, Human Factors, Theory
Additional Key Words and Phrases: full-text document retrieval, litigation support, retrieval evaluation, Recall and Precision

Received 4/84; accepted 9/84

Authors' Present Addresses: David C. Blair, Graduate School of Business Administration, The University of Michigan, Ann Arbor, MI 48109; M.E. Maron, School of Library and Information Studies, The University of California, Berkeley, CA 94720.

Permission to copy without fee all or part of this material is granted provided that the copies are not made or distributed for direct commercial advantage, the ACM copyright notice and the title of the publication and its date appear, and notice is given that copying is by permission of the Association for Computing Machinery. To copy otherwise, or to republish, requires a fee and/or specific permission.

# *SUBSCRIBE TO ACM PUBLICATIONS*

Whether you are a computing novice or a master of your craft, ACM has a publication that can meet your individual needs. Do you want broad-gauge, high quality, highly readable articles on key issues and major developments and trends in computer science? Read *Communications of the ACM.* Do you want to read comprehensive surveys, tutorials, and overview articles on topics of current and emerging importance: *Computing Surveys* is right for you. Are you interested in a publication that offers a range of scientific research designed to keep you abreast of the latest issues and developments? Read *Journal of the ACM.* What specific topics are worth exploring further? The various ACM transactions cover research and applications

in-depth—*ACM Transactions on Mathematical Software, ACM Transactions on Database Systems, ACM Transactions on Programming Languages and Systems, ACM Transactions on Graphics, ACM Transactions on Office Information Systems,* and *ACM Transactions on Computer Systems.* Do you need additional references on computing? *Computing Reviews* contains original reviews and abstracts of current books and journals. The *ACM Guide to Computing Literature* is an important bibliographic guide to computing literature. *Collected Algorithms from ACM* is a collection of ACM algorithms available in printed version, on microfiche, or machine-readable tape.

For more information about ACM publications, write for your free copy of the ACM Publications Catalog to: The Publications Department, The Association for Computing Machinery, 11 West 42nd Street, New York, NY 10036.

# Exhibit M

# Overview of the TREC 2007 Legal Track

**Stephen Tomlinson**, `stomlins@opentext.com`

Open Text Corporation, Ottawa, Ontario, Canada


**Douglas W. Oard**, `oard@umd.edu`

College of Information Studies and Institute for Advanced Computer Studies

University of Maryland, College Park, MD 20742, USA


**Jason R. Baron**, `jason.baron@nara.gov`

National Archives and Records Administration

Office of the General Counsel, Suite 3110, College Park, MD 20740, USA


**Paul Thompson**, `Paul.Thompson@dartmouth.edu`

Institute for Security Technology Studies

Dartmouth College, Hanover, NH 03755, USA

### Abstract

TREC 2007 was the second year of the Legal Track, which focuses on evaluation of search technology for discovery of electronically stored information in litigation and regulatory settings. The track included three tasks: Ad Hoc (i.e., single-pass automatic) search, Relevance Feedback (two-pass search in a controlled setting with some relevant and nonrelevant documents manually marked after the first pass) and Interactive (in which real users could iteratively refine their queries and/or engage in multi-pass relevance feedback). This paper describes the design of the three tasks and analyzes the results.

## 1 Introduction

The use of information retrieval techniques in law has traditionally focused on providing access to legislation, regulations, and judicial decisions. Searching business records for information pertinent to a case (or "discovery") has also been important, but searching records in electronic form was until recently the exception rather than the norm. The goal of the Legal Track at the Text Retrieval Conference (TREC) is to assess the ability of information retrieval technology to meet the needs of the legal community for tools to help with retrieval of business records, an issue of increasing importance given the vast amount of information stored in electronic form to which access is increasingly desired in the context of current litigation. Ideally, the results of a study of how well comparative search methodologies perform when tasked to execute types of queries that arise in real litigation will serve to better educate the legal community on the feasibility of automated retrieval as well as its limitations. The TREC Legal Track was held for the first time in 2006, when 6 research teams participated in an ad hoc retrieval task. This year, 13 research teams participated in the track, which consisted of three tasks: 1) Ad Hoc, 2) Interactive, and 3) Relevance Feedback.

The results of the Legal Track are especially timely and important given recent changes in the U.S. Federal Rules of Civil Procedure that went into effect on December 1, 2006. The amended rules introduce a new category of evidence, namely, "Electronically Stored Information" (ESI) in "any medium," intended to stand on an equal footing with existing rules covering the production of "documents." Against the backdrop of the Federal Rules changes, the status quo in the legal profession, even in large and complex litigation, is

continued reliance on free-text Boolean searching to satisfy document (and now ESI) production demands [6]. An important aspect of e-discovery and thus of the TREC Legal Track is an emphasis on recall over precision. In light of the fact that a large percentage of requests for production of documents (and now ESI) routinely state that "all" such evidence is to be produced, it becomes incumbent on responding parties to attempt to maximize the number of responsive documents found as the result of a search.

The key goal of the TREC Legal Track is to apply objective benchmark criteria for comparing search technologies, using topics that approximate how real lawyers would go about propounding discovery in civil litigation, and a large, representative (unstructured and heterogeneous) document collection. Given the reality of the use of Boolean search in present day litigation, comparing the efficacy of Boolean search using negotiated queries with alternative methods is of considerable interest. The Legal Track has shown that alternative methods do identify many relevant documents that were missed by a reference implementation of a Boolean search, though no single alternative method has yet been shown to consistently outperform Boolean search without increasing the number of documents to review.

The remainder of this paper is organized as follows. Section 2 describes the Ad Hoc task, Section 3 describes the Interactive and Relevance Feedback tasks, Section 4 lists the individual topic results, Section 5 summarizes the workshop discussions and analysis conducted after the conference, and Section 6 concludes the paper.

## 2    Ad Hoc Task

In the Ad Hoc task, the participants were given requests to produce documents, herein called "topics", and a set of documents to search. The following sections provide more details, but an overview of the differences from the previous year is as follows:

- At the time of topic release, the B value (the number of documents matching the final negotiated Boolean query) was provided for each topic in 2007, along with an alphabetical list (by document-id) of the documents matching the Boolean query (the "refL07B" run) for optional use by participants.

- A new evaluation measure, Estimated Recall@B, where B is the number of documents matching the Boolean query, was established as the principal measure for the track (although other measures are also reported). The legal community is interested in knowing whether additional relevant documents (those missed by a Boolean query) can be found for the same number of retrieved documents.

- A new sampling method (herein called "L07") was used to produce estimates of the main measure for each topic for all submitted runs. All runs submitted to the Ad Hoc task were pooled this year, and all pooled runs were treated equally by the sampling procedure.

- The new topics were vetted to ensure that the B value for any topic was in the 100 to 25,000 range. (In 2006, B ranged from 1 to 128,195.)

- Participating teams were allowed to submit up to 25,000 documents for each topic (up from 5,000 in 2006).

- To facilitate cross-site comparisons, a "standard condition" run which just used the (typically one-sentence) request text field was requested from all groups. Additional runs which used other topic fields were also welcome, and encouraged.

- Three different Boolean queries were provided for each topic (defendant, plaintiff and final). In 2006, the plaintiff and final queries had (usually) been the same.

## 2.1   Document Collection

The 2007 Legal Track used the same collection as the 2006 Legal Track, the IIT Complex Document Information Processing (CDIP) Test Collection, version 1.0 (referred to here as "IIT CDIP 1.0") which is based on documents released under the tobacco "Master Settlement Agreement" (MSA). The MSA settled a range of lawsuits by the Attorneys General of several US states against seven US tobacco organizations (five tobacco companies and two research institutes). One part of this agreement required those organizations to make public all documents produced in discovery proceedings in the lawsuits by the states, as well as all documents produced in a number of other smoking and health-related lawsuits. Notable among the provisions is that the organizations were required to provide to the National Association of Attorneys General (NAAG) a copy of metadata and the scanned documents from the websites, and are forbidden from objecting to any subsequent distribution of this material.

The University of California San Francisco (UCSF) Library, with support from the American Legacy Foundation, has created a permanent repository, the Legacy Tobacco Documents Library (LTDL), for tobacco documents [10]. The IIT CDIP 1.0 collection is based on a snapshot, generated between November 2005 and January 2006, of the MSA subcollection of the LTDL. The snapshot consisted of 1.5 TB of scanned document images, as well as metadata records and Optical Character Recognition (OCR) produced from the images by UCSF. The IIT CDIP project subsequently reformatted the metadata and OCR, combined the metadata with a slightly different version obtained from UCSF in July 2005, and discarded some documents with formatting problems, to produce the IIT CDIP 1.0 collection [8]. The IIT CDIP 1.0 collection consists of 6,910,192 document records in the form of XML elements.

IIT CDIP 1.0 has had strengths and weaknesses as a collection for the Legal Track. Among the strengths are the wide range of document genres (including letters, memos, budgets, reports, agendas, minutes, plans, transcripts, scientific articles, and email) and the large number of documents. Among the weaknesses are that the documents themselves were released as a result of tobacco-related discovery requests, and thus may exhibit a skewed topic distribution when compared with the larger collections from which they were initially selected. See the 2006 TREC Legal Track overview paper for additional details about the IIT CDIP 1.0 collection [3].

## 2.2   Topics

Topic development in 2007 continued to be modeled on U.S. civil discovery practice. In the litigation context, a "complaint" is filed in court, outlining the theory of the case, including factual assertions and causes of action representing the legal theories of the case. In a regulatory context, often formal letters of inquiry serve a similar purpose by outlining the scope of the proposed investigation. In both situations, soon thereafter one or more parties create and transmit formal "requests for the production of documents" to adversary parties, based on the issues raised in the complaint or letter of inquiry. See the TREC 2006 Legal Track overview for additional background [3].

A survey of case law issued subsequent to the adoption of the new Federal Rules of Civil Procedure in December 2006 suggests that increasing attention is being paid by judges and lawyers to the idea of adversaries in litigation negotiating some form of "search protocol," including coming to consensus on what keywords will be used to search for relevant documents. In one reported case, a judge suggested to the parties that they reach consensus on what form of Boolean queries should be used [13]. In another case, a judge urged the parties to reflect upon recent scholarship discussing the use of "concept searches" to supplement traditional "keyword" searching [7, 9]. Although it remains unclear whether and to what extent lawyers are fully incorporating Boolean and other operators (e.g., proximity operators) in their proposed searches, as an example of best practices the TREC 2007 Legal Track chose to highlight the importance of negotiating Boolean queries by including for each newly created topic a three-stage Boolean query negotiation, consisting of (i) an initial Boolean query[1] as proposed by the receiving party on a discovery request, usually reading the request narrowly; (ii) a "counter"-proposal by the propounding party, usually including a broader set

---

[1] Although often referred to as "Boolean," these queries contain additional operators (e.g., proximity and truncation operators) that are commonly found in the query languages of commercial search systems that employ Boolean logic.

of terms; and (iii) a final "negotiated" query, representing what was deemed the consensus arrangement as agreed to by the parties without resort to further judicial intervention.

For the TREC 2007 Legal Track, four new hypothetical complaints were created by members of the Sedona Conference® Working Group on Electronic Document Production, a group of lawyers who play a leading role in the development of professional practices for e-discovery. These complaints described: (1) a wrongful death and product liability action based on the use of a certain type of radioactive phosphate resulting in contaminated candy and drinking water; (2) a patent infringement action on a device going by the name "Suck out the Bad, Blow in the Good," designed to ventilate smoke; (3) a shareholder class action suit alleging securities fraud and false advertising in connection with a fictional "Smoke Longer, Feel Younger" campaign relying on "60s-era folk music;" and (4) a fictional Justice Department antitrust investigation looking in to a planned merger and acquisition of a casualty and property insurance company by a tobacco company. As in 2006, in using fictional names and jurisdictions, the track coordinators attempted to ensure that no third party would mistake the academic nature of the TREC Legal Track for an actual lawsuit involving real-world companies or individuals, and any would-be link or association with either past or present real litigation was entirely unintentional.

For each of these four complaints, a set of topics (formally, "requests to produce") were initially created by the creator of the complaint, and revised by the track coordinators. The final topic set contained 50 topics, numbered from 52 to 101. An XML formatted version of the topics (fullL07_v1.xml) was created for (potentially automated) use by the participants.

## 2.3  Participation

12 research teams participated in this year's Ad Hoc task. The teams experimented with a wide variety of techniques including the following:

- Carnegie Mellon University: structured queries, Indri operators, Dirichlet smoothing, Okapi BM25, boolean constraints, wildcards.

- Dartmouth College: Combination of Expert Opinion (CEO) algorithm, Lemur/Indri, Lucene.

- Fudan University: Indri 2.3, Yatata, word distribution model, corpus pre-processing methods, query expansion, query shrink.

- Open Text Corporation: negotiated boolean queries, defendant boolean, plaintiff boolean, word proximity distances, vector query runs, blind feedback, fusion.

- Sabir Research, Inc.: SMART 16.0, statistical vector space model, ltu.Lnu weighting, Rocchio feedback weighting.

- University of Amsterdam: query formulations, run combinations, LUCENE engine version 1.9, vector-space retrieval model, parsimonious language modeling techniques.

- The University of Iowa (Eichmann): analysis of OCR, 3-4 ngram analysis, translation of boolean query, pseudo-relevance feedback on persons (authors, recipients and mentions) and production boxes.

- The University of Iowa (Srinivasan): Lucene library, Okapi reranking, metadata, wildcard expansion, blind feedback, query reduction.

- University of Massachusetts, Amherst: Indri, term dependence, Markov Random Field (MRF) model, pseudo-relevance feedback, Latent Concept Expansion (LCE), phrase dictionaries, synonym classes, proximity operators.

- University of Missouri, Kansas City: query formulations, vector space model, language model, Lucene, query expansion model, conceptual relevance framework.

- University of Waterloo: Wumpus search engine, cover density ranking, Okapi BM25 ranking, boolean terms, character 4-grams, pseudo-relevance feedback, logistic regression, fusion, CombMNZ combination method, proximity-ranked boolean queries, relaxed boolean.

- Ursinus College: document normalization, log normalization, power normalization, cosine normalization, enhanced OCR error detection, generalized vector space retrieval, query pruning.

The teams submitted a total of 68 experimental runs by the Aug 5, 2007 deadline (each team could submit a maximum of 8 runs). Please consult the individual team papers in the TREC proceedings for the details of the experiments conducted. Also, please check the track web site [1] for the slides of many of the participant presentations at the conference, along with links to the aforementioned individual team members' papers in the TREC proceedings.

## 2.4  Evaluation

### 2.4.1  Background on Estimating Precision and Recall

The most straightforward way to produce an unbiased estimate of the number of relevant documents retrieved would be to use simple random sampling (i.e., sampling in which all samples have an equal chance of being selected). Unfortunately, for our purpose, the individual estimates would usually be too imprecise. For example, suppose the target collection has 7 million documents, and for a particular topic 700 of these are relevant. Suppose further that we have the resources to judge 1,000 documents. If we pick those 1,000 documents from a simple random sample of the collection, most likely 0 of the documents will be judged relevant, producing an estimate of 0 relevant documents, which is far too low. If 1 of the documents were to be judged relevant, then we would produce an estimate of 7,000 relevant documents, which is far too high.

TREC evaluations have typically dealt with this issue by using an extreme variant of stratified sampling. The primary stratum, known as the pool, is typically the set of documents ranked in the top-100 for a topic by the participating systems. Traditionally, all of the documents in the pool are judged. Contrary to the usual approach to stratified sampling, typically none of the unpooled documents are judged (these documents are just assumed non-relevant). For the older TREC collections of about 500,000 documents, [15] found that the results for comparing retrieval systems are reasonably reliable, even though that study also found that probably only 50%-70% of relevant documents for a topic were assessed, on average.

Traditional pooling can be too shallow for larger collections. As the judging pools have become relatively shallower, either from TREC collections becoming larger and/or the judging depth being reduced, concerns have been expressed with the reliability of results. For example, [4] recently reported bias issues with depth-55 judging for the 1 million-document AQUAINT corpus, and [12] estimated that fewer than 20% of the relevant documents were judged on average for the 7 million-document TREC 2006 Legal Track test collection. The TREC 2006 Terabyte Track [5] experimented with taking simple random samples of 200 documents from (up to) depth-1252 pools, and estimated the average precision score for each run based on this deeper pooling by using the "inferred average precision" (infAP) measure suggested by [14]. They found that infAP scores were highly correlated with Mean Average Precision (MAP) scores based on traditional depth-50 pooling.

### 2.4.2  The L07 Method

The L07 method for estimating recall and precision was based on how the recall and precision components are estimated in the infAP calculation. What distinguishes the L07 method is support for much deeper pooling by sampling higher-ranked documents with higher probability. For legal discovery, recall is of central concern. It was found last year by [12] that marginal precision exceeded 4% on average even at depth 9,000 for standard vector-based retrieval approaches. Hence we used depth-25000 pooling this year to get better coverage of the relevant documents. A simple random sample of a depth-25000 pool, however, would be unlikely to produce accurate estimates for recall at less deep cutoff levels. Hence we sampled higher-ranked

documents with higher probability in such a way that recall estimates at all cutoff levels up to max(25000,B) should be of similar accuracy. (Details are provided in the following sections.)

The L07 method was developed independently from the similar "statAP" method evaluated by Northeastern University in the TREC 2007 Million Query Track [2]. (The common ancestor was the infAP method, which also came from Northeastern.) Both methods associate a probability with each document judgment. The differences are in how the probabilities are assigned (which should not matter on average) and in the measures being estimated (we are estimating the recall and precision of a set, whereas statAP is estimating the "average precision" measure which factors in the ranks of the relevant documents). The L07 formulas are provided below, but please consult the Northeastern work for a more thorough discussion of the theoretical underpinnings of measure estimation than we aim to provide here.

### 2.4.3    Ad Hoc Task Pooling

As stated earlier, a total of 68 runs were submitted by the 12 research teams for the Ad Hoc task by the Aug 5, 2007 deadline. Each run included as many as 25,000 documents (sorted in a putative best-first order) for each of the 50 topics. All submitted runs, plus a 69th run described below, were pooled to depth 25,000 for each topic and then each pool was sampled. The pool sizes before sampling ranged from 195,688 (for topic 76) to 476,252 (for topic 84). (The pool sizes for all of the topics are listed in Section 4.)

The initial plan (given in the Ad Hoc task guidelines) was to assign judging probability $p(d) = \min(C / hiRank(d), 1)$ to each submitted document d, where $hiRank(d)$ is the highest (i.e., best) rank at which any submitted run retrieved document d, and C is chosen so that the sum of all $p(d)$ (for all submitted documents d) was the number of documents that could be judged (typically 500). It was hoped that C would be at least 10 for all topics, so that we would have the accuracy of at least 10 simple random sample points for estimates at all depths. After the runs came in, it turned out the C values would range from only 1.6 to 3.3 if judging only 500 documents, substantially limiting the accuracy of the estimates of all measures.

Running some experiments, it turned out for specific depths we could get greater accuracy. For example, if all resources went to a simple random sampling for estimating precision at depth-B, we could get the accuracy of at least 17 sample points for each topic. If instead all resources were directed to just depth-25000, we could get at least 26 sample points for each topic. Of course, if we targeted just one deep measure, we wouldn't have a lot of top-documents for training future systems or for contrasting our measure with traditional rank-based IR measures. Experiments also found that if we just did traditional depth-k pooling, we could only go to at least depth-12 for each topic. But if all resources went to top-12 documents, we wouldn't have the ability to estimate deeper measures.

The sampling process that we ultimately adopted was a hybrid of all of the above. The final $p(d)$ formula for the probability of judging each submitted document d was as follows:

```
If (hiRank(d) <= 5) { p(d) = 1.0; }
Else if (hiRank(d) <= B) { p(d) = min(1.0, ((5/B)+(C/hiRank(d)))); }
Else { p(d) = min(1.0, ((5/25000)+(C/hiRank(d)))); }
```

This formula causes the the first judging bin of 500 documents to contain the top-5 documents from each run, and it causes measures at depths B and 25000 to have the accuracy of approximately 5+C simple random sample points. Measures at other depths will have the accuracy of approximately (at least) C simple random sample points. If C is set to the largest multiple of 0.01 which produces a bin of at most 500 documents, C ranges from 0.34 (topic 82) to 2.42 (topic 76). So by just dropping C by approximately 1 compared to the original plan, we gained more top document judging and at least 5-sample accuracy for depth-B and depth-25000.

To allow for the possibility that some assessors could judge more than 500 documents, the above process was adapted to have a first bin of approximately 500 documents and 5 additional bins of approximately 100 documents each, using the following approach. The C values were set so that the $p(d)$ values would sum to 1,000, and an initial draw of approximately 1000 documents was done. Then the C values were set so that the $p(d)$ values would sum to 900, and approximately 900 documents were drawn from the initial draw of 1000 (using the ratio of the probabilities); the approximately 100 documents that were not drawn became

"bin 6". This process was repeated to create "bin 5", "bin 4", "bin 3" and "bin 2". The approximately 500 documents drawn in the last step became "bin 1".

When the judgments were received from the assessors (as described in the next section), the final p(d) values were based on how many bins the assessor had completed (e.g., if 3 bins had been completed, then the p(d) values from choosing C so that the p(d) sum to 700 were used). If there had been partial judging of deeper bins, the judged documents from these bins were also kept, but with their p(d) reset to 1.0. Note that if the 1st bin was not completed, the topic had to be discarded. For each completed topic, the final number of assessed documents and corresponding C values are listed in Section 4.

Two "runs" deserve special mention. First, the reference Boolean run (refL07B), which would have been the 69th run, was not included in the pooling because it had been created by simply resorting one of the pooled runs (otL07fb) alphabetically by docno. Instead, a 69th run called randomL07 was created, which for each topic had 100 randomly chosen documents that were not retrieved by any of the other 68 runs for the topic. We only included 100 random documents per topic, not 25000, to reduce the number of judgments taken away from submitted runs. After the draw, it turned out that the 1st bin of 500 documents to be judged contained between 5 and 15 random documents (average 9.38).

## 2.5   Relevance Judgments

For the TREC 2007 Legal Track, the track coordinators primarily sought out second-year and third-year law students who would be willing to volunteer as assessors in order to fulfill a law school requirement or expectation to perform some form of pro bono service to the larger community. Based on a nationwide solicitation in mid-August 2007, we received an enthusiastic response from students at a variety of U.S. law schools. All 50 new Ad Hoc task topics for the second year were assigned to assessors, but judgments for 7 topics were not available in time for use in the evaluation.[2] Most of the assessors (42) were law students from a wide variety of institutions: Loyola-L.A. (23 volunteers), University of Indiana-Indianapolis (5), George Washington (3), Case Western Reserve (3), Loyola-New Orleans (2), Boston University (2), University of Dayton (2), University of Maryland (1), and University of Texas (1). Additionally, one Justice Department attorney and one archivist on staff in NARA's Office of the General Counsel participated.

This year, the assessors used a Web-based platform developed by NIST that was hosted at the University of Maryland to view scanned documents and to record their relevance judgments. Assessors found the interface easy to navigate, with the only reported problem being a technical one involving an inability to read or advance screens properly (due to use of a Web browser other than Firefox, the only one supported). Each assessor was given a set of approximately 500 documents to assess, which was labeled "Bin 1." Additional bins 2 through 6, each consisting of 100 documents, were available for optional additional assessment, depending on willingness and time. (It turned out that 8 of the assessors completed at least 1 of the optional bins, and 5 assessors completed all 5 optional bins.) In total, 24,404 judgments were produced for the 43 topics. The assessment phase extended from August 17, 2007 through September 24, 2007.

As in 2006, we provided the assessors with an updated "How To Guide" that explained that the project was modeled on the ways in which lawyers make and respond to real requests for documents, including in electronic form. Assessors were told to assume that they had been requested by a senior partner, or hired by a law firm or another company, to review a set of documents for "relevance." No special, comprehensive knowledge of the matters discussed in each complaint was expected (e.g., no need to be an expert in federal election law, product liability, etc.). The heart of the exercise was to look for relevant and nonrelevant documents within a topic. Relevance, consistent with all known legal definitions from Wigmore to Wikipedia, was to be defined broadly. Special rules were to be applied for any document of over 300 pages. The same process was used for assessment for the interactive and relevance feedback tasks (which had different topics, as described below). See the TREC 2006 Legal Track overview for additional background (including a discussion of inter-assessor agreement which was measured in 2006 but not in 2007) [3].

On the whole, there was less confusion reported by assessors as to the definitional scope of the assigned

---

[2]The assessments for one additional topic were completed after the deadline, and are available for research use, but results are reported in this paper for 43 topics.

topics in 2007 than in 2006, although some questions did arise. For example, for topic 75 ("All documents that memorialize any statement or suggestion from an elected federal public official that further research is necessary to improve indoor environmental air quality"), the assessor questioned whether "memorialize" would be broad enough to include a mere reference to a Superfund bill, without a quotation as such from the official. We responded that a quotation or allusion to an actual statement made by an official was necessary for the document to be responsive. On the same topic, the assessor wondered if a quote from an appointed federal official (e.g., from the EPA) would qualify, in light of the fact that the negotiated Boolean contained the term "public official" without further qualification. We responded that the topic, not the Boolean string, controlled interpretation, and that the topic contained the additional condition "elected," hence a mere quote from an EPA official without more would not be responsive.

In the case of topic 62, involving press releases concerning water contamination related to irrigation, the assessor reported afterwards that in performing the evaluation "it was sometimes difficult to determine what constituted a press release." Another post-assessment comment stated that because "assessments for responsiveness were done in different sessions, the triggers for responsiveness may not have been consistent," i.e., "sometimes a single word" convinced this assessor that the document was relevant, "while at other intervals I read on to see whether [a finding of relevance] would make more sense in the narrower context of the complaint."

The assessor of topic 80 found it difficult to determine if certain types of radio and magazine advertising were sufficiently clear so as to say that the document made "a connection between folk songs and music and the sale of cigarettes," as the topic required. In the words of the assessor: "While it was easy to identify a connection when a music magazine contained a cigarette ad or when a cigarette magazine contained a music article, other magazines were less obvious. An outdoor magazine[] that contains an interview with a musician as well as a cigarette ad, for example. Or a general interest[] magazine that contains a cigarette ad near its music section." In wondering "how close" the connection had to be, the assessor went on to conclude that "Ultimately, unless the cigarette ad was on the same page as the music section, or in the middle of it, I had to say there was no connection."

One assessor found an error in Complaint C, noting a one-time stray reference to a "Defendant Jones" (at Second Claim for Relief preceding paragraph 46), where all other references in the complaint were to "Defendant Smaug." This circumstance led to a lively debate among track coordinators as to whether the complaint should be left as is, amended for assessors still engaged, or alternatively discarded (we decided to leave it as is given the *de minimis* nature of the error). However, some form of sensitivity analysis might be profitably applied to see if eliminating the anomalous reference changed any run results.

The track coordinators asked assessors to record how much time they spent on their task. Based on 23 survey returns, assessors averaged 25 hours in accomplishing their review of the 500 documents in Bin 1, for an average of 20 documents per assessor per hour. (In 2006 the review rate averaged to 25 documents per hour.) Based on the 2007 returns, the total time devoted works out to approximately 1400 total hours spent on this year's Legal Track tasks (based on 28,141 total judgments divided by 20, including the 24,404 judgments for the 43 Ad Hoc topics, 3,238 judgments for the 10 Interactive/RF topics, and a bin of 499 judgments received after the official results went out). If second-year and third-year law student time were billed at the same rate as summer associates at law firms ($150/hour), those 1400 hours roughly translate to $200,000 in pro bono effort for performing combined relevance assessments during the Ad Hoc and Interactive/RF tasks in 2007.

Not only did the greater cadre this year of law students perform conscientiously during the compressed period of mid-August through mid-September for completing assessments, they appeared to enjoy and benefit from the exercise. Comments from post-assessment surveys included students saying: (i) "On a personal level, the documents were quite interesting. If I had had the time, I gladly would have done another bin of 500, but the semester is starting to get very busy." (ii) "I know more about the effects of cigarettes and smoking than I could have ever thought possible . . ." (iii) "I would love to help out in the future. I found my topic very interesting and enjoyed assessing documents." (iv) "I thought I was getting the short end of the stick because the U.S. Beet Sugar Association had to be the lamest topic of all time. But the documents were really interesting and I learned a lot about the sordid political wrangling over sugar." (v) "I thought

that the project was worthwhile from a purely practical standpoint, in that learning how to review massive amounts of information as efficiently as possible is a skill that all lawyers need to work on."

## 2.6   Results

Each reviewed document was judged relevant, judged non-relevant, or left as "gray." (Our "gray" category includes all documents that were presented to the assessor, but for which a judgment could not be determined. Among the most common reasons for this were documents that were too long to review (more than 300 pages, according to our "How To Guide") or for which there was a technical problem with displaying the scanned document image.)

A qrelsL07.normal file was created in the common trec_eval qrels format. Its 4th column was a 1 (judged relevant), 0 (judged non-relevant), -1 (gray) or -2 (gray). (In the assessor system, -1 was "unsure" (the default setting for all documents) and -2 was "unjudged" (the intended label for gray documents).)

A qrelsL07.probs file was also created, which was the same as qrelsL07.normal except that there was a 5th column which listed the p(d) for the document (i.e., the probability of that document being selected for assessment from the pool of all submitted documents). qrelsL07.probs can be used with the experimental l07_eval utility to estimate precision and recall to depth 25,000 for runs which contributed to the pool.

### 2.6.1   Estimating the Number of Relevant Documents for a Topic

To estimate the number of relevant, non-relevant and gray documents in the pool for each topic, the following procedure was used:

Let $D$ be the set of documents in the target collection. For the Legal Track, $|D|$=6,910,912.

Let $S$ be a subset of $D$.

Define $JudgedRel(S)$ to be the set of documents in $S$ which were judged relevant.

Define $JudgedNonrel(S)$ to be the set of documents in $S$ which were judged non-relevant.

Define $Gray(S)$ to be the set of documents in $S$ which were reviewed but not judged relevant nor non-relevant.

Define $estRel(S)$ to be the estimated number of relevant documents in $S$:

$$estRel(S) = \min\left(\left(\sum_{d \in JudgedRel(S)} \frac{1}{p(d)}\right),\ (|S| - |JudgedNonrel(S)|)\right) \quad (1)$$

Note that $estRel(S)$ is 0 if $|JudgedRel(S)| = 0$.

Define $estNonrel(S)$ to be the estimated number of non-relevant documents in $S$:

$$estNonrel(S) = \min\left(\left(\sum_{d \in JudgedNonrel(S)} \frac{1}{p(d)}\right),\ (|S| - |JudgedRel(S)|)\right) \quad (2)$$

Note that $estNonrel(S)$ is 0 if $|JudgedNonrel(S)| = 0$.

Define $estGray(S)$ to be the estimated number of gray documents in $S$:

$$estGray(S) = \min\left(\left(\sum_{d \in Gray(S)} \frac{1}{p(d)}\right),\ (|S| - (|JudgedRel(S)| + |JudgedNonrel(S)|))\right) \quad (3)$$

Note that $estGray(S)$ is 0 if $|Gray(S)| = 0$.

Applying the above formulas, the estimated number of relevant documents in the pool, on average per topic, was 16,904(!). The number varied considerably by topic, from 18 (for topic 63) to 77,467 (for topic 71). (The estimates for all of the topics are listed in Section 4.) Obviously, traditional top-ranked pooling would not have been sufficient to cover the high numbers of relevant documents. On average (per topic), the estimated number of non-relevant documents in the pool was 298,678, and the estimated number of gray documents in the pool was 4,303.

### 2.6.2   Estimating Recall

The L07 approach to estimating recall is similar to how infAP estimates its recall component (i.e., it's based on the run's judged relevant documents found to depth k compared to the total judged relevant documents). In our case, we have to weight the judged relevant documents to account for the sampling probability.

For a particular ranked retrieved set $S$:

Let $S(k)$ be the set of top-k ranked documents of $S$. (Note that $|S(k)| = \min(k, |S|)$.)

Define $estRecall@k$ to be the estimated recall of $S$ at depth $k$:

$$estRecall@k = \frac{estRel(S(k))}{estRel(D)} \qquad (4)$$

The mean estimated recall of the reference Boolean run (refL07B) was just 22%. Hence the final negotiated boolean query was missing about 78% of the relevant documents (on average across all topics). Note that the estimated recall of refL07B varied considerably per topic, from 0% (topic 77) to 100% (topic 84). Figure 1 illustrates the breakdown of the estimated relevant documents into those matching the Boolean query and those only found by at least one of the ranked systems.

Section 4 lists the final Boolean query's estimated recall for each topic; it also lists several relevant documents (underlined) which did not match the final Boolean query. For example, it shows that for topic 74 ("All scientific studies expressly referencing health effects tied to indoor air quality") the final negotiated Boolean query of "(scien! OR stud! OR research) AND ("air quality" w/15 health)" missed matching relevant document vkm92d00. This document did not contain required Boolean terms such as "air" or "health", but it was judged relevant presumably because it referred to the "largest study ever" on whether "secondary smoke causes cancer" and also to a study of the "carcinogenic effects" of the "gas released from volatile organic compounds in shower water"[3].

Despite the low recall of the final Boolean query, none of the 68 submitted runs had a higher mean estimated Recall@B than the reference Boolean run (as Table 1 shows). This is a surprising result, since the refL07B run had been available to the participants since early July and thus could have been used by participating systems as one source of evidence. At least one participant (Open Text, which contributed the reference Boolean run) reported that combining other techniques with the Boolean run did not increase average recall at depth B. We anticipate that more participants will attempt to make use of the reference Boolean run next year.

One factor that may be limiting average recall across topics is that our Boolean queries targeted a B range between 100 and 25,000 to keep the size of submitted runs manageable. We should perhaps review whether our Boolean queries might be higher precision (and hence lower recall) than the Boolean queries used in practice.

Table 1 also lists mean estimated Recall@25000. The highest score (47%) was by a run which used both the final Boolean and request text fields (wat1fuse).

Section 4 lists the median scores for each topic in both Recall@B and Recall@25000. Although the final Boolean query had a higher recall than the median Recall@B for 31 of the 43 topics (and 4 tied), the median Recall@25000 was higher than the Boolean query's recall for 33 of the 43 topics (and 1 tied). The median run typically could not match the precision of the Boolean query to depth B, but by retrieving deeper it typically would find more relevant documents. (Table 1 shows that the average B value was 5004, while most of the runs retrieved the allowed maximum of 25,000 per topic.)

### 2.6.3   Estimating Precision

The L07 approach to estimating precision is similar to how infAP estimates its precision component (i.e., it's based on the precision of the run's judged documents to depth k). In our case, we have to weight the judged documents to account for the sampling probability. We also multiply by a factor to ensure that unretrieved documents are not inferred to be relevant.

---

[3]In the OCR output used by the participants, this latter phrase actually appeared as "Ras released f rom volatile organtc compounds in .houer water".

| Run | Fields | Avg. Ret. | Est. R@B | Est. R25000 | Est. P5 | Est. P@B | Est. P25000 | Est. Gray@B | S1J | GS10J | (raw) R-Prec |
|---|---|---|---|---|---|---|---|---|---|---|---|
| refL07B | bM | 5004 | **0.216** | | | | **0.292** | | 0.042 | | |
| otL07fb | bM | 5004 | **0.216** | 0.216 | 0.507 | **0.292** | 0.056 | 0.042 | 24/43 | 0.863 | 0.201 |
| otL07fb2x | bM | 6053 | 0.209 | 0.242 | 0.486 | 0.282 | 0.065 | 0.031 | 21/43 | 0.837 | 0.193 |
| CMUL07ibs | bM | 25000 | 0.208 | 0.392 | 0.452 | 0.267 | 0.137 | 0.022 | 24/43 | 0.832 | 0.151 |
| wat5nofeed | brM | 24999 | 0.196 | 0.447 | 0.537 | 0.263 | 0.159 | 0.016 | 24/43 | 0.864 | 0.204 |
| CMUL07irs | bM | 25000 | 0.194 | 0.395 | 0.372 | 0.242 | 0.149 | 0.013 | 23/43 | 0.813 | 0.133 |
| otL07frw | brM | 25000 | 0.193 | 0.428 | **0.550** | 0.278 | 0.150 | 0.015 | **26/43** | **0.883** | **0.224** |
| CMUL07ibt | bM | 25000 | 0.187 | 0.391 | 0.495 | 0.261 | 0.136 | 0.024 | 23/43 | 0.847 | 0.175 |
| otL07pb | pM | 18555 | 0.186 | 0.327 | 0.424 | 0.235 | 0.119 | 0.025 | 17/43 | 0.792 | 0.147 |
| wat1fuse | brM | 25000 | 0.186 | **0.469** | 0.529 | 0.271 | 0.155 | 0.012 | 21/43 | 0.837 | 0.197 |
| CMUL07ibp | bM | 25000 | 0.183 | 0.392 | 0.472 | 0.252 | 0.131 | 0.026 | **26/43** | 0.859 | 0.178 |
| wat7bool | bM | 7059 | 0.172 | 0.198 | 0.420 | 0.250 | 0.064 | 0.047 | 18/43 | 0.761 | 0.140 |
| CMUL07o3 | bdpM | 25000 | 0.170 | 0.400 | 0.491 | 0.236 | 0.146 | 0.012 | 23/43 | 0.867 | 0.190 |
| otL07fbe | bM | 25000 | 0.169 | 0.369 | 0.492 | 0.273 | 0.160 | 0.015 | 22/43 | 0.792 | 0.178 |
| IowaSL0704 | bdpr | 20071 | 0.167 | 0.382 | 0.461 | 0.232 | 0.123 | 0.015 | 21/43 | 0.760 | 0.173 |
| UMass15 | r | 25000 | 0.165 | 0.354 | 0.465 | 0.229 | 0.122 | 0.006 | 23/43 | 0.789 | 0.172 |
| IowaSL0703 | bdpr | 25000 | 0.164 | 0.403 | 0.451 | 0.216 | 0.139 | 0.009 | 19/43 | 0.808 | 0.181 |
| otL07fv | bM | 25000 | 0.163 | 0.357 | 0.467 | 0.225 | 0.129 | 0.005 | 20/43 | 0.856 | 0.176 |
| UMass13 | br | 25000 | 0.162 | 0.322 | 0.442 | 0.195 | 0.118 | 0.007 | 20/43 | 0.861 | 0.175 |
| IowaSL0705 | dpr | 7396 | 0.161 | 0.260 | 0.502 | 0.243 | 0.066 | 0.017 | 22/43 | 0.799 | 0.184 |
| UMKC4 | d | 24419 | 0.157 | 0.412 | 0.391 | 0.253 | 0.145 | 0.014 | 16/43 | 0.749 | 0.144 |
| IowaSL0706 | br | 7396 | 0.153 | 0.247 | 0.428 | 0.252 | 0.067 | 0.012 | 21/43 | 0.792 | 0.176 |
| otL07rvl | rM | 25000 | 0.153 | 0.420 | 0.471 | 0.235 | 0.151 | 0.010 | 15/43 | 0.850 | 0.187 |
| CMUL07o1 | bM | 25000 | 0.152 | 0.361 | 0.467 | 0.204 | 0.133 | 0.009 | 24/43 | 0.848 | 0.168 |
| UMass12 | b | 24028 | 0.150 | 0.285 | 0.350 | 0.197 | 0.117 | 0.005 | 21/43 | 0.804 | 0.125 |
| SabL07arbn | bdpr | 25000 | 0.149 | 0.321 | 0.393 | 0.203 | 0.117 | 0.009 | 19/43 | 0.790 | 0.132 |
| UMass14 | r | 25000 | 0.147 | 0.362 | 0.464 | 0.208 | 0.113 | 0.010 | 25/43 | 0.813 | 0.167 |
| wat8gram | bM | 25000 | 0.142 | 0.389 | 0.419 | 0.256 | 0.143 | 0.009 | 21/43 | 0.781 | 0.137 |
| IowaSL0707 | brM | 5004 | 0.142 | 0.142 | 0.409 | 0.237 | 0.053 | 0.013 | 20/43 | 0.781 | 0.173 |
| wat6qap | bM | 17179 | 0.142 | 0.239 | 0.385 | 0.194 | 0.089 | 0.031 | 13/43 | 0.733 | 0.113 |
| UMKC6 | b | 25000 | 0.137 | 0.400 | 0.371 | 0.258 | 0.161 | 0.020 | 20/43 | 0.794 | 0.149 |
| UMass11 | r | 25000 | 0.137 | 0.325 | 0.377 | 0.191 | 0.104 | 0.007 | 14/43 | 0.764 | 0.145 |
| UMKC1 | d | 24419 | 0.135 | 0.426 | 0.436 | 0.241 | 0.153 | 0.019 | 20/43 | 0.752 | 0.124 |
| IowaSL0702 | bdpr | 25000 | 0.134 | 0.363 | 0.429 | 0.205 | 0.132 | 0.007 | 19/43 | 0.816 | 0.183 |
| SabL07ab1 | bdpr | 25000 | 0.132 | 0.316 | 0.371 | 0.204 | 0.123 | 0.013 | 18/43 | 0.747 | 0.119 |
| CMUL07irt | bM | 25000 | 0.132 | 0.294 | 0.467 | 0.189 | 0.115 | 0.013 | 22/43 | 0.829 | 0.158 |
| UMass10 | rM | 23649 | 0.131 | 0.306 | 0.489 | 0.207 | 0.117 | 0.016 | 23/43 | 0.800 | 0.136 |
| UMKC5 | r | 25000 | 0.126 | 0.411 | 0.370 | 0.260 | **0.172** | 0.014 | 18/43 | 0.750 | 0.148 |
| wat3desc | rM | 24999 | 0.124 | 0.394 | 0.426 | 0.235 | 0.143 | 0.010 | 20/43 | 0.775 | 0.160 |
| CMUL07std | rM | 25000 | 0.123 | 0.314 | 0.451 | 0.191 | 0.115 | 0.006 | 22/43 | 0.833 | 0.163 |
| fdwim7xj | rM | 25000 | 0.113 | 0.354 | 0.408 | 0.180 | 0.114 | 0.017 | 22/43 | 0.781 | 0.142 |
| ursinus1 | r | 25000 | 0.113 | 0.329 | 0.340 | 0.195 | 0.125 | 0.016 | 16/43 | 0.751 | 0.131 |
| ursinus2 | r | 25000 | 0.112 | 0.314 | 0.307 | 0.154 | 0.117 | 0.008 | 14/43 | 0.685 | 0.099 |
| ursinus6 | r | 25000 | 0.110 | 0.298 | 0.242 | 0.153 | 0.108 | 0.009 | 10/43 | 0.628 | 0.089 |
| IowaSL07Ref | r | 25000 | 0.108 | 0.343 | 0.366 | 0.148 | 0.120 | 0.009 | 15/43 | 0.754 | 0.130 |
| UMKC3 | b | 25000 | 0.107 | 0.391 | 0.444 | 0.243 | 0.161 | 0.031 | 17/43 | 0.790 | 0.131 |
| fdwim7rs | r | 25000 | 0.106 | 0.319 | 0.431 | 0.210 | 0.126 | 0.013 | 21/43 | 0.790 | 0.142 |
| UIowa07LegE2 | b | 16708 | 0.106 | 0.268 | 0.283 | 0.224 | 0.114 | 0.021 | 11/43 | 0.651 | 0.109 |
| UIowa07LegE0 | r | 24997 | 0.103 | 0.318 | 0.312 | 0.156 | 0.120 | 0.009 | 19/43 | 0.736 | 0.118 |
| fdwim7ss | cir | 25000 | 0.102 | 0.309 | 0.409 | 0.170 | 0.115 | 0.014 | 17/43 | 0.788 | 0.129 |
| fdwim7sl | cir | 25000 | 0.101 | 0.288 | 0.422 | 0.164 | 0.120 | 0.010 | 20/43 | 0.783 | 0.120 |
| UMKC2 | r | 25000 | 0.100 | 0.409 | 0.416 | 0.226 | 0.171 | 0.016 | 17/43 | 0.770 | 0.125 |
| ursinus7 | bM | 25000 | 0.099 | 0.283 | 0.265 | 0.161 | 0.109 | 0.010 | 12/43 | 0.601 | 0.086 |
| SabL07ar2 | r | 25000 | 0.098 | 0.295 | 0.364 | 0.178 | 0.105 | 0.016 | 16/43 | 0.789 | 0.102 |
| SabL07ar1 | r | 25000 | 0.097 | 0.288 | 0.369 | 0.174 | 0.105 | 0.015 | 15/43 | 0.784 | 0.101 |
| ursinus4 | r | 25000 | 0.096 | 0.315 | 0.332 | 0.233 | 0.139 | **0.131** | 14/43 | 0.714 | 0.066 |
| Dartmouth1 | r | 25000 | 0.083 | 0.275 | 0.285 | 0.137 | 0.102 | 0.010 | 15/43 | 0.682 | 0.095 |
| wat2nobool | brM | 25000 | 0.082 | 0.320 | 0.327 | 0.217 | 0.131 | 0.018 | 12/43 | 0.713 | 0.071 |
| ursinus8 | bM | 25000 | 0.071 | 0.191 | 0.093 | 0.101 | 0.085 | 0.018 | 4/43 | 0.416 | 0.032 |
| fdwim7ts | r | 25000 | 0.070 | 0.177 | 0.163 | 0.109 | 0.067 | 0.012 | 6/43 | 0.592 | 0.044 |
| ursinus3 | r | 25000 | 0.063 | 0.213 | 0.072 | 0.084 | 0.078 | 0.008 | 3/43 | 0.401 | 0.024 |
| ursinus5 | r | 25000 | 0.063 | 0.220 | 0.072 | 0.081 | 0.083 | 0.009 | 3/43 | 0.396 | 0.023 |
| wat4feed | brM | 25000 | 0.061 | 0.224 | 0.261 | 0.151 | 0.092 | 0.025 | 9/43 | 0.600 | 0.063 |
| catchup0701p | r | 24016 | 0.061 | 0.171 | 0.126 | 0.130 | 0.098 | 0.023 | 5/43 | 0.528 | 0.041 |
| UIowa07LegE1 | r | 24996 | 0.031 | 0.083 | 0.206 | 0.067 | 0.057 | 0.004 | 11/43 | 0.651 | 0.036 |
| UIowa07LegE3 | b | 24999 | 0.028 | 0.110 | 0.194 | 0.090 | 0.070 | 0.012 | 9/43 | 0.550 | 0.035 |
| otL07db | dM | 368 | 0.027 | 0.027 | 0.301 | 0.026 | 0.006 | 0.003 | 15/43 | 0.576 | 0.074 |
| UIowa07LegE5 | b | 24992 | 0.003 | 0.019 | 0.105 | 0.018 | 0.026 | 0.017 | 6/43 | 0.324 | 0.011 |
| UIowa07LegE4 | b | 9879 | 0.002 | 0.004 | 0.023 | 0.012 | 0.009 | 0.010 | 1/43 | 0.101 | 0.002 |
| randomL07 | | 100 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.001 | 0/43 | 0.038 | 0.001 |

Table 1: Mean scores for submitted Ad Hoc task runs.

| Run | Depths 1-5000 | Depths 5001-10000 | Depths 10001-15000 | Depths 15001-20000 | Depths 20001-25000 |
|---|---|---|---|---|---|
| Ad Hoc - high | 0.238 | 0.182 | 0.183 | 0.168 | 0.199 |
| Ad Hoc - median | 0.178 | 0.127 | 0.110 | 0.101 | 0.099 |
| RF - high | 0.218 | 0.197 | 0.146 | 0.197 | 0.150 |
| RF - median | 0.126 | 0.118 | 0.069 | 0.055 | 0.052 |

Table 2: High and Median Estimated Marginal Precision Rates

Define $estPrec@k$ to be the estimated precision of $S$ at depth $k$:

$$estPrec@k = \frac{estRel(S(k))}{estRel(S(k)) + estNonrel(S(k))} \times \frac{|S(k)|}{k} \quad (5)$$

Note: we define $estPrec@k$ as 0 if both $estRel(S(k))$ and $estNonrel(S(k))$ are 0.

The mean estimated precision of the reference Boolean run (refL07B) was just 29%. Again, this varied by topic, from 0% (topic 77) to 97% (topic 69) (Section 4 lists the precision scores for all of the topics). As Table 1 shows, none of the 68 submitted runs had a higher mean estimated Precision@B than the reference Boolean run. The submitted run with the highest mean estimated Precision@25000 (17%) just used the request text field (UMKC5).

### 2.6.4  Marginal Precision Rates to Depth 25,000

Table 2 shows how precision falls with retrieval depth for the Ad Hoc task runs. The table includes the highest and median estimated marginal precision rates of the Ad Hoc task runs for depths 1-5000, 5001-10000, 10001-15000, 15001-20000 and 20001-25000. The median run was still maintaining 10% precision at the deepest stratum (depths 20001-25000), and some runs were close to 20% precision in this stratum. It appears for this test collection that depth 25,000 was not deep enough to cover all of the relevant documents that a run could potentially find.

We note however that the median precision in the deepest stratum exceeded 10% for only 6 of the 43 topics. These included topics 69, 74 and 71, which also had among the highest number of estimated relevant documents (as per the listing in Section 4). 13 of the 43 topics had more than 25,000 estimated relevant documents (hence 100% recall was not possible for these topics at depth 25,000). Perhaps it would be better for reusability to discard these 13 topics, but additional analysis will be needed before we can draw firm conclusions.

We hope to investigate reusability issues with the collection as (near) future work. But generally speaking, for runs that did not contribute to the pools, if the 25,000 documents retrieved for a topic are mostly a subset of the (approximately) 300,000 documents that were pooled for the topic, or if the unpooled documents contain few relevant documents, then the estimated measures from the l07_eval utility should still be comparable to the pooled systems' scores, particularly at deeper depths (e.g., at depth 25,000).

### 2.6.5  Estimated Gray Percentages

Table 1 also lists the estimated percentage of gray documents at depth B. The ursinus4 run retrieved a lot more gray documents (13%) than the other runs; we therefore suspect this run's approach favored longer documents. Boolean runs retrieved 4-5% gray, perhaps because the Boolean constraints matched some long documents. Most other runs retrieved less than 2% gray. These systematic differences suggest that it may be productive to reconsider the techniques being used for dealing with long documents, both in system design and in our assessment process.

### 2.6.6    Random Run Results

It was hoped that the randomL07 run would give us at least a rough indication of the number of relevant documents that may have been outside of the pooled results of participating systems. A total of 446 of the randomL07 documents were judged (over 43 topics), and 3 of these were judged relevant (0.7%). Typically, about 6.5 million documents of the almost 7 million documents in the collection were not submitted by any participating system and thus not included in our pooling process. If 0.7% of those are relevant, that would suggest another 50,000 relevant documents (per topic). However, when we reviewed the 3 judged relevant documents from the randomL07 run (zsm67e00 for topic 58, cdf53e00 for topic 70 and dkb74d00 for topic 71), none of them appeared to actually be relevant to us (though the official qrels have not been altered). So perhaps the overall precision of the unpooled documents is actually much less than 0.7% (though even 0.1% would represent more than 5,000 relevant documents per topic).

There were 6 randomL07 documents that were considered "gray" (i.e., not judged relevant nor non-relevant). None of these 6 documents were very long. For one of them, the PDF document would not display (bev71d00 for topic 84). 2 of the 6 were non-English documents (tpv77e00 and xyu37e00 for topic 52). The other 3 had relatively little text (lkf03d00 and xqx21a00 for topic 69, and qge12c00 for topic 89). However, these documents do not seem to be typical of the gray documents retrieved by system runs, which generally were very long documents.

### 2.6.7    Table Glossary

Table 1 lists the mean scores for each of the 68 submitted runs for the Ad Hoc task and the 2 additional reference runs. The following glossary explains the codes used in that table.

"Fields": The topic fields used by the run: 'b' Boolean query (final negotiated), 'c' complaint, 'd' defendant Boolean (initial proposal), 'i' instructions and definitions, 'p' plaintiff Boolean (rejoinder query), 'r' request text, 'M' manual processing was involved, 'F' feedback run (2006 relevance assessments were used, applicable to RF task only).

"Avg. Ret.": The Average Number of Documents Retrieved per Topic.

"R@B" and "R@25000": Estimated Recall at Depths B and 25000.

"P5", "P@B" and "P25000": Estimated Precision at Depths 5, B and 25000.

"Gray@B": Estimated percentage of Gray documents at Depth B.

"S1J": Success of the First Judged Document.

"GS10J": Generalized Success@10 on Judged Documents ($1.08^{1-r}$ where $r$ is the rank of the first relevant document, only counting judged documents, or zero if no relevant document is retrieved). GS10J is a robustness measure which exposes the downside of blind feedback techniques [11]. Intuitively, it is a predictor of the percentage of topics for which a relevant document is retrieved in the first 10 rows.

"R-Prec": R-Precision (raw Precision at Depth R, where R is the raw number of known relevant documents). Estimation is not used for this measure. It is provided so that we can see if the results differ with a traditional IR measure.

For the reference Boolean run (refL07B), only measures at depth B are shown so that the ordering of Boolean results does not matter.

## 3    Interactive and Relevance Feedback Tasks

In 2006, most teams applied existing information retrieval systems to obtain what might best be characterized as baseline results. Moreover, in 2006 the relevance assessment pools were (with two exceptions) drawn from near the top of submitted ranked retrieval runs. Both factors tend to reduce the utility of the available relevance judgments for the 2006 topic set somewhat. We therefore created two opportunities for teams to contribute runs that would permit us to enrich the 2006 relevance judgments: a Relevance Feedback task, and an Interactive task. The same document collection was used in 2006 and 2007, so participation in these tasks did not require indexing a new collection.

The objective in the Relevance Feedback task was to automatically discover previously unknown relevant documents by augmenting the evidence available from the topic description with evidence available from the relevance assessments that were created in 2006. Teams could use positive and/or negative judgments in conjunction with the metadata for and/or full text from the judged documents to refine their models. This task provides a simple and well controlled model for assessing the utility of a two-pass search process.

Interactive searchers have an even broader range of strategies available for enhancing their results, including iteratively improving their query formulation (based on their examination of search results) and/or performing more than one iteration of relevance feedback. There is, therefore, significant scope for research on processes by which specific search technologies can best be employed. Participants in the Interactive task could use any combination of: systems of their own design, the Legacy Tobacco Document Library system (LTDL, a Web-based system provided by the University of California, San Francisco), or the Tobacco Documents Online system (TDO, the same Web-based system that was used for relevance assessment in the TREC 2006 Legal Track). Standardized questionnaires were used to collect information about the search process from the perspective of individual participants, and research teams could employ additional methods (e.g., observation or log file analysis) to collect complementary information at their option.

## 3.1   Topics

Twelve topics out of the first year's 39 completed topics were selected for the Interactive task. These topics were chosen by the track coordinators based on a variety of factors, including (i) not being too closely tied to a "tobacco-related" topic, so as to mitigate whatever inherent bias exists; (ii) the absolute number of relevant documents found for each topic in year one, with topics returning under a threshold of 50 documents being considered lesser priority; (iii) relatively high kappa scores from year 1 on inter- assessor agreement, and (iv) their inherent interest. The top three interactive topics ended up, in priority order, involving the subjects of pigeon deaths (topic 45), memory loss (topic 51), and the placement of tobacco products in G-rated movies (topic 7). A total of 10 of the 12 interactive topics were completely assessed by volunteers. These same 10 topics were used for the Relevance Feedback task in 2007.

## 3.2   Evaluation

Eight Relevance Feedback runs were submitted by 3 research teams. Participating teams were allowed to submit up to max(25000,B)+1000 documents per topic. "Residual evaluation" was used for the Relevance Feedback task. Hence, before pooling, any documents that were judged last year (of which there were at most 1000 per topic) were removed from the Relevance Feedback runs. For topics with $B_r$>25000, which was the case for two of the Relevance Feedback topics, depth-$B_r$ pooling was used; other topics were pooled to depth 25,000. The resulting ranked lists were therefore truncated at max(25000,$B_r$), where $B_r$ is the number of documents matching the reference Boolean query (refL06B) after last year's judged documents are removed. Because $B_r$>25000 for two topics, R@$B_r$ scores can exceed R@25000 in the Relevance Feedback task, which is not possible for the Ad Hoc task.

The pools were then enriched before judgment with three additional runs:

- A special "oldrel07" run was added which included 25 relevant documents (or all if less than 25 were available) randomly chosen from last year's judgments for each topic.

- A special "oldnon07" run was added which included 25 non-relevant documents randomly chosen from last year's judgments for each topic.

- A special "randomRF07" run was added which included 100 randomly chosen documents that were not otherwise pooled (or judged last year).

Finally, all documents from the Interactive task runs were included in this year's pools (even if they were judged in 2006).

The p(d) formula for the Relevance Feedback task was the same as for the Ad Hoc task except that: (1) all documents from the Interactive task and from the oldrel07 and oldnon07 runs were assigned probability

1.0 so that they would all be presented to the assessor, (2) topics with $B_r > 25000$ were sampled to depth $B_r$, with p(d) of min(1.0, ((5/25000)+(C/hiRank(d))) for documents with hiRank(d) between 6 and 25000 inclusive, and (3) the sum of the p(d) could be just 250 instead of 500 for some of the topics (because fewer documents needed to be judged to maintain the same accuracy (C value) as in the Ad Hoc task).

For the Interactive task, teams could submit as many as 100 documents per topic, but submission of nonrelevant documents was penalized. A simple utility function (the number of submitted relevant documents minus half the number of submitted nonrelevant documents) was chosen as the principal evaluation measure for the Interactive task in order to encourage participants to submit fewer than 100 documents when that many relevant documents could not be found.

### 3.3 Interactive Task Results

Table 3 shows the results for each Interactive task team. Eight teams from three sites participated:

**Long Island University (LIU).** Nine participants worked in groups of three, with one group assigned to each of the highest priority topics. All three groups searched only the LTDL. A tenth participant reviewed each group's top 100 retrieved results and only those considered relevant were submitted. The estimated total search time (across all three searchers in a team) was 39 hours for topic 51, 39 hours for topic 45, and 25 hours for topic 7. Results were reported as both Bates numbers and URL's; the DOCNO was extracted from the URL for pooling and scoring. The reported results for LIU were corrected after they were initially distributed to remove 14 LTDL documents that are not contained in the TREC Legal Track test collection.

**Sabir Research (Sabir).** One participant worked alone to search the eight highest priority topics. Multiple relevance feedback iterations were performed based on judgments from 2006, plus judgments for an additional 10 previously unjudged documents that were added at each iteration. The limited multi-pass interaction in this process was intended as a contrastive condition to the one-pass relevance feedback runs from the same site; comparison with results from other sites may be less informative because manual query refinement was not performed in this case. The process required an average of about 16 minutes per topic. Results were reported as both Bates numbers and URL; the DOCNO was therefore extracted from the URL.

**University of Washington (UW).** Sixteen participants worked in six teams, each consisting of two or three participants, and the results for each team were submitted and scored separately. The average time per topic was not reported. Results were submitted as Bates numbers and were automatically mapped to DOCNO values based on exact string match. This process resulted in frequent failures (44% of all values reported as Bates numbers proved to be unmappable); inspection of the values revealed that some were very similar to valid Bates numbers that were present in the collection (e.g., with a dash in place of a slash or with a brief prefix indicating the source), but that others were not. After relevance judgments were completed, the mapping script was modified to accommodate some patterns that were detected by inspection and the UW runs were rescored. The rescored values are shown in italics in Table 3 where they differ from the initially computed (completely assessed) results.

The evaluation design that we chose can in some sense be thought of as comparing the opinion of one person (the relevance assessor) with the opinion of one or more other people (the experiment participants). From the LIU results, we can see that a moderately good level of agreement can be achieved, with agreement on 96 (81%) of the 118 positive judgments made by the participants. Perhaps the most interesting conclusion that we can draw from comparing the results from the seven LIU and UW teams that tried a fully interactive process is that searchers exhibited substantial variation. For example, among the six UW teams (which were given consistent instructions) we see a variation of at least a factor of two in the number of relevant documents found (in the opinion of the relevance assessor) for each of the three topics. Of course, we must caveat this result by noting that the process used for recording Bates numbers by UW participants exhibited substantial variation both by team and by topic, so variations in the effectiveness of the mapping process are a possible confounding factor.

| Team | Score | 45S | 45R | 45N | 51S | 51R | 51N | 7S | 7R | 7N |
|---|---|---|---|---|---|---|---|---|---|---|
| LIU | **85.0** | 13.5 | 18 | 9 | 20.0 | 24 | 8 | **51.5** | **54** | 5 |
| UW6 | *66.5* | **28.0** | **35** | 14 | *15.0* | *19* | *8* | 23.5 | 38 | 29 |
| UW2 | *51.5* | *24.5* | 32 | *15* | 15.5 | 31 | 31 | *11.5* | *24* | 25 |
| UW1 | 48.0 | 17.0 | 28 | 22 | **24.0** | **35** | 22 | 7.0 | 10 | 6 |
| UW3 | *43.0* | *16.0* | *17* | *2* | 9.5 | 23 | 27 | 17.5 | 30 | 25 |
| UW5 | *39.0* | 12.5 | 21 | *17* | *15.0* | 23 | *16* | 11.5 | 23 | 23 |
| UW4 | *36.0* | 18.0 | 28 | 20 | 5.5 | *17* | *23* | *12.5* | 20 | *15* |
| Sabir | -10.5 | -7.0 | 11 | 36 | -0.5 | 0 | 1 | 3.0 | 3 | 12 |
| oldrel07 | 14.5 | 5.5 | 12 | 13 | 12.0 | 16 | 8 | -3.0 | 6 | 18 |
| refL06B | 12.0 | 6.5 | 71 | 129 | 7.0 | 73 | 132 | -1.5 | 16 | 35 |
| randomRF07 | -23.5 | -10.0 | 0 | 20 | -5.0 | 1 | 12 | -8.5 | 0 | 17 |
| oldnon07 | -34.5 | -11.5 | 0 | 23 | -10.5 | 1 | 23 | -12.5 | 0 | 25 |

Table 3: Mean scores for all Interactive task teams (S=Score, R=relevant, N=Not relevant).

Table 3 also lists the scores of the reference Boolean run (refL06B). Most of the Interactive teams scored higher than the Boolean run on all 3 topics. It should be noted that, unlike the participants, the Boolean run was not limited to 100 retrieved documents, and its results were sampled unevenly (it includes the documents selected for the residual RF evaluation along with the documents from the Interactive, oldrel07 and oldnon07 runs).

## 3.4   Relevance Feedback Task Results

Table 4 shows the results for the 10 Relevance Feedback runs. Three research teams participated, and two additional reference reference runs were also scored (refL06B and randomRF07). The following summarizes each team's submissions:

**Carnegie Mellon University (CMU07).**  The CMU team treated the Relevance Feedback task as a supervised learning problem and retrieved documents using Indri queries that approximated Support Vector Machines (SVMs) learned from training documents. Both keyword features and simple structured "term.field" features were investigated. Named-Entity tags, the LingPipe sentence breaker, and metadata provided in the collection with each document were used to generate the field information. The CMU07RSVMNP run included negative and positive weight terms, while the CMURFBSVME run was formulated using only terms with positive weights.

**Open Text Corporation (ot).**  The two runs submitted by Open Text performed the Relevance Feedback task, but without actually using the available positive or negative assessments. Run otRF07fb ranked the documents in the reference Boolean run (refL06B). Run otRF07fv performed ranked retrieval using the query terms from the same Boolean query.

**Sabir Research (sab07).**  Sabir's runs provided a baseline for multi-pass relevance feedback runs that were submitted for the Interactive task.

Mean scores over just 10 topics may not be very reliable, so little should be read from the result that no participating system outperformed the reference Boolean run on the mean Est. R@B$_r$ measure or that every run (other than the random run) outperformed the reference Boolean run on the mean Est. P@B$_r$ measure. An encouraging result from this pilot study is that the median of the 5 feedback runs outscored the reference Boolean run in Est. R@B$_r$ for 7 of the 10 topics, in contrast with the Ad Hoc task in which the median run outscored the reference Boolean run in just 8 of the 43 topics. Of course, these results were obtained on different topics, by different numbers of teams, and 10 topics remains a small sample however you slice it (the track hopes to conduct a larger study in the upcoming year). Some useful insights may come from failure analysis of the topics for which the feedback runs were still outscored by the reference Boolean run.

| Run | Fields | Avg. Ret. | Est. R@B_r | Est. R25000 | Est. P5 | Est. P@B_r | Est. P25000 | Est. Gray@B_r | S1J | GS10J | (raw) R-Prec |
|---|---|---|---|---|---|---|---|---|---|---|---|
| refL06B | bM | 20185 | **0.386** | | | 0.106 | | **0.051** | | | |
| otRF07fb | bM | 20185 | **0.386** | 0.367 | 0.380 | 0.106 | 0.044 | **0.051** | 3/10 | 0.735 | 0.100 |
| CMU07RSVMNP | F-bM | 25159 | 0.380 | 0.598 | **0.570** | 0.170 | **0.155** | 0.007 | 5/10 | **0.870** | 0.182 |
| CMU07RBase | bM | 25100 | 0.353 | 0.578 | 0.500 | 0.115 | 0.102 | 0.024 | **7/10** | 0.843 | 0.117 |
| CMU07RFBSVME | F-bM | 25116 | 0.334 | 0.578 | **0.570** | 0.118 | 0.072 | 0.034 | 6/10 | 0.855 | 0.173 |
| sab07legrf2 | F-bdpr | 36625 | 0.333 | 0.515 | 0.500 | 0.173 | 0.099 | 0.012 | 4/10 | 0.788 | 0.199 |
| sab07legrf3 | F-bdpr | 36625 | 0.321 | **0.616** | 0.520 | **0.194** | 0.117 | 0.012 | 4/10 | 0.814 | **0.202** |
| sab07legrf1 | F-brM | 25106 | 0.278 | 0.475 | 0.480 | 0.132 | 0.072 | 0.013 | 5/10 | 0.802 | 0.197 |
| otRF07fv | bM | 36625 | 0.248 | 0.444 | 0.355 | 0.156 | 0.064 | 0.007 | 3/10 | 0.612 | 0.065 |
| randomRF07 | | 100 | 0.002 | 0.002 | 0.040 | 0.004 | 0.000 | 0.000 | 0/10 | 0.159 | 0.004 |

Table 4: Mean scores for submitted Relevance Feedback task runs.

# 4   Individual Topic Results

This section provides summary information for each of the assessed topics of the Ad Hoc and Relevance Feedback tasks.

The 44 assessed Ad Hoc topics are listed first (including one topic (#62) whose judgments arrived after the official results had been released). The information provided is as follows:

**Topic** : The topic numbers range from 52 to 101. In parentheses are the year of the topic set (2007), the label of the complaint (A, B, C or D), and the request number inside the complaint. (The complaints run several pages and are available on the track web site [1].)

**Request Text** : The one-sentence statement of the request.

**Initial Proposal by Defendant, Rejoinder by Plaintiff and Final Negotiated Boolean Query** :

The following syntax was used for the Boolean queries:

- `AND, OR, NOT, ()`: As usual.
- `x BUT NOT y`: Same meaning as `(x AND (NOT (y)))`
- `x`: Match this word exactly (case-insensitive).
- `x!`: Truncation – matches all strings that begin with substring `x`.
- `!x`: Truncation – matches all strings that end with substring `x`.
- `x?y`: Single-character wildcard – matches all strings that begin with substring `x`, end with substring `y`, and have exactly one-character in between `x` and `y`.
- `x*y`: Muliple-character wildcard – matches all strings that begin with substring `x`, end with substring `y`, and have 0 or more characters between `x` and `y`.
- `"x"`, `"x y"`, `"x y z"`, etc.: Phrase – match this string or sequence of words exactly (case-insensitive).
- `"y x!"`, `"x! y"`, etc.: If `!` is used internal to a phrase, then do the truncated match on the words with `!`, and exact match on the others. (The `*` and `?` wildcard operators may also be used inside a phrase.)
- `w/k`: Proximity – `x w/k y` means match `"x a b ...  c y"` or `"y a b ...  c x"` if `"a b ...  c"` contains `k` or fewer words.
- `x w/k1 y w/k2 z`: Chained proximity – a match requires the same occurrence of `y` to satisfy `x w/k1 y` and `y w/k2 z`.

**Sampling and Est. Rel.** : The number of pooled documents is given (i.e., all distinct documents from all of the submitted runs for the topic), followed by the number presented to the assessor, the number the assessor judged relevant, the number the assessor judged non-relevant, and the number the assessor left as "gray" (defined earlier). The "C" value of the p(d) formula is given (the measures at depths B and 25000 have approximately the accuracy of 5+C simple random sample points, as described earlier). "Est. Rel." is the estimated number of relevant documents in the pool for the topic (based on the sampling results).

**Final Boolean Result Size (B), Est. Recall and Est. Precision** : "B" is the number of documents matching the final negotiated Boolean query (which always was between 100 and 25000 in 2007). "Est. Recall" is the estimated recall of the final negotiated Boolean query result set. "Est. Precision" is the estimated precision of the final negotiated Boolean query result set.

**Participant High Recall@B and Median Recall@B** : The highest estimated recall at depth B of the participant runs is listed, followed in parentheses by the run's identifier; if more than one run tied for the highest score, just one of them is listed (chosen randomly) and the number of other tied runs is stated. The median estimated recall at depth B is based on the median score of 70 runs (the 68 participant runs along with the refL07B and randomL07 runs).

**Participant High Recall@25000 and Median Recall@25000** : Same as previous line except that the measures are at depth 25000 instead of depth B.

**5 Deepest Sampled Relevant Documents** : The identifiers of the 5 deepest sampled documents that were judged relevant are listed in descending depth order. The identifier is underlined if the document was not retrieved by the final negotiated Boolean query. Each identifier is followed by its weight in the estimation formulas (i.e., the estimated number of relevant documents it represents) which is 1/p(d) (i.e., the reciprocal of the probability of being selected for judging). In parentheses is the identifier of the run which retrieved the document at the highest rank, followed by that rank (which can range from 1 to 25000); if multiple runs retrieved the document at that rank, just one of them is listed. For example, for topic 52, the entry of "hdz83f00-93.4 (otL07fbe-515)" indicates that the hdz83f00 document was judged relevant and, because it is not underlined, it matched the final Boolean query. It counts as 93.4 estimated relevant documents in the estimation formulas (because it was selected for judging with probability 1/93.4). The otL07fbe run retrieved this document at rank 515; any other run that retrieved the document did so at the same or deeper rank (i.e., if the pooling had been to less than depth 515, the document would not have been in the pool). Note that the document content and metadata can be found online by appending the document identifier to the url "http://legacy.library.ucsf.edu/tid/" (e.g., `http://legacy.library.ucsf.edu/tid/hdz83f00`). One can do failure analysis for the final Boolean query for most topics by reviewing the underlined document identifiers.

---

**Topic 52** (2007-A-1)
**Request Text**: Please produce any and all documents that discuss the use or introduction of high-phosphate fertilizers (HPF) for the specific purpose of boosting crop yield in commercial agriculture.
**Initial Proposal by Defendant**: "high-phosphate fertilizer!" AND (boost! w/5 "crop yield") AND (commercial w/5 agricultur!)
**Rejoinder by Plaintiff**: (phosphat! OR hpf OR phosphorus OR fertiliz!) AND (yield! OR output OR produc! OR crop OR crops)
**Final Negotiated Boolean Query**: (("high-phosphat! fertiliz!" OR hpf) OR ((phosphat! OR phosphorus) w/15 (fertiliz! OR soil))) AND (boost! OR increas! OR rais! OR augment! OR affect! OR effect! OR multipl! OR doubl! OR tripl! OR high! OR greater) AND (yield! OR output OR produc! OR crop OR crops)
**Sampling**: 361264 pooled, 1000 assessed, 55 judged relevant, 941 non-relevant, 4 gray, "C"=4.68, **Est. Rel.**: 257.4
**Final Boolean Result Size (B)**: 3078, **Est. Recall**: 97.6%, **Est. Precision**: 10.6%
**Participant High Recall@B**: 100.0% (wat5nofeed), **Median Recall@B**: 48.2%
**Participant High Recall@25000**: 100.0% (wat1fuse and 10 others), **Median Recall@25000**: 73.1%
**5 Deepest Sampled Relevant Documents**: hdz83f00-93.4 (otL07fbe-515), dud53d00-21.8 (UMass15-106), huw23d00-18.8 (UMKC2-91), zge78d00-17.0 (SabL07ar1-82), ehe58c00-13.4 (wat5nofeed-64)

---

**Topic 53** (2007-A-2)

**Request Text**: Please produce any and all documents concerning the effect of Maleic hydrazide (MH) on the tumorigenicity in hamsters.

**Initial Proposal by Defendant**: "maleic hydrazide" AND tumorigenicity AND hamster!

**Rejoinder by Plaintiff**:  ("maleic hydr?zide" OR MH OR pesticid! OR "weed killer" OR herbicid! OR ((growth OR sprout!) w/3 (inhibitor! OR retardant)) OR "potassium salt" OR De-cut OR "Drexel MH" OR Gro-taro OR C4N2H4O2) AND (hamster! OR mice OR mouse OR rat OR rats OR rodent! OR subject! OR animal!)

**Final Negotiated Boolean Query**: ("maleic hydr?zide" OR (MH AND (pesticid! OR "weed killer" OR herbicid! OR (growth OR sprout!) w/3 (inhibitor! OR retardant))) OR "potassium salt" OR De-cut OR "Drexel MH" OR Gro-taro OR C4N2H4O2) AND (tumor! OR oncogenic OR oncology! OR pathology! OR pathogen!) AND (hamster! OR mice OR mouse OR rat OR rats OR rodent!)

**Sampling**: 309106 pooled, 499 assessed, 140 judged relevant, 359 non-relevant, 0 gray, "C"=2.26,  **Est. Rel.**: 31632.5

**Final Boolean Result Size (B)**: 4066,  **Est. Recall**: 8.3%,  **Est. Precision**: 60.7%

**Participant High Recall@B**: 12.0% (UMKC6),  **Median Recall@B**: 3.0%

**Participant High Recall@25000**: 44.7% (ursinus4),  **Median Recall@25000**: 16.7%

**5 Deepest Sampled Relevant Documents**:  piq79c00-3407.2 (otL07rvl-24173), <u>cdn65e00</u>-3009.0 (UIowa07LegE5-17078), <u>bin58d00</u>-2556.7 (otL07fbe-11824), <u>urb90d00</u>-2284.6 (wat6qap-9507), pcp77c00-2194.5 (UMKC2-8839)

---

**Topic 55** (2007-A-4)

**Request Text**: Please produce any and all documents concerning the known radioactivity of apatite rock.

**Initial Proposal by Defendant**: apatite w/15 radioactiv!

**Rejoinder by Plaintiff**:  (Apatite OR "CA5(PO4)3OH" OR "CA5(PO4)3F" OR "CA5(PO4)3Cl" OR Fluorapatite OR Chlorapatite OR Hydroxylapatite) OR ((rock OR geolo!) AND (radioactiv! OR unstable OR instabil! OR radiat! OR radium OR polonium OR lead))

**Final Negotiated Boolean Query**:  (Radioactiv! OR unstable OR instabil! OR radiat! OR radium OR polonium OR lead) AND (apatite OR "CA5(PO4)3OH" OR "CA5(PO4)3F" OR "CA5(PO4)3Cl" OR Fluorapatite OR Chlorapatite OR Hydroxylapatite)

**Sampling**: 380213 pooled, 496 assessed, 46 judged relevant, 440 non-relevant, 10 gray, "C"=1.27,  **Est. Rel.**: 5564.7

**Final Boolean Result Size (B)**: 580,  **Est. Recall**: 1.7%,  **Est. Precision**: 22.5%

**Participant High Recall@B**: 6.4% (wat4feed),  **Median Recall@B**: 0.6%

**Participant High Recall@25000**: 52.2% (fdwim7ss),  **Median Recall@25000**: 3.8%

**5 Deepest Sampled Relevant Documents**:  <u>vwc40e00</u>-1871.6 (wat4feed-3799), <u>dmm74e00</u>-1507.2 (fdwim7ss-2740), jwr99d00-1289.2 (fdwim7ss-2206), qsj72f00-92.3 (UMKC1-574), <u>dtn01e00</u>-91.4 (wat4feed-548)

---

**Topic 56** (2007-A-5)

**Request Text**: Please produce any and all documents concerning soil water management as it pertains to commercial irrigation.

**Initial Proposal by Defendant**: ("soil water" w/10 manage!) AND "commercial irrigation"

**Rejoinder by Plaintiff**:  (Soil! OR sewage OR sewer! OR septic OR drain! OR dirt OR field! OR groundwater OR (ground w/3 water)) AND (manage! OR control!) AND irrigat!

**Final Negotiated Boolean Query**:  (((Soil! OR sewage OR sewer! OR septic OR drain! OR dirt OR field! OR groundwater OR (ground w/3 water)) AND (manage! OR "control system")) AND irrigat!)

**Sampling**: 319017 pooled, 499 assessed, 112 judged relevant, 361 non-relevant, 26 gray, "C"=2.02,  **Est. Rel.**: 2461.0

**Final Boolean Result Size (B)**: 3288,  **Est. Recall**: 46.8%,  **Est. Precision**: 42.0%

**Participant High Recall@B**: 64.5% (UMKC5),  **Median Recall@B**: 26.0%

**Participant High Recall@25000**: 87.3% (otL07frw),  **Median Recall@25000**: 56.3%

**5 Deepest Sampled Relevant Documents**:  <u>nxw38d00</u>-445.2 (ursinus8-2785), <u>lmz34c00</u>-421.3 (fdwim7ts-2369), <u>amx11c00</u>-291.1 (UMKC6-1055), rin34d00-283.6 (wat3desc-1007), cyp41a00-255.1 (UMKC2-842)

---

**Topic 57** (2007-A-6)

**Request Text**: Please produce any and all documents that discuss methods for decreasing sugar loss in sugar-beet crops.

**Initial Proposal by Defendant**: "sugar beet" AND "sugar loss"

**Rejoinder by Plaintiff**:  sugar! AND (beet OR beets OR crop OR crops) AND (lost OR loss OR losses OR decreas! OR wane! OR reduc! OR prevent!)

**Final Negotiated Boolean Query**:  (sugar-beet OR sugarbeet OR beet OR beets OR crop OR crops) w/75 (lost OR loss OR losses OR decreas! OR wane! OR reduc! OR prevent!) w/75 sugar!

**Sampling**: 307648 pooled, 1000 assessed, 340 judged relevant, 643 non-relevant, 17 gray, "C"=4.67,  **Est. Rel.**: 49048.1

**Final Boolean Result Size (B)**: 3006,  **Est. Recall**: 3.2%,  **Est. Precision**: 64.4%

**Participant High Recall@B**: 5.7% (ursinus6),  **Median Recall@B**: 2.9%

**Participant High Recall@25000**: 39.0% (wat4feed),  **Median Recall@25000**: 13.4%

**5 Deepest Sampled Relevant Documents**:  <u>vet80a00</u>-2564.3 (wat4feed-24583), <u>urp52d00</u>-2502.5 (wat4feed-23396), <u>vxr81a00</u>-2436.5 (fdwim7ss-22194), <u>rrx98e00</u>-2423.5 (catchup0701p-21963), <u>fgo02a00</u>-2354.2 (wat4feed-20777)

---

**Topic 58** (2007-A-7)

**Request Text**: Please produce any and all documents that discuss health problems caused by HPF, including, but not limited to immune disorders, toxic myopathy, chronic fatigue syndrome, liver dysfunctions, irregular heart-beat, reactive depression, and memory loss.

**Initial Proposal by Defendant**:  phosphat! AND ("immune disorder!" OR "toxic myopathy" OR "chronic fatigue

syndrome" OR "liver dysfunction!" OR "irregular heart-beat" OR "reactive depression" OR "memory loss") AND
(cause OR relate OR associate! OR derive! OR correlate!)

**Rejoinder by Plaintiff:** (HPF OR phosphat! OR phosphorus OR fertiliz!) AND (illness! OR health OR disorder! OR
toxic! OR "chronic fatigue" OR dysfunction! OR irregular OR memor! OR immun! OR myopath! OR liver! OR kidney!
OR heart! OR depress! OR loss OR lost))

**Final Negotiated Boolean Query:** Phosphat! w/75 (caus! OR relat! OR assoc! OR derive! OR correlat!) w/75
(health OR disorder! OR toxic! OR "chronic fatigue" OR dysfunction! OR irregular OR memor! OR immun! OR
myopath! OR liver! OR kidney! OR heart! OR depress! OR loss OR lost)

**Sampling:** 346836 pooled, 495 assessed, 41 judged relevant, 454 non-relevant, 0 gray, "C"=1.37, **Est. Rel.:** 1150.6

**Final Boolean Result Size (B):** 8183, **Est. Recall:** 94.0%, **Est. Precision:** 11.8%

**Participant High Recall@B:** 94.0% (wat7bool and 1 other), **Median Recall@B:** 7.0%

**Participant High Recall@25000:** 94.9% (otL07fb2x), **Median Recall@25000:** 9.4%

**5 Deepest Sampled Relevant Documents:** rnw20d00-571.8 (otL07fb-1204), mqo61a00-284.1 (wat6qap-471),
riy94d00-70.5 (wat8gram-101), bcx01d00-66.5 (wat8gram-95), zyd58c00-23.7 (wat4feed-33)

---

**Topic 59** (2007-A-8)

**Request Text:** Please produce any and all studies, reports, discussions or analyses of the limestone wastewater
treatment method that discusses this treatment's effectiveness in minimizing water contamination.

**Initial Proposal by Defendant:** (limestone OR quicklime) AND "wastewater treatment"

**Rejoinder by Plaintiff:** (Limestone OR quicklime) AND (wastewater OR waste! OR water! OR sewage OR sewer!
dispos! OR irrigate! OR well OR wells OR treat! OR purify! OR purification OR reduc! OR septic OR clean! OR
steril! OR minim!)

**Final Negotiated Boolean Query:** (Limestone OR quicklime) w/75 (wastewater OR waste! OR water! OR sewage OR
sewer! OR dispos! OR irrigate! OR well OR wells) w/75 (treat! OR purify! OR purification OR reduc! OR septic
OR clean! OR steril! OR minim!)

**Sampling:** 329585 pooled, 499 assessed, 15 judged relevant, 482 non-relevant, 2 gray, "C"=1.09, **Est. Rel.:** 111.8

**Final Boolean Result Size (B):** 240, **Est. Recall:** 0.9%, **Est. Precision:** 0.8%

**Participant High Recall@B:** 60.8% (UMKC4), **Median Recall@B:** 7.2%

**Participant High Recall@25000:** 100.0% (CMUL07ibp and 12 others), **Median Recall@25000:** 63.7%

**5 Deepest Sampled Relevant Documents:** yuz34f00-38.1 (UMKC4-202), uql43d00-29.6 (CMUL07ibp-84), aqo33d00-
13.3 (CMUL07std-20), bti91f00-11.2 (CMUL07o1-16), eex53e00-9.6 (SabL07ar1-13)

---

**Topic 60** (2007-A-9)

**Request Text:** Please produce any and all documents that discuss phosphate precipitation as a method of water
purification.

**Initial Proposal by Defendant:** (phosphate w/3 precipitation) AND (water w/3 purification)

**Rejoinder by Plaintiff:** phosphat! AND (precip! OR septic OR method!) AND purif!

**Final Negotiated Boolean Query:** (phosphat! w/75 (precip! OR septic OR method!)) AND ((water! OR waste!) w/75
purif!)

**Sampling:** 279129 pooled, 700 assessed, 10 judged relevant, 669 non-relevant, 21 gray, "C"=2.49, **Est. Rel.:** 83.2

**Final Boolean Result Size (B):** 1496, **Est. Recall:** 7.2%, **Est. Precision:** 0.5%

**Participant High Recall@B:** 71.8% (UMass11 and 1 other), **Median Recall@B:** 7.6%

**Participant High Recall@25000:** 100.0% (CMUL07ibp and 16 others), **Median Recall@25000:** 90.6%

**5 Deepest Sampled Relevant Documents:** ake51c00-53.7 (UMass10-163), tcg42d00-18.1 (ursinus3-48), rbc63d00-4.4
(ursinus1-11), oma59c00-1.0 (UMass13-3), bmc65c00-1.0 (otL07fbe-3)

---

**Topic 61** (2007-A-10)

**Request Text:** Please produce any and all waste treatment schedules that discuss phosphate concentrations in water.

**Initial Proposal by Defendant:** ("waste treatment" w/3 schedule!) AND (phosphate w/5 water)

**Rejoinder by Plaintiff:** schedul! AND (phosphat! OR phosphor!) AND (water OR waste! OR runoff OR irrigat! OR
drain! OR sewage OR sewer OR liquid!)

**Final Negotiated Boolean Query:** Treat! w/150 schedul! w/150 (phosphat! OR phosphor!) w/150 (water OR waste!
OR runoff OR irrigat! OR drain! OR sewage OR sewer OR liquid!)

**Sampling:** 252532 pooled, 507 assessed, 64 judged relevant, 440 non-relevant, 3 gray, "C"=1.11, **Est. Rel.:** 372.1

**Final Boolean Result Size (B):** 296, **Est. Recall:** 43.9%, **Est. Precision:** 50.1%

**Participant High Recall@B:** 57.0% (otL07frw), **Median Recall@B:** 8.0%

**Participant High Recall@25000:** 98.9% (otL07fv), **Median Recall@25000:** 78.7%

**5 Deepest Sampled Relevant Documents:** bzz83e00-37.8 (wat6qap-116), una63e00-34.4 (otL07fb2x-91), nwe73e00-
34.1 (otL07fb2x-89), txe73e00-29.4 (wat3desc-65), hpo02a00-27.0 (fdwim7sl-55)

---

**Topic 62** (2007-A-11) *(This topic's assessments were completed too late for inclusion in the official set of 43 topics.)*

**Request Text:** Please produce any and all documents relating to any and all press releases concerning water contami-
nation related to irrigation.

**Initial Proposal by Defendant:** "press release!" AND "water contamination" AND irrigation

**Rejoinder by Plaintiff:** ("press release" OR "press releases" OR news! OR report! OR public! OR announce! OR
noti!) AND (contamina! OR toxic! OR pollut!) AND (irrigat! OR water)

**Final Negotiated Boolean Query:** ("press release" OR "press releases" OR news! OR report! OR public! OR

announce! OR noti!) w/150 water w/100 (contamina! OR toxic! OR pollut!) w/150 irrigat!

**Sampling:** 355008 pooled, 499 assessed, 25 judged relevant, 466 non-relevant, 8 gray, "C"=0.50,  **Est. Rel.:** 271.0

**Final Boolean Result Size (B):** 354,  **Est. Recall:** 1.1%,  **Est. Precision:** 1.9%

**Participant High Recall@B:** 47.5% (otL07fbe),  **Median Recall@B:** 1.1%

**Participant High Recall@25000:** 67.3% (otL07fbe),  **Median Recall@25000:** 30.3%

**5 Deepest Sampled Relevant Documents:** ahq25c00-64.0 (otL07fbe-334), aov39e00-59.6 (otL07fbe-189), bei86c00-57.8 (CMUL07o1-157), cul10a00-35.2 (UMKC6-35), ufm82c00-13.1 (CMUL07ibp-8)

---

## Topic 63 (2007-A-12)

**Request Text:** Please produce any and all documents that specifically discuss an exclusivity clause in a sugar contract.

**Initial Proposal by Defendant:** "sugar contract" AND "exclusivity clause"

**Rejoinder by Plaintiff:** Sugar AND (contract! OR agreement! OR deal! OR exclusiv!)

**Final Negotiated Boolean Query:** (Sugar w/20 (contract! OR agreement! OR deal!)) AND exclusiv!

**Sampling:** 341624 pooled, 506 assessed, 11 judged relevant, 479 non-relevant, 16 gray, "C"=0.79,  **Est. Rel.:** 18.6

**Final Boolean Result Size (B):** 294,  **Est. Recall:** 26.8%,  **Est. Precision:** 2.4%

**Participant High Recall@B:** 89.3% (UMass13),  **Median Recall@B:** 16.1%

**Participant High Recall@25000:** 100.0% (otL07fv and 7 others),  **Median Recall@25000:** 83.9%

**5 Deepest Sampled Relevant Documents:** hko97e00-8.6 (otL07pb-8), whv93d00-1.0 (wat1fuse-5), avt49c00-1.0 (otL07fv-4), gko97e00-1.0 (otL07pb-3), axb56e00-1.0 (UIowa07LegE1-3)

---

## Topic 64 (2007-A-13)

**Request Text:** Please produce any and all documents that specifically discuss any and all deceptive implied health claims related to sugar.

**Initial Proposal by Defendant:** deceptive AND (health w/5 claim!) w/75 sugar

**Rejoinder by Plaintiff:** (Decept! OR deceive OR false OR inaccurate OR mislead! OR misinform! OR misguid! OR untrue OR claim! OR state! OR declar! OR inform!) AND sugar

**Final Negotiated Boolean Query:** (Decept! OR deceive OR false OR inaccurate OR mislead! OR misinform! OR misguid! OR untrue) w/15 (claim! OR state OR statement! OR declare! OR inform!) w/75 sugar

**Sampling:** 335933 pooled, 594 assessed, 16 judged relevant, 558 non-relevant, 20 gray, "C"=1.64,  **Est. Rel.:** 159.1

**Final Boolean Result Size (B):** 131,  **Est. Recall:** 6.9%,  **Est. Precision:** 8.3%

**Participant High Recall@B:** 41.0% (wat4feed),  **Median Recall@B:** 0.6%

**Participant High Recall@25000:** 99.4% (wat1fuse),  **Median Recall@25000:** 3.8%

**5 Deepest Sampled Relevant Documents:** fzw07d00-79.8 (wat4feed-133), ubd22d00-18.2 (wat4feed-97), bbb63e00-14.1 (wat4feed-50), bhe58c00-13.1 (wat4feed-43), hvh77e00-11.9 (wat4feed-36)

---

## Topic 65 (2007-A-14)

**Request Text:** Please produce any and all documents that explicitly discuss candy packaging, the labeling of candy, or which provide examples of candy packages or wrappers.

**Initial Proposal by Defendant:** candy w/5 (packag! OR label! OR wrapper!)

**Rejoinder by Plaintiff:** Candy AND (pack! OR label! OR wrap! OR adverti! OR box OR ingredient! OR contain!)

**Final Negotiated Boolean Query:** Candy w/15 (pack! OR label! OR wrap! OR adverti! OR box OR ingredient! OR contain!)

**Sampling:** 338958 pooled, 500 assessed, 58 judged relevant, 425 non-relevant, 17 gray, "C"=1.04,  **Est. Rel.:** 609.7

**Final Boolean Result Size (B):** 8700,  **Est. Recall:** 67.2%,  **Est. Precision:** 7.8%

**Participant High Recall@B:** 97.0% (otL07rvl),  **Median Recall@B:** 65.7%

**Participant High Recall@25000:** 99.2% (wat1fuse),  **Median Recall@25000:** 68.8%

**5 Deepest Sampled Relevant Documents:** abh6aa00-159.8 (CMUL07ibp-183), aue3aa00-143.0 (SabL07ab1-162), czp15d00-75.4 (wat5nofeed-82), gtt92d00-41.3 (otL07fbe-44), rim00e00-35.8 (UMKC6-38)

---

## Topic 66 (2007-A-15)

**Request Text:** Please produce any and all documents concerning the formation of the U.S. Beet Sugar Association.

**Initial Proposal by Defendant:** ((U.S. OR US) w/3 "Beet Sugar Association") AND (impact OR policy OR policies OR legislation)

**Rejoinder by Plaintiff:** ("beet sugar" w/30 association!) AND (form OR formed OR start! OR create! OR founded OR began OR first OR initiat! OR initial OR begin! OR conceive!)

**Final Negotiated Boolean Query:** "beet sugar" AND association! AND (form OR formed OR start! OR create! OR founded OR began OR first OR initiat! OR initial OR begin! OR conceive!)

**Sampling:** 415787 pooled, 488 assessed, 25 judged relevant, 455 non-relevant, 8 gray, "C"=1.01,  **Est. Rel.:** 454.6

**Final Boolean Result Size (B):** 162,  **Est. Recall:** 9.0%,  **Est. Precision:** 27.1%

**Participant High Recall@B:** 9.0% (otL07fb2x and 1 other),  **Median Recall@B:** 1.8%

**Participant High Recall@25000:** 99.1% (UMass11),  **Median Recall@25000:** 6.7%

**5 Deepest Sampled Relevant Documents:** hls25e00-400.7 (UMass10-440), jgu96d00-21.4 (CMUL07ibt-64), ewn59e00-6.4 (wat6qap-8), ogi57d00-5.0 (wat7bool-6), apk48c00-1.0 (otL07pb-5)

---

## Topic 67 (2007-A-16)

**Request Text:** Please produce any and all documents that explicitly refer to "The Sugar Program," and/or discuss the

formation, contemplation or existence of a sugar cartel, or that discuss the sugar lobby in the context of Sugar Acts passed by Congress.

**Initial Proposal by Defendant:** "Sugar Program" AND "sugar cartel"

**Rejoinder by Plaintiff:** "Sugar Program" OR (Sugar AND (lobby! OR Congress OR "sugar acts" OR law! OR polic! OR legis! OR regulat! OR ordinance! OR control! OR cartel! OR combine OR syndicate OR trust OR conspir!))

**Final Negotiated Boolean Query:** "Sugar Program" OR ((sugar OR sucrose) AND (cartel OR combine)) OR ((Sugar OR sucrose) w/15 (lobby! OR Congress OR "sugar acts" OR law! OR polic! OR legis! OR regulat! OR ordinance! OR control!))

**Sampling:** 383624 pooled, 493 assessed, 75 judged relevant, 418 non-relevant, 0 gray, "C"=1.01,   **Est. Rel.:** 41189.6

**Final Boolean Result Size (B):** 13241,  **Est. Recall:** 1.4%,  **Est. Precision:** 5.7%

**Participant High Recall@B:** 13.0% (UMass12),  **Median Recall@B:** 3.8%

**Participant High Recall@25000:** 26.9% (ursinus8),  **Median Recall@25000:** 8.0%

**5 Deepest Sampled Relevant Documents:** <u>lgo18d00</u>-4085.5 (ursinus8-22561), <u>idj24d00</u>-3706.9 (UIowa07LegE3-14476), <u>gog85a00</u>-3670.2 (UMKC3-13938), <u>izo81d00</u>-3627.2 (SabL07ar2-13343), <u>clc07e00</u>-2190.5 (UIowa07LegE0-12801)

---

**Topic 69** (2007-B-1)

**Request Text:** All documents referring or relating to indoor smoke ventilation.

**Initial Proposal by Defendant:** "indoor smoke ventilation"

**Rejoinder by Plaintiff:** (indoor OR inside) AND ("smoke ventilation" OR filtration)

**Final Negotiated Boolean Query:** (indoor OR inside) w/25 ("smoke ventilation" OR filtration)

**Sampling:** 226267 pooled, 495 assessed, 280 judged relevant, 110 non-relevant, 105 gray, "C"=1.55,   **Est. Rel.:** 37457.5

**Final Boolean Result Size (B):** 5123,  **Est. Recall:** 8.3%,  **Est. Precision:** 96.9%

**Participant High Recall@B:** 13.7% (wat2nobool),  **Median Recall@B:** 11.5%

**Participant High Recall@25000:** 61.0% (UMKC3),  **Median Recall@25000:** 39.6%

**5 Deepest Sampled Relevant Documents:** <u>khk42d00</u>-3732.5 (catchup0701p-22822), <u>vyh91f00</u>-2931.7 (SabL07ar1-10985), <u>bfm91f00</u>-2212.0 (UMKC3-6149), <u>mjf08d00</u>-2122.2 (otL07fbe-5715), <u>art52c00</u>-2042.9 (CMUL07ibs-5354)

---

**Topic 70** (2007-B-2)

**Request Text:** All documents that make reference to the smell of baked goods, including but not limited to baked cookies.

**Initial Proposal by Defendant:** smell w/3 ("baked goods" OR "baked cookie!")

**Rejoinder by Plaintiff:** (smell OR aroma) AND baked OR pie! OR bread! OR cake OR food!

**Final Negotiated Boolean Query:** (smell OR aroma) w/15 ("baked good!" OR "baked cookie!" OR pie! OR bread! OR cake! OR foodstuff!)

**Sampling:** 352690 pooled, 499 assessed, 43 judged relevant, 452 non-relevant, 4 gray, "C"=1.26,   **Est. Rel.:** 19828.1

**Final Boolean Result Size (B):** 1381,  **Est. Recall:** 0.1%,  **Est. Precision:** 1.7%

**Participant High Recall@B:** 1.1% (UIowa07LegE2),  **Median Recall@B:** 0.1%

**Participant High Recall@25000:** 35.4% (ursinus4),  **Median Recall@25000:** 1.6%

**5 Deepest Sampled Relevant Documents:** <u>ajk32d00</u>-3551.3 (ursinus4-15444), <u>eth06c00</u>-2631.9 (UIowa07LegE1-7002), <u>bue80c00</u>-2388.1 (otL07fbe-5760), <u>fyl99d00</u>-2202.2 (UIowa07LegE1-4959), <u>eli23e00</u>-1957.4 (ursinus1-4053)

---

**Topic 71** (2007-B-3)

**Request Text:** All documents discussing the condition of bromhidrosis (a/k/a body odor).

**Initial Proposal by Defendant:** bromhidrosis

**Rejoinder by Plaintiff:** bromhidrosis OR ((body OR human OR person) AND odor!))

**Final Negotiated Boolean Query:** bromhidrosis OR ((body OR human OR person) w/3 odor!)

**Sampling:** 356441 pooled, 697 assessed, 308 judged relevant, 376 non-relevant, 13 gray, "C"=2.28,   **Est. Rel.:** 77466.9

**Final Boolean Result Size (B):** 4527,  **Est. Recall:** 4.3%,  **Est. Precision:** 69.5%

**Participant High Recall@B:** 5.8% (CMUL07ibt and 2 others),  **Median Recall@B:** 3.4%

**Participant High Recall@25000:** 23.1% (otL07pb),  **Median Recall@25000:** 11.2%

**5 Deepest Sampled Relevant Documents:** <u>myo01d00</u>-3186.1 (wat4feed-20024), <u>rsi55d00</u>-3112.8 (ursinus5-18803), <u>cqr42e00</u>-3084.7 (fdwim7xj-18361), <u>tfp94a00</u>-3049.7 (IowaSL07Ref-17826), <u>dns25e00</u>-2710.8 (UMKC5-13499)

---

**Topic 72** (2007-B-4)

**Request Text:** All documents referring to the scientific or chemical process(es) which result in onions have the effect of making persons cry.

**Initial Proposal by Defendant:** ("scientific process! OR "chemical process!") AND onion AND cry

**Rejoinder by Plaintiff:** ((scien! OR research! OR chemical) AND onion!) AND (cries OR cry! OR tear!)

**Final Negotiated Boolean Query:** ((scien! OR research! OR chemical) w/25 onion!) AND (cries OR cry! OR tear!)

**Sampling:** 400625 pooled, 499 assessed, 11 judged relevant, 477 non-relevant, 11 gray, "C"=0.60,   **Est. Rel.:** 97.7

**Final Boolean Result Size (B):** 119,  **Est. Recall:** 77.9%,  **Est. Precision:** 43.0%

**Participant High Recall@B:** 77.9% (otL07fb),  **Median Recall@B:** 3.1%

**Participant High Recall@25000:** 100.0% (UMKC5 and 6 others),  **Median Recall@25000:** 50.5%

**5 Deepest Sampled Relevant Documents:** tmj97c00-20.7 (otL07fb-94), <u>hes71f00</u>-20.6 (otL07fbe-91), brq10e00-18.8

(wat7bool-54), cmj97c00-12.6 (otL07frw-16), vlj97c00-12.2 (CMUL07ibp-15)

---

**Topic 73** (2007-B-5)

**Request Text**: Any advertisements or draft advertisements that target women seen in the kitchen or cooking.

**Initial Proposal by Defendant**: advertisement AND "target! women"

**Rejoinder by Plaintiff**:   (("ad campaign" OR advertis!) AND (woman OR women OR girl OR female) AND (kitchen OR cook!)

**Final Negotiated Boolean Query**:   (("ad campaign" OR advertis!) w/25 (woman OR women OR girl OR female)) AND (kitchen OR cook!)

**Sampling**: 370452 pooled, 498 assessed, 72 judged relevant, 426 non-relevant, 0 gray, "C"=0.74,  **Est. Rel.**: 31894.5

**Final Boolean Result Size (B)**: 4085,  **Est. Recall**: 4.9%,  **Est. Precision**: 41.5%

**Participant High Recall@B**: 8.7% (UMKC5),  **Median Recall@B**: 1.0%

**Participant High Recall@25000**: 51.6% (UMKC2),  **Median Recall@25000**: 4.9%

**5 Deepest Sampled Relevant Documents**: tdc58e00-4345.7 (UMKC2-24574), qyf46e00-4279.2 (UIowa07LegE5-21967), nth79d00-4259.8 (CMUL07irs-21294), myc81a00-4067.3 (UIowa07LegE5-16135), djv94c00-3504.2 (wat6qap-8668)

---

**Topic 74** (2007-B-6)

**Request Text**: All scientific studies expressly referencing health effects tied to indoor air quality.

**Initial Proposal by Defendant**: "health effect!" w/10 "air quality"

**Rejoinder by Plaintiff**: (scien! OR stud! OR research) AND ("air quality" OR health)

**Final Negotiated Boolean Query**: (scien! OR stud! OR research) AND ("air quality" w/15 health)

**Sampling**: 225883 pooled, 499 assessed, 299 judged relevant, 196 non-relevant, 4 gray, "C"=1.50,  **Est. Rel.**: 62406.2

**Final Boolean Result Size (B)**: 20516,  **Est. Recall**: 22.2%,  **Est. Precision**: 77.2%

**Participant High Recall@B**: 32.8% (wat3desc),  **Median Recall@B**: 24.3%

**Participant High Recall@25000**: 40.0% (UMKC4),  **Median Recall@25000**: 29.2%

**5 Deepest Sampled Relevant Documents**: vkm92d00-3123.0 (Dartmouth1-19609), gew24e00-3095.9 (SabL07ab1-18917), ljq87c00-3070.3 (otL07fbe-18296), mhf57d00-2942.7 (UIowa07LegE3-15606), bof25d00-2912.1 (otL07pb-15048)

---

**Topic 75** (2007-B-7)

**Request Text**: All documents that memorialize any statement or suggestion from an elected federal public official that further research is necessary to improve indoor environmental air quality.

**Initial Proposal by Defendant**:   "public official" AND research w/10 ("indoor air quality" OR "indoor environment! air quality")

**Rejoinder by Plaintiff**:   (("public official" OR senator OR representative OR congressman OR congresswoman OR president OR vice-president OR VP) AND ((research OR scienc! OR stud!) AND (indoor AND (environment! w/5 "air quality") AND (statement OR "public debate" OR suggestion OR remark!)

**Final Negotiated Boolean Query**:   ("public official" OR senator OR representative OR congressman OR congresswoman OR president OR vice-president OR VP) AND ((research OR scienc! OR stud!) w/25 indoor w/25 environment! w/5 "air quality") AND (statement OR "public debate" OR suggestion OR remark!)

**Sampling**: 263784 pooled, 499 assessed, 23 judged relevant, 469 non-relevant, 7 gray, "C"=0.91,  **Est. Rel.**: 228.1

**Final Boolean Result Size (B)**: 788,  **Est. Recall**: 13.5%,  **Est. Precision**: 5.3%

**Participant High Recall@B**: 45.6% (SabL07ab1 and 1 other),  **Median Recall@B**: 4.0%

**Participant High Recall@25000**: 100.0% (fdwim7ss and 11 others),  **Median Recall@25000**: 86.1%

**5 Deepest Sampled Relevant Documents**: bxc52c00-89.4 (UMKC4-188), zku96d00-60.8 (SabL07ab1-90), kiu34e00-30.2 (SabL07ab1-34), twh67c00-28.7 (otL07fb2x-32), iif12f00-1.0 (CMUL07o1-5)

---

**Topic 76** (2007-B-8)

**Request Text**: All documents that make reference to any public meeting or conference held in Washington, D.C. on the subject of indoor air quality.

**Initial Proposal by Defendant**: ("public meeting" OR conference) AND "Washington, D.C." "indoor air quality"

**Rejoinder by Plaintiff**: ((meeting OR conference OR event OR symposium) AND (Washington! OR "D.C." OR "District of Columbia") AND (indoor AND "air quality")

**Final Negotiated Boolean Query**: (meeting OR conference OR event OR symposium) AND (Washington! OR "D.C." OR "District of Columbia") AND (indoor w/5 "air quality")

**Sampling**: 195688 pooled, 1000 assessed, 254 judged relevant, 730 non-relevant, 16 gray, "C"=6.49,  **Est. Rel.**: 4408.9

**Final Boolean Result Size (B)**: 22518,  **Est. Recall**: 50.8%,  **Est. Precision**: 10.9%

**Participant High Recall@B**: 77.8% (CMUL07std),  **Median Recall@B**: 50.8%

**Participant High Recall@25000**: 78.4% (ursinus2),  **Median Recall@25000**: 52.1%

**5 Deepest Sampled Relevant Documents**: ijz83e00-415.2 (UIowa07LegE3-2968), qwf00a00-403.1 (UIowa07LegE1-2873), agq30c00-396.2 (UIowa07LegE3-2819), bwf69d00-345.7 (fdwim7ts-2430), jxp57d00-304.8 (SabL07ar1-2122)

---

**Topic 77** (2007-B-9)

**Request Text**: All documents that refer or relate to the effect of smoke on bystanders, excluding studies on cigarette smoking or tobacco smoke.

**Initial Proposal by Defendant:** (effect AND smoke) w/5 bystander BUT NOT (tobacco OR cigarette)
**Rejoinder by Plaintiff:** (smok! OR effect) AND (bystander! OR "third party" OR passive!)
**Final Negotiated Boolean Query:** (smok! AND bystander!) BUT NOT (tobacco OR cigarette)
**Sampling:** 345347 pooled, 499 assessed, 11 judged relevant, 477 non-relevant, 11 gray, "C"=0.83, **Est. Rel.:** 11233.8
**Final Boolean Result Size (B):** 154, **Est. Recall:** 0.0%, **Est. Precision:** 0.0%
**Participant High Recall@B:** 0.2% (wat4feed), **Median Recall@B:** 0.0%
**Participant High Recall@25000:** 53.1% (wat4feed), **Median Recall@25000:** 0.0%
**5 Deepest Sampled Relevant Documents:** <u>ivm59c00</u>-4116.8 (otL07rvl-19345), <u>zul52d00</u>-3883.9 (wat4feed-14441), <u>usn97c00</u>-1805.7 (wat4feed-2346), <u>gof44c00</u>-1153.1 (IowaSL0706-1244), <u>rrp87d00</u>-250.6 (wat4feed-219)

---

**Topic 78** (2007-B-10)
**Request Text:** All documents referencing patents on odors, excluding tobacco or cigarette related patents.
**Initial Proposal by Defendant:** (patent! w/15 odor!) BUT NOT (tobacco OR cigarette)
**Rejoinder by Plaintiff:** patent! AND odor!
**Final Negotiated Boolean Query:** (patent! AND odor!) BUT NOT (tobacco OR cigarette!)
**Sampling:** 288711 pooled, 499 assessed, 24 judged relevant, 440 non-relevant, 35 gray, "C"=1.30, **Est. Rel.:** 835.4
**Final Boolean Result Size (B):** 1611, **Est. Recall:** 25.3%, **Est. Precision:** 11.7%
**Participant High Recall@B:** 61.3% (otL07pb), **Median Recall@B:** 7.7%
**Participant High Recall@25000:** 99.9% (CMUL07ibt and 7 others), **Median Recall@25000:** 38.4%
**5 Deepest Sampled Relevant Documents:** <u>anc13c00</u>-232.2 (wat8gram-1081), <u>agu15d00</u>-191.2 (IowaSL0704-611), xph02a00-130.5 (UIowa07LegE2-285), <u>wau60c00</u>-52.2 (otL07fv-81), <u>gnb97c00</u>-45.0 (otL07pb-68)

---

**Topic 79** (2007-C-1)
**Request Text:** All documents making a connection between the music and songs of Peter, Paul, and Mary, Joan Baez, or Bob Dylan, and the sale of cigarettes.
**Initial Proposal by Defendant:** (music OR songs) AND (((peter w/2 paul AND (paul w/2 mary)) OR "bob Dylan" OR "joan baez") AND sale
**Rejoinder by Plaintiff:** ((peter AND paul AND mary) OR dylan OR baez) AND (sale! OR sell! OR advertis! OR promot! OR market!)
**Final Negotiated Boolean Query:** (((peter w/3 paul) AND (paul w/3 mary)) OR (simon w/3 garfunkel) OR "Bob Dylan" OR "Joan Baez") AND (sale! OR sell! OR advertis! OR promot! OR market!)
**Sampling:** 409225 pooled, 491 assessed, 35 judged relevant, 448 non-relevant, 8 gray, "C"=1.03, **Est. Rel.:** 1486.6
**Final Boolean Result Size (B):** 317, **Est. Recall:** 6.5%, **Est. Precision:** 50.2%
**Participant High Recall@25000:** 9.5% (otL07frw), **Median Recall@B:** 3.3%
**Participant High Recall@25000:** 100.0% (otL07fbe), **Median Recall@25000:** 10.9%
**5 Deepest Sampled Relevant Documents:** <u>thr11a00</u>-766.2 (otL07fbe-932), <u>ecp25d00</u>-478.5 (IowaSL0706-545), <u>bea05d00</u>-51.9 (otL07fbe-294), <u>goq26e00</u>-48.3 (SabL07arbn-208), dhv36c00-28.4 (fdwim7xj-53)

---

**Topic 80** (2007-C-2)
**Request Text:** All documents making a connection between folk songs and music and the sale of cigarettes.
**Initial Proposal by Defendant:** "folk songs" AND (sale! OR sell! OR promot! OR advertis! OR market!)
**Rejoinder by Plaintiff:** folk AND (sale OR sell! OR promot! OR advertis! OR market!)
**Final Negotiated Boolean Query:** ("folk songs" OR "folk music" OR "folk artists") AND (sale! OR sell! OR promot! OR advertis! OR market!)
**Sampling:** 364619 pooled, 999 assessed, 391 judged relevant, 602 non-relevant, 6 gray, "C"=4.40, **Est. Rel.:** 38649.9
**Final Boolean Result Size (B):** 331, **Est. Recall:** 0.6%, **Est. Precision:** 81.9%
**Participant High Recall@B:** 0.8% (otL07rvl and 1 other), **Median Recall@B:** 0.6%
**Participant High Recall@25000:** 39.9% (otL07rvl and 1 other), **Median Recall@25000:** 15.8%
**5 Deepest Sampled Relevant Documents:** <u>vxf58c00</u>-2519.3 (UIowa07LegE0-22342), <u>oxb28d00</u>-2496.5 (ursinus5-21938), <u>cwq61c00</u>-2392.0 (IowaSL0702-20178), <u>iyb70f00</u>-2362.3 (UMKC6-19703), <u>bcm43f00</u>-2074.0 (wat4feed-15594)

---

**Topic 82** (2007-C-4)
**Request Text:** All documents discussing the color of the paper used to make cigarettes in connection with increasing sales.
**Initial Proposal by Defendant:** (color! w/2 paper) AND (increas! w/3 sales)
**Rejoinder by Plaintiff:** (color! OR shade! OR pastel! OR tint!) AND paper AND (sale! OR sell!)
**Final Negotiated Boolean Query:** ((color! OR shade! OR pastel! OR tint!) w/5 paper) AND (increas! w/15 (sale! OR sell!))
**Sampling:** 418281 pooled, 491 assessed, 176 judged relevant, 310 non-relevant, 5 gray, "C"=0.34, **Est. Rel.:** 75558.9
**Final Boolean Result Size (B):** 888, **Est. Recall:** 0.8%, **Est. Precision:** 61.2%
**Participant High Recall@B:** 1.1% (otL07pb), **Median Recall@B:** 0.4%
**Participant High Recall@25000:** 33.1% (otL07fbe), **Median Recall@25000:** 4.7%
**5 Deepest Sampled Relevant Documents:** <u>nlq90a00</u>-4664.5 (UMass10-23634), <u>bim31f00</u>-4627.1 (otL07fbe-21093), <u>qwf74f00</u>-4596.9 (otL07fbe-19384), <u>dmv71d00</u>-4396.0 (CMUL07irs-12373), <u>hko20f00</u>-4366.2 (otL07fbe-11712)

**Topic 83** (2007-C-5)

**Request Text**: All documents discussing using psychedelic colors to increase sales of cigarettes.

**Initial Proposal by Defendant**: "psychedelic color!" AND (increas! w/3 sales)

**Rejoinder by Plaintiff**: psyched∗lic AND (sale! OR sell! OR promot! OR advertis! OR market

**Final Negotiated Boolean Query**: psyched∗lic AND color! AND (sale! OR sell! OR promot! OR advertis! OR market!)

**Sampling**: 385402 pooled, 496 assessed, 44 judged relevant, 452 non-relevant, 0 gray, "C"=0.52, **Est. Rel.**: 13987.5

**Final Boolean Result Size (B)**: 281, **Est. Recall**: 0.8%, **Est. Precision**: 32.1%

**Participant High Recall@B**: 1.2% (otL07frw), **Median Recall@B**: 0.4%

**Participant High Recall@25000**: 33.3% (wat4feed), **Median Recall@25000**: 1.6%

**5 Deepest Sampled Relevant Documents**: <u>bco01e00</u>-4467.9 (wat4feed-21831), aqm49d00-4228.5 (UMass10-14250), <u>xfk10d00</u>-3935.5 (fdwim7sl-9612), <u>ait55f00</u>-967.7 (ursinus4-624), <u>ect68c00</u>-45.9 (SabL07ab1-131)

---

**Topic 84** (2007-C-6)

**Request Text**: All documents referencing "Bonnie and Clyde" or a James Bond film or the films of Stanley Kubrick in connection with sales of cigarettes.

**Initial Proposal by Defendant**: (Bonnie w/2 Clyde) OR "James Bond film" OR "Stanley Kubrick"

**Rejoinder by Plaintiff**: ((Bonnie w/3 Clyde) OR ("James Bond" OR "Agent 007" OR Goldfinger OR "Dr. No" OR "Dr No" OR "From Russia With Love" OR Thunderball OR "Sean Connery" OR "Roger Moore") OR ("Stanley Kubrick" OR (Kubrick w/3 (movie! OR film)) OR "2001: A Space Odyssey" OR HAL OR Lolita OR "James Mason" OR "Dr Strangelove" OR "Dr. Strangelove" OR "Peter Sellers")) AND (sale! OR sell! OR promot! OR advertis! OR market!)

**Final Negotiated Boolean Query**: ((Bonnie w/3 Clyde) OR ("James Bond" OR "Agent 007" OR Goldfinger OR "Dr No" OR "Dr. No" OR "From Russia With Love" OR Thunderball) OR ("Stanley Kubrick" OR (Kubrick w/3 (movie! OR film)) OR "2001: A Space Odyssey" OR Lolita OR "Dr Strangelove" OR "Dr. Strangelove")) AND (sale! OR sell! OR promot! OR advertis! OR market!)

**Sampling**: 476252 pooled, 498 assessed, 63 judged relevant, 431 non-relevant, 4 gray, "C"=0.73, **Est. Rel.**: 450.1

**Final Boolean Result Size (B)**: 2493, **Est. Recall**: 100.0%, **Est. Precision**: 18.6%

**Participant High Recall@B**: 100.0% (CMUL07ibp and 3 others), **Median Recall@B**: 38.3%

**Participant High Recall@25000**: 100.0% (CMUL07ibp and 7 others), **Median Recall@25000**: 85.7%

**5 Deepest Sampled Relevant Documents**: mrj70e00-137.8 (CMUL07ibs-139), qcm09c00-71.6 (otL07fb-61), gqd62d00-41.4 (wat5nofeed-33), mel03f00-41.4 (ursinus7-33), gsd19d00-29.6 (otL07db-23)

---

**Topic 85** (2007-C-7)

**Request Text**: All documents discussing or referencing generally accepted accounting principles in connection with the decision to record as sales products shipped to distributors on a sale-or-return basis, and the implementation thereof.

**Initial Proposal by Defendant**: ("gaap" OR "generally accepted accounting principle!") AND (revenue! OR records OR recording OR account!)) AND (sale w/5 return)

**Rejoinder by Plaintiff**: ("gaap" OR "generally accepted accounting principle!" OR "fasb" OR "financial accounting standards board" OR "sab" OR "Staff accounting bulletin" OR "sas" OR (statement w/2 "auditing standards")) AND ((sale! OR allowance OR reserve! OR right! OR entitle! OR could) w/5 return!)

**Final Negotiated Boolean Query**: ("gaap" OR "generally accepted accounting principle!" OR "fasb" OR "financial accounting standards board" OR "sab" OR "Staff accounting bulletin" OR "sas" OR (statement w/2 "auditing standards")) AND (revenue! OR recording OR records OR account!) AND ((right! OR entitle! OR could) w/5 return!)

**Sampling**: 361317 pooled, 497 assessed, 96 judged relevant, 392 non-relevant, 9 gray, "C"=0.80, **Est. Rel.**: 3890.7

**Final Boolean Result Size (B)**: 1305, **Est. Recall**: 13.8%, **Est. Precision**: 44.3%

**Participant High Recall@B**: 31.6% (IowaSL0705 and 1 other), **Median Recall@B**: 9.8%

**Participant High Recall@25000**: 77.5% (ursinus7), **Median Recall@25000**: 42.8%

**5 Deepest Sampled Relevant Documents**: <u>lma14c00</u>-221.5 (otL07fbe-1170), <u>yip12d00</u>-214.3 (ursinus3-957), <u>ynz51d00</u>-206.1 (SabL07ar1-783), yde76d00-203.7 (otL07fb-742), <u>xsh35f00</u>-201.7 (UIowa07LegE2-710)

---

**Topic 86** (2007-C-8)

**Request Text**: All documents discussing or referencing both generally accepted accounting principles and the defendants' decision to restate its financial results.

**Initial Proposal by Defendant**: restate AND ("gaap" OR "generally accepted accounting principle!" OR "financial accounting standards board" OR "staff accounting bulletin" OR (statement w/2 "auditing standards")) AND (revenue! OR records OR recording)

**Rejoinder by Plaintiff**: (restate! OR revise!) AND (gaap OR "generally accepted accounting principle!" OR fasb OR financial OR sab OR accounting OR sas OR auditing

**Final Negotiated Boolean Query**: (restate! OR revise!) AND ("gaap" OR "generally accepted accounting principle!" OR "fasb" OR "financial accounting standards board" OR "sab" OR "staff accounting bulletin" OR "sas" OR (statement w/2 "auditing standards")) AND (revenue! OR records OR recording)

**Sampling**: 370179 pooled, 499 assessed, 21 judged relevant, 465 non-relevant, 13 gray, "C"=1.21, **Est. Rel.**: 8830.1

**Final Boolean Result Size (B)**: 6446, **Est. Recall**: 4.8%, **Est. Precision**: 8.2%

**Participant High Recall@B**: 24.2% (UIowa07LegE0), **Median Recall@B**: 4.8%

**Participant High Recall@25000**: 51.2% (IowaSL07Ref), **Median Recall@25000**: 6.9%

**5 Deepest Sampled Relevant Documents**: gnl85a00-3408.1 (otL07fbe-12953), vgm85c00-981.3 (wat4feed-4971), ohk68c00-830.7 (wat3desc-2826), jbm58c00-755.8 (UIowa07LegE0-2210), rsc58c00-607.5 (catchup0701p-1390)

---

**Topic 87** (2007-C-9)

**Request Text**: All documents discussing Securities and Exchange Commission 10b-5 reports or reporting requirements.

**Initial Proposal by Defendant**: "10b-5 Report!" AND (Securities w/3 "exchange commission")

**Rejoinder by Plaintiff**: 10! AND (SEC OR (Securities w/3 "Exchange Commission"))

**Final Negotiated Boolean Query**: 10b-5 AND (SEC OR (securities w/3 "exchange commission"))

**Sampling**: 351913 pooled, 496 assessed, 41 judged relevant, 444 non-relevant, 11 gray, "C"=1.36, **Est. Rel.**: 875.3

**Final Boolean Result Size (B)**: 138, **Est. Recall**: 3.8%, **Est. Precision**: 40.1%

**Participant High Recall@B**: 6.5% (UMKC5 and 1 other), **Median Recall@B**: 1.8%

**Participant High Recall@25000**: 100.0% (UMKC2 and 6 others), **Median Recall@25000**: 11.0%

**5 Deepest Sampled Relevant Documents**: bgb65a00-758.0 (UMKC5-1215), hse51c00-21.5 (UMass12-132), ckq92f00-18.0 (fdwim7ts-70), xbn93c00-13.1 (UMKC1-34), cqp92e00-7.5 (wat8gram-14)

---

**Topic 89** (2007-D-1)

**Request Text**: Submit all documents listing monthly and/or annual sales for companies in the property and casualty insurance business in the United States between 1980 and the present.

**Initial Proposal by Defendant**: (("monthly sales" OR "annual sales") AND ("property insurance" OR "casualty insurance")) AND (United States OR U.S.) AND (198* OR 199*)

**Rejoinder by Plaintiff**: (month! OR annual!) AND (sales OR sell! OR revenue) AND insurance AND (198* OR 199*)

**Final Negotiated Boolean Query**: (((month! OR annual!) w/15 (sales OR sell! OR revenue)) AND ((property OR casualty) AND insurance)) BUT NOT (England OR "Great Britain" OR U.K. OR UK)

**Sampling**: 345011 pooled, 496 assessed, 78 judged relevant, 392 non-relevant, 26 gray, "C"=1.16, **Est. Rel.**: 6083.6

**Final Boolean Result Size (B)**: 3636, **Est. Recall**: 9.9%, **Est. Precision**: 16.8%

**Participant High Recall@B**: 21.0% (wat3desc), **Median Recall@B**: 8.9%

**Participant High Recall@25000**: 91.9% (otL07fbe), **Median Recall@25000**: 17.1%

**5 Deepest Sampled Relevant Documents**: mwv44d00-3850.5 (otL07fbe-19428), qxd35a00-561.1 (SabL07ab1-2850), qhc48c00-495.2 (IowaSL0707-1800), jyl13d00-259.1 (otL07fbe-467), ltq35f00-203.1 (SabL07ab1-327)

---

**Topic 90** (2007-D-2)

**Request Text**: Submit all documents listing monthly and/or annual sales for companies in the property and casualty insurance business in England for all available years.

**Initial Proposal by Defendant**: (("monthly sales" OR "annual sales") AND ("property insurance" OR "casualty insurance")) AND England

**Rejoinder by Plaintiff**: (month! OR annual!) AND (sales OR sell! OR revenue) AND Insurance AND (England OR Brit! OR U.K. OR UK)

**Final Negotiated Boolean Query**: (((month! OR annual!) w/15 sales) AND ((property OR casualty) AND insurance)) AND (England OR "Great Britain" OR U.K. OR UK)

**Sampling**: 330155 pooled, 492 assessed, 34 judged relevant, 458 non-relevant, 0 gray, "C"=1.30, **Est. Rel.**: 1066.1

**Final Boolean Result Size (B)**: 2665, **Est. Recall**: 10.3%, **Est. Precision**: 9.0%

**Participant High Recall@25000**: 63.9% (otL07fbe), **Median Recall@B**: 14.6%

**Participant High Recall@25000**: 99.3% (otL07fbe), **Median Recall@25000**: 33.7%

**5 Deepest Sampled Relevant Documents**: fds95c00-393.5 (otL07fbe-1954), umo55a00-159.9 (CMUL07irt-297), wyu71f00-153.4 (wat4feed-280), cmr03f00-91.2 (otL07pb-143), hre33f00-85.8 (otL07fbe-133)

---

**Topic 92** (2007-D-4)

**Request Text**: Submit all documents relating to competition or market share in the property and casualty insurance industry, including, but not limited to, market studies, forecasts and surveys.

**Initial Proposal by Defendant**: ("market stud!" OR forecast! OR survey!) AND "market share" AND ("property insurance" OR "casualty insurance")

**Rejoinder by Plaintiff**: (competition OR market OR share) AND insurance

**Final Negotiated Boolean Query**: ("market stud!" OR forecast! OR survey!) AND (competition OR share) AND (property OR casualty) AND insurance

**Sampling**: 313137 pooled, 498 assessed, 117 judged relevant, 369 non-relevant, 12 gray, "C"=1.63, **Est. Rel.**: 18070.2

**Final Boolean Result Size (B)**: 9401, **Est. Recall**: 12.8%, **Est. Precision**: 21.0%

**Participant High Recall@B**: 18.6% (ursinus6), **Median Recall@B**: 8.6%

**Participant High Recall@25000**: 36.0% (UMass15), **Median Recall@25000**: 13.5%

**5 Deepest Sampled Relevant Documents**: ahe53c00-3532.2 (UMass13-19613), ggr75d00-3162.8 (wat8gram-14031), pkr48d00-2733.5 (CMUL07irt-9829), cxu05d00-1413.5 (SabL07ab1-9283), ams51d00-1309.8 (ursinus6-7038)

---

**Topic 94** (2007-D-6)

**Request Text**: Submit all documents relating to insurance price lists, pricing plans, pricing policies, pricing forecasts, pricing strategies, pricing analyses, and pricing decisions.

**Initial Proposal by Defendant**: ("price lists" OR "pricing plans" OR "pricing policies" OR "pricing forecasts" OR "pricing strategies" OR "pricing analyses" OR "pricing decisions") AND ("property insurance" OR "casualty

insurance")

**Rejoinder by Plaintiff:** ((price OR pricing) AND (list! OR plan! OR polic! OR Forecast! OR strateg! OR decision!)) AND insurance

**Final Negotiated Boolean Query:** ((price OR pricing) w/15 (list! OR plan! OR polic! OR forecast! OR strateg! OR analys! OR decision!)) AND insurance

**Sampling:** 279484 pooled, 500 assessed, 104 judged relevant, 391 non-relevant, 5 gray, "C"=1.36, **Est. Rel.:** 40068.5

**Final Boolean Result Size (B):** 12080, **Est. Recall:** 6.7%, **Est. Precision:** 23.7%

**Participant High Recall@B:** 21.4% (CMUL07irs), **Median Recall@B:** 4.5%

**Participant High Recall@25000:** 45.5% (CMUL07irs), **Median Recall@25000:** 7.5%

**5 Deepest Sampled Relevant Documents:** <u>nhw23f00</u>-3901.8 (UMKC3-24159), <u>fek48d00</u>-3813.1 (CMUL07irs-21845), <u>bsv84a00</u>-3521.7 (wat6qap-16200), <u>clg85a00</u>-3281.1 (wat6qap-12980), <u>ayy84a00</u>-1831.4 (UIowa07LegE2-10294)

---

**Topic 95 (2007-D-7)**

**Request Text:** Submit all documents discussing or relating to the historical, current, or future financial impact of tobacco usage on the property and casualty insurance industry.

**Initial Proposal by Defendant:** ("historical" OR "current" OR "future") AND "financial impact" AND usage AND ("property insurance" OR "casualty insurance")

**Rejoinder by Plaintiff:** (financial OR (increas! w/3 cost!) OR (smoking w/5 (illness OR sick! OR death!)) AND insurance

**Final Negotiated Boolean Query:** ("financial impact" OR (increas! w/3 cost!) OR ("smoking-related" w/5 (illness OR sick! OR death!)) AND insurance

**Sampling:** 315430 pooled, 499 assessed, 120 judged relevant, 379 non-relevant, 0 gray, "C"=1.53, **Est. Rel.:** 34111.6

**Final Boolean Result Size (B):** 16324, **Est. Recall:** 18.5%, **Est. Precision:** 33.5%

**Participant High Recall@B:** 27.1% (CMUL07ibt), **Median Recall@B:** 8.7%

**Participant High Recall@25000:** 36.6% (CMUL07ibt), **Median Recall@25000:** 12.9%

**5 Deepest Sampled Relevant Documents:** <u>qns51a00</u>-3690.8 (otL07fbe-21566), <u>qyn44a00</u>-3435.7 (CMUL07irs-16802), <u>pem65a00</u>-2424.3 (UMKC1-14407), <u>yns76d00</u>-2418.1 (CMUL07ibp-14266), <u>yxb15a00</u>-2363.2 (UMass10-13092)

---

**Topic 96 (2007-D-8)**

**Request Text:** Submit all documents that discuss entry conditions into the property and casualty insurance industry.

**Initial Proposal by Defendant:** "entry condition!" AND ("property insurance" OR "casualty insurance"

**Rejoinder by Plaintiff:** (entry AND (barrier! OR condition!)) AND ((property OR casualty) w/10 insurance)

**Final Negotiated Boolean Query:** (entry w/10 (barrier! OR condition!)) AND ((property OR casualty) w/10 insurance)

**Sampling:** 279511 pooled, 499 assessed, 140 judged relevant, 349 non-relevant, 10 gray, "C"=1.62, **Est. Rel.:** 43945.8

**Final Boolean Result Size (B):** 103, **Est. Recall:** 0.1%, **Est. Precision:** 38.3%

**Participant High Recall@B:** 0.2% (IowaSL0706), **Median Recall@B:** 0.1%

**Participant High Recall@25000:** 39.4% (UMKC1), **Median Recall@25000:** 14.7%

**5 Deepest Sampled Relevant Documents:** <u>bts05f00</u>-3598.7 (UMKC1-20802), <u>ypn31e00</u>-3594.6 (otL07fbe-20717), <u>wgp97d00</u>-3427.9 (UMKC5-17662), <u>gyd20e00</u>-3425.8 (UIowa07LegE5-17627), <u>wpc45c00</u>-3297.4 (UIowa07LegE3-15687)

---

**Topic 97 (2007-D-9)**

**Request Text:** Submit all documents that relate to any plans of, interest in, or efforts undertaken for any acquisition, divestiture, joint venture, alliance, or merger of any kind within or related to the property and casualty insurance industry.

**Initial Proposal by Defendant:** (plan OR interest OR effort) AND (acquisition OR divestiture OR "joint venture" OR alliance OR merger) AND ("property insurance" OR "casualty insurance")

**Rejoinder by Plaintiff:** (acquisition OR divestiture OR venture OR alliance OR merger) AND insurance

**Final Negotiated Boolean Query:** (acquisition OR divestiture OR "joint venture" OR alliance OR merger) AND ((property OR casualty) AND insurance)

**Sampling:** 256752 pooled, 499 assessed, 90 judged relevant, 404 non-relevant, 5 gray, "C"=2.36, **Est. Rel.:** 9032.0

**Final Boolean Result Size (B):** 13296, **Est. Recall:** 29.4%, **Est. Precision:** 18.1%

**Participant High Recall@B:** 33.0% (CMUL07ibs), **Median Recall@B:** 10.1%

**Participant High Recall@25000:** 71.7% (otL07pb), **Median Recall@25000:** 11.6%

**5 Deepest Sampled Relevant Documents:** <u>bib83c00</u>-2696.3 (otL07pb-13811), <u>cht55f00</u>-1758.8 (CMUL07ibs-12259), rnr35f00-1451.4 (ursinus4-7542), <u>czr93f00</u>-1100.7 (otL07pb-4432), <u>oht84f00</u>-779.0 (UIowa07LegE3-2600)

---

**Topic 98 (2007-D-10)**

**Request Text:** Submit all documents that describe the policies and procedures relating to the retention and destruction of documents (hard copy or electronic) for any company in the property and casualty insurance industry.

**Initial Proposal by Defendant:** record w/2 (schedule OR retention OR destruction) AND ("property insurance" OR "casualty insurance")

**Rejoinder by Plaintiff:** (schedule OR retention OR destr!) AND insurance

**Final Negotiated Boolean Query:** (record w/5 (schedule OR retention OR destr!)) AND ((property OR casualty) AND insurance)

**Sampling:** 256036 pooled, 499 assessed, 100 judged relevant, 385 non-relevant, 14 gray, "C"=1.33, **Est. Rel.:** 26640.9

**Final Boolean Result Size (B)**: 682, **Est. Recall**: 0.5%, **Est. Precision**: 19.2%
**Participant High Recall@B**: 2.3% (wat4feed), **Median Recall@B**: 0.4%
**Participant High Recall@25000**: 39.1% (fdwim7sl), **Median Recall@25000**: 15.4%
**5 Deepest Sampled Relevant Documents**: lbh20f00-3725.4 (otL07pb-19437), yav99c00-3613.9 (catchup0701p-17338), pvl48d00-3389.9 (ursinus3-14001), aql40f00-2878.1 (UIowa07LegE5-9020), qfb94a00-2747.0 (UMass12-8108)

---

**Topic 99** (2007-D-11)
**Request Text**: Submit all documents describing natural disasters leading to claims handled by the property and casualty insurance industry.
**Initial Proposal by Defendant**: "natural disaster" AND ("property insurance" OR "casualty insurance")
**Rejoinder by Plaintiff**: ("natural disaster!" OR devastation OR catastroph!) AND insurance
**Final Negotiated Boolean Query**: ("natural disaster!" OR earthquake! OR fire! OR flood!) AND ((property OR casualty) AND insurance)
**Sampling**: 286700 pooled, 498 assessed, 84 judged relevant, 414 non-relevant, 0 gray, "C"=2.36, **Est. Rel.**: 7484.0
**Final Boolean Result Size (B)**: 19716, **Est. Recall**: 20.6%, **Est. Precision**: 8.2%
**Participant High Recall@B**: 52.1% (CMUL07o3), **Median Recall@B**: 31.1%
**Participant High Recall@25000**: 55.0% (CMUL07o1), **Median Recall@25000**: 33.8%
**5 Deepest Sampled Relevant Documents**: pzl46e00-3320.6 (UIowa07LegE3-23332), fex21c00-1283.7 (fdwim7sl-4492), frz84a00-695.5 (otL07fbe-1993), oqc77e00-613.0 (UMKC5-1713), yhc77e00-440.1 (UMKC5-1169)

---

**Topic 100** (2007-D-12)
**Request Text**: Submit all documents representing or referencing a formal statement by a CEO of a tobacco company describing a company merger or acquisition policy or practice.
**Initial Proposal by Defendant**: "formal statement" AND (CEO OR C.E.O. OR "Chief Executive Officer") AND (merger OR acquisition)
**Rejoinder by Plaintiff**: (CEO OR C.E.O. OR chief OR head) AND (merger OR acquisition)
**Final Negotiated Boolean Query**: (CEO OR C.E.O. OR "Chief Executive Officer") AND (merger OR acquisition)
**Sampling**: 310268 pooled, 497 assessed, 93 judged relevant, 404 non-relevant, 0 gray, "C"=1.31, **Est. Rel.**: 8710.0
**Final Boolean Result Size (B)**: 11480, **Est. Recall**: 43.9%, **Est. Precision**: 31.6%
**Participant High Recall@B**: 45.0% (wat5nofeed), **Median Recall@B**: 19.7%
**Participant High Recall@25000**: 61.2% (wat1fuse), **Median Recall@25000**: 24.0%
**5 Deepest Sampled Relevant Documents**: qjh54d00-3378.7 (UIowa07LegE1-13650), bek21f00-719.2 (otL07pb-1372), hzl04e00-651.3 (ursinus4-1191), oqa08c00-528.8 (IowaSL0707-900), rrk60d00-518.3 (wat7bool-877)

---

**Topic 101** (2007-D-13)
**Request Text**: Submit all documents specifically referencing a lawsuit filed against a named property and casualty insurance company (as either sole or joint defendant).
**Initial Proposal by Defendant**: (lawsuit OR "complaint filed") AND ("property insurance" OR "casualty insurance")
**Rejoinder by Plaintiff**: (lawsuit OR complaint OR pleading) AND insurance
**Final Negotiated Boolean Query**: (lawsuit OR "complaint filed") AND ((property OR casualty)) AND insurance
**Sampling**: 204551 pooled, 1000 assessed, 184 judged relevant, 785 non-relevant, 31 gray, "C"=6.68, **Est. Rel.**: 8950.9
**Final Boolean Result Size (B)**: 6008, **Est. Recall**: 22.0%, **Est. Precision**: 27.4%
**Participant High Recall@B**: 30.8% (wat3gram), **Median Recall@B**: 10.0%
**Participant High Recall@25000**: 81.5% (wat3desc), **Median Recall@25000**: 25.3%
**5 Deepest Sampled Relevant Documents**: yhv39e00-1403.1 (wat4feed-13029), ihj31e00-492.2 (IowaSL0707-5569), rvl21f00-484.4 (wat3desc-5421), kon90d00-480.0 (wat8gram-5340), dsq44a00-478.4 (UMKC5-5310)

---

The 10 assessed Relevance Feedback topics are listed next. The summary information differs from that given earlier for the Ad Hoc topics as follows:

**Topic** : The 10 topics were selected from 2006, whose numbers ranged from 6 to 51. There were 5 complaints in 2006 (labelled A, B, C, D and E).

**Initial Proposal by Defendant and Final Negotiated Boolean Query** :

The "Rejoinder by Plaintiff" is not listed because it was usually the same as the Final Negotiated Boolean Query in 2006.

**Sampling and Est. Rel.** : The number of pooled documents includes not just the the residual output of the relevance feedback runs but also all of the documents submitted by the Interactive runs and the special oldrel07 and oldnon07 runs. The number presented to the assessor, the number the assessor judged relevant, the number the assessor judged non-relevant, and the number the assessor left as

"gray" are based on the full pool and hence includes rejudging of some documents judged in 2006 (particularly from the oldrel07 and oldnon07 runs). But the "Est. Rel." is just the estimated number of *residual* relevant documents in the pool for the topic (i.e., the number of relevant documents after those judged in 2006 are removed). Hence, unlike for the Ad Hoc topics, "Est. Rel." can be (and sometimes is) lower than "judged relevant".

**Final Boolean Result Size $B_r$, Est. Recall and Est. Precision** : "$B_r$" is the number of documents matching the final negotiated Boolean query after the documents judged in 2006 are removed; for 2 topics, $B_r$ exceeded 25,000. "Est. Recall" and "Est. Precision" are for the residual Boolean result set.

**Feedback High Recall@$B_r$ and Median Recall@$B_r$** : Only the 5 runs which used feedback (i.e., the runs which made use of the 2006 judgments) are considered for this listing.

**Feedback High Recall@25000 and Median Recall@25000** : Again, only the 5 runs which used feedback are considered for this listing.

**5 Deepest Sampled Relevant Documents** : Only residual relevant documents are listed. The ranks following the run identifiers are residual ranks. For Interactive runs, all documents were assigned rank 1.

---

**Topic 7** (2006-A-2)
**Request Text**: All documents discussing, referencing, or relating to company guidelines, strategies, or internal approval for placement of tobacco products in movies that are mentioned as G-rated.
**Initial Proposal by Defendant**: (guidelines OR strategies OR "internal approval") AND placement AND "G-rated movie"
**Final Negotiated Boolean Query**: ((guide! OR strateg! OR approv!) AND (place! or promot!)) AND (("G-rated" OR "G rated" OR family) W/5 (movie! OR film! OR picture!))
**Sampling**: 119645 pooled, 500 assessed, 170 judged relevant, 318 non-relevant, 12 gray, "C"=2.58, **Est. Rel.**: 1280.2
**Final Boolean Result Size ($B_r$)**: 425, **Est. Recall**: 0.9%, **Est. Precision**: 4.8%
**Feedback High Recall@$B_r$**: 16.7% (sab07legrf1), **Median Recall@$B_r$**: 10.3%
**Feedback High Recall@25000**: 95.0% (CMU07RFBSVME), **Median Recall@25000**: 88.4%
**5 Deepest Sampled Relevant Documents**: mak24d00-640.7 (CMU07RSVMNP-1896), lpd41a00-194.5 (CMU07RSVMNP-522), gvc91c00-55.7 (CMU07RFBSVME-416), czc42e00-50.0 (sab07legrf1-313), vwj35c00-44.2 (CMU07RFBSVME-238)

---

**Topic 8** (2006-A-3)
**Request Text**: All documents discussing, referencing or relating to company guidelines, strategies, or internal approval for placement of tobacco products in live theater productions.
**Initial Proposal by Defendant**: (guidelines OR strategies OR "internal approval") AND placement AND ("live theater" OR "live theatre")
**Final Negotiated Boolean Query**: ((guide! OR strateg! OR approv!) AND (place! or promot!) AND (live W/5 (theatre OR theater OR audience"))
**Sampling**: 119011 pooled, 244 assessed, 100 judged relevant, 143 non-relevant, 1 gray, "C"=2.12, **Est. Rel.**: 10983.9
**Final Boolean Result Size ($B_r$)**: 623, **Est. Recall**: 1.7%, **Est. Precision**: 37.1%
**Feedback High Recall@$B_r$**: 4.2% (sab07legrf3), **Median Recall@$B_r$**: 2.5%
**Feedback High Recall@25000**: 50.0% (sab07legrf3), **Median Recall@25000**: 17.4%
**5 Deepest Sampled Relevant Documents**: cyy57d00-1942.2 (sab07legrf3-6733), jwf04e00-1695.8 (sab07legrf2-5440), eif71c00-1166.4 (CMU07RSVMNP-3225), ahw04c00-1129.4 (sab07legrf3-3093), cqs81e00-1015.9 (CMU07RBase-2703)

---

**Topic 13** (2006-A-9)
**Request Text**: All documents to or from employees of a tobacco company or tobacco organization referring to the marketing, placement, or sale of chocolate candies in the form of cigarettes.
**Initial Proposal by Defendant**: (marketing OR placement OR sale) AND "chocolate cigarettes" AND candy
**Final Negotiated Boolean Query**: (cand! OR chocolate) w/10 cigarette!
**Sampling**: 123630 pooled, 250 assessed, 28 judged relevant, 212 non-relevant, 10 gray, "C"=3.01, **Est. Rel.**: 288.8
**Final Boolean Result Size ($B_r$)**: 20240, **Est. Recall**: 99.3%, **Est. Precision**: 1.4%
**Feedback High Recall@$B_r$**: 100.0% (CMU07RFBSVME and 1 other), **Median Recall@$B_r$**: 76.7%
**Feedback High Recall@25000**: 100.0% (CMU07RFBSVME and 1 other), **Median Recall@25000**: 76.7%
**5 Deepest Sampled Relevant Documents**: egg72c00-153.4 (CMU07RFBSVME-480), exg09c00-67.3 (CMU07RFBSVME-206), xej32e00-35.2 (otRF07fb-107), akq55a00-12.3 (sab07legrf3-37), oyz23a00-4.3 (CMU07RFBSVME-13)

---

**Topic 26** (2006-C-2)

**Request Text**: All documents discussing or referencing retail prices of tobacco products in the city of San Diego.

**Initial Proposal by Defendant**: "retail prices" AND tobacco AND California

**Final Negotiated Boolean Query**: ((retail OR net) w/2 pric!) AND ("San Diego" or ("S.D." w/3 Calif))

**Sampling**: 104952 pooled, 250 assessed, 95 judged relevant, 152 non-relevant, 3 gray, "C"=2.11, **Est. Rel.**: 15466.3

**Final Boolean Result Size ($B_r$)**: 2301, **Est. Recall**: 3.1%, **Est. Precision**: 20.9%

**Feedback High Recall@$B_r$**: 11.2% (sab07legrf3), **Median Recall@$B_r$**: 3.9%

**Feedback High Recall@25000**: 71.0% (sab07legrf3), **Median Recall@25000**: 47.6%

**5 Deepest Sampled Relevant Documents**: dkm65e00-2785.0 (sab07legrf2-13265), mqp25d00-2650.1 (sab07legrf3-11898), ubo68c00-1820.0 (CMU07RFBSVME-6038), gcd65e00-1670.5 (CMU07RBase-5293), lpk24d00-1055.2 (sab07legrf2-2822)

---

**Topic 27** (2006-C-3)

**Request Text**: All documents discussing or relating to the placement of product logos at events held in the State of California.

**Initial Proposal by Defendant**: "product placement" AND "logos" AND California

**Final Negotiated Boolean Query**: ("product placement" OR advertis! OR market! OR promot!) AND (logo! OR symbol OR mascot OR marque OR mark) AND (California OR cal. OR calif. OR "CA")

**Sampling**: 335971 pooled, 249 assessed, 120 judged relevant, 129 non-relevant, 0 gray, "C"=1.96, **Est. Rel.**: 23229.7

**Final Boolean Result Size ($B_r$)**: 127525, **Est. Recall**: 36.7%, **Est. Precision**: 6.9%

**Feedback High Recall@$B_r$**: 64.0% (sab07legrf2), **Median Recall@$B_r$**: 49.1%

**Feedback High Recall@25000**: 59.1% (CMU07RSVMNP), **Median Recall@25000**: 20.0%

**5 Deepest Sampled Relevant Documents**: ofg48e00-3543.2 (CMU07RSVMNP-23835), uzn25d00-3455.1 (CMU07RBase-21917), ber19c00-3292.7 (sab07legrf2-18900), urt66d00-3156.6 (CMU07RSVMNP-16781), dah15d00-2441.8 (CMU07RSVMNP-9354)

---

**Topic 30** (2006-C-6)

**Request Text**: All documents discussing or referencing the California Cartwright Act.

**Initial Proposal by Defendant**: "California Cartwright Act"

**Final Negotiated Boolean Query**: California w/3 (antitrust OR monopol! OR anticompetitive OR restraint OR "unfair competition" OR "Cartwright")

**Sampling**: 125617 pooled, 250 assessed, 24 judged relevant, 226 non-relevant, 0 gray, "C"=2.34, **Est. Rel.**: 7.0

**Final Boolean Result Size ($B_r$)**: 202, **Est. Recall**: 28.6%, **Est. Precision**: 1.8%

**Feedback High Recall@$B_r$**: 57.1% (CMU07RFBSVME and 1 other), **Median Recall@$B_r$**: 42.9%

**Feedback High Recall@25000**: 100.0% (CMU07RFBSVME and 2 others), **Median Recall@25000**: 100.0%

**5 Deepest Sampled Relevant Documents**: idc90e00-1.0 (sab07legrf1-5), zce78c00-1.0 (CMU07RSVMNP-5), phh71c00-1.0 (CMU07RSVMNP-3), dzk44c00-1.0 (CMU07RBase-3), pbx64d00-1.0 (CMU07RBase-1)

---

**Topic 34** (2006-D-1)

**Request Text**: All documents discussing or referencing payments to foreign government officials, including but not limited to expressly mentioning "bribery" and/or "payoffs."

**Initial Proposal by Defendant**: (bribery OR payoffs) AND payments AND "foreign government officials"

**Final Negotiated Boolean Query**: (payment! OR transfer! OR wire! OR fund! OR kickback! OR payola OR grease OR bribery OR payoff!) AND (foreign w/5 (official! OR ministr! OR delegat! OR representative!))

**Sampling**: 122598 pooled, 248 assessed, 105 judged relevant, 140 non-relevant, 3 gray, "C"=2.41, **Est. Rel.**: 20113.0

**Final Boolean Result Size ($B_r$)**: 2380, **Est. Recall**: 1.8%, **Est. Precision**: 16.5%

**Feedback High Recall@$B_r$**: 6.5% (CMU07RSVMNP), **Median Recall@$B_r$**: 2.0%

**Feedback High Recall@25000**: 54.7% (CMU07RSVMNP), **Median Recall@25000**: 16.3%

**5 Deepest Sampled Relevant Documents**: rut15e00-2950.9 (CMU07RSVMNP-17353), yph30a00-2910.5 (CMU07RBase-16784), oyf37c00-2719.0 (sab07legrf1-14364), uva40f00-2686.7 (sab07legrf3-13995), nnj14e00-2587.3 (CMU07RSVMNP-12922)

---

**Topic 37** (2006-D-4)

**Request Text**: All documents relating to defendants' tobacco advertising, marketing or promotion plans in China's capital.

**Initial Proposal by Defendant**: (advertising OR marketing OR "promotion plans") AND (China OR Beijing)

**Final Negotiated Boolean Query**: (advertis! OR market! OR promot! OR encourag! OR incentiv!) AND (China OR Beijing OR Peking)

**Sampling**: 149493 pooled, 250 assessed, 74 judged relevant, 175 non-relevant, 1 gray, "C"=2.85, **Est. Rel.**: 7086.3

**Final Boolean Result Size ($B_r$)**: 38723, **Est. Recall**: 59.0%, **Est. Precision**: 13.6%

**Feedback High Recall@$B_r$**: 50.6% (sab07legrf1), **Median Recall@$B_r$**: 49.2%

**Feedback High Recall@25000**: 50.6% (sab07legrf1), **Median Recall@25000**: 49.2%

**5 Deepest Sampled Relevant Documents**: rgd60a00-2384.7 (CMU07RSVMNP-12994), aer19e00-1178.8 (sab07legrf2-4396), jmy90d00-1100.0 (otRF07fb-4019), awk95c00-1018.2 (CMU07RBase-3644), ziv19e00-519.1 (sab07legrf1-1651)

---

**Topic 45** (2006-E-4)

**Request Text**: All documents that refer or relate to pigeon deaths during the course of animal studies.
**Initial Proposal by Defendant**: "animal studies" AND "pigeon deaths"
**Final Negotiated Boolean Query**:  (research OR stud! OR "in vivo") AND pigeon AND (death! OR dead OR die! OR dying)
**Sampling**: 112239 pooled, 498 assessed, 91 judged relevant, 400 non-relevant, 7 gray, "C" =4.97, **Est. Rel.**: 83.2
**Final Boolean Result Size ($B_r$)**: 2507,  **Est. Recall**: 70.0%,  **Est. Precision**: 2.4%
**Feedback High Recall@$B_r$**: 97.6% (sab07legrf2),  **Median Recall@$B_r$**: 94.5%
**Feedback High Recall@25000**: 100.0% (CMU07RSVMNP and 2 others),  **Median Recall@25000**: 100.0%
**5 Deepest Sampled Relevant Documents**:  qwl16d00-16.0 (CMU07RSVMNP-82), jbr10a00-15.4 (otRF07fb-79), ivw00a00-8.3 (CMU07RSVMNP-42), wzn20a00-7.9 (otRF07fb-40), phg81d00-3.6 (otRF07fb-18)

---

**Topic 51** (2006-E-10)
**Request Text**: All documents referencing or regarding lawsuits involving claims related to memory loss.
**Initial Proposal by Defendant**: (lawsuits OR "tort claims") AND "memory loss"
**Final Negotiated Boolean Query**:  ((memory w/2 loss) OR amnesia OR Alzheimer! OR dementia) AND (lawsuit! OR litig! OR case OR (tort w/2 claim!) OR complaint OR allegation!)
**Sampling**: 108434 pooled, 499 assessed, 83 judged relevant, 400 non-relevant, 16 gray, "C" =4.01, **Est. Rel.**: 65.7
**Final Boolean Result Size ($B_r$)**: 6927,  **Est. Recall**: 84.8%,  **Est. Precision**: 0.8%
**Feedback High Recall@$B_r$**: 84.8% (CMU07RFBSVME),  **Median Recall@$B_r$**: 23.9%
**Feedback High Recall@25000**: 84.8% (CMU07RFBSVME),  **Median Recall@25000**: 46.7%
**5 Deepest Sampled Relevant Documents**:  qcm10d00-7.7 (CMU07RBase-31), war78e00-1.0 (randomRF07-4), ptn85d00-1.0 (uw07T2-1), bee61e00-1.0 (uw07T2-1), sfw87e00-1.0 (liu07-1)

---

# 5   Workshop Discussion

There were several opportunities for interaction among the participants from the research and legal communities during the conference, culminating in the Thursday, November 8 workshop which discussed future plans for the track (which will continue for a 3rd year in 2008).

At the workshop, two smaller document sets were considered for 2008. One option was a collection of State Department cables from the 1970's, which would be a cleaner collection to work with (e.g., no OCR issues), but there were concerns about whether the legal community would accept results based on it. The other option was an Enron collection, which would feature email resembling modern e-discovery scenarios, but it was considered a difficult collection to work with (e.g., attachments in proprietary formats). It was decided to continue in 2008 with the same IIT CDIP collection as the past couple years, particularly since there were a lot of new participants in 2007 who would like the chance to fully focus on research issues in 2008 rather than deal with the details of using a new collection.

There were concerns raised at the workshop about the appropriateness of the Recall@B measure which was used as the primary measure in 2007; e.g., the real goal of discovery is to produce the set of relevant documents, not just to maximize success at a particular given size B. (We followup on the choice of measure in the next section.)

More focus on relevance feedback was suggested at the workshop, both to encourage more use of metadata (e.g., author, Bates number) and to enrich the relevance judgments for past topics to further improve their re-usability. Deeper and denser assessing was also suggested, even if it meant fewer new topics.

A proposal also discussed among track coordinators before and during the workshop concerned whether in future years the Legal Track should introduce and evaluate the concept of "highly relevant" documents, as a third category for purposes of assessment along with not relevant and relevant. The problem of isolating a true set of "hot" or "material" documents for use in later phases of discovery (e.g., depositions) and at trial, amongst a large universe of merely potentially tangentially relevant documents, remains a key concern for the legal profession. This issue will be explored further in Year 3 of the track.

We look forward to continuing the discussion in 2008!

## 5.1   Post-Workshop Analysis

After the conference, we analyzed the Ad Hoc runs from the perspective of trying to produce a set as close as possible to the desired set of R relevant documents. In particular, we looked at the F1 measure which

combines recall and precision into one measure (F1 = 2*Prec*Recall / (Prec+Recall)).

The reference Boolean run averaged an F1 of 0.14 over the 43 topics, whereas if we cutoff the Ad Hoc runs at their top-ranked R retrieved (where R is the estimated number of relevant documents, rounding up fractional estimated R values to the next integer) several Ad Hoc runs scored higher (to a high of 0.22 (otL07frw); the median was also 0.14). Hence, if the Ad Hoc runs can pick a good cutoff value, they apparently can produce a closer set to the optimal set of R documents than the reference Boolean run's set of B documents, taking both recall and precision into account.

This result suggests that we should enhance the Ad Hoc task in 2008 to require each system to additionally specify a cutoff value K for each topic. (Unfortunately, in 2007, we did not ask the Ad Hoc systems to specify a cutoff value before R was known.) A measure which balances recall and precision (such as F1) could then be used to evaluate whether automated approaches can produce a set of K documents closer to the optimal set of R relevant documents than the reference Boolean query result set (for which K=B). We would still ask the systems to submit their top-25,000 ranked documents (or whatever the agreed limit is in 2008) to enrich the pools and enable post hoc analysis of different choices of K.

# 6    Conclusion

In its second year, the TREC Legal Track made several advances. The Ad Hoc task developed a much deeper sampling approach to more accurately estimate recall and precision and evaluated a wider variety of automated search techniques thanks to a doubling in participation. A separate Interactive task was created for studying the effectiveness of "expert" searchers. A new Relevance Feedback task was created to study automated ways of making use of judgments from an initial sample. Baseline results for each task were established and several resources are now available to support further study going forward.

For the Ad Hoc task, 50 new topic statements, i.e., requests for documents with associated negotiated Boolean queries, were created. 12 research teams used a wide variety of (mostly automated) techniques to search the IIT CDIP collection (a complex collection of almost 7 million scanned documents) and submit a total of 68 result sets of 25,000 top-ranked documents for each topic. These submissions were pooled, producing a set of approximately 300,000 documents per topic. A new sampling scheme was used to select between 500 and 1000 documents from the pool for each topic. Volunteers from the legal community assessed 43 of the 50 result samples in time for reporting the results at the conference. Based on the samples, we can estimate that there were on average almost 17,000 relevant documents per topic, and that this number varied considerably by topic (from a low of 18 to a high of more than 77,000).

The deep sampling allows us to estimate the recall and precision of the final negotiated Boolean query more accurately than before. On average (over the 43 topics), the reference Boolean query found just 22% of the relevant documents that are estimated to exist. Its precision averaged 29%. Again, these numbers varied considerably by topic (the recall ranged from 0% to 100%, while the precision ranged from 0% to 97%). It is quite striking that, on average per topic, 78% of the relevant documents were only found by participant research techniques and not by the reference Boolean query.

Surprisingly, when recall was estimated at depth B, where B is the number of documents matched by the reference Boolean query, no system participating in the Ad Hoc task submitted results that improved over the reference Boolean run (on average), despite the systems' collective success at finding relevant documents missed by the Boolean query. However, post hoc analysis using the F1 measure (which balances recall and precision) found that the Ad Hoc systems potentially can produce a set of results closer to the optimal set of R relevant documents than the reference Boolean result set. Unfortunately, this latter possibility was not properly evaluated in 2007 because the systems were not asked to specify a cutoff value before R was known (where R is the estimated number of relevant documents). We should consider refining the methodology in 2008 to require each system to specify a cutoff value K for each topic for targeting a measure (such as F1) which balances the demand for recall with the cost of reviewing unresponsive documents.

A new Interactive task was created in 2007 to followup on an interesting result from 2006, which was that the sole expert searcher achieved a higher mean R-precision than any of the automated runs in 2006 (albeit based on the shallower sampling used in 2006, which underestimated R considerably). In 2007, 8



Figure 1: Estimated relevant documents found by the reference Boolean query (black) and found only by one or more ranked systems (white) for the 43 Ad Hoc topics.

teams from 3 sites took up the Interactive challenge. Some teams invested several hours per search topic, and most teams completed just 3 topics. It was found that there was substantial variation in the results of the participating teams, but most of them outscored the reference Boolean query in the task's utility measure for each of the 3 topics. This result is another encouraging one for expert searching, albeit one with many caveats. For instance, the participating teams in 2007 were limited to submitting 100 documents per topic (as was the sole expert searcher in 2006). We intend to remove this limit in 2008 so that the experts' ability to recall much larger numbers of relevant documents can be evaluated.

In the new Relevance Feedback task of 2007, 10 of the previous year's Ad Hoc topics were re-used. Participants were encouraged to use the previous year's document assessments as feedback to improve their results. 3 teams submitted a total of 8 runs, including 5 feedback runs. Residual evaluation was used, i.e., documents judged in the previous year were removed from the result sets before evaluating. The deep sampling approach of the Ad Hoc task was likewise applied to the Relevance Feedback task. An encouraging result from this pilot study was that the median of the 5 feedback runs found more relevant documents than the reference Boolean run by depth $B_r$ for 7 of the 10 topics (where $B_r$ is the number of documents matched by the reference Boolean query after removing documents judged the previous year), in contrast with the Ad Hoc task in which the median run outscored the reference Boolean run at depth B for just 8 of the 43 topics. We hope to run a larger study of Relevance Feedback (more test topics and more participants) in 2008.

The evaluation of e-discovery approaches remains a daunting challenge. The findings so far are very preliminary. Automated approaches can improve upon the recall of negotiated Boolean results, but typically at the expense of reviewing additional documents. Experts can improve upon automated approaches, but

they also vary a lot in performance. Feedback approaches are promising, but a larger study is needed. We are heartened that so many volunteers have contributed to the track's endeavours in 2006 and 2007 and look forward to working with everyone to make further advances in 2008.

# Acknowledgments

This track would not have been possible without the efforts of a great many people. Our heartfelt thanks go to Ian Soboroff for creating the relevance assessment system; to the dedicated group of pro bono relevance assessors and the pro bono coordinators at the participating law schools; to Conor Crowley (DOAR Consulting), Joe Looby (FTI Consulting), Stephanie Mendelsohn (Genentech), and the team from H5 (Todd Elmer, Bruce Hedin, Jim Donahue and Michelle Luke) for their invaluable assistance with complaint drafting, topic formulation, and participating in Boolean negotiations; and to Richard Braman, Executive Director of The Sedona Conference®, for his continued support of the TREC Legal Track.

# References

[1] TREC Legal Track Home Page. http://trec-legal.umiacs.umd.edu/.

[2] James Allan, Ben Carterette, Javed A. Aslam, Virgil Pavlu, Blagovest Dachev, and Evangelos Kanoulas. Million query track 2007 overview. In *The Sixteenth Text REtrieval Conference (TREC 2007) Proceedings*, November 2007. http://trec.nist.gov.

[3] Jason R. Baron, David D. Lewis, and Douglas W. Oard. TREC-2006 legal track overview. In *The Fifteenth Text REtrieval Conference (TREC 2006) Proceedings*, November 2006. http://trec.nist.gov.

[4] Chris Buckley, Darrin Dimmick, Ian Soboroff, and Ellen Voorhees. Bias and the limits of pooling. In *Proceedings of the 29th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, pages 619–620, 2006.

[5] Stefan Büttcher, Charles L. A. Clarke, and Ian Soboroff. The TREC 2006 terabyte track. In *The Fifteenth Text REtrieval Conference (TREC 2006) Proceedings*, November 2006. http://trec.nist.gov.

[6] The Sedona Conference. The Sedona conference best practices commentary on the use of search and information retrieval methods in e-discovery. *The Sedona Conference Journal*, pages 189–223, 2007.

[7] Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth. (D.D.C.). 2007 WL 1585452.

[8] D. Lewis, G. Agam, S. Argamon, O. Frieder, D. Grossman, and J. Heard. Building a test collection for complex document information processing. In *Proceedings of the 29th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, pages 665–666, 2006.

[9] George L. Paul and Jason R. Baron. Information inflation: Can the legal system adapt? *Richmond Journal of Law and Technology*, 13(3), 2007.

[10] H. Schmidt, K. Butter, and C. Rider. Building digital tobacco document libraries at the university of california, san francisco library/center for knowledge management. *D-Lib Magazine*, 8(2), 2002.

[11] Stephen Tomlinson. Early Precision Measures: Implications from the Downside of Blind Feedback. In *Proceedings of the 29th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, pages 705–706, 2006.

[12] Stephen Tomlinson. Experiments with the negotiated boolean queries of the TREC 2006 legal discovery track. In *The Fifteenth Text REtrieval Conference (TREC 2006) Proceedings*, November 2006. http://trec.nist.gov.

[13] Williams v. Taser Intern, Inc. (N.D. Ga.). 2007 WL 1630875.

[14] Emine Yilmaz and Javed A. Aslam. Estimating Average Precision with Incomplete and Imperfect Judgments. In *Proceedings of the 15th International Conference on Information and Knowledge Management (CIKM)*, pages 102–111, 2006.

[15] Justin Zobel. How reliable are the results of large-scale information retrieval experiments? In *Proceedings of the 21st Annual International ACM SIGIR Conference on Research and Development in Information Retrieval*, pages 307–314, 1998.

# Exhibit N

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 291 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

**15 Sedona Conf. J. 217**

**Sedona Conference Journal**
Fall, 2014

**Article**
The Sedona Conference

Copyright © 2014 by The Sedona Conference; The Sedona Conference

# THE SEDONA CONFERENCE BEST PRACTICES COMMENTARY ON THE USE OF SEARCH & INFORMATION RETRIEVAL METHODS IN E-DISCOVERY [a1]

## A Project of the Sedona Conference Working Group on Electronic Document Retention & Production (WG1)

*Author:*

The Sedona Conference

*2013 Editors-in-Chief:*

Jason R. Baron

Maura R. Grossman

*2007 Editor-in-Chief:*

Jason R. Baron

*2007 Senior Editors:*

Thomas Y. Allman

M. James Daley

George L. Paul

Thanks go to all who participated in the dialogue that led to this Commentary. We thank all of our Working Group Series Sustaining and Annual Sponsors, whose support is essential to our ability to develop Working Group Series publications. For a listing of our sponsors just click on the "Sponsors" Navigation bar on the homepage of our website.

The opinions expressed in this publication, unless otherwise attributed, represent consensus views of the members of The Sedona Conference Working Group 1. They do not necessarily represent the views of any of the individual participants or their employers, clients, or any other organizations to which any of the participants belong, nor do they necessarily represent official positions of The Sedona Conference.

**\*218 PREFACE AND ACKNOWLEDGEMENTS**

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 292 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

Welcome to the 2013 Edition of The Sedona Conference *Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery.* Since the publication of the 2007 Public Comment Version of this Search Commentary, there have been significant developments in both case law and technology in the area of search and retrieval. Indeed, the 2007 Search Commentary itself has been prominently cited in a number of reported cases as an authoritative source on best practices in this area.

The 2013 Edition of the Commentary reflects changes in legal practice with a new section on computer‑ or technology‑assisted review, as well as citations to more recent case law. Certain of the original eight Practice Points have been revised to reflect developments in law and practice, including recognition of the key principles of cooperation and proportionality advanced by The Sedona Conference. The Appendix on Information Retrieval Methods has also been modified to reflect changes in technology. The text of the 2007 Version of this Commentary otherwise remains largely intact, except for the deletion and/or updating of outdated information, and for minor stylistic and grammatical edits. The text was not edited with an eye towards being a fully‑revised "Second Edition" of the original Commentary. Nevertheless, The Sedona Conference recognizes that the rapidly‑evolving nature of automated techniques calls for continuing close attention to further changes in professional practice in this area, especially with respect to defending the process used, and we will endeavor to meet that need through future publications.

I want to thank the entire Working Group for all their hard work and contributions, and especially the 2013 Editorial Committee for leading this effort to update the existing Search Commentary. I wish to acknowledge the contributions of Jason R. Baron and Maura R. Grossman for taking the lead in revising and updating the prior version, as assisted by Bobbi Basille, Todd Elmer, Amir Milo, Priya Keshav, and James Sherer. Finally, but certainly not least, the Working Groups of The Sedona Conference could not accomplish their goals without the financial support of the sustaining and annual sponsors of the Working Group Series listed at *www.thesedonaconference.org/sponsors*.

Kenneth J. Withers

Deputy Executive Director

The Sedona Conference

December 2013

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Overview | | 220 |
| Executive Summary | | 222 |
| I. | Introduction | 226 |
| II. | The Search and Information Retrieval Problem Confronting Lawyers | 228 |
| III. | Lawyer's Current use of Search and Retrieval Methodologies | 230 |
| IV. | Some Key Terms, Concepts, and History in Information Retrieval Technology | 237 |
| V. | Boolean and Beyond: A World of Search Methods, Tools, and Techniques | 241 |
| VI. | Practical Guidance for Evaluating the use of Automated Search and Retrieval Methods | 243 |
| VII. | Future Directions in Search and Retrieval Science | 249 |
| Appendix: Types of Search Methods | | 255 |

## *220 OVERVIEW

***Traditional Approaches To Searching For Relevant Evidence Are No Longer Practical Or Financially Feasible***

Discovery of relevant information about a topic in dispute is at the core of the litigation process. [1] However, the advent of "e‑discovery" is causing a rapid transformation in how that information is gathered. While discovery disputes are not new, the huge volume of available electronically stored information ("ESI") poses unique challenges. Some years ago, a party facing a review of information for production to the other side in a document‑intensive case might have been concerned with hundreds of "banker's" boxes of documents.

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 293 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

Today, that same amount of data is easily found on a single computer hard drive. [2] Moreover, as the ability to create and store massive volumes of electronic information mushrooms, the cost to store that information inversely plummets. In 1990, a gigabyte of storage cost about $20,000; as of 2013, two-terabyte drives readily sell for less than $70, or 3.5¢ per gigabyte, with even lesser rates charged for hosting gigabytes in the "cloud." As a result, more individuals and organizations are generating, receiving, and storing more data, which in some cases means more information must be identified, collected, reviewed, and produced in litigation.

With billable rates for associates at many law firms averaging between $200 and $500 per hour, [3] the cost to review just one gigabyte of data can easily exceed $30,000. [4] These economic realities – i.e., the huge cost differential between the nominal cost to store a gigabyte of data and the $30,000 to review it – act as drivers to change traditional attitudes and approaches of lawyers, clients, courts, and litigation support providers forced to search for relevant evidence during discovery and investigations. Data volumes now numbering in the billions of ESI objects, review costs, and shrinking discovery timetables have created the need for a profound change in practice.

As discussed in this Commentary, just as technology has given rise to these new litigation challenges, technology can help to solve them. The emergence of new discovery strategies, best practices, and processes, as well as new search and retrieval technologies are transforming the way lawyers litigate. Collectively, they provide opportunities for huge volumes of information to be reviewed faster, more accurately, and more affordably than ever before. The good news is that search and retrieval systems are improving in effectiveness and expanding their capacities, buoyed by a tsunami of activity aimed at improving the "search" experience for users generally. [5] For example, advanced forms of **\*221** machine learning – including supervised and unsupervised document and content classifiers – can automatically organize ESI in new ways not achieved by the more familiar methods of the past (which include the use of simple "keywords" as an automated aid to conducting manual searches). And not only can these new techniques increase accuracy and efficiency, through the proper use of statistical sampling and validation techniques, practitioners can measure the accuracy of the results of either traditional or alternative forms of search, retrieval, and review.

New challenges require new solutions. This Commentary aspires to present the bench and bar with an intelligible picture of the new challenges associated with the search and retrieval of ESI. The Commentary also presents alternative ways to address those challenges and to select the best solution for a given set of circumstances, taking into account the just, speedy, and inexpensive determination of every action (consistent with Federal Rule of Civil Procedure 1).

## *222 EXECUTIVE SUMMARY

Discovery has changed. For a growing number of cases, the process of identifying, reviewing, and producing information has evolved from the manual review of paper documents to an evaluation of vastly greater volumes of ESI.

A perfect review of the resulting volume of information is impossible. It is also not economical. But governing legal principles and best practices do not require perfection in making disclosures or in responding to discovery requests. [6] Instead, best practices focus on reasonable and proportional actions taken by practitioners as part of their duties, which must include an appreciation for the particular challenges of electronic information.

The Sedona Conference has helped establish the benchmarks governing the evolution and refinement of reasonable, good faith practices for searching intimidating amounts of data. Principle 6 of The Sedona Principles, Second Edition (2007) notes that "[r]esponding parties are best situated to evaluate the procedures, methodologies and technologies appropriate for preserving and producing their own electronically stored information," and Principle 11 amplifies the point by stating that "[a] responding party may satisfy its good faith obligation to preserve and produce relevant electronically stored information by using electronic tools and processes, such as data sampling, searching, or the use of selection criteria, to identify data reasonably likely to contain relevant information."

This Commentary discusses the existing and evolving methods by which a party may choose to search unprecedented volumes of information. As the practice of using these "search and retrieval" technologies – the generic term we will utilize in this Commentary – advances, a new understanding of what is "reasonable" and "proportional" under any particular set of

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 294 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

circumstances will advance as well. Therefore, the challenges addressed by this Commentary go beyond litigation and also encompass the full breadth of the search and retrieval of information from large volumes of data.

### The Revolution in Discovery

Not long ago, all information was stored on physical records such as paper. There was typically a single "original" document, and the number of duplicate copies and their locations were generally limited. Administrative assistants, file clerks, records managers, and archivists developed expertise in managing that storage, generally pursuant to pre-existing file systems. In the case of litigation, it was reasonable and relatively easy (in all but the exceptional case), for a legal representative to gather, manually review, and prepare each individual item prior to its production.

The digital revolution did more than make documents truly portable - it also created a review-process paradigm shift in terms of what is truly feasible regarding document review in litigation. This revolution has shifted nearly all information storage (as a percentage of existing information) to the digital realm and has caused an explosion in the amount of information that resides in any organization. And not only did the information's volume and format change, the very geography of where information "lives" moved from a file cabinet to a broad distribution amongst many different storage devices: from large mainframe computers to handheld devices.

 **223**  Each device may be capable of storing the equivalent of several warehouses of paper documents; each device may also have networking capabilities which allow it to integrate into complex systems. These systems are intricate, interdependent, and evolve spontaneously, behaving nearly like living ecosystems. To further complicate the picture, a legal professional who completely understands the workings of this new form of "information ecosystem" is rare indeed.

Finally, in addition to the search and retrieval challenge, a large percentage of the records searched in litigation are written in human language, not just numbers. Human language is an inherently elastic, ambiguous, "living" tool of enormous power. Its elasticity allows for jargon, private codes, and discrete vocabularies to exist in different subcultures in any organization, thereby making the identification of search terms much more challenging.

### Essential Conclusions of this Commentary

This Sedona Conference *Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery* strives to set forth state-of-the-art knowledge defining the challenges associated with searching enormous databases for relevant information (the "Problems"), and presents methods and tools to retrieve that information with a minimum of wasted effort (the "Solutions").

By way of summary, we set forth our conclusions about the Problems and their Solutions, and summarize our Practical Advice articulated in the balance of this Commentary.

### Problems

> • The exponential growth in digital information is a critical challenge to the justice system.

> • Parties are frequently unable to identify ESI that is likely to contain information relevant to the claims and defenses in the dispute.

> • Electronically stored information consists of human language, which challenges computer search tools. These challenges are posed by the ambiguity inherent in human language; the imprecision resident in human use of logic; and the tendency of people within organizations or networks to speak in metaphor, to invent their own words, and to communicate in jargon, short forms, or code.

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 295 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

• The application of simple keyword searching, while still a valuable tool, has well-documented deficiencies. There are also documented problems with manual document review.

## Solutions

• Educating clients that good information governance reduces e-discovery costs by reducing the volume of ESI that is kept, and effective management of the ESI that is kept results in collecting a smaller collection with a higher concentration of relevant information.

**\*224**  • Counsel should work closely with their clients to identify and then narrow sources of ESI that are likely to contain information relevant to the dispute.

• The proper selection of information for production in discovery can benefit from the learning from a variety of other disciplines, including, but not limited to, Information Retrieval science, linguistics, and the implementation of effective project management processes.

• Alternative search tools may properly supplement simple keyword searching and Boolean search techniques. These include using various forms of computer- or technology-assisted review, machine learning, relevance ranking, and text mining tools which employ mathematical probabilities, as well as other techniques incorporating supervised and unsupervised document and content classifiers. [7]

• Parties and their counsel should cooperate and seek ways to agree on measurements to evaluate the effectiveness of the search and retrieval process. The metrics currently used in information retrieval science, most notably "precision" and "recall," may serve as key points of reference.

## Practical Advice

*Practice Point 1. In many settings involving large amounts of relevant electronically stored information ("ESI"), relying solely on a manual search process for the purpose of finding responsive documents may be infeasible or unwarranted. In such cases, the use of automated search methods should be viewed as reasonable, valuable, and even necessary under certain circumstances.*

*Practice Point 2. The successful use of any automated search method or technology will be enhanced by a well-thought-out process with substantial human input on the front end.*

Case 1:23-cv-01952-RC    Document 27-2    Filed 08/22/24    Page 296 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

*Practice Point 3. The choice of a specific search and retrieval method will be highly dependent on the specific legal context in which it is to be employed. Parties and their counsel must match the use case with the tools and best practices appropriate to address it, and must incorporate proportionality considerations involving the overall costs and the stakes of the litigation.*

*Practice Point 4. Parties and their counsel should perform due diligence when choosing a particular information retrieval product or vendor service.*

*\*225 Practice Point 5. Because of the characteristics of human language, no search and information retrieval tool can guarantee the identification of all responsive documents in large data collections. Moreover, different search methods may produce different results, subject to a measure of statistical variation inherent in the science of information retrieval.*

*Practice Point 6. Parties and their counsel should make a good faith attempt to cooperate when determining the use of particular search and information retrieval methods, tools, and protocols (including keywords, concepts, computer- or technology-assisted review and other types of search parameters and quality control measures.*

*Practice Point 7. Parties and their counsel should expect that their choice of search methodology (and any validation of it) will need to be explained, either formally or informally, in subsequent legal contexts (including in depositions, evidentiary proceedings, and at trial).*

*Practice Point 8. Parties, counsel, and the courts should be alert to new and rapidly evolving search and information retrieval methods. Moreover, parties and their counsel should recognize that information retrieval is a distinct field of study that includes expertise in such areas as computer science, statistics, and linguistics, and that consultation with or utilization of experts in information retrieval may improve the quality of search results in complex cases involving large volumes of ESI.*

### How The Legal Community Can Contribute to The Growth of Knowledge

A consensus is forming in the legal community that human review of documents in discovery is expensive, time consuming, and error‑prone. There is also a growing awareness that, used correctly, linguistic and mathematically‑based content analysis, embodied in new forms of search and retrieval technologies, tools, techniques, and processes in support of the review function, can effectively reduce litigation cost, time, and error rates.

### Recommendations

*1. The legal community should continue to support collaborative research with the scientific and academic sectors aimed at establishing the efficacy of a range of automated search and information retrieval methods.*

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 297 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

*2. The legal community should encourage the establishment of objective benchmarking criteria, to assist lawyers in their evaluation of the competitive legal and regulatory search and retrieval services market.*

Members of The Sedona Conference community have and will continue to participate in collaborative workshops and other forums dedicated to information retrieval issues. The Sedona Conference intends to remain in the forefront of the efforts of the legal community aimed at seeking out centers of excellence in this area, including the possibility of fostering private-public partnerships focusing on continued research.

## *226  I. INTRODUCTION

The exponential growth in the volume and complexity of ESI found in modern organizations poses a substantial challenge to the justice system. Today, even routine discovery requests can require searches of, and retrieval from, the storage devices found on servers, networked workstations, desktops and laptops, home computers, removable media (such as CDs, DVDs, and USB flash drives), handheld devices (such as PDAs, smart phones, cell phones, and iPods), and the "cloud." Complicating things further, such information is now almost always flowing robustly throughout a "network," in which it has likely been replicated, distributed, modified, linked, attached, accessed, backed-up, overwritten, deleted, undeleted, fragmented, defragmented, morphed, and multiplied. Complying with preservation or discovery obligations in some ESI cases may require a process to identify relevant emails from among thousands, millions, or even tens-of-millions of individual messages, with attachments in various file formats.

The volume and complexity of ESI highlights several issues: First, whether automated search and information retrieval methods are reliable and accurate, and if so, how accurate. Second, whether the legal profession has the skills, knowledge, and processes required to use such automated search and retrieval methods intelligently in conjunction with huge data sets, in ways that are defensible under the rules governing discovery.

In *The Sedona Principles*, Second Edition (2007), The Sedona Conference endorsed several highly pragmatic and relevant consensus best practices relevant to this discussion. [8]

First, Principle 6 provides that parties responding to discovery are in the best position "to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information." Principle 11 expands this concept to include the use of "electronic tools and processes, such as data sampling, searching, or the use of selection criteria, to identify data reasonably likely to contain relevant information."

Second, the Commentary to Principle 11 provides that the "selective use of keyword searches can be a reasonable approach when dealing with large amounts of electronic data," and states that it "is also possible to use technology to search for 'concepts,' which can be based on ontologies, taxonomies, or data clustering approaches, for example." [9]  This exploits a unique feature of electronic information: the ability to conduct fast, iterative searches for the presence of patterns of words and concepts in large document populations. The Commentary to Principle 11 also states that "[c]ourts should encourage and promote the use of search and retrieval techniques in appropriate circumstances," and suggests that "[i]deally, the parties should agree on the search methods, including search terms or concepts, to be used as early as practicable. Such agreements should take account of the iterative nature of the discovery process and allow for refinement as the parties' understanding of the relevant issues develops." [10]

Third, The Sedona Conference has recognized that "there are now hundreds of companies offering electronic discovery services." [11]  This is also true of search and  *227  information retrieval products and services for use in legal contexts - which form a subset of a burgeoning sector of the economy devoted to improving users' "search" experience. However, there remains some confusion as to the strengths and weaknesses of such tools. Legal practitioners have a need for guidance as to the appropriate use of search and information retrieval technologies. Such guidance can help practitioners judge the relative costs and benefits of such tools in specific cases.

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 298 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

This Commentary is designed to help educate the justice system – attorneys, judges, and litigants alike – on "state of the art" search and retrieval tools, techniques, and methodologies, and how they can best be used as part of an overall process to more efficiently manage discovery. This discussion includes the critically important concept of an integrated process of search and retrieval; the ability to differentiate among different search methods; how to evaluate such differences; and what questions to ask before using any particular method or product in a specific legal setting.

For the past three decades, the legal community has had familiarity with simple keyword and natural language searches on Westlaw® and Lexis® in the context of legal research, and to a lesser extent the use of "Boolean" logic to combine keywords and "operators" (such as "AND," "OR," and "AND NOT," or "BUT NOT") that produce broader or narrower searches. Over time, lawyers have applied this knowledge to employ simple keyword, Boolean, and other search and retrieval tools to reduce the amount of information to be reviewed for production in discovery.[12] In the past few years, the relative efficacy of competing search and retrieval tools used to accomplish review for production has begun to be measured. However, the field is still wide open for the development of more advanced search and information retrieval best practices. These methods include merging keyword searching with more sophisticated systems that use computer- and technology-assisted techniques, incorporating mathematical algorithms and various forms of linguistic techniques, to help find, group, and present related content.

What follows is an in-depth analysis of the problems lawyers confront in managing massive amounts of data in discovery, including how search and retrieval techniques are used in everyday practice and the key element of "process." This Commentary also provides background on the field of information retrieval and at least partially describes the world of search tools, techniques, and methodologies that are currently commercially available. It also includes "practice pointers" on the factors to consider in making an overall legal evaluation among different search methods, both on a conceptual and practical level. In a concluding section, the future of search and retrieval efforts is discussed. A more technical discussion of various search methodologies is included in an Appendix. Where appropriate, reference will be made to technical definitions found in The Sedona Conference Glossary: *E-Discovery and Digital Information Management* (4th ed. 2014).[13]

## *228  II. THE SEARCH AND INFORMATION RETRIEVAL PROBLEM CONFRONTING LAWYERS

Discovery today is drowning in an exponential flood of potential sources of information. This increase in volume, especially since the mid-1990s, is principally due to the combined effects of the PC revolution, the widespread use of email and other new forms of communication, and the growth of mobile device and social networks. Indeed, the implication of this growth in volume is that it places at severe risk the justice system's ability to achieve the "just, speedy and inexpensive" resolution of disputes, as contemplated by Rule 1 of the Federal Rules of Civil Procedure.

### The Rise of Crushing Volumes of Information in the Digital Realm

A history of the computer and information technology advances occurring since the mid 1970s is beyond the scope of this Commentary. Suffice it to say that over the last 40 years, there has been a fast-paced and widespread shift from physical information storage technologies to new, digital information storage technologies. This "digital realm" was created by an accretion of technological advances, each built on preceding advances, which together have resulted in as fundamental a shift in the way information is shared, such as that which occurred in 1450 when Johannes Guttenberg invented the printing press. Included among the advances contributing to the new "digital realm" are the invention of the microchip, the development and diffusion of the personal computer, the spread of various types of networks linking together both computers and other networks, the rise of email and its dominant use in the business world, the plunging cost of computing power and storage, and of course, the spread of the Internet and with it, the World Wide Web.[14]

By the mid-1990s, networked computers and their storage devices had created a true information-based society, with a constant flow of messages in all forms exchanged on a 24/7 basis. For example, studies reflect that the typical corporate worker sends and receives about 105 emails per day.[15] The size and nature of the attachments to these emails is also growing, with increased integration of image, audio, and video files. More recently, there has been a similar explosion in the use of instant and text messaging throughout organizations, including increasingly, through the use of mobile devices. In many organizations, the average worker maintains several gigabytes of stored data.[16] At the same time, the costs of storage have plummeted from $20,000 per gigabyte in 1990 to less than 3.5¢ per gigabyte in 2013.[17] Existing technologies are only beginning to grapple

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 299 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

with providing a viable automated means for applying records retention requirements, including the ability to implement legal holds, in the new digital world.

 **\*229**  Organizations have continued to aggressively leverage technology to increase productivity. But leveraged technology sometimes comes with a lack of oversight or control. In many organizations, no one really controls how, where, how many times, and in how many forms information is stored. For example, copies of the same Word document can be found in email attachments, local hard drives, network drives, document management systems, websites, and on all manner of backup and removable media, such as USB flash drives, CDs, DVDs, and so on.

### Discovery In the Recent Past: Manageable Amounts of Physically Stored Information

Historically, outside counsel played a key role in a comparatively simpler discovery process: Litigants, assisted by their counsel, identified and collected information that was relevant to pending or reasonably foreseeable litigation. Counsel manually reviewed the information and produced any information that was responsive and not otherwise protected from disclosure by the attorney-client privilege, the attorney work product, or by trade secret protections.

This worked fine in the days where most of the potentially relevant information was created in or was stored in printed, physical form, and in reasonable volumes, so that it required only "human eyes" to review and interpret it. However, with increasingly complex computer networks, and the exponential increase in the volume of information existing in the digital realm, the venerated process of "eyes only" review is no longer generally workable or economically feasible.

The cost of manual review of such volumes is prohibitive, often exceeding the damages at stake. Anecdotal reports indicate that the cost of reviewing information can easily exceed thousands of dollars per custodian, per event, for collection and attorney review. Litigants often cannot afford to review all available ESI in the time permitted for discovery. [18] Accordingly, the conventional document review process is poorly adapted to a growing percentage of today's litigation. [19] Lawyers of all stripes therefore have a vital interest in utilizing automated search and retrieval tools where appropriate. The plaintiff 's bar has a particular interest in being able to efficiently extract key information received in mammoth document productions, and in automated tools that facilitate the process. The defense bar has an obvious interest in reducing attendant costs, increasing efficiency, and in better risk management of litigation (including reducing surprises). All lawyers, clients, and judges have an interest in reducing cost and barriers to entry to the justice system, and maximizing the quality of discovery, by means of using automated tools that produce a reliable, reproducible, and consistent result.

Ideally, then, judges and litigants should strive to increase their awareness of search and retrieval sciences generally, and of the sciences' appropriate application to discovery. Some technologies have been used for years to produce documents from large litigant document databases, but often without much critical analysis. The legal system may benefit from the rich body of research available through the Information Retrieval and library science disciplines. The discussion that follows is designed to provide a common framework  **\*230**  and vocabulary for proper application of search and retrieval technologies in this new "age of information complexity" in the legal environment.

### The Reigning Myth of "Perfect" Retrieval Using Traditional Means

It is not possible to discuss this issue without noting that there appears to be a myth that manual review by humans of large amounts of information is as accurate and complete as possible - perhaps even perfect - and constitutes the gold standard by which all searches should be measured. Even assuming that the profession had the time and resources to continue to conduct manual or "linear" review of massive sets of electronic data (which it does not), the relative efficacy of that approach versus utilizing newly developed automated methods of review appears to be increasingly in question. [20] Moreover, past research demonstrates the gap between lawyers' expectations and the true efficacy of certain types of keyword searches. The Blair and Maron study (discussed below) shows that human beings are far less accurate and complete than they believe themselves to be when searching and retrieving information from a heterogeneous set of documents (i.e., in many data types and formats), using ad hoc, simple keywords as the sole means to identify potentially relevant documents. The importance of this point cannot be overstated, as it provides a critical frame of reference in evaluating how new and enhanced forms of automated search methods and tools may benefit litigation practices.

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 300 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

*The Intelligent Use of Tools*

Although the continued use of manual search and review methods may be infeasible or even indefensible in discovery involving significant amounts of ESI, merely adopting sophisticated automated search tools, alone, will not necessarily lead to successful results. Lawyers must recognize that the process by which a legal team uses such tools, including close involvement of lead counsel, is just as important as the automated tools themselves. This may require an iterative process which importantly incorporates feedback and learning and allows for measurement and validation of results. The time and effort spent up front on designing a sophisticated discovery process that targets the real needs of the litigation must be viewed as a condition precedent to deploying automated methods of search and retrieval.

## III. LAWYERS' CURRENT USE OF SEARCH AND RETRIEVAL METHODOLOGIES

Attorneys across all disciplines are generally familiar with search and retrieval methodologies based on their exposure over the past thirty-plus years to automated means of searching of caselaw and other databases provided by LexisNexis ® and Westlaw ®. More recently, lawyers are using Google ® and other Web-based search engines to hunt down the increasing amounts of online information relevant to their practices. Additionally, law firms and corporate legal departments use search methods for administrative matters, such as locating data on personnel, supporting billing functions, managing conflicts of interest, and for contact management. Many products employing search methods of various kinds exist in the legal marketplace to assist lawyers in these functions.

*Current Database Tools in the Practice of Law*

Litigators use automated search and retrieval tools at many stages of the litigation process. PACER and other automated means are used to uncover data on opposing **\*231** counsels' pleadings, motions, and pretrial filings in similar litigation, as well as showing how a judge has ruled on similar issues even if unreported in legal reporting services. Lawyers also use a variety of search methods involving online, CD-ROM, client-developed, and "cloud" databases to unearth facts on opposing parties, witnesses, and even potential jurors. At later stages of litigation, lawyers use various litigation support software applications to search through potential exhibits in connection with proceedings held in "electronic courtrooms." But until recently, litigators seldom used automated search and retrieval methods with their clients' or their opponents' growing collections of unstructured ESI.

*"Deduplication" in the Processing of ESI*

With the exponential increase in the volume of data subject to e-discovery, lawyers have begun to take steps towards employing automated search tools to manage the discovery process. One example of this is "deduplication" software used to find duplicate electronic files, since ESI often consists of a massively redundant universe. For example, the same email can be copied tens or even hundreds of times in different file locations on a network or on backup media. Deduplication software reduces the time attorneys must spend reviewing a large document set and helps to ensure consistent classification of documents for responsiveness or privilege. [21] Increasingly, "email threading" and "near deduplication" tools are used to assist in organizing and expediting overall document reviews, even if the technique is not used to reduce the actual number of unique documents subject to review. [22]

*The Use of "Keywords"*

The most commonly used search methodology today still entails the use of "keyword searches" of full text and metadata as a means of filtering data for producing responsive documents in civil discovery. For the purpose of this Commentary, the use of the term "keyword searches" refers to set-based searching using simple words or word combinations, with or without Boolean and related operators (see below and Appendix for definitions). The ability to perform keyword searches against large quantities of evidence has become a widely accepted practice, as recognized by the courts. As one United States Magistrate Judge stated in 2004, "the glory of electronic information is not merely that it saves space but that it permits the computer to search for words or 'strings' of text in seconds." [23]

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 301 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

**\*232** Courts have not only accepted, but in many cases have ordered, the use of keyword searches to define discovery parameters and resolve discovery disputes. [24] Early on, one court suggested that a party might satisfy its duty to preserve documents in anticipation of litigation by conducting a system-wide keyword search and preserving a copy of each "'hit." [25]

Because of the costs and burdens associated with the review of increasingly vast volumes of electronic data, it makes sense in appropriate cases for producing parties to negotiate with requesting parties in advance to define the scope of discoverable information. For example, parties could agree on conducting a search of only files maintained by key witnesses, in certain data sources, and/or for certain date ranges. They may negotiate and agree to a set of key words relevant to the case. Both sides might see the advantage to using such protocols or filters to reduce the volume of extraneous information, such as spam, routine listserv notifications, and personal correspondence, typically found when searching through electronic data collections. [26]

In Treppel v. Biovail Corp., [27] the defendant refused to produce documents because the plaintiff would not agree to keyword search terms. Citing to Principle 11 of the Sedona Principles for Electronic Document Production, the Court held that the defendant was justified in using keyword search terms to find responsive documents and should have proceeded unilaterally to use its list of terms when the plaintiff refused to endorse the list. The Court held that plaintiff 's "recalcitrance" did not excuse defendant's failure to produce any records and ordered the company immediately to conduct the automated search, produce the results, and explain its search protocol. Another early case emphasized the need to confer after plaintiff was successful in obtaining a "mirror image" of data on all of defendant's computers. [28]

*Issues With Keywords*

There are nonetheless a number of notable limitations to the effectiveness of traditional or basic keyword searching. Keyword searches work best when the legal inquiry is focused on finding particular documents and when the use of language is relatively predictable. For example, basic keyword searches work well to find all documents that mention a specific individual or date, regardless of context. However, while basic keyword searching techniques have been widely accepted both by courts and parties as sufficient to **\*233** define the scope of their obligation to perform a search for responsive documents, the experience of many litigators is that simple keyword searching alone is inadequate in at least some discovery contexts. This is because simple keyword searches are both over- and under-inclusive in light of the inherent malleability and ambiguity of spoken and written English (as well as all other languages). [29]

Traditional keyword searches identify all documents containing a specified term regardless of context, often capturing many documents irrelevant to the user's query. For example, the term "strike" could be found in documents relating to a labor union tactic, a military action, options trading, or baseball, to name just a few (illustrating "polysemy," or ambiguity in the use of language). The problem of the relative percentage of "false positives" or noise in the data is potentially huge, amounting in some cases to enormous numbers of files which must be searched to find responsive documents. [30]

On the other hand, basic keyword searches have the potential to miss documents that contain a word that has the same meaning as the term used in the query, but is not specified. For example, a user making queries about labor actions might miss an email referring to a "boycott" if that particular word was not included as a keyword, and a lawyer investigating tax fraud via options trading might miss an email referring to "exercise price" if that term was not specifically searched (illustrating "synonymy" or variation in the use of language). And of course, if authors of records are inventing words "on the fly," or using short-forms or code names (as they have done throughout history, and with increasing frequency in electronic communications), such problems are compounded. [31]

Keyword searches can also exclude common or inadvertently misspelled instances of the term (e.g., "Phillip" for "Philip," or "strik" for "strike") or variations on "stems" of words (e.g., "striking"). Even the best of optical character recognition (OCR) programs introduce a certain rate of random error into document texts, potentially transforming would-be keywords into gibberish. Finally, using keywords alone results in a return set of potentially responsive documents that are not weighted or ranked based upon their potential importance or relevance. In other words, each document is considered to have an equal probability of being responsive subject to further manual review.

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 302 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

More advanced keyword searches using "Boolean" operators and techniques borrowed from "fuzzy logic" may increase the number of relevant documents and decrease the number of irrelevant documents retrieved. These searches attempt to emulate the way humans use language to describe concepts. In essence, they simply translate ordinary words and phrases into a Boolean search argument. Thus, a natural language search for "all birds that live in Africa" is translated to something like ("bird* + liv* + Africa").

At the present time, it would appear that the majority of automated litigation support providers and software rely on some form of keyword searching, although the legal landscape is changing (see discussion below). Such methods are limited by their dependence **234** on matching a specific, sometimes arbitrary choice of language to describe the targeted topic of interest. [32]

However, these challenges can be at least partially overcome by employing a more methodical and informed approach to defining keywords. Such a process begins with a clear definition of relevance, outlining criteria to identify relevant documents for each issue and subtopic. The problem of false positives can be minimized by combining key terms within a certain proximity of one another or in a specified order. Singular keywords are often ambiguous, but disambiguating (for verbs) and specifying words (for nouns) when joined to the central keyword with Boolean operators can reduce over-inclusiveness. Additionally, gaps in keywords can be a big issue in early stages or when the issues at stake are relatively unknown. One approach to identify such gaps trains a software system on initial custodians (i.e., utilizes a software-assisted review workflow) and uses the trained system to generate a set of potential keywords that can then be used to confirm or add to the original assumptions regarding keywords in subsequent stages of review. [33]

Recent judicial opinions, including several citing to the 2007 Version of this Commentary, have examined many of the limitations of keyword searching. [34] Notably, the Court in *William A. Gross Construction Associates* declared a

> [W]ake-up call to the Bar ... about the need for careful thought, quality control, testing, and cooperation with opposing counsel in designing search terms or 'keywords' to be used to produce e-mails or other electronically stored information ('ESI') .... Moreover, where counsel are using keyword searches for retrieval of ESI, they at a minimum must carefully craft the appropriate keywords, with input from the ESI custodians as to the words and abbreviations they use, and the proposed methodology must be quality control tested to assure accuracy in retrieval and elimination of 'false positives.' [35]

### *Use of Alternative Search Tools and Methods*

Lawyers are beginning to feel more comfortable using alternative search tools to identify potentially relevant ESI. These more advanced text mining tools include, but are not limited to, "conceptual search methods," which rely on semantic relations between words, and/or use "thesauri" to capture documents that would be missed in keyword searching. Specific types of alternate search methods are set out in detail in the Appendix.

"Concept" search and similar information retrieval technologies attempt to locate information that relates to a desired concept without the presence of a particular word or phrase. The classic example is the concept search that will recognize that documents about Eskimos and igloos are related to Alaska, even if they do not specifically mention the word **235** "Alaska." The first reported case referencing the possible use of "concept searching" as an alternative to strict reliance on keyword searching was decided in 2007. [36]

Other automated tools rely on "taxonomies" and "ontologies" to help find documents conceptually related to the topic being searched, based on commercially available data or on specifically compiled information. This information is provided by attorneys or developed for the business function or specific industry (e.g., the concept of "strike" in labor law vs. "strike" in options trading). These tools rely on the information that linguists collect from the lawyers and witnesses about the key factual issues in the case - the people, organization, and key concepts relating to the business as well as the idiosyncratic forms of communication that might be lurking in documents, files, and emails. For example, a linguist would want to know how union organizers or company officials might communicate plans, any special code words or lingo used in the industry, the relationships of collective bargaining units, the company's management structure, and other issues and concepts.

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 303 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

Another type of search tool relies on mathematical probabilities that a certain text is associated with a particular conceptual category. These types of machine learning tools, which include "clustering" and "latent semantic indexing," are potentially helpful in addressing cultural biases of taxonomies because they do not depend on linguistic analysis, but on mathematical probabilities. They can also help identify communications hidden in code language and neologisms. For example, if the labor lawyer were searching for evidence that management was targeting neophytes in the union, she might miss the term "n00b" (a neologism for "newbie"). This technology, first used in government intelligence, and now increasingly used as part of computer- or technology-assisted review in e-discovery, is particularly apt in helping lawyers find information when they do not know exactly what to look for. For example, when a lawyer is looking for evidence that key players conspired to violate the labor union laws, she will usually not know the "code words" or expressions the players may have used to disguise their communications. For a discussion of recent developments in computer- or technology-assisted review, see below.

With so many different search methods currently available, it is important to choose the most appropriate search strategy for any particular case. The choice of a search method will always depend heavily on the particular context. Practitioners should be aware of the strengths and limitations of varying approaches. Sometimes the most appropriate search method is obvious from the outset of a case; in other situations, the best method(s) only become evident after experimentation and use. But practitioners must recognize if a particular search method is ineffective and must be willing to modify their approach based on the results. See also Practice Pointers, below.

### Resistance by the Legal Profession

Some litigators continue to primarily rely upon manual review of information as part of their review process. [37] Principal rationales are: (1) concerns that computers cannot be trusted to replace the human intelligence required to make complex determinations on *236 relevance and privilege; (2) the perception that there is a lack of scientific validity of search technologies necessary to defend against a court challenge; and (3) widespread lack of knowledge (and confusion) about the capabilities of automated search tools.

Other parties and litigators may accept simple keyword search, yet be reluctant to use alternative search techniques. They may not be convinced that the chosen method would be defensible if confronted with a court challenge. They may perceive a risk that problem documents will not be found despite the additional effort, or that documents might be missed which would otherwise be picked up in a straight keyword search. Moreover, acknowledging that there is no one solution for all situations, they may opt for an accepted, lowest common denominator approach. Finally, litigators often lack the time and resources to sort out these highly complex technical issues on a case-by-case basis. [38]

But the legal landscape is changing rapidly. The year 2012 saw the first judicial opinions approving the use of the alternative search method of computer- or technology-assisted review (as described in Section V, below). [39] In the *Moore* opinion, the magistrate judge noted that "[c]ounsel no longer have to worry about being the "first" or "guinea pig" for judicial acceptance of computer-assisted review .... Computer-assisted review now can be considered judicially-approved for use in appropriate cases." [40] This and future precedent will hasten acceptance by lawyers (and their clients) of the use of such alternate methods and techniques.

### Challenging the Choice of Search Method

Challenge to the choice of a search methodology used in a review prior to production can arise in one of two contexts: (1) a requesting party's objection to the unilateral selection of a search method by a responding party; or (2) a court's *sua sponte* review of the use of a method or technology. Accordingly, the preferable method to preempt challenges - advocated by the proponents of the 2006 Federal Rules Amendments and some practitioners - is for a full and transparent discussion among counsel of the search methodology. Where the parties are in agreement on the method and a reasonable explanation can be provided, it is unlikely that a court will second-guess the process.

Absent agreement, a party has the presumption, under Sedona Principle 6, that it is in the best position to choose an appropriate method of searching and culling its data. However, a unilateral choice of a search methodology may risk challenge if an opponent can show that the results of the search are not accurate, complete, or reliable. As a practical matter, those who might object to a particular search and retrieval technology may face several challenges. First, the legal system has, for decades, blessed the

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 304 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

use of keyword search tools and databases for discovery review. And second, if human review or even keyword searching is the benchmark for accuracy and completeness, it arguably should not be  **\*237**  difficult to measure new technologies against keyword searching or human review, especially when guided by a reasonable process. The discovery standard is, after all, reasonableness, not perfection.

Given the continued exponential growth in information, a large body of precedent will likely develop over time that critically analyzes new and alternative search methods in use in particular legal contexts. Indeed, the first case in which a court held an evidentiary hearing on a challenge to the use of keywords in favor of one type of alternative computer-assisted review method occurred in 2012. [41]

## IV. SOME KEY TERMS, CONCEPTS, AND HISTORY IN INFORMATION RETRIEVAL TECHNOLOGY

The evaluation of Information Retrieval ("IR") systems has, at least until recently, largely been of interest to computer scientists and graduate students in information and library science. Unlike performance benchmarking for computer hardware, there are no accepted, objective criteria for evaluating the performance of IR systems. That is, for IR systems, the notion of effectiveness is subjective. Human judgment is ultimately the criterion for evaluating whether an IR system returns the relevant information in the correct manner. Two users may have differing needs when using an IR system. For example, one may want to find all potentially relevant documents. Another may want to correctly sort information by priority. In addition, subject matter and information type may impact a user's IR requirements.

Over the past 50 years, a large body of research has emerged concerning the evaluation of IR systems. The study of IR metrics helps quantify and compare the benefits of various search and IR systems. In 1966, C.W. Cleverdon listed various "metrics" which have become the standard for evaluating IR systems within what has become known as the "Cranfield tradition." [42] Two of the metrics, *precision* and *recall,* are based on binary relationships. That is, either a document is relevant or it is not, and either a document is retrieved or it is not. Several modifications and additional metrics have been added in the IR literature since then, as the scientific field continues to add and refine techniques for measuring the efficiency of IR systems - both in terms of retrieval and also in user access to relevant information.

### *Measuring the Effectiveness of Information Retrieval Methods*

*Recall,* by definition, is "an information retrieval performance measure that quantifies the fraction of known relevant documents which were effectively retrieved." [43]  That is, out of the total number of relevant documents in the document collection, how many were retrieved correctly?

 **\*238** *Precision* is defined as "an information retrieval performance measure that quantifies the fraction of retrieved documents which are known to be relevant." [44]  Put another way, how much of the returned result set is "on target"?

Recall and precision can be expressed by simple ratios:

| | | |
|---|---|---|
| **Recall** | = | **Number of responsive documents retrieved** |
| | | **Number of responsive documents overall** |
| **Precision** | = | **Number of responsive documents retrieved** |
| | | **Number of documents retrieved** |

If a collection of documents contains, for example, 1,000 documents, 100 of which are relevant to a particular topic and 900 of which are not, then a system that returned only these 100 documents in response to a query would have a precision of 1.0, and a recall of 1.0.

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 305 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

If the system returned all 100 of these documents, but also returned 50 of the irrelevant documents, then it would have a precision 100/150 = .667, and still have a recall of 100/100 = 1.0.

If it returned only 90 of the relevant documents along with 50 irrelevant documents, then it would have a precision of 90/140 = 0.64, and a recall of 90/100 = 0.9.

Importantly for the practitioner, there is typically a trade-off between precision and recall. One can often adjust a system to retrieve more documents - increasing recall - but the system achieves this result at the expense of retrieving more irrelevant documents - decreasing precision. Effectively, one can cast either a narrow net and retrieve fewer relevant documents, along with fewer irrelevant documents, or cast a broader net and retrieve more relevant documents, but at the expense of retrieving more irrelevant documents. [45]

### Measuring the Efficiency of Information Retrieval Methods

Efficiency is important to the success of an IR system, but it does not affect the quality of the results. Efficiency is measured in three ways. The first measurement is the mean time for returning search results (this can be measured by the average time it takes to return results, or the computational complexity of the search). The second measurement is the mean time it takes a user to complete a search. This measurement is more subjective and is a function of the ease of use of the IR system. A third method involves the number of documents that must be reviewed to achieve a particular level of recall or precision.

### *239 The Blair and Maron Study

A well-known study testing recall and precision in a legal setting was conducted by David Blair and M.E. Maron in 1985. [46] The Blair and Maron study demonstrated the problems caused by the rich use of human language among the many people that can be involved in a dispute and how difficult it is to take such richness into account in a search for information. Indeed, Blair and Maron found that attorneys were only about 20% effective at identifying all of the different ways that document authors could refer to words, ideas, or issues in their case.

For the purposes of their study, Blair and Maron evaluated a case involving an accident on the San Francisco Bay Area Rapid Transit (BART) in which a computerized BART train failed to stop at the end of the line. There were about 40,000 documents, totaling about 350,000 pages, in the discovery database. The attorneys worked with experienced paralegal search specialists in an effort to find all of the documents that were relevant to the issues. The attorneys estimated that they had found more than 75% of the relevant documents, but more detailed analysis found that the number was actually only about 20%. The authors found that the different parties in the case used different words to describe the same thing, depending on their role in the case. The parties on the BART side of the case referred to "the unfortunate incident," but parties on the victim's side called it a "disaster." Other documents referred to the "event," "incident," "situation," "problem," or "difficulty." Proper names were often not mentioned.

As Roitblat notes, *supra*, note 46, Blair and Maron even found:

> that the terms used to discuss one of the potentially faulty parts varied greatly depending on where in the country the document was written. Some people called it an 'air truck,' a 'trap correction,' 'wire warp,' or 'Roman circle method.' After 40 hours of following a 'trail of linguistic creativity' and finding many more examples, Blair and Maron gave up trying to identify all of the different ways in which the document authors had identified this particular item. They did not run out of alternatives, they only ran out of time.

### More Recent Studies on Precision and Recall in E-Discovery

In the years since publication of the 2007 Version of this Commentary, a variety of other efforts have been made to study the precision/recall issues in a legal discovery context. Many of these have been initiated by members of The Sedona Conference. Numerous studies emanating from the TREC Legal Track (see discussion, below) have confirmed relatively low rates of recall

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 306 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

obtained from basic keyword searching. [47]   Moreover, two widely-cited recent studies have provided the foundation for lawyers making the claim that some of the more advanced computer- or technology-assisted review methods yield more accurate results than reliance solely on human review (as measured by precision,  *240  recall, and F1 measures). [48]   Both the 2010 study by Roitblat et al., and the 2011 study by Grossman and Cormack, used secondary data to compare the effectiveness of human review to that of certain computer- or technology-assisted review methods. Roitblat et al. used a collection of 1.6 million documents reviewed in response to a Department of Justice Second Request. The 1.6 million documents were re-reviewed by two teams using (unspecified) technology-assisted review methods. A statistical sample of 5,000 documents from the 1.6 million was also re-reviewed by two teams using manual review. The two technology-assisted review efforts both yielded better agreement with the original production than the two human review efforts, supporting the conclusion that technology-assisted review can be at least as effective as human review. Grossman and Cormack used the TREC 2009 collection of 836,135 documents captured from Enron by the Federal Energy Regulatory Commission. During the course of the TREC 2009 Legal Track Interactive Task, these documents were reviewed for responsiveness to seven "topics" (requests for production composed by TREC) by several participating teams using various technology-assisted review methods, which are detailed in the TREC proceedings. [49]   Two teams showed superior effectiveness over five of the topics, according to F1 (the harmonic mean of recall and precision). Grossman and Cormack compared these results to those of a human review of a statistical sample conducted (for three topics) by professional contract reviewers and (for two topics) by third-year law students. For all topics and all measures (recall, precision, and F1) either the technology-assisted review was superior, or the measured difference was not statistically significant. On average, the technology-assisted reviews achieved recall, precision, and F1 scores of 76.7%, 84.7%, and 80.0%, respectively, while the human reviews achieved 59.3%, 31.7%, and 36.0%, respectively. Overall, these studies indicate that one should not presume human review to be the most effective approach, that certain technology-assisted review methods can improve on human review, and that no review method is perfect. On the other hand, these studies do not indicate that all technology-assisted review methods are more effective than human review in all circumstances.

The limitations of keyword approaches to search and retrieval first exposed in the Blair and Maron study, and validated in subsequent research, have not faulted the ability of computers to locate documents meeting the attorneys' search criteria - but rather the inability of the attorneys and paralegals to anticipate all of the possible ways that people might refer to the issues in the case. The richness and ambiguity of human language causes severe challenges in identifying relevant information.

As Blair and Maron (and subsequent studies) demonstrate, human language is highly ambiguous and full of variation. In the years since Blair and Maron, and with increasing attention focused on the e-discovery space, the IR community has been engaged in research and the development of methods, tools, and techniques that compensate for endemic ambiguity and variation in human language, thereby improving the recall and precision of searches.

## *241  V. BOOLEAN AND BEYOND: A WORLD OF SEARCH METHODS, TOOLS, AND TECHNIQUES

In the decades since the Blair and Maron study, a variety of new search tools and techniques have been introduced to help find relevant information and weed out irrelevant information. Understanding these various tools and methods is critical. All automated methods are not created equal and do not perform the same functions and tasks. It is important to know what each methodology does when it is used alone or in conjunction with other methods and which tools are most effective for which purposes.

Clearly, different search methods have different functions and values in different circumstances. There is no one best system for all situations, an important fact for practitioners learning the techniques of search and retrieval technology to understand.

A more detailed description of search methods and techniques is set out in the Appendix. These methods can be grouped into four broad categories, but there are hybrid and crosscutting approaches that defy easy placement in any particular "box."

### Keywords and Boolean Operators

First, there are keyword-based methods, ranging from the simple use of keywords alone, to the use of strings of keywords with what are known as "Boolean operators" (including AND, OR, "AND NOT," or "BUT NOT").

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 307 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

*Categorizations of Data Sets*

Second, there are other techniques relying on categorizations of the entire data set with various methodologies heavily reliant on deriving (i.e., coming to a consensus on) a thesaurus, taxonomy, or "ontology" of related words or terms. These techniques can be used to categorize the entire data set into specified categories all at once or as more data is added to the data set.

However, data sets generally need to be indexed to use any of the latter methodologies - where the indexing will take more time depending on what one indexes (e.g., indexing all of the data will take substantially longer than indexing selected fields).

There are a variety of indexing tools, some of which are available as open source tools. Indexing structured data may take less time than indexing data in an unstructured form, if only designated fields are indexed. Indexing an unstructured data set is time consuming because of the need to index all the words (except for "and," "a," "the," or other common "noise" words). Knowing what is being indexed will be important to set expectations in terms of timing and making the data useful for querying or review.

Alternative search methods to keywords can, in some instances, free the user from having to guess, for every document, what word the author might have used. For example, there are more than 120 words that could be used in place of the word "think" (e.g., guess, surmise, anticipate and so on). As the Blair and Maron study shows, people are actually very poor at guessing the right words to use as search terms to find the documents they are looking for without overwhelming the retrieval with irrelevant documents. In light of this fact, alternative search methods help organize large collections of documents which humans would otherwise be unable to organize.

**\*242**  Using a thesaurus, taxonomy, or ontology generally provides the results one would expect, because these systems explicitly incorporate one's expectations about what is related to what. They are most useful when one has (or can buy) a good idea of the conceptual relations to be found in one's documents - or one has the time and resources needed to develop them. Clustering, Bayesian classifiers, and other types of systems have the power to discover potentially unanticipated relationships in the text. This means that one gets unexpected results from time to time, which can be of great value, but can also be somewhat over-inclusive (or even wrong). An example: after training on a collection of medical documents, one of these systems learned that Elavil and Klonopin were related (they are both anti-anxiety drugs). A search for Elavil turned up all the documents that contained that word, along with "false positive" documents containing only the word "Klonopin" (without the word "Elavil").

Such systems can discover the meaning of at least some acronyms, jargon, and code words appropriate to the context of the specific document collection. No one has to anticipate their usage in all possible contexts; the systems, however, can help to derive them directly from the documents.

*Computer- or Technology-Assisted Review Methods*

Third, there are a variety of methods that combine both technological and human inputs in an iterative search design. These techniques stem from various research directions in Artificial Intelligence and can be categorized under the general rubric of computer- or technology-assisted review. When drawing on machine-learning techniques, these tools are sometimes referred to as Predictive Coding"; however, the more inclusive nomenclature for the entire spectrum of advanced methods remains computer- or technology-assisted review. Generally put, computer- or technology-assisted approaches are based on iterative processes where one (or more) attorneys or IR experts train the software, using document exemplars, to differentiate between relevant and non-relevant documents. In most cases, these technologies are combined with statistical and quality assurance features that assess the quality of the results. The research cited above has demonstrated such techniques superior, in most cases, to traditional keyword based search, and, even, in some cases, to human review.[50]

The computer- or technology-assisted review paradigm is the joint product of human expertise (usually an attorney or IR expert working in concert with case attorneys) and technology. The quality of the application's output, which is an assessment or ranking of the relevance of each document in the collection, is highly dependent on the quality of the input, that is, the human training. Best practices focus on the utilization of informed, experienced, and reliable individuals training the system. These individuals work in close consultation with the legal team handling the matter, for engineering the application. Similarly, as explained below, the defensibility and usability of computer- or technology-assisted review tools require the application of sound approaches to selection of a "seed" or "training" set of documents, monitoring of the training process, sampling, and quantification and verification of the results.[51]

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 308 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

Well-thought-out techniques are needed in order to ensure that the set of documents used to train the system provides thorough coverage of the entire document  *243  population and particularly, of the relevant material (both expected and unexpected) contained therein. Sampling will be an essential component of any effective quality control regimen; it is important that samples drawn for quality control are separate from those used for training, in order to ensure independence of statistical measurement.

*Iterative monitoring* of the training process ensures that the system is adequately trained, (meaning that additional exemplars could not substantially enhance review effectiveness), while avoiding wasteful use of expensive "expert" resources through excessive training. In some cases, active learning techniques are applied to accelerate the training process, reducing to a minimum the number of training documents required, and avoiding the inefficiencies of random sampling, especially in low prevalence populations. Active learning systems select new exemplars for training based on knowledge of the population that the application has generated from previous training examples.

Statistically valid *measurement techniques,* based on precision and recall, as described above, are expressed within confidence intervals and at certain confidence levels to estimate results. Quality assurance techniques are critical in order to verify outcomes; for example, sampling of the documents culled as irrelevant to verify that they contain the expected low prevalence of relevant documents.

None of these systems is magical. Language is sometimes shared between two people who invent a shorthand or code. And all tools require a healthy dose of good legal judgment, based on a well thought out approach. Some techniques may be difficult to understand to those without technical backgrounds, but they need not be mysterious. If a vendor cannot explain how a system works, then the buyer should beware and either require an explanation or consider an alternate approach.

There is no magic to the science of search and retrieval; it is comprised of mathematics, linguistics, computer science, and hard work. If lawyers do not become conversant in this area, they risk surrendering the field's intellectual jurisdiction to other disciplines, as well as risk poor quality and costly e-discovery outcomes.

## VI. PRACTICAL GUIDANCE FOR EVALUATING THE USE OF AUTOMATED SEARCH AND RETRIEVAL METHODS

*Practice Point 1. In many settings involving large amounts of relevant electronically stored information (ESI), relying solely on a manual search process for the purpose of finding responsive documents may be infeasible or unwarranted. In such cases, the use of automated search methods should be viewed as reasonable, valuable, and even necessary under certain circumstances.*

For the reasons articulated in prior sections, the demands placed on practitioners and parties in litigation and elsewhere increasingly dictate that practitioners must evaluate the use of automated search and retrieval methods in a wide variety of cases and contexts. Particularly (but not exclusively) in large and complex litigation, where discovery is expected to encompass hundreds of thousands to hundreds of millions of potentially responsive electronic records, there is no reasonable possibility of marshalling the human labor required to undertake a document-by-document, manual review of the potential universe of discoverable materials. This is increasingly true both for parties responding to a discovery request and for parties who propound discovery (and receive a massive amount of  *244  material in response). Where the infeasibility of undertaking manual review is acknowledged, utilizing automated search methods may not only be reasonable and valuable, but also necessary.

Even in less complex settings, overreliance on manual review may be an inefficient use of scarce resources. This is especially the case where automated search tools used on the front end of discovery could prove useful in a variety of ways, including early case assessment for settlement or other purposes, or for prioritizing or grouping documents to allocate resources or facilitate later manual review.

Of course, the use of automated search methods is not intended to entirely eliminate the need for manual review; indeed, in many cases, both automated and manual searches will be conducted, with initial automated searches used for culling down a universe of material to more manageable size (or prioritizing documents), followed by a secondary manual review process. So too, while automated search methods may help identify privileged documents within a larger set, the majority of practitioners may still rely on largely manual review processes to identify the basis for the assertion of privilege.

***Practice Point 2. The successful use of any automated search method or technology will be enhanced by a well-thought-out process with substantial human input on the front end.***

As discussed above, the decision to employ an automated search method or technology cannot be made in a vacuum, on the assumption that the latest "tool" will solve an attorney's discovery obligations. Rather, to maximize the chances of success in terms of finding responsive documents, a well-thought-out strategy capitalizing on "human knowledge" available to a party should be implemented at the earliest opportunity. This knowledge can take many forms.

First, a party must evaluate the specific legal setting, since the nature of the lawsuit or investigation, the field of law involved, and the specific causes of action under which a discovery obligation may arise must all be taken into account. For example, keyword searches alone in highly technical patent cases may prove highly efficacious. But in other types of cases, including those with broad causes of action involving subjective states of intent, a practitioner should consider alternative search methods.

Second, in any legal setting involving consideration of automated methods for conducting searches, counsel and client should perform an analysis to define the target universe of documents that is central to the relevant causes of action. This would include not only assessing relevant subject areas and "drilling down" with as much specificity as possible, but also analyzing the custodians (or others) who would be in possession of such relevant data. Time and cost considerations must also be factored in, including budgeting for human review time. These practice points apply whether a party is a defendant and holds a universe of potentially discoverable data, or a plaintiff who is expecting to receive a massive data set in response to requests for production.

***Practice Point 3. The choice of a specific search and retrieval method will be highly dependent on the specific legal context in which it is to be employed. Parties and their counsel must match the use case with the tools and best practices appropriate to address it and must incorporate proportionality considerations involving the overall cost the stakes and the stakes of the litigation.***

 **\*245**  The choice of a search and retrieval method for a given situation depends upon a number of factors. Two of the biggest decisions to make are the acceptable level of false positive "noise" (i.e., achieving higher "precision"), and the acceptable level of false negatives (i.e., maximizing "recall"). There are a number of overarching factors that lawyers should consider in evaluating the use of particular search and retrieval methods in particular settings.

First, the "heterogeneity" of the relevant universe of ESI is a significant factor. ESI that is potentially relevant may be found in multiple locations, and in a variety of forms, including structured and unstructured active computer environments, removable media, backup tapes, and a variety of email applications and file formats. In some cases, information that provides historical, contextual, tracking, or managerial insight (such as metadata) may be relevant to a specific matter and demand specialized data mining search tools. But in other cases, the very same data will be irrelevant.

Second, the volume, prevalence, and condition of the likely relevant ESI, and the extent to which ESI is contained within static or dynamic electronic applications, are all relevant to the party's or its counsel's decisions.

Third, for any particular search and IR method, the time it takes and its cost (compared to other automated methods or human review) must also be considered.

Fourth, the goals of the search are a factor (e.g., capturing or finding as many responsive documents as possible regardless of time and cost versus finding responsive documents as efficiently as possible, i.e., with the least number of non-responsive documents). In other words, the practitioner must consider the desired trade-off between precision and recall. Given the particular setting, the party seeking to employ one or more search methods should assess the relative importance in that setting of finding responsive ESI versus the importance of eliminating non-responsive data. Depending on this assessment, one or more alternative search methodologies may prove to be a better match in the context of a particular task.

Fifth, one must consider the skills, experience, financial, and practical constraints of the representatives of the party making the selection (e.g., the attorneys, litigation support staff, vendors, the Special Master, etc.).

Sixth, the current status of electronic discovery in the matter, including the extent to which activities including preservation and collection are occurring in addition to processing and/or attorney review.

Seventh, one must investigate empirical research supporting the reliability of the search and IR method for particular types of data, or in particular settings.

* * *

Although not the focus of this Commentary, practitioners may also wish to consider the use of advanced search methods at earlier stages of the e-discovery process before traditional document review.

> • Early Case Assessment: A key objective of early case assessment is to assess case risk and cost, with the goal of avoiding futile and wasteful litigation activity. Tools with sophisticated metadata search and computer- or technology-assisted **\*246** review capabilities can be helpful in identifying a small subset of highly probative documents within the population with high precision. Users can then focus on this "rich" subset of data to make rapid and informed decisions on case strategy.

> • Culling: For proper use in culling strategies, search and retrieval technologies should support a valid statistical framework able to estimate characteristics such as prevalence, precision, and recall. This facilitates a user's quantifiable assessment of the cost and risk involved in culling decisions: for example, whether culling a certain set of documents will potentially yield 5% or 95% of the relevant documents.

> • Prioritized review: Prioritized review structures the review process to start with the documents most likely to be relevant, progressing to the documents least likely to be relevant. Stratified review, a variation of prioritized review, matches document importance and reviewer quality, such that more skilled reviewers can review documents requiring greater expertise. Prioritized and stratified reviews require computer- or technology-assisted review tools that are able to classify documents as "more likely to be relevant" through "less likely to be relevant."

Finally, in adopting proportionality, parties need to balance the costs of using alternative search methods with the perceived benefits and risks in a given litigation context. Costs and time will vary depending on the desired rate of recall (how many documents need to be found) and precision (how many documents need to be reviewed to yield relevant documents). Risk also is reflected in recall, i.e., how many documents are found versus how many are "left on the table." The proportionate costs versus benefits and risks that a user is willing to bear are a function of what technology is reasonably available and what is at stake in the particular matter, taking into account what e-discovery phase is being addressed (document review versus other aspects of discovery, at earlier stages, per the above).

*Practice Point 4. Parties and their counsel should perform due diligence when choosing a particular information retrieval product or vendor service.*

The prudent practitioner should ask questions regarding search and retrieval features and the specific processing and searching rules that are applied to such features. Some tools are fully integrated into a vendor's search and review system, whereas others are "stand alone" tools that may be used separately from the particular review platform. It is essential not only to understand how the various tools function, but also to understand how the tools fit within the overall workflow planned for discovery. A practitioner should inquire as to which category or categories the specific tool fits into, how it functions, and what third-party technology lies behind the tool.

It is also essential that specific methods or tools be made understandable to the court, opposing parties, and the attorney's client. How data is captured and indexed (and how long it takes to build an index) also may affect a decision on use; it is therefore important to understand how a particular system deals with rolling input and output over time, considering its flexibility and scalability. The ability to perform searches across metadata, to search across multiple indices or stores of data, to search

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 311 of 329

embedded data, to refine search results (nested searches), to save queries, to capture duplicates and perform **\*247** deduplication, to trace email threads, and to provide listings of related terms or synonyms are all examples of specific functional requirements that should be clarified depending on case needs.

Other types of due diligence may involve administrative matters (e.g., understanding maintenance and upkeep, additional charges, system upgrades, availability of consultants or technicians to address problems, system performance), quality control issues (e.g., prior testing of the method or tool in question; how databases and dictionaries supporting concept search were populated; the strength of the provider's application development group), and, finally, any relevant licensing issues which could involve proprietary software or escrow agreements with third parties.

*Practice Point 5. Because of the characteristics of human language, no search and information retrieval tool can guarantee the identification of all responsive documents in large data collections. Moreover, different search methods may produce different results, subject to a measure of statistical variation inherent in the science of information retrieval.*

Just as with past practice involving manual search through traditional paper document collections, there is no requirement that "perfect" searches will occur – only that parties and their counsel act reasonably and in good faith in the performance of their discovery obligations. From decades of IR research, it is clear that a 100% rate of recall, i.e., the ability to retrieve all responsive documents from a given universe of electronic data, is an unachievable goal. As discussed in prior sections, the richness of human language, with its attendant elasticity, causes all present day automated search methods to fall short of perfection.

Moreover, there will always be a measure of statistical variation associated with alternative search methods, i.e., some responsive documents will be found by one search method while being missed by others. Even the same search method may return different results if new documents are added to the searched universe. Particularly in the context of a large data set, a search method should be judged by its overall results (such as using measures of recall and precision), rather than being judged by whether it produces the identical document set as compared with a different technique.

However, it is important not to compare "apples with oranges." Given the present state of information science, it would be a mistake to assume that one search method will work optimally across all types of possible inquiries or data sets (e.g., what works well in finding word processing documents in a given proprietary format may not be as optimal for finding information in structured databases, or in a collection of scanned images). This is another area where, consistent with the above principles, a good deal of thought should be given at the outset to the precise problem, in terms of its scope and relevancy considerations, before committing to a particular search method.

*Practice Point 6. Parties and their counsel should make a good faith attempt to cooperate when determining the use of particular search and information retrieval methods, tools, and protocols (including keywords, concepts, computer- and technology-assisted review and other types of search parameters and quality control measures).*

**\*248**  The body of case law that has emerged since 2006 [52]  indicates that courts are becoming more comfortable with addressing search and retrieval issues, particularly in the context of approving protocols, or ordering parties to share information that would lead to the development of more refined search protocols. The fact that some courts have waded into these issues demonstrates how rapidly the law has been evolving since the 2006 amendments to the Federal Rules of Civil Procedure. [53]

Under Rule 26(f), the parties' initial planning should address "[a]ny issues relating to disclosure or discovery of electronically stored information," as well as "[a]ny issues relating to preserving discoverable information." These initial discussions on preservation and production should include a specific discussion on search methods and protocols to be employed by one or both parties. [54]  While disclosure of these methods and protocols is not mandated or legally required under this rule, the advantages of collaborating should strongly be considered. In many cases, reaching an early consensus on the scope of searches can minimize the overall time, cost, and resources spent on such efforts, as well as minimize the risk of collateral litigation challenging the reasonableness of the search method employed. [55]

*The Sedona Conference Cooperation Proclamation*, published in 2008 underscores Practice Point 6, here, by including among the methods for accomplishing cooperation in e-discovery: (i) "Exchanging information on relevant data sources,

including those not being searched;" and (ii) "Jointly developing automated search and retrieval methodologies to cull relevant information."[56]

***Practice Point 7. Parties and their counsel should expect that their choice of search methodology (and any validation of it) will need to be explained, either formally or informally, in subsequent legal contexts (including in depositions, evidentiary proceedings, and at trial).***

Counsel should be prepared to explain what keywords, search protocols, and alternative search methods were used to generate their production set, including ESI made subject to a subsequent manual search for responsiveness and privilege. This explanation may need to come from a technical "IT" expert, a statistician, or an expert in search and retrieval technology. Parties should anticipate that in contested matters, an opposing party may request the justification of particular search methods used; this may require a demonstration of the recall and precision (or other measures) for the output of a chosen search method.[57] Counsel must be prepared to answer questions and even prove the reasonableness and good faith of their methods.

**\*249** ***Practice Point 8. Parties, counsel, and the courts should be alert to new and rapidly evolving search and information retrieval methods. Moreover, parties and their counsel should recognize that Information Retrieval is a distinct field of study that includes expertise in such areas as computer science, statistics, and linguistics, and that consultation with or utilization of experts in information retrieval may improve the quality of search results in complex cases involving large volumes of ESI.***

Given the rapid evolution of technology, what constitutes a reasonable search and IR method is subject to change. The legal community needs to be vigilant and must examine new and emerging techniques and methods which can yield better search results. In particular settings, lawyers should endeavor to incorporate evolving technological progress at the earliest opportunity in the planning stages of discovery or other legal setting involving search and retrieval issues.

Successful search of large amounts of ESI is increasingly dependent on the expertise of those doing the searches. Attorneys who lack expertise in IR or statistics should consider consulting or collaborating with IR experts, when appropriate, in complex cases. In general, the Bar would do well to understand that a greater appreciation of IR and scientific methods will result in better overall search. This is analogous to the situation where a tool, such as a scalpel, could in theory be used by anyone, regardless of their expertise in medicine or surgery. But when that tool is used in the hands of a trained surgeon (as opposed to someone who lacks that expertise), common sense dictates that the results will likely be better.

## VII. FUTURE DIRECTIONS IN SEARCH AND RETRIEVAL SCIENCE

What prospects exist for improving present day search and retrieval methodologies? And how can lawyers play a greater role in working with the IR research community to improve the accuracy and efficiency of search and review technology?

### A. Harnessing the Power of Artificial Intelligence (AI)

A statement from page 36 of The Sedona Conference, *Navigating The Vendor Proposal Process* (2007 ed.), under the general heading "Advanced Search and Retrieval Technology," bears repetition here: "Technology is developing that will allow for electronic relevancy assessments and subject matter, or issue coding. These technologies have the potential to dramatically change the way electronic discovery is handled in litigation, and could save litigants millions of dollars in document review costs. Hand-in-hand with electronic relevancy assessment and issue coding, it is anticipated that advanced searching and retrieval technologies may allow for targeted collections and productions, thus reducing the volume of information involved in the discovery process."

The growing enormity of data stores, the inherent elasticity of human language, and the unfulfilled goal of computational thinking to approximate the ability and subtlety of human language all present steep challenges to the IR and AI communities in their quest to develop optimal search and retrieval techniques.

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 313 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

But the future holds promise. Not only is there available technology to apply sophisticated computer algorithms to data mine traditional text, but new and better **\*250** approaches to image and voice pattern recognition are looming on the horizon. Indeed, there is already rudimentary technology available for searching audio by search terms, and some processes are confronting - and succeeding - in searching by image or picture. [58] Clearly, at some point, all forms of data stored in corporations and institutions will be within the scope of future information demands in legal settings, and likely within the ambit of future automated searching processes.

Finding information on the Web sometimes is easier than finding documents on one's own hard drive. The post-Google interest in building better search engines for the Web can only lead to new and better search techniques applied to more well-defined contexts, such as corporate and institutional intranets and data stores.

A "2020 Science" report issued by Microsoft in March 2006 anticipated the near-term development of "novel data mining technologies and novel analysis techniques," including "active learning" in the form of "autonomous experimentation" and "artificial scientists," in replacement of "traditional machine learning techniques [that] have failed to bring back the knowledge out of the data." [59] With the emergence of computer- or technology-assisted review methods in e-discovery, we are beginning to see such techniques played out in litigation. Beyond the short-term horizon, scientists are expected to embrace emergent technologies including the use of genetic algorithms, nanotechnology, quantum computing, and a host of other advanced means of information processing. And future AI research in the specific domain of search and retrieval is unbounded and, at least in part, unpredictable.

## B. The Role of Process in the Search and Retrieval Challenge

Every search and retrieval technology has its own methodology to ensure the technology works properly, relying on a set of instructions that outline the workflow for the tool. How well these methods are applied significantly impacts the performance, and therefore the results achieved by the technology. This is where process comes in to play. Process provides order and structure by setting guidelines and procedures designed to ensure that a technology performs as intended. Effectively applied, process drives the consistent and predictable application of the search and retrieval technology. The results derived from the consistent and predictable application of search and retrieval tools establish the technology's credibility and value.

### The Importance of Process

A process is a considered series of events, acts, or operations leading to a predictable result or effect. A process, like a technology, is a "tool" that can be used to assist in completing a task. The use of a well-defined and controlled process promotes consistency, reliability, and predictability of the results and ensures the efficient use of the resources required to produce them. As such, a process does not find the answer to or attain the objective of a task on its own. Process, no matter how well designed and executed, cannot replace the exercise of judgment; however, process promotes the exercise of judgment by ensuring that the most accurate and reliable information is available when making decisions. In the search and retrieval context, this means the availability of consistent and reliable information to assist the parties in making informed decisions.

**\*251** The use of process promotes consistency by establishing a defined approach to a task. The resulting consistency promotes reliability and predictability. Reliability and predictability allow for better planning, performance, and cost management. Altogether, risk is reduced and confidence is promoted.

One can visualize search and retrieval as a process enabling a party to distinguish potentially discoverable information from among a broader set of electronic data collected for the purposes of production. It consists of several steps that take place in the context of a particular search and retrieval technology. Because the application of process is flexible, it can be used to address unique conditions that might be associated with a technology, such as where the use of a search and retrieval technology itself creates issues. For example, the use of search and retrieval technologies to address significant volumes of information may not address all problems: as review volumes increase (even with carefully crafted and tested search criteria) the likelihood of being swamped by false positives or missing false negatives increases greatly. By developing and implementing process steps which consistently address these issues, their impact can be diminished and the reasonableness and good faith of the technology can be established.

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 314 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

### *"Process" as a Measure of Reasonableness and Good Faith*

Search and retrieval in this new era requires the establishment and recognition of a new standard. A standard of absolute perfection is and always has been unrealistic; but now, with quantitative data available, we know perfection is not only unrealistic but also quite simply unachievable.

Rather than perfection, which would demand the identification and production of every relevant, non-privileged document, the standard against which to measure these new technologies and processes should incorporate the same principles that have traditionally governed all discovery: reasonableness, good faith, and proportionality. [60] Although these terms raise concerns about ambiguity and uncertainty, they can actually represent a well-defined set of expectations in the context of the discovery process.

A process that emphasizes reasonableness, good faith, and proportionality is fully consistent with what is required under the discovery process. Discovery of information relevant to a dispute gathered by an opponent is often central to a fair and efficient resolution. [61] A party need only identify and produce that which is relevant, as defined by the rules, with the degree of diligence expected and available by experienced practitioners acting reasonably. [62] As noted in Sedona Principles 6 and 11, a party may choose to implement this approach in a reasonable manner.

Sound process applied to the use of search and retrieval technology can readily establish a measurable means for conducting discovery that satisfies the Rules. Reasonableness, good faith, and proportionality can be defined and measured by identifying performance criteria based on their attributes. Accordingly, the unreasonable and unattainable goal of "perfection" should not hinder the attainable and measurable goal of reasonableness.

**\*252** As search and retrieval technologies and associated processes are developed, parties will no doubt want to use them to achieve defensible and credible results. If a party fails to adhere to appropriate performance guidelines, it will be subject to scrutiny and criticism, and perhaps even sanctions. Therefore, an established process - in conjunction with sound technology - can serve as a benchmark for conducting future discovery. Further, defensibility with opposing counsel and the court will likely depend implementing and adhering to processes developed for use with search and retrieval technologies.

### *Implementing Process*

Using a search and retrieval technology in conjunction with an implementing process will involve iterative activity. This will incorporate feedback loops at appropriate decision points to allow integration of what a case team learns after each step of the process. This, in turn, will calibrate and maximize the technology's ability to identify relevant information. It is through this feedback that case teams will acquire sound information to use in making both strategic and tactical decisions.

The initial search and retrieval process should be designed as a "pilot" process that can be evaluated and modified as the team learns more about the corpus of information to be reviewed. One useful approach initiates the process by focusing on the information collected from a few key custodians at the center of the facts at issue in the litigation or investigation. Focusing on information collected from core custodians (information with a higher likelihood of relevance) will help the team efficiently understand the issues and language used by the custodians, and enable them to more efficiently develop and implement an appropriate search and retrieval process for subsequent custodians and ESI.

The initial selection and refinement of search terms can also benefit from sampling techniques used to rank the effectiveness of various terms or concepts. Reviewing samples of information that include selected search terms or concepts and ranking their relative value based on their efficacy in retrieving relevant information (recall) and their efficiency in excluding non-relevant information (precision) can help focus the selection of appropriate search terms. [63]

The development of process control logs and improved second-level review techniques can also help the review team consistently apply the designed process to all of the information to be reviewed. Additionally, a second-level review process based on statistical sampling techniques can ensure acceptable levels of quality. While these techniques are relatively unknown in the typical review processes in use today, their widespread adoption in businesses of all types should drive their implementation in large document review projects in the near future. [64]

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 315 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

## C. How The Legal Community Can Contribute to The Growth of Knowledge

Human review of documents in discovery is expensive, time consuming, and error-prone. The application of linguistic and statistically-based content analysis, search and retrieval technologies such as computer- or technology-assisted review, and other tools, techniques, and process in support of the review function can effectively reduce cost, time, and error rates. [65]

**\*253 Recommendations**

*1. The legal community should support collaborative research with the scientific and academic sectors aimed at establishing the efficacy and efficiency of a range of automated search and information retrieval methods.*

*2. The legal community should encourage the establishment of objective benchmarking criteria, for use in assisting lawyers in evaluating the competitive legal and regulatory search and retrieval services market.*

Up until recently, in the years since the 1985 Blair and Maron study, there was little in the way of peer-reviewed research establishing the efficacy of various methods of automated content analysis, search, and retrieval as applied to a legal discovery context. Research into the relative efficacy of search and retrieval methods should acknowledge that each alternative should be viewed in the context of its suitability to specific document review tasks. Different technologies, tools, and techniques obviously have different strengths and weaknesses. Moreover, the outcomes of the application of advanced content analysis, search, and retrieval methods may be significantly different based on expertise of the operator. Ideally, research should advance the goal of setting a minimum or baseline standard for what constitutes an adequate information retrieval process, as well as reaching agreement on how to benchmark competing methods against agreed-upon objective evaluation measures.

Since 2006, The Sedona Conference has supported the TREC Legal Track (part of the TREC research program run by the National Institute of Standards and Technology). NIST is a federal agency that collaborates with industry and academia to develop and apply technology, measurements, and standards. TREC is designed "to encourage research in information retrieval from large text collections." [66] The TREC legal track has involved evaluation of a set of search methodologies based on lawyer relevancy assessments on topics drawn from large publicly available document databases. The results that have come out of the TREC Legal Track represent the type of objective research into the relative efficacy of Boolean and other search methods that the legal community should further encourage. [67]

However, a need exists to expand upon TREC research to accommodate the potential retrieval of tens or hundreds of millions of arguably relevant documents among a greater universe of terabytes, petabytes, exabytes, and beyond, and to study new and emerging forms of ESI, including text messaging and all forms of online social media. Members of The Sedona Conference community have and will continue to participate in collaborative workshops and other fora focused on issues involving IR. [68] How best to **\*254** leverage the work of the IR community to date is an enterprise beyond the scope of this paper. The Sedona Conference intends to remain in the forefront of the efforts of the legal community in seeking out centers of excellence in this area, including the possibility of fostering private-public partnerships aimed at focused research.

## *255 APPENDIX: TYPES OF SEARCH METHODS

*This Appendix is a "survey" of some of the different search methods found in the information retrieval literature, which form the basis of offerings by vendors in the legal marketplace. The list is not exhaustive. Indeed, as the main body of the Commentary makes clear, rapid technological progress will inevitably affect how methods are described, implemented, and subsequently replaced with new ways of performing search and retrieval.*

*Three further notes on this survey are in order. First, the following search methods are not intended to be mutually exclusive. Indeed, many products encourage the use of hybrid, combined, or cumulative approaches to search.*

*Second, the choice of method is condition- and objective-specific. The method best suited to one circumstance may not be the best suited to another circumstance. The methods reviewed in this survey may be viewed as distinct tools in the search "toolbox," each with its appropriate application or applications.*

*Third, potential users of the technologies reviewed in this survey are reminded that the tools alone cannot guarantee an effective search, any more than a well-made scalpel guarantees a successful surgery. Search tools will be effective only if applied with sound methodological principles and with appropriate expertise.*

### A. Boolean Search

A "Boolean search" utilizes the principles of Boolean logic named for George Boole, a British born mathematician. Boolean logic is a method for describing a "set" of objects or ideas. Boolean logic was applied to IR as computers became more widely accepted. Boolean searches can easily be applied to large sets of unstructured data and return results which exactly match the search terms and logical connectors applied by the operators.

As used in set theory, a Boolean notation demonstrates the relationship between sets or groups of information **-** in our example, two sets of information, "A" and "B" **-** and, in effect, creates a new set of information.

If a search seeks information contained within either original set "A" *or* original set "B" (essentially any area within either set in the Venn diagram below), the searcher is creating a "Union" of A and B (denoted "A<<Unknown Symbol>>B"). If the search seeks information which would be found within both set "A" *and* set "B," if each set was searched separately (the area within the overlap of the Venn diagram below), the searcher is creating an "Intersection" of A and B (denoted "A<<Unknown Symbol>>B"). A Venn diagram picture easily depicts these relationships (see below).

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The "**OR**" Boolean operator directs that the set may contain any, some, or all of the keywords searched. The purpose of this command is to encompass alternative   **\*256**   vocabulary terms. **OR** is represented by the union of the sets ("A<< Unknown Symbol>>B") (the entire area within both the circles above). The use of **OR***expands* the resulting Boolean set.

The "**AND**" Boolean operator identifies the intersection of two sets or two keywords. The purpose of this command is to help construct more complex concepts from more simple vocabulary word "building blocks." **AND** is represented by intersection of the sets ("A<<Unknown Symbol>>B") (the shaded area within the intersection of the two circles). The use of **AND***restricts* the resulting Boolean set.

The "**NOT**" Boolean operator eliminates unwanted terms. The purpose of this command (often preceded by either "**AND**" or "**BUT**") helps suppress multiple meanings of the same term; in other words, eliminating ambiguity. **NOT** would be represented by the area within the rectangle surrounding both circles, or the "empty" set ("ø").

Different search engines or tools may provide additional Boolean operators or connectors to create more complex search statements. These may include:

• **Parenthesis:** A Boolean search may include the use of parentheses to force a particular order to the execution of the search, as well as to create more refined and flexible criteria. Any number of logical ANDs (or any number of logical ORs) may be chained together without ambiguity; however, the combination of ANDs and ORs and AND NOTs or BUT NOTs can lead to ambiguous directions. In such cases, parentheses may be used to clarify the order of operations. The operations within the innermost pair of parentheses are performed first, followed by the next pair out, etc., until all operations are completed.

• **Proximity or NEAR/WITHIN operator:** This technique checks the location of terms and only matches those within the specified distance. This is a useful method for establishing relevancy between search criteria, as well as paring down irrelevant

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 317 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

matches and obtaining better results (improving precision). Some search engines permit the user to define the order, in addition to the distance of the search terms. For example: budget w/10 deficit would mean "deficit within the 10 words of word budget." [w/ does not specify order in most systems, only distance; there is another connector that is generally used to specify the particular order. We should ask a vendor if we want to include it here.]

• **Phrase searching:** Some search engines provide an option to search a set of words as an exact phrase, either by typing the phrase in quotation marks (" ") or by using a command. When they receive this kind of instruction, the search engine will locate all words that precisely match the search terms, and then discard those which are not next to each other in the correct order. To perform this task efficiently, the index typically will store the position of the word in the document, so the search engine can tell where the words are located.

• **Wildcard operators** (also sometimes referred to as "truncation" or "stemming"). This search capability allows the user to widen the search by searching a word stem or incomplete term. Such a search is typically reflected by a symbol such as a question mark (?), asterisk (*), or exclamation point (!).  **\*257**  The search engine may also allow the user to restrict the truncation to a certain number of letters by adding additional truncation symbols. For example: "Teach??" would find "teaches" and "teacher," but would not find "teaching." In addition, some engines will allow for internal truncation such as "wom?n," which would find "women" or "woman." The "*" and "!" terms have broader application: for example, hous* would find house, housemate, Houston, household, or other words with the stem "hous."

## B. Probabilistic Search Models

Probability theories are used in IR to make decisions regarding relevant documents. A probabilistic search system is based on a formula that places a value on words, their interrelationships, proximity, and frequency. By computing these values, a relevancy ranking can be determined for each document in a search result. This weighting may be based on a variety of factors:
• Frequency of terms within a document **-** the more times the term appears, the more weight it carries.

• Location of terms within a document **-** terms in titles and closer to the top of documents are more heavily weighted.

• Adjacency or proximity **-** the closer the terms are to each other, the heavier the weighting.

• Explicit or implicit feedback on relevance, in which the top-ranked documents are examined, and used to refine the probabilistic model. [1]

Examples of probabilistic search models include Okapi BM25, Bayesian networks, and language models. [2]

## C. "Fuzzy" Search

Boolean and probabilistic search models rely on exact word matches to form the results of a query. Exact matching is very strict: either a word matches or it doesn't. "Fuzzy" search is an attempt to improve recall by matching more than the exact word: fuzzy matching techniques try to reduce words to their core and then match all forms of the word. The method is similar to stemming in Boolean classifiers, discussed above.

Some algorithms for fuzzy matching rely on the understanding that the beginning and end of English words are more likely to change than the core, so they count matching letters and give more weight to words with matching letters in the center than at the edges. Unfortunately, this can sometimes yield results that make little sense (a search for "Tivoli" might bring up "ravioli").

Many systems allow the user to assign a degree of "fuzziness" based on the percentage of characters that are different. Fuzzy search, or matching, has at least two different variations: finding one or more matching strings of a text, and finding similar

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 318 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

strings within a  **\*258**  fixed string set often referred to as a "dictionary." Fuzzy search has many applications in legal IR including: spellchecking, auto-filling of email addresses, and OCR clean up.


### D. Dimensionality Reduction Systems

Bayesian classifiers are often considered "naïve" because they assume that every word in a document is independent of every other word in the document. In contrast, there is a class of concept learning technologies that rely on the notion that words are often correlated with one another, and that there is value in that correlation. These methods are also referred to as "dimensionality reduction techniques" or "dimension reduction systems."

These systems recognize there is redundancy among word usage and take advantage of that redundancy to find "simpler" representations of text. For example, a document that mentions "lawsuits" is also likely to mention "lawyers," "judges," "attorneys," etc. These words are not synonyms, but they do share certain meaning characteristics. The presence of any one of these words would be suggestive of a common theme. Documents that mentioned any of these terms would likely be about law. Conversely, in searching for one of these words, one might be interested in finding a document that did not contain that exact word, but did contain one of these related words.


TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

*Figure 1. Dimension reduction - the original dimensions of "Lawyer" and "judge" are combined into a single dimension. Each point in the graph represents a document. Its location in the graph shows how much the document is related to each dimension.*

The figure above illustrates the kind of relationships identified by such systems. The word "lawyer" tends to occur in the same context as the word "judge." Each document has a certain strength along the "lawyer" dimension, related, for example, to how many times the word "lawyer" appears. Similarly, documents have strength along the "judge" dimension, related, for example, to how many times the word "judge" appears. These systems find a new dimension that summarizes the relationship between "lawyer" and "judge." In this example, we are reducing the dimensions from two to one.

Mathematically, we can then describe documents by how much strength they have along this dimension and not concern ourselves with its strength along either the original "lawyer" or "judge" dimensions. The new dimension is a summary of the original dimensions, and the same thing can be done for all words in all documents. We can locate documents along these new, reduced, dimensions or we can represent words along these dimensions in a similar way.

Similarly, multiple words can be represented along dimensions; instead of having just one summary dimension, we can have many of them. Instead of describing a document by how it relates to each of the words it contains, as is done with Vector Space Models,[3] we  **\*259**  can describe the document by how it relates to each of these reduced dimensions. Latent Semantic Indexing ("LSI," also called "Latent Semantic Analysis") is the most well-known of these dimension -reducing techniques, but there are others, including neural networks and other kinds of statistical language modeling.

These techniques are similar to one another in that they "learn" the representations of the words in the documents from the documents themselves. Their power comes from reducing the dimensionality of the documents. They simplify representation, and make recognizing meaning easier.

For example, a collection of a million documents might contain 70,000 or more unique words. Each document in this collection can be represented as a list of 70,000 numbers, where each number stands for each word (i.e., the frequency with which that word occurs in that document). Using these techniques, one can represent each document by its strength along each of the reduced dimensions.

One can think of these strengths as a "meaning signature," where similar words will have similar meaning signatures. Documents with similar meanings will have similar meaning signatures. As a result, the system can recognize documents that are related, even if they have different words, because they have similar meaning signatures.

### E. Machine Learning Approaches

There are two main types of machine learning: Unsupervised and Supervised. Unsupervised learning is performed using a large set of examples, without any additional human input. In Supervised Learning methods, the learning examples are tagged individually by a user, and the learning process relies heavily on these examples. Both Supervised and Unsupervised learning may use dimension-reduction techniques as described in Section D.

### 1. Unsupervised Machine Learning (Statistical Clustering)

Systems may use statistics or other unsupervised machine learning tools to recognize the category to which certain information belongs. The simplest of these is the use of "statistical clustering." Clustering is the process of grouping together documents with similar content. There are a variety of ways to define similarity, but one way is to count the number of words that overlap between each pair of documents. The more words they have in common, the more likely they are to be about the same thing.

Many clustering tools build hierarchical clusters of documents. Some organize the documents into a fixed number of clusters. The quality or "purity" of clustering (i.e., the degree to which the cluster contains only what it should contain) is rarely as high as that obtained using custom built taxonomies or ontologies, but since they require no human intervention to construct, clustering is often an economical and effective first-pass at organizing the documents in a collection. One of the major hurdles when deploying clustering is that there are no objective measures of "clustering quality." Some systems improve the quality of clusters that are produced by starting with a selected number of clusters, each containing selected related documents. These selected documents then function as "seeds" for the clusters. Other related documents are then joined to them to form clusters that correspond to their designer's interests. Then, additional documents are added to these clusters if they are sufficiently similar.

### *260 2. Supervised Machine Learning

In the context of text categorization, the general objective of machine learning is to generate a classifier that can automatically classify new untagged documents accurately and efficiently based on a small set of tagged exemplar documents. There are many learning algorithms that can be used in the classifier paradigm, including, but not limited to, Naïve Bayesian, Artificial Neural Networks, Support Vector Machines, and Logistic Regression. The choice of which algorithm to use depends on the nature of the task at hand, the type of data, the characteristics of the learning process, etc.

Selecting the set of exemplar documents that will be used to build a classifier is a key challenge of supervised machine learning - it must ensure comprehensive coverage of the population of documents while minimizing the size of this training set to control costs.

One common approach to selecting the training set is the use of active learning. Active learning is a widely researched field, within which several methods and technologies have been developed and tested. [4]

The premise of active learning, and the main differentiator between this approach and other types of machine learning, is that the learning process is conducted in a number of iterations. The algorithm selects a small sample of documents for each iteration. Each sample is tagged by an expert user, and the tags are fed back to the algorithm as a training set. The algorithm learns from these new tags and generates another sample for the next iteration. The process continues until sufficient learning has occurred and the algorithm can accurately predict the user's classification decisions.

The main advantage of the active learning technique is that it enables the algorithm to make an informed decision as to which documents are to be included in the next sample. The basis for this decision becomes more and more informed as the number

of iterations increases. The objective of active learning is to optimize learning performance by choosing sample documents that provide the maximum contribution to the training of the classifier. In comparison to random sampling, active learning dramatically reduces the number of documents needed for the training stage.

### F. Concept and Categorization Tools: Thesauri, Taxonomies, and Ontologies

To deal with the problem of synonymy, some systems rely on a thesaurus, which lists alternative ways of expressing the same or similar ideas. When a term is used in a query, the system uses a thesaurus to automatically search for all similar terms. The combination of query term and the additional terms identified by the thesaurus can be said to constitute a "concept."

The quality of the results obtained with a thesaurus depends on the quality of the thesaurus, which, in turn, depends on the effort expended to match the vocabulary and usage of the organization using it. Generic thesauri, which may attempt to represent the **\*261** English language or are specialized for particular industries, are sometimes available to provide a starting point, but each group or organization has its own jargon and own way of talking that require adjustment for effective categorization. In America, for example, the noun "jumper" is a child's one-piece garment. In Australia, the noun "jumper" is a sweater. In America, a 3.5 inch removable disk device was called a "floppy" during its heyday. But in Australia, it was called a "stiffy."

Taxonomies and ontologies are also used to provide conceptual categorization. Taxonomy is a hierarchical scheme for representing classes and subclasses of concepts. The figure below shows a part of a taxonomy for legal personnel. Attorneys, lawyers, etc., are all types of legal personnel. The only relations typically included in a taxonomy are hierarchical or inclusion relations. Items lower in the taxonomy are subclasses of items higher in the taxonomy. For example, the NAICS (North American Industry Classification System) is one generally available taxonomy that is used to categorize businesses. In this taxonomy, the category "Information" has subclasses of "Publishing," "Motion Picture and Sound Recording Industries," and "Broadcasting."

One can use this kind of taxonomy to recognize conceptual relationship among these different types of personnel. If a category includes law personnel, then any document that mentions attorney, lawyer, paralegal, etc., should be included in that category. Like thesauri, there are a number of commercially available taxonomies for various industries.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

*Figure 2. A simple taxonomy for law personnel.*

Predefined taxonomies exist for major business functions and specific industries. It may be necessary to adapt these taxonomies to one's particular organization or matter.

An ontology is a more generic species of taxonomy, often including a wider variety of relationship types than are found in the typical taxonomy. An ontology specifies the relevant set of conceptual categories and how they are related to one another. The figure below shows part of an ontology covering subject matter similar to that described in the preceding taxonomy. For clarity, only a subset of the connections between categories is shown. According to this ontology, if the category includes attorneys, the user may also be interested in documents that use words such as "lawyer," "paralegal," or "Esq." Like taxonomies, ontologies are most useful when they are adapted to the specific information characteristics of the organization.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

*Figure 3. A section of an ontology of legal personnel.*

**\*262** Taxonomies, ontologies, and thesauri are all knowledge structures. They represent explicit knowledge about some subject. An expert writes down the specific relations she knows about. Although there are tools that help the expert create these structures, they still tend to represent only the information the expert can explicitly describe as important.

The structure of the thesaurus, taxonomy, or ontology can be used as the organizing principle for a collection of documents. Rules are derived that specify how documents with specific words in them are related to each of these categories, and the computer can then be used to organize the documents into the corresponding categories.

These rules can be created explicitly, or they can be created using machine learning techniques. Explicit rules are created by knowledge engineers. For example, one rule might include a Boolean statement like this: (acquir* or acquisition or divest* or joint venture or alliance or merg*) and (compet* or content or program*) that specifies the critical words that must appear for a document to be assigned to the "merger" category. The effectiveness of rules like these depends critically on the ability of the knowledge engineers to guess the specific words that document authors actually used. Syntactic rules may also be employed by some systems. For example, a system may only look for specific words when they are part of the noun phrase of a sentence.

### G. Presentation/Visualization and Social Networking Tools

Presentation and visualization software technologies may incorporate search and retrieval functionality that may be found to have useful applications. These technologies can organize information (e.g., emails) so that a searcher can more efficiently study the search topic (including finding relevant emails). They also are good at highlighting patterns of "social networks" within an organization that would not necessarily be apparent by more traditional searches. Subject to some exceptions, the results of any search and retrieval query can be presented in a variety of forms, including as a:

1. List **-** items in sequence, for example messages ordered by sent date

2. Sort **-** sortable items aggregated into rows by columns, for example messages by sender

3. Group **-** items categorized or totaled, for example count of messages by sender

4. Cluster **-** items in groups organized by spatial proximity, for example relevant groups spiraling out to less relevant groups

5. Tree **-** items in parent/child hierarchy, for example, folder and subfolder(s)

6. Timeline **-** items arrayed by a time element, for example a list/group of items arrayed by sent date

7. Thread **-** items grouped by conversation

8. Network **-** items arrayed by person, for example a diagram of message traffic between sender(s) and recipient(s)

 **\*263**  9. Map **-** items plotted by geography, for example items plotted by city and state of origin

10. Cube **-** items in a multi dimensional pivot table; including, table, group, timeline, and tree functionality

In practice, a searcher can load search results into a presentation technology for an organized view and then drill down to access discrete items of particular interest or concern. This often iterative process may help a searcher to learn more about, act on, and manage search results.

### Footnotes

a1    Copyright 2014, The Sedona Conference. All Rights Reserved.

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 322 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

1    *Hickman v. Taylor,* 329 U.S. 495, 507 (1947) ("Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.").

2    Here's why: One gigabyte of electronic information can generate approximately 70,000 to 80,000 pages of text, or 35 to 40 banker's boxes of documents (at 2,000 pages per box). Thus, a 250 gigabyte storage device (e.g., a laptop or hard drive), theoretically, could hold as much as the equivalent of 8,750 to 10,000 banker's boxes of documents. In contrast, in 1990, a typical personal computer held just 200 megabytes of data - less than 1/1000 the capacity of a typical hard drive today. Even if only 10% of a computer's available capacity today contains user-created information (as distinguished from application programs, operating systems, utilities, etc.), attorneys still would need to consider and potentially review 1,750,000 to 2,000,000 pages per device.

3    See Alex Vorro, *Law firm billing rates steadily climbing despite down economy,* (April 17, 2012) (citing TyMetrix Legal Analytics' 2012 Real Rate Report™), http://www.insidecounsel.com/2012/04/17/law-firm-billing-rates-steadily-climbing-despite-d.

4    *See infra* note 18 and accompanying text.

5    One indication of the amount of ongoing effort and investment to improve search and retrieval capabilities is evidenced by the research and development spending of internet and technology giants Google, Microsoft, Apple, and IBM. According to published reports, Google spent $ 3.76 billion, Microsoft spent $8.7 billion, Apple spent $1.78 billion, and IBM spent $6.03 billion on core research and development activities in 2010. See Booz & Company, *The 2011 Global Innovation 1000 - Why Culture Is Key* (October, 2011), http://www.booz.com/media/file/BoozCo-Global-Innovation-1000-2011-Webinar.pdf.

6    *See, e.g.,* Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 685 F. Supp. 2d 456, 461, 465 (S.D.N.Y. 2010), *overruled in part on other grounds by* Chin v. Port Authority of New York & New Jersey, 685 F.3d 135 (2nd Cir. 2012).

7    There is great variation in the description and application of these technologies, whether for technical, sales, or marketing differentiation or other business purposes. Some of the terms currently in use as of the date of this Commentary include: computer-assisted review; technology-assisted review; predictive coding; relevance ranking; text mining; tools that employ mathematical probabilities; as well as other techniques, including fuzzy logic to capture variations on words, and conceptual search, which makes use of taxonomies and ontologies assembled by linguistic means. For a glossary of terms relating to these technologies see Maura R. Grossman and Gordon V. Cormack, *The Grossman-Cormack Glossary of Technology-Assisted Review with Foreword by John M. Facciola, U.S. Magistrate Judge,* 2013, FED. CTS. L. REV. 7 (January 2013), http://www.fclr.org/fclr/articles/html/2010/grossman.pdf.

8    The Sedona Principles, *Best Practices Recommendations & Principles for Addressing Electronic Document Production* (2d ed. 2007) (hereinafter *The Sedona Principles*), *available at* https://thesedonaconference.org/download-pub/81.

9    *Id.* at Comment 11.a.

10    *Id.*

11    The Sedona Conference Best Practices for the Selection of Electronic Discovery Vendors: *Navigating the Vendor Proposal Process* (2007), *available at* https://thesedonaconference.org/download-pub/80.

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 323 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

12    There may be a role for the use of some type of search and retrieval technology in discharging obligations to preserve ESI, as well as during the initial pre-review data culling or "collection" phases, in anticipation of complying with specific ESI and document requests. During the collection phase, for example, the goal is to maximize the amount of potentially relevant evidence in a subset of the greater universe of available ESI, without necessarily selecting only the more relevant information that might be the focus of the review phase preceding production. Accordingly, parties may well end up using (and agreeing to use) differing search methods in the initial collection and later review phases of litigation. While we acknowledge that use of advanced search tools during earlier phases of litigation (e.g., during early case assessment, at preservation, etc.) remains cutting edge and worthy of future discussion, the primary focus of this Commentary will be on search tools as they are used in the review process. *See generally* Thomas Y. Allman, Jason R. Baron, and Maura R. Grossman, *Preservation, Search Technology, and Rulemaking*, 30 THE COMPUTER AND INTERNET LAWYER No. 2 (February 2013); Mia Mazza, Emmalena K. Quesada, and Ashley L. Sternberg, *In Pursuit of FRCP 1: Creative Approaches To Cutting and Shifting the Costs of Discovery of Electronically Stored Information*, 13 RICH. J. L. & TECH. 11 (2007), at [53] & [60], *available at* http://law.richmond.edu/jolt/v13i3/article11.pdf (discussing the use of concept searching in regard to preservation); *The Sedona Principles*, *supra* n.8 ("Organizations should internally address search terms and other filtering criteria as soon as possible so that they can begin a dialogue on search methods as early as the initial discovery conference.").

13    The Sedona Conference Glossary: *E-Discovery & Digital Information Management* (4th ed. 2014), 15 SEDONA CONF. J. 305 (2014).

14    *See* George L. Paul and Jason R. Baron, *Information Inflation: Can the Legal System Adapt?,* 13 RICH. J. L. & TECH. 10 (2007), at [1], n.2, *available at* http://law.richmond.edu/jolt/v13i3/article10.pdf ("Organizations have thousands if not tens of thousands of times as much information within their boundaries as they did 20 years ago."); Peter Lyman and Hal R. Varian, *How Much Information*, 2003, *available at* http:// www2.sims.berkeley.edu/research/projects/how-much-info-2003/.

15    *See* Sara Radicati, Ed., *Email Statistics Report, 2011-2015*, The Radicati Group, Inc., May 2011, *available at* http:// www.radicati.com/wp/wp-content/uploads/2011/05/Email-Statistics-Report-2011-2015-Executive-Summary.pdf.

16    One gigabyte is equivalent in volume to between 70,000 and 80,000 pages of material. At 2,000 pages per box, one gigabyte is therefore equivalent to 35 to 40 boxes of documents. *See supra* n.2.

17    *See Memory Storage Density*, Wikipedia, http:// en.wikipedia.org/wiki/Memory_storage_density#Effects_on_price (last visited April 7, 2013); Michelle Kessler, *Days of officially drowning in data almost upon us*, USA TODAY, Mar. 5, 2007, www.usatoday.com/tech/news/20070305data_ N.htm. Cloud storage reduces the costs of storage even further. *See, e.g.,* https://developers.google.com/storage/docs/pricingandterms (last visited April 7, 2013); http:// mashable.com/2012/08/21/amazon-glacier (last visited April 7, 2013).

18    Compare mere pennies to store a gigabyte of data with $32,000 to review it in a traditional, linear fashion (i.e., assuming one gigabyte equals 80,000 pages and assuming that an associate billing $200 per hour can review 50 documents per hour at 10 pages in length, such a review would take 160 hours at $200/hr., or approximately $32,000). *See generally* Nicholas M. Pace & Laura Zakaras, WHERE THE MONEY GOES: UNDERSTANDING LITIGANT EXPENDITURES FOR PRODUCING ELECTRONIC DISCOVERY 17-27 (2012) [hereinafter RAND 2012 STUDY], http://www.rand.org/pubs/monographs/MG1208.html.

19    Not all cases are equally reliant on electronic discovery - from time to time, counsel may even forgo the production of electronically stored information and rely solely on hard-copy documents.

20    *See infra* text accompanying note 48.

21   "Deduplication" tools tag identical documents as duplicates by means of a "binary hash function" (a mathematical way of comparing the text of two documents represented in the underlying digital 1's and 0's actually stored on the computer to see if the documents are perfectly alike). Deduplication by binary hash has been widely used without much notice in court opinions to date. *See Wiginton v. CB Richard Ellis*, Inc., 229 F.R.D. 568, 571 (N.D. Ill. 2004) (referring to deduplication process); *Medtronic Sofamor Danek Inc. v. Michelson*, 229 F.R.D. 550, 561 (W.D. Tenn. 2003) (same).

22   "Email threading" refers to a particular message and a running list of all subsequent replies pertaining to that original email. David D. Lewis & Kimberly A. Knowles, *Threading electronic mail: A preliminary study* 33 INFORMATION PROCESSING AND MANAGEMENT 209 – 217 (1997) ("Near deduplication" involves files that "are not hash value duplicates but are materially similar."), *available at* http://pdf.aminer.org/000/936/211/threading_electronic_mail_a_preliminary_study.pdf.

23   *In re Lorazepam & Clorazepate,* 300 F. Supp. 2d 43, 46 (D.D.C. 2004); *see also In re CV Therapeutics, Inc.,* 2006 WL 2458720 (N.D. Cal. Aug. 22, 2006) (court endorses employment of search terms as reasonable means of narrowing production); *J.C. Associates v. Fidelity & Guaranty Ins. Co.,* 2006 WL 1445173 (D.D.C. 2006) (requiring search of files using four specified keywords); *FTC v. Ameridebt, Inc.,* 2006 WL 618563 (N.D. Cal. Mar. 13, 2006) ("email could likely be screened efficiently through the use of electronic search terms that the parties agree upon"); *Windy City Innovations, LLC v. America Online, Inc.,* 2006 WL 2224057 (N.D. Ill. July 31, 2006) ("[k]eyword searching permits a party to search a document for a specific word more efficiently"); *Reino de Espana v. Am. Bureau of Shipping*, 2006 WL 3208579 (S.D.N.Y. Nov. 3, 2006) (court approves of keyword search for names and email addresses as a "targeted and focused discovery search"); *U.S. ex rel. Tyson v. Amerigroup Ill.*, Inc., 2005 WL 3111972 (N.D. Ill. Oct. 21, 2005) (referencing agreement by parties to search terms); *Medtronic*, 229 F.R.D. at 561 (court orders defendant to conduct searches using the keyword search terms provided by plaintiff); *Alexander v. FBI,* 194 F.R.D. 316 (D.D.C. 2000) (court places limitations on the scope of plaintiffs' proposed keywords to be used to search White House email).

24   *See generally* Jason R. Baron, *Law in the Age of Exabytes: Some Further Thoughts on 'Information Inflation' and Current Issues in E-Discovery Search*, 17 RICH. J.L. & TECH. 9 (2011) (compiling case law), *available at* http://jolt.richmond.edu/v17i3/article9.pdf.

25   *Zubulake v. UBS Warburg, LLC,* 229 F.R.D. 422 (S.D.N.Y. 2004); *see also Zakre v. Norddeutsche Landesbank Girozentrale,* 2004 WL 764895 (S.D.N.Y. Apr. 9, 2004) (court denies plaintiff 's request for additional indexing of records, holding that defendant's production of CD-ROMS in a text searchable form was sufficient, citing to Guideline 11 of *The Sedona Principles*, 2004 Edition). *cf. Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,* 2007 WL 684001 (D. Colo. Mar. 2, 2007) (where court denied motion for sanctions based on an allegation that the opposing party failed to properly monitor compliance with its discovery obligations by not conducting keyword searches, court also stated that *The Sedona Principles*, 2004 Edition and Zubulake were not to the contrary).

26   *See also* R. Brownstone, *Collaborative Navigation of the Stormy e-Discovery Seas*, 10 RICH. J.L. & TECH. 53 (2004), *available at* http:// law.richmond.edu/jolt/v10i5/article53.pdf (arguing that parties must agree to search terms and other selection criteria to narrow the scope to manageable data sets); *The Sedona Principles*, *supra* note 8, Comment 11.a ("For example, use of search terms could reveal that a very low percentage of files (such as emails and attachments) on a data tape contain terms that are responsive to 'key' terms. This may weigh heavily against a need to further search that source, or it may be a factor in a cost-shifting analysis. Such techniques may also reveal substantial redundancy between sources (i.e., duplicate data is found in both locations) such that it is reasonable for the organization to preserve and produce data from only one of the sources."). *See generally* Kenneth J. Withers, *Computer-Based Discovery in Federal Court Litigation*, 2000 FED. CTS. L. REV. 2 (2000), http:// www.fclr.org/fclr/articles/html/2000/fedctslrev2.shtml (suggesting parties adopt collaborative strategies on search protocols).

THE SEDONA CONFERENCE BEST PRACTICES…, 15 Sedona Conf. J. 217

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 325 of 329

27    233 F.R.D. 363 (S.D.N.Y. 2006).

28    *Balboa Threadworks v. Stucky,* 2006 WL 763668 (D. Kan. Mar. 24, 2006) (court ordered parties to meet and confer on the use of a search protocol, including keyword searching).

29    Some case law has held that keyword searches were either incomplete or over inclusive. *See Alexander v. FBI,* 194 F.R.D. at 316; *Quinby v. WestLB AG,* 2006 WL 2597900 (S.D.N.Y. Sept. 5, 2006) (court narrows party's demand for 170 proposed search terms in part due to the inclusion of commonly used words).

30    *See, e.g.,* G. Paul and J. Baron, *Information Inflation, supra* n.14, at [20] (discussing potential time and cost of searching through 1 billion emails); Craig Ball, *Crafting A More Effective Keyword Search,* LAW TECHNOLOGY NEWS (June 24, 2009), http:// www.law.com/jsp/lawtechnologynews/PubArticleLTN.jsp?id=1202431693400&slreturn=20130302113909.

31    Philosophers use colorful imagery to describe the dynamism and complexity of human language. *See, e.g.,* Ludwig Wittgenstein, THE PHILOSOPHICAL INVESTIGATIONS, Section 18 (G.E.M. Anscombe, trans., 3d ed. 1973) ("[T]o imagine a language is to imagine a form of life …. [L]anguage can be seen as an ancient city; a maze of little streets and squares, of old and new houses, and of houses with additions from various periods; and this surrounded by a multitude of new boroughs with straight regular streets and uniform houses").

32    *See infra* Part IV; *see generally* S.I. Hayakawa, LANGUAGE IN THOUGHT AND ACTION (5th ed.1990) (stating that such methods are inherently limited by their specific choice of language to describe a specific object or reality).

33    *See generally* The Sedona Conference *Commentary on Achieving Quality in E-Discovery (2013)*, 15 Sedona Conf. J. 265 (2014), (discussing how to construct a better quality search process).

34    *See, e.g., United States v. O'Keefe,* 537 F. Supp. 2d 14, 24 (D.D.C. 2008) (Facciola, M.J.); *Equity Analytics, LLC v. Lundin,* 248 F.R.D. 331, 333 (D.D.C. 2008) (Facciola, M.J.); *Victor Stanley, Inc. v. Creative Pipe, Inc.,* 250 F.R.D. 251, 260, 262 (D. Md. 2008) (Grimm, M.J.); *see also NDLON v. Immigration and Customs Enforcement, Dep't of Homeland Security,* 811F. Supp. 2d 713 (S.D.N.Y. 2011) (Scheindlin, J.); see *generally* Baron, *Law in the Age of Exabytes, supra* note 24.

35    *William A. Gross Construction Associates, Inc. v. American Manufacturers Mutual Insurance Co.,* 256 F.R.D265. 134, 136 (S.D.N.Y. 2009) (Peck, M.J.); *see also* Hon. Andrew Peck, *Search, Forward,* LAW TECH. NEWS (Oct. 1, 2011) at 1-2, *available at* http://www.recommind.com/sites/default/files/LTN_ Search_Forward_Peck_Recommind.pdf.

36    *See Disability Rights Council of Greater Washington v. Washington Metro. Transit Auth.,* 242 F.R.D. 139, 148 (D.D.C. 2007); *see generally Mazza, et al., supra* note 12, at [54] (discussing concept searching).

37    *But see In re Instinet Group, Inc.,* 2005 WL 3501708 at *3 (Del. Ch. Dec. 14, 2005). The court reduced plaintiffs' attorneys' fee claim by $1 million (75% of the total claim) for "obvious" inefficiencies in plaintiffs' counsel's review of paper printouts ("blowbacks") from digital files. The court stated that plaintiffs' counsel's decision to "blow back" the digital documents to paper "both added unnecessary expense and greatly increased the number of hours required to search and review the document production."

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 326 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

38    *See, e.g.*, Ron Friedmann, *A Future Beyond Hammers*, STRATEGIC LEGAL TECHNOLOGY BLOG (Feb. 4, 2005, 1:38PM), http://prismlegal.com/a-future-beyond-hammers/ (suggesting that not one solution fits all cases); *see also* Ron Friedmann, *Thoughts on Full Text Retrieval (A KM and Litigation Support Topic)*, STRATEGIC LEGAL TECHNOLOGY BLOG (July 30, 2003) (questioning the incremental value of sophisticated searching over simple searching because of the costs of implementation and need to build taxonomies and to test methodologies).

39    *See* ⬜ *Moore v. Publicis Groupe SA*, 287 F.R.D. 182 (S.D.N.Y. 2012) (Peck, M.J.), *aff'd*, *Moore v. Publicis Groupe SA*, 2012 WL 1446534 (S.D.N.Y. Apr. 26, 2012) (Carter, J.) (approving joint search protocol for technology-assisted review); *see also In re Actos (Pioglitazone) Products*, 2012 WL 3899669 (W.D. La. July 27, 2012) (same); *Global Aerospace Inc. v. Landow Aviation LP*, Consol. Case No. CL 00061040-00 (Va. Cir. Ct. Apr. 23, 2012) (Chamblin, J.) (granting responding party's request to use technology-assisted review); *EORHB, Inc. v HOA Holdings, LLC*, Civ. No. 7409-VCL (Del. Ch. Oct. 15, 2012) (ordering, *sua sponte*, parties to use technology-assisted review with same vendor).

40    ⬜ *Moore*, 287 F.R.D. at 195.

41    *See* ⬜ *Kleen Prod., LLC v. Packaging Corp. of Am.,* 2012 WL 4498465 (N.D. Ill. Sept. 28, 2012) (Nolan, M.J.) (discussing evidentiary hearings held prior to parties reaching agreement on choice of method).

42    *See* Cyril W. Cleverdon, et al., ASLIB CRANFIELD RESEARCH PROJECT: FACTORS DETERMINING THE PERFORMANCE OF INDEXING SYSTEMS (Vol. I,, 1966), *available at* http://www.sigir.org/museum/pdfs/Factors%20Determining%C20the%C20Performance%C20of%C20Indexing%C20Systems%C20Vol%C201%-%20Part%201% 20Text/pdfs/frontmatter.pdf; Cyril W. Cleverdon, et al., ASLIB CRANFIELD RESEARCH PROJECT: REPORT OF CRANFIELD II (Vol II, 1966), *available at* http:// www.sigir.org/museum/pdfs/Factors_Determining_the_Performace_of_Indexing_ Systems_Vol_2/ pdfs/frontmatter.pdf.; *see generally*, C.J. Rjiisbergen, INFORMATION RETRIEVAL (2d ed. 1979), *available at* http:// www.dcs.gla.ac.uk/Keith/Preface.html (last visited November 25, 2013).

43    *See* Ricardo Baeza Yates & Berthier Ribeiro Neto, MODERN INFORMATION RETRIEVAL 437, 455 (1999) (glossary), *available at* http:// www.sims.berkeley.edu/~hearst/irbook/glossary.html; *see also The Grossman-Cormack Glossary, supra* n.7.

44    R. Yates & B. Neto, *supra* n.43, at 455.

45    There are many other common metrics that are considered in information retrieval literature, including F-measure, average precision, and average search length. F-measure is an approximation of the "crossover point" between precision and recall, where both are maximized. Average precision determines the precision level for each retrieved relevant item. Average search length is the average position of a relevant retrieved item. Still other terms include "fallout" (the ratio of the number of non-relevant items retrieved to the total number of items retrieved") and "elusion" (the proportion of responsive documents that have been missed by the search). *See generally*, the Grossman-Cormack Glossary, *supra* n.7.

46    David L. Blair & M.E. Maron, *An Evaluation of Retrieval Effectiveness For a Full-Text Document-Retrieval System*, 28 Comm. ACM 289 (1985). The discussion that follows of the Blair and Maron study is drawn directly from Herbert L. Roitblat, *Search and Information Retrieval Science*, 8 SEDONA CONF. J. 225, 231 (2007).

47    *See, e.g.*, Stephen Tomlinson, et al., *Overview of The TREC 2007 Legal Track*, http://trec.nist.gov/pubs/trec16/ t16_proceedings.html (baseline Boolean search captured only 22% of universe of all relevant documents found

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 327 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

by all combined search methods); *see generally*, *TREC Legal Track Overview Papers*, 2006-2011, http://treclegal.umiacs.umd.edu/.

48    *See* Maura R. Grossman & Gordon Cormack, *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, 17 RICH. J. L. & TECH. 11 (2011), *available at* http://jolt.richmond.edu/v17i3/article11.pdf; Herbert L. Roitblat, et al., *Document Categorization in Legal Electronic Discovery: Computer Classification vs. Manual Review*, 61 J. AM. SOC'Y FOR INFO. SCI. & TECH. 70 (2010), *available at* http://jolt.richmond.edu/v17i3/article11.pdf; Patrick Oot, et al., *Mandating Reasonableness In A Reasonable Inquiry*, 87 DENV. U. L. REV. 533 (2011), *available at* http://law.du.edu/documents/denver-university-law-review/v87-2/Oot_PDF.pdf; *see also* Howard Turtle, *Natural Language vs. Boolean Query Evaluation: A Comparison of Retrieval Performance*, 1994 PROCEEDINGS OF THE 17TH ANNUAL INTERNATIONAL ACM SIGIR CONFERENCE ON RESEARCH AND DEVELOPMENT IN INFORMATION RETRIEVAL 212220 (using structured case law in Westlaw databases), *see generally*, RAND 2012 STUDY, pp. 59-69 (summarizing results from these and other recent studies).

49    *See* Bruce Hedin, et al., *Overview of the TREC 2009 Legal Track*, http://trec.nist.gov/pubs/trec18/papers/LEGAL09.OVERVIEW.pdf (last visited November 25, 2013).

50    *See supra,* notes 48-49.

51    *See generally*, The Sedona Conference *Commentary on Achieving Quality in E-Discovery*, *supra* note 33.

52    *See* Baron, *Law in the Age of Exabytes*, *supra* note 24.

53    *See* Kenneth J. Withers, *Electronically Stored Information: The December 2006 Amendments to the Federal Rules of Civil Procedure*, 4NW. J. OF TECH. & INTELL. PROP. 171 (2006) (what "probably strikes the reader [of Treppel], *supra* note 26] as matter of fact, sensible, and routine, would have been extraordinary a scant six years ago, when the last major revision of the discovery rules went into effect [in 2000])."

54    *See, e.g., In re* Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York (Standing Order, Nov 1. 2011), http://www.nysd.uscourts.gov/cases/show.php?db=notice_bar&id=261.

55    *See* Paul and Baron, *Information Inflation*, *supra* note 14, at paras. 50-55 (discussing an iterative collaboration process that includes adoption of multiple "meet and confers" to discuss and refine preliminary search results).

56    *The Sedona Conference Cooperation Proclamation*, *available at* https://thesedonaconference.org/download-pub/3802. A companion piece, *The Case for Cooperation*, published in *The Sedona Conference Journal*® goes on to say:

    [W]orking cooperatively with opposing counsel to identify a reasonable search protocol, rather than making boilerplate objections to the breadth of a requested protocol or unilaterally selecting the keywords used without disclosure to opposing counsel, may help avoid sanctions or allegations of intentional suppression. Indeed, because knowledge of the producing party's data is usually asymmetrical, it is possible that refusing to 'aid' opposing counsel in designing an appropriate search protocol that the party holding the data knows will produce responsive documents could be tantamount to concealing relevant evidence.

    10 SEDONA CONF. J. 339, 344 (2009 Supp.).

57    *See, e.g.,* *Moore*, 287 F.R.D. at 182; *Kleen Prod.,* 2012 WL 4498465 at *1.

58    *See, e.g.*, Idée, Inc., *TinEye: Reverse Image Search*, http:// www.tineye.com/ (last visited November 25, 2013).

59    *See* Microsoft, *2020 Science*, at 15, *available at* http:// research.microsoft.com/towards2020science/downloads.htm.

60    *See* Fed. R. Civ. P. 26(g) & 26(b)(2)(C).

61    *See* Hickman, 329 U.S. at 507.

62    Under Fed. R. Civ. P. Rule 26(g)(1), an attorney of record is expected to certify that to the best of his or her "knowledge, information, and belief, formed after a reasonable inquiry," that disclosures are "complete and correct" as of the time they were made. Similarly, under Rule 26(g)(2), an attorney must certify that to the best of his or her "knowledge, information, and belief, formed after a reasonable inquiry," that discovery "requests, responses, and objections" are made "consistent with these rules." *See also* Fed. R. Civ. P. 26(b)(2)(C).

63    *See supra*, text at Part IV.

64    *See generally* The Sedona Conference *Commentary on Achieving Quality in E-Discovery*, *supra* note 33.

65    *See supra* note 48 and accompanying text.

66    The Text Retrieval Conference (TREC) was started in 1992. Its purpose is to support research within the IR community by providing the infrastructure necessary for large-scale evaluation of text retrieval methodologies. TREC is overseen by a program committee consisting of representatives from government, industry, and academia. Each TREC track involves a test database of documents and topics. Participants run their own search and retrieval systems on the data, and return to NIST a list of the retrieved top-ranked documents. NIST generally pools the individual results, judges the retrieved documents for correctness, and evaluates the results. The TREC cycle ends with a workshop forum for participants to share their experiences. The TREC test collections and evaluation software are available to the IR research community at large, so organizations can evaluate their own retrieval systems at any time. TREC has successfully met its dual goals of improving the state-of-the-art in IR and of facilitating technology transfer, and some of today's commercial search engines include technology first developed at TREC. For further information, *see* http://trec.nist.gov.

67    *See* TREC Legal Track Overview Papers, 2006-2011, http://trec-legal.umiacs.umd.edu/.

68    *See, e.g.*, Discovery of Electronically Stored Information ("DESI") Workshops, held at the Eleventh, Twelfth, Thirteenth, and Fourteenth International Conferences on Artificial Intelligence and Law (ICAIL 2007, ICAIL 2009, ICAIL 2011, ICAIL 2013) (links available at http://www.umiacs.umd.edu/~ oard/desi5/); Information Retrieval for E-Discovery (SIRE) Workshop, SIGIR 2011 (link available at http://www.umiacs.umd.edu/~oard/sire11/).

1    In explicit relevance feedback, the user codes the top-ranked documents, and only those coded relevant are used to refine the model. In implicit relevance feedback, the top-ranked documents are simply assumed to be relevant.

2    *See* Christopher D. Manning, Prabhakar Raghavan & Hinrich Schütze, INTRODUCTION TO INFORMATION RETRIEVAL, 219-252 (2008), *available* at http://www-nlp.stanford.edu/IR-book/.

3    *See* Roitblat, *supra* note 48.

Case 1:23-cv-01952-RC   Document 27-2   Filed 08/22/24   Page 329 of 329

THE SEDONA CONFERENCE BEST PRACTICES..., 15 Sedona Conf. J. 217

4    For a general discussion and comparison of various active learning techniques, *see* S. B. Kotsiantis, *Supervised Machine Learning: A Review of Classification Techniques*, 31 INFORMATICA JOURNAL 249 (2007), *available at* http://www.informatica.si/PDF/31-3/11_Kotsiantis%20-%20Supervised%20Machine%C20Learning%-%20A%20Review%20of...pdf; G. Cormack and M. Mojdeh, *Machine Learning for Information Retrieval: TREC 2009 Web, Relevance Feedback and Legal Tracks*, 18th Text Retrieval Conference (TREC 2009) Proceedings (2010), http://trec.nist.gov/pubs/trec18/papers/uwaterloo-cormack.WEB.RF.LEGAL.pdf.

15 SEDCJ 217

**End of Document**                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.